HUGHES HUBBARD & REED LLP
Daniel H. Weiner
Michael D. Tiger
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)





Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DOLPHIN DIRECT EQUITY PARTNERS,
LP and RACE CAR SIMULATION CORP.,

                              Plaintiffs,

          -vs-

INTERACTIVE MOTORSPORTS AND
ENTERTAINMENT CORPORATION,
PERFECT LINE, INC., RACE CAR
SIMULATORS, INC. and WILLIAM
DONALDSON,

                              Defendants.

___ Civ.

COMPLAINT

Plaintiffs Dolphin Direct Equity Partners, LP ("Dolphin") and Race Car

Simulation Corp. ("Race Car Corp."), by and through their undersigned attorneys, for

their complaint against defendants Interactive Motorsports and Entertainment

Corporation ("IMTS"), Perfect Line, Inc. ("Perfect Line"), Race Car Simulators, Inc.

("RCSI") and William Donaldson ("Donaldson") (collectively, "defendants"), allege as

follows:

## Nature of the Action

1.      Plaintiffs bring this action to recover at least $685,667, plus interest and costs, arising from defendants' breaches of written agreements regarding purchase of race car simulators and lease of those race car simulators to third parties.

## Jurisdiction and Venue

2.      This Court has jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy in this action exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

3.      Venue is proper in this District pursuant to agreement of the parties.

## The Parties

4.      Dolphin is a Delaware limited partnership with its principal place of business at 4924 First Coast Highway, Fernandina, Florida.   Prior to January 1, 2007, Dolphin had its principal place of business at 87 South Saxon Avenue, Bay Shore, New York.  Dolphin is a private investment firm.

5.      Race Car Corp. is a corporation organized under the laws of New York with its principal place of business at 4924 First Coast Highway, Fernandina, Florida. Prior to January 1, 2007, Race Car Corp. had its principal place of business at 87 South Saxon Avenue, Bay Shore, New York.  Race Car Corp. is a Dolphin affiliate.

6.      IMTS is a corporation organized under the laws of Indiana with its principal place of business at 5624 West 73rd Street, Indianapolis, Indiana.  Among other things, IMTS sells and markets race car simulators, which are stationary machines that provide users with the simulated experience of driving in an actual racing car.

7.      Perfect Line and RCSI are corporations organized under the laws of Indiana with their principal places of business at 5624 West 73rd Street, Indianapolis, Indiana.  Perfect Line and RCSI are IMTS affiliates.  IMTS, Perfect Line and RCSI have consented to the Court's jurisdiction.

8.      Donaldson is a natural person who resides in Indiana.  Donaldson owns approximately 18.4% of the common stock of IMTS and is its Chairman of the Board of Directors, Chief Executive Officer and Secretary.  (*See* Interactive Motorsports and Entertainment Corp., Form 10-KSB, dated March 28, 2007, at pp. 48, 51, a copy of which is attached hereto as Exhibit A.)  Donaldson does business in the State of New York and negotiated the agreements at issue in this action, in part, in New York.

## Factual Allegations

### Background

9.      Effective December 31, 2004, plaintiffs entered into an Asset Purchase Agreement (the "Purchase Agreement," a copy of which is attached hereto as Exhibit B) with IMTS and its affiliates Perfect Line and RCSI.

10.     Under the Purchase Agreement, plaintiffs agreed to purchase forty-four (44) race car simulators (the "Simulators") from IMTS, Perfect Line and RCSI.  (Exh. B Art. 1, at p. 1.)  IMTS, Perfect Line and RCSI also agreed to indemnify plaintiffs in the event of "any breach of any covenant or obligation of any Seller in this Agreement or other Transaction Agreement."  (*Id.* §§ 5.1, 5.2, at pp. 11-13.)

11.     Effective December 31, 2004, plaintiffs also entered into a management agreement (the "Management Agreement," a copy of which is attached hereto as

Exhibit C) with IMTS, Perfect Line and RCSI whereby those defendants would lease the Simulators to third parties and "in every manner maintain, protect and enhance the value of all Simulators." (Exh. C ¶ 1.a.iv, at p. 1.)

12.    Under the Management Agreement, plaintiffs were to receive all proceeds from any leases arranged by IMTS, Perfect Line or RCSI for the Simulators.

13.    Effective December 31, 2004, Race Car Corp. and Donaldson entered into a Non-Competition Agreement (the "Non-Competition Agreement," a copy of which is attached hereto as Exhibit D.)  Among other things, that Agreement states that Donaldson would not compete against Race Car Corp. in the race car simulator market. (Exh. D § 3, at pp. 1-2.)

14.    As described below, IMTS, Perfect Line and RCSI have breached the Purchase Agreement and the Management Agreement, while Donaldson has breached the Non-Competition Agreement.

**Performance Guarantee**

15.    Section 4.12 of the Purchase Agreement contains a guarantee that plaintiffs would receive from IMTS, Perfect Line and RCSI no less money from each lease of the Simulators than certain minimum payments specified in each lease for a period equal to the greater of the lease term or three (3) years from plaintiffs' purchase of the underlying Simulators (the "Performance Guarantee"):

> "Section 4.12. Performance Guarantee.  Each of the Sellers hereby absolutely and unconditionally guarantees to Buyer, with respect to each Lease in effect on the date hereof and the Nextel 6 Lease (as defined below), **that Buyer shall receive an amount at least equal**

4

**to the minimum payments to Sellers provided for therein as in effect on the date hereof** (or, in the case, of the Nextel 6 Lease, provided for in the Form of Simulation Lease Agreement attached hereto as Exhibit E (the "Form Simulation Lease"), **without offset, reduction or other claim of any kind,** no later than (x) the respective times provided for therein as in effect on the date hereof (or, in the case, of the Nextel 6 Lease provided for in the Form Simulation Lease) or (y) in the event such Lease has expired or otherwise terminated, on the same payment schedule as in effect under such Lease on the date hereof (or, in the case, of the Nextel 6 Lease as set forth in Form Simulation Lease), until no earlier than the later of (i) the end of the term provided for therein as in effect on the date hereof (or, in the case, of the Nextel 6 Lease provided for in the Form Simulation Lease) or (ii) the third anniversary of the date the Simulators relating to such Lease are purchased from the Sellers by Buyer. **The foregoing is a guarantee of payment and not of collection, and each Seller shall make payment to Buyer as provided in this Section from time to time within ten business days' notice from Buyer of its failure to receive any amount contemplated in the first sentence of this 4.12.**" (Emphasis added)

16.    After execution of the Purchase Agreement and the Management Agreement, IMTS, Perfect Line and RCSI, acting on plaintiffs' behalf, leased the Simulators to various third parties, including National Tour, Inc. ("National Tour") and RLB Development LLC (collectively, the "Leases").

17.    Each of the Leases contains a provision detailing minimum payments required under that Lease. Under the Performance Guarantee, IMTS, Perfect Line and RCSI guaranteed that plaintiffs would receive no less than those expected minimum payments with respect to each of the Leases.

18.    The total amounts guaranteed by IMTS, Perfect Line and RCSI from two Leases with National Tour and one Lease with RLB Development LLC was $540,000, $456,000 and $600,000, respectively.

19.    As of the date hereof, plaintiffs have collected on those three Leases only $225,000, $152,000 and $533,333, respectively.  IMTS, Perfect Line and RCSI thus owe at least $685,667 to plaintiffs under the Performance Guarantee.   By failing to pay at least this amount to plaintiffs, IMTS, Perfect Line and RCSI have breached the Performance Guarantee.

**Most Favored Nation Clause**

20.    Section 1 of the Management Agreement provides that IMTS, Perfect Line and RCSI must place into service any Simulators that are lying idle prior to placing any other race car simulators into service (the "Most Favored Nation Clause"):

> "Services.
>
> (a)    The Company hereby retains the Manager to, and the Manager hereby agrees to be retained to (i) accept and perform, on behalf of the Company, each and all of the Company's obligations of any kind (other than the obligation to leave Simulators in place) under all Leases whether now existing or entered into after the date hereof, **(ii) if any Simulators are not, at any time, being utilized to generate revenue for the Company, place such Simulators into service under Leases with operators prior to placing any of its own or any competing racecar simulators into any such arrangements**; provided, however, that the Company may reject any such arrangement in its sole discretion, and thereafter the Manager may place its own or any competing racecar simulators into such arrangement if the terms thereof are no more favorable to the Manager than the rejected terms would have been to the Company, (iii) use its best efforts to market and negotiate competitive terms for the placement of Simulators, and bear all costs of relocation and refurbishment of such Simulators, (iv) in every manner maintain, protect and enhance the value of all Simulators and all Leases, and perform the Company's and the Manager's obligations under all Leases, with the highest standard of care and with the highest commitment of financial, personnel, marketing, time and other resources as Manager applies with respect to its own racecar simulators and leases or other revenue

sharing arrangements; (v) otherwise advise the Company with respect to the utilization of all Simulators, and perform such additional services relating thereto, as reasonably requested by the Company from time to time, in every case diligently, promptly and at the Manager's sole expense; and (vi) maintain, on terms no less favorable to the Company and to the operators under the Leases than the existing arrangement, the ability of the Company and to the operators under the Leases to utilize the marks subject of the license agreement by and among National Association for Stock Car Racing, Inc. and PL, effective as of June 1, 2001, as the same may be amended from time to time." (Emphasis added)

21.      National Tour leased twelve (12) Simulators and RLB Development LLC leased eight (8) Simulators.

22.      In or about December 2006 and January 2007, National Tour returned six (6) of the Simulators to defendants.  In or about late May and early June 2007, National Tour returned its remaining six (6) Simulators to defendants.  In October 2007, RLB Development LLC returned eight (8) Simulators to defendants.  At the time each Simulator was returned to defendants, the Most Favored Nation Clause obligated IMTS, Perfect Line and RCSI to place those Simulators into service before placing into service any of their own race car simulators or race car simulators belonging to any other owner.

23.      In 2007 and 2008, Perfect Line entered into new revenue share or lease agreements with third parties with respect to thirty-three (33) of its own race car simulators, and none with respect to plaintiffs' Simulators.  IMTS also sold at least sixteen (16) other race car simulators to third parties in 2007 and 2008.  (*See* Interactive Motorsports and Entertainment Corp., Form 10-QSB, dated November 19, 2007, at pp. 15-16, a copy of which is attached hereto as Exhibit E.)

24.    In or about March 2007, DGI, Inc. ("DGI"), an Indiana corporation owned and operated by Donaldson, purchased at least fourteen (14) race car simulators from Perfect Line and subsequently leased those simulators (and possibly others) to third parties Sprint, Nextel and Toyota. (*See* Exh. E, at p. 12.)

25.    By placing other race car simulators into service after National Tour and RLB Development LLC returned their Simulators, IMTS, Perfect Line and RCSI violated the Most Favored Nation Clause.

**Non-Competition Clauses**

26.    Section 5.3 of the Purchase Agreement (the "Corporate Non-Competition Clause") provides that IMTS, Perfect Line and RCSI may not compete against plaintiffs in the race car simulator market if that competition would favor those defendants:

> "Non-Competition; Non-Solicitation.
>
> (a)    For so long as and at all times until IMTS shall have exercised in full its repurchase option as contemplated by Section 4.11 hereof, **Sellers shall not and shall cause their respective affiliates not to, without the prior written consent of Buyer, directly or indirectly, own, manage, control, participate in, consult with, render services for, or in any manner engage in or represent any business involving, directly or indirectly, racecar simulators; provided that actions or inactions prohibited by the foregoing shall not constitute a violation of this Section 5.3(a) so long as such actions or inactions do not favor or result in more favorable treatment to the operation and maintenance of other racecar simulators and related assets over the operation and maintenance of the Assets.** " (Emphasis added)

27.    Section 3 of the Non-Competition Agreement (the "Personal Non-Competition Clause" and, along with the Corporate Non-Competition Clause, the

"Non-Competition Clauses") provides that Donaldson may not compete against Race

Car Corp. in the race car simulator market if that competition would favor him over

Race Car Corp.:

> "(a)    During the term of this Agreement, **Executive agrees not to
> compete, directly or indirectly, with the business (including
> without limitation the ownership, maintenance or operation of
> racecar simulators and any related assets, such as are the subject
> of the Asset Purchase Agreement) conducted or to be conducted
> by the Company or its affiliates, including without limitation any
> activity on behalf of, in conjunction with or otherwise relating to
> NASCAR (collectively, the "Restricted Business") anywhere in
> North America (the "Restricted Territory"); provided, however,
> that the foregoing shall not prohibit such actions or inactions to
> the extent that they do not result in more favorable treatment to
> the operation and maintenance of other racecar simulators and
> related assets owned or operated by IMTS over the operation and
> maintenance of the Assets.**  For purposes of this Agreement, direct
> or indirect competition includes competition as a sole proprietor,
> partner, corporate officer, director, shareholder, manager, member,
> employee, consultant, agent, independent contractor, trustee, or in
> any other manner in which such person or entity holds any
> beneficial interest in a competitive business, derives any income
> from any beneficial interest in a competitive business, or provides
> any service to such business anywhere in the world; provided,
> however, that direct or indirect competition does not include the
> ownership of not more than one percent (1%) of the capital stock of
> a publicly traded corporation so long as the party that owns such
> stock is not otherwise engaged or interested in such corporation.
> For purposes of this Agreement, competitive business shall mean
> any business engaged in the sale, manufacturing, engineering,
> distribution, design, development or installation of the products
> and/or services included within the Restricted Business."
> (Emphasis added)

28.    Perfect Line's entry into revenue share or lease agreements with third

parties with respect to thirty-three (33) of its own race car simulators, its sale of at least

sixteen (16) other race car simulators to third parties, and its sale of at least fourteen (14)

simulators to DGI violated the Corporate Non-Competition Clause.    Furthermore, Donaldson's direction of Perfect Line to enter into revenue share or lease agreements with third parties with respect to thirty-three (33) of its own race car simulators, to sell at least sixteen (16) other race car simulators to third parties, and to sell at least fourteen (14) simulators to DGI violated the Personal Non-Competition Clause.  Donaldson's direction of DGI to purchase at least fourteen (14) simulators from Perfect Line and the lease of those simulators to third parties also violated the Personal Non-Competition Clause.

**Plaintiffs' Demand Letters**

29.    On or about January 23, 2008, plaintiffs wrote to IMTS, Perfect Line, RCSI and Donaldson seeking remedy for defendants' violations of the Performance Guarantee, the Most Favored Nation Clause, and the Non-Competition Clauses. (Copies of those letters are attached hereto as Exhibits F and G.)

30.    Defendants have not complied with plaintiffs' requests.

## FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT
### AGAINST IMTS, PERFECT LINE AND RCSI)

31.    Plaintiffs re-allege each and every allegation contained in Paragraphs 1 through 30 above as if fully set forth herein.

32.    Plaintiffs have performed all their obligations under the Purchase Agreement.

33.    IMTS, Perfect Line and RCSI breached the Purchase Agreement by violating the Performance Guarantee.

10

34.     As a direct and proximate cause of the foregoing, plaintiffs have been damaged in an amount not less than $685,667, plus interest as allowed by law.

## SECOND CAUSE OF ACTION
### (BREACH OF CONTRACT
### AGAINST IMTS, PERFECT LINE AND RCSI)

35.     Plaintiffs re-allege each and every allegation contained in Paragraphs 1 through 34 above as if fully set forth herein.

36.     Plaintiffs have performed all their obligations under the Management Agreement.

37.     IMTS, Perfect Line and RCSI breached the Management Agreement by violating the Most Favored Nation Clause.

38.     As a direct and proximate cause of the foregoing, plaintiffs have been damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### (BREACH OF CONTRACT
### AGAINST ALL DEFENDANTS)

39.     Plaintiffs re-allege each and every allegation contained in Paragraphs 1 through 38 above as if fully set forth herein.

40.     Plaintiffs have performed all their obligations under the Purchase Agreement and the Non-Competition Agreement.

41.     IMTS, Perfect Line and RCSI breached the Purchase Agreement by competing against plaintiffs.  Donaldson breached the Non-Competition Agreement by competing against plaintiffs.

42.    As a direct and proximate cause of the foregoing, plaintiffs have been damaged in an amount to be proven at trial.

### Demand For Relief

WHEREFORE, plaintiffs demand judgment against defendants as follows:

A.    On Count One, finding that IMTS, Perfect Line and RCSI breached the Purchase Agreement and awarding plaintiffs damages in the sum of at least $685,667, plus interest allowed by law;

B.    On Count Two, finding that IMTS, Perfect Line and RCSI breached the Management Agreement and awarding plaintiffs damages in an amount to be determined at trial;

C.    On Count Three, finding that IMTS, Perfect Line and RCSI breached the Purchase Agreement and Donaldson breached the Non-Competition Agreement and awarding plaintiffs damages in an amount to be determined at trial;

D.    Awarding attorney's fees incurred during plaintiffs' investigation and prosecution of this action;

E.    Awarding plaintiffs their costs of this action; and

F.    Granting such other and further relief as the Court finds just and proper.


Dated:  New York, New York
        February 14, 2008


                              HUGHES HUBBARD & REED LLP

                              By: _____
                                  Daniel H. Weiner
                                  (weiner@hugheshubbard.com)
                                  Michael D. Tiger
                                  (tiger@hugheshubbard.com)
                              One Battery Park Plaza
                              New York, N.Y. 10004
                              (212) 837-6000 (telephone)
                              (212) 422-4726 (facsimile)

                              Attorneys for Plaintiffs


60207290_2.DOC



10KSB 1 fourthqtr200610ksb-03282007.htm FORM 10-KSB
UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D. C. 20549

# FORM 10-KSB

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended
December 31, 2006

*Commission File Number: 000-30771*

# INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP.

f.k.a. Pacific International Holding, Inc.
(Exact name of registrant as specified in charter)

Indiana
(State or other jurisdiction of incorporation or organization)

35-2205637
(I.R.S. Employer I.D. No.)

5624 West 73rd Street, Indianapolis, Indiana 46278
(Address of principal executive offices)

(317) 295-3500
(Registrant's telephone number, including area code)

Indicate by checkmark whether the Issuer: (1) filed all reports required to be filed by section 13 or 15 (d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. (1) Yes ☒ No [] (2) Yes ☒ No []

Issuer's Revenues for its most recent fiscal year: $5,351,298

As of March 21, 2007, the aggregate market value of the voting stock held by non-affiliates of the Issuer, 46,386,137 shares, was $788,564. The market value of Common Stock of the Issuer, par value $0.0001 per share, was computed by reference to the average of the closing bid and asked prices of one share on such date which was $0.016.

The number of shares of the issuer's Common Stock, par value $0.0001 issued and outstanding as of March 21, 2007, was 96,397,506.

Exhibit Index located on Page 57

1

# INDEX TO ANNUAL REPORT ON FORM 10-KSB

|  |  | PAGE NUMBER |
|---|---|---|
| **SECTION** |  |  |
| NOTE ON FORWARD-LOOKING INFORMATION |  | 3 |
| BASIS OF PRESENTATION |  | 4 |

## PART I

| ITEM 1. | Description of Business | 5 |
|---|---|---|
| ITEM 2. | Description of Properties | 11 |
| ITEM 3. | Legal Proceedings | 11 |
| ITEM 4. | Submission of Matters to a Vote of Security Holders | 11 |

## PART II

| ITEM 5. | Market for Common Equity and Related Stockholder Matters | 12 |
|---|---|---|
| ITEM 6. | Management's Discussion and Analysis of Financial Conditions and Results of Operations | 13 |
| ITEM 7. | Financial Statements and Notes to Financial Statements |  |
|  | Report of Independent Registered Public Accounting Firm | 22 |
|  | Consolidated Balance Sheet at |  |
|  | December 31, 2006 | 23 |
|  | Consolidated Statements of Operations for the Years Ended |  |
|  | December 31, 2006 and December 31, 2005 | 25 |
|  | Consolidated Statements of Changes in Shareholders' Equity for the Years Ended |  |
|  | December 31, 2006 and December 31, 2005 | 26 |
|  | Consolidated Statements of Cash Flows for the Years Ended |  |
|  | December 31, 2006 and December 31, 2005 | 27 |
|  | Notes to Consolidated Financial Statements | 29 |
| ITEM 8. | Changes In and Disagreements With Accountants on Accounting and Financial Disclosure | 47 |
| ITEM 8A. | Controls and Procedures | 47 |

## PART III

| ITEM 9. | Directors, Executive Officers, Promoters and Control Persons | 48 |
|---|---|---|
| ITEM 10. | Executive Compensation | 50 |
| ITEM 11. | Security Ownership of Certain Beneficial Owners and Management | 51 |
| ITEM 12. | Certain Relationships and Related Transactions | 52 |
| ITEM 13. | Exhibits and Reports on Form 8-K | 53 |
| ITEM 14. | Principal Accountant Fees and Services | 54 |
| SIGNATURES |  | 56 |
| EXHIBITS INDEX |  | 57 |

2

**NOTE ON FORWARD-LOOKING INFORMATION**

This Form 10-KSB and other statements issued or made from time to time by the Company or its representatives contain statements, which may constitute "forward-looking statements" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995, 15 U.S.C.A Sections 77z-2 and 78u-5. Those statements include statements regarding the intent, belief, or current expectations of the Company and members of its management team as well as the assumptions on which such statements are based. All statements, trend analyses, and other information contained in this report relative to markets for the Company's products and/or trends in the Company's operations or financial results, as well as other statements which include words such as "anticipate(s)," "could," "feel(s)," "believes," "plan," "estimate(s)," "expect(s)," "should," "intend(s)," "will," and other similar expressions, constitute forward-looking statements and are subject to known and unknown risks, uncertainties and other factors that may cause actual results to be materially different from those contemplated by the forward-looking statements. Such factors include, among other things: (i) general economic conditions that may impact the disposable income and spending habits of consumers; (ii) the availability of alternative entertainment for consumers; (iii) the ability of the Company to obtain additional capital; (iv) the receipt of a going concern opinion from the Company's independent public accountants; and (v) the ability of the Company to control costs and execute its business plan.

The reader is cautioned that any such forward-looking statements are not guarantees of future performance and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Important factors currently known to management that could cause actual results to differ materially from those in forward-looking statements are set forth herein. The Company undertakes no obligation to update or revise forward-looking statements to reflect changed assumptions, the occurrence of unanticipated events or changes to future operating results over time.

3

**BASIS OF PRESENTATION**

Effective August 2, 2002, Pacific International Holding, Inc., a Utah corporation ("PIH"), which was originally organized in 1986, changed its state of domicile and name by merging with and into Interactive Motorsports and Entertainment Corp. (the surviving entity), an Indiana corporation (the "Company"), pursuant to an Agreement and Plan of Reorganization. Per the merger agreement, each share of PIH common stock outstanding immediately prior to the effective date of the merger was cancelled and converted into four shares of Interactive Motorsports and Entertainment Corp. common stock. Although it had been in a variety of businesses for over 15 years, at the time of the merger, PIH had limited operations.

Subsequent to the merger and effective as of the same date, the Company acquired pursuant to a Plan and Agreement of Exchange all of the issued and outstanding shares of common stock and preferred stock of Perfect Line, Inc., an Indiana corporation ("Perfect Line"), from the Perfect Line shareholders in exchange on a "share-for-share" basis for shares of the Company's common stock and preferred stock. As a result of the share exchange, the Perfect Line shareholders held as of August 2, 2002 Company shares representing approximately eighty-two percent (82%) of the Company's capital stock. Also effective as of August 2, 2002, the members of the Board of Directors of Perfect Line were elected to replace the members of the Company's Board of Directors and the executive officers of Perfect Line became the executive officers of the Company.

As Perfect Line had revenues, operations, and business activity, for financial reporting purposes, Perfect Line is considered the acquirer, and therefore the predecessor, and the Company is considered the acquiree for accounting and reporting purposes. Due to the fact that the merger is being treated as a reverse acquisition, the equity of the Company has been recapitalized for financial reporting purposes. The operations of Interactive Motorsports and Entertainment Corp. have been included in consolidation from August 2, 2002 until December 31, 2006.

All information in this Form 10-KSB is presented from the perspective of Interactive Motorsports and Entertainment Corp. and its subsidiary Perfect Line and not from the perspective of PIH.

4

# PART I

## ITEM 1. DESCRIPTION OF BUSINESS

### Overview

Interactive Motorsports and Entertainment Corp. ("IMTS" or the "Company"), an Indiana corporation, through its wholly owned subsidiary, Perfect Line, Inc., is a world leader in race simulation. The Company is in the business of manufacturing and then selling, revenue sharing or leasing race car simulators for the "out-of-home" interactive gaming market, contracting with operators in malls, amusement parks, family entertainment centers, casinos and trade shows and mobile fan interactive experiences. Under licenses from America's fastest growing sport, NASCAR, simulator customers experience driving in a NASCAR race car that simulates the motion, sights and sounds of an actual NASCAR event. The Company owns and operates NASCAR Silicon Motor Speedway racing centers at the Mall of America in Minneapolis, MN, and at Universal CityWalk in Hollywood, CA, where racing on 12 simulators and NASCAR merchandise are sold at each site. The Company is positioning itself to be a world leader in the "out-of-home", multi-site virtual league market as further described in Current Operations, Recent Developments and Plan for the Future.

The Company currently has two versions of race car simulators, the SMS and the Reactor, and in marketing these two products it leverages its strategic relationships and proprietary assets, which include (a) sophisticated racing simulation technology (including 2 patents), (b) an exclusive licensing agreement with NASCAR (see Note 6 to the Consolidated Financial Statements), and (c) license agreements with other racing entities including race tracks, race teams, and race sponsors to offer a unique and affordable race simulation experience.

For the year ended December 31, 2006, the Company's racing centers, leased and revenue share simulators and sold simulators generated revenue of approximately $5.4 million. Management has transitioned the Company's business model from an owned and operated, mall-based racing center concept to a simulator purchase, revenue share or leasing business, with the owner of the purchased simulators required to enter into an ongoing license and maintenance agreement. The Company now offers two simulator products, both using the proprietary software and motion platform, but each offering different features and different price points.

Major Agreements: During 2006, the Company entered into sales contracts for 15 SMS simulators and 29 Reactor simulators. This included Reactors that were installed in Mobile Experiences for high profile clients such as Dodge, Toyota and Sprint Nextel.

Perfect Line's race simulators, including those owned by Race Car Simulation Corporation as discussed herein, are currently featured in the following locations:

5

**Locations**

*Company Owned (24 Simulators):*

| Location | Year | Market | Sq. Ft. | Simulators |
|---|---|---|---|---|
| *1)* Mall of America | 2001 | Minneapolis, MN | 5,899 | 12 SMS |
| *2)* Universal CityWalk | 2001 | Los Angeles, CA | 5,000 | 12 SMS |

*Revenue Share (71 Simulators):*

| Location | Year | Market | Sq. Ft. | Simulators |
|---|---|---|---|---|
| *1)* NASCAR SpeedPark | 2003 | Sevierville, TN | 1,584 | 6 SMS# |
| *2)* NASCAR SpeedPark | 2003 | St. Louis, MO | 1,496 | 6 SMS# |
| *3)* Burdick Driver's Village | 2004 | Syracuse, NY | 3,472 | 8 SMS# |
| *4)* Bass Pro Outdoor | 2004 | Harrisburg, PA | 500 | 2 SMS |
| *5)* Mall of Georgia | 2004 | Atlanta, GA | 5,895 | 8 SMS!! |
| *6)* Riverchase Galleria | 2004 | Birmingham, AL | 6,188 | 8 SMS |
| *7)* Jordan Creek Town Ctr | 2004 | Des Moines, IA | 4,000 | 8 SMS |
| *8)* NASCAR SpeedPark | 2005 | Toronto, Canada | 1,500 | 6 SMS# |
| *9)* Bass Pro Outdoor | 2005 | Clarksville, IN | 750 | 3 SMS |
| *10)* University Mall | 2005 | Burlington, VT | 3,700 | 5 SMS |
| *11)* NASCAR SpeedPark | 2006 | Myrtle Beach, SC | 1,600 | 6 SMS# |
| *12)* Bass Pro Outdoor | 2006 | Springfield, MO | 500 | 3 SMS |
| *13)* Bass Pro Outdoor | 2006 | San Antonio, TX | 500 | 2 SMS |

*Mobile Units (56 Simulators):*

| Buyer | Year | Market | Simulators |
|---|---|---|---|
| *1)* Nextel Mobile Experience | 2004 | 2004-06 NASCAR Nextel Cup series events | 6 SMS# |
| *2)* Nextel Mini Experiences | 2004 | Nextel regional marketing | 6 SMS# |
| *3)* DaimlerChrysler | 2005 | European Auto Shows | 2 SMS |
| *4)* Perfect Line/NTI Experience | 2005 | Mobile Experience | 2 SMS |
| *5)* H&H Motorsports | 2006 | Mobile Experience | 4 Reactors |
| *6)* Florida Simulated Racing Network | 2006 | Mobile Experience | 4 Reactors |
| *7)* Exhibit Enterprises (Dodge) | 2006 | Mobile Experience | 4 Reactors |
| *8)* Exhibit Enterprises (Dodge) | 2006 | Mobile Experience | 4 Reactors |
| *9)* DGI, Inc (Nextel) | 2006 | Mobile Experience | 6 Reactors |
| *10)* DGI, Inc (Toyota) | 2006 | Mobile Experience | 4 Reactors |
| *11)* DGI, Inc (Nextel, Toyota) | * | Mobile Experience | 14 Reactors |

6

*Sales of Simulators (72 Simulators):*

| Buyer | Year | Market | Simulators |
|---|---|---|---|
| *1)* Opry Mills | 2004 | Nashville, TN | 10 SMS!! |
| *2)* Gurnee Mills | 2004 | Chicago, IL | 6 SMS |
| *3)* Concord Mills | 2004 | Charlotte, NC | 12 SMS!! |
| *4)* I-Vision Tech. | 2004 | Abu Dhabi, UAE | 2 SMS |
| *5)* I-Vision Tech. | 2005 | Abu Dhabi, UAE | 4 SMS |
| *6)* Ft. Gordon | 2005 | Ft. Gordon, GA | 2 SMS |
| *7)* Fun City | 2005 | Burlington, IA | 1 SMS |
| *8)* DaimlerChrysler | 2005 | US Auto Shows | 2 SMS |
| *9)* Gate A Sports | 2006 | Cleveland, OH | 5 SMS |
| *10)* Skycoaster of Florida | 2006 | Kissimmee, FL | 6 SMS |
| *11)* Vacationland F.E. | 2006 | Brainerd, MN | 4 SMS |
| *12)* NASCAR SpeedPark | 2006 | Concord, NC | 3 Reactors |
| *13)* Roltex | * | Moscow, Russian Federation | 8 SMS |
| *14)* Tonne Mgmt. | * | Wisconsin Dells, WI | 4 SMS |
| *15)* Prime Time FEC | * | Abilene, TX | 3 SMS |

# Denotes assets sold to Race Car Simulation Corporation with no current revenue stream to Company
* Denotes that simulators are not yet installed
!! Denotes site that CFL closed in January, and may or may not re-open

The balance of the 192 SMS simulators built since inception are at the Company's warehouse or Elan Motorsports Technologies where they are built.

**Pricing**

In a typical racing center, an individual race typically costs $8.50-$9.00 and quantity discounts are offered with purchases of multiple races. Customers pay an average of $25 per hour to use a simulator during leagues and competitions. Depending on the program or package, the targeted yield for group sales averages between $300 and $800 per hour for the use of the entire racing center. Prices of merchandise range from $16 for a hat up to $200 for high-end leather jackets. Prices for the die-cast and collectable cars range between $15 and $65. The Company's owned and operated locations provide the only means to generate revenues from merchandise sales. The Company does not receive any payments from the revenue share sites for merchandise sales.

In revenue share locations, the revenue share partner provides the space and the labor, and the Company provides the simulators and the license to use the software that operates the simulators. The revenue share split varies, but is usually in the range of 60-65% to revenue share partner, and 35-40% to Company. The Company typically requires a minimum guarantee per simulator of $20,000-$25,000 per year for the SMS simulator, and lower minimums are expected for the new Reactor simulators.

Lease agreements are typically one year flat fees, and the pricing depends upon the number of uses per year.

Pricing for the sale of simulators varies between the age and planned usage of the simulators. A new SMS sold domestically is priced at $95,000, and refurbished SMS simulators sold domestically range from $65,000-$80,000. International sales can be 20-30% higher due to the added work that is required for use in other markets. Reactor simulators are sold in the $36,000-$38,000 range excluding support software features.

7

**History**

NSMS racing centers were originally owned and developed by Silicon Entertainment, Inc. ("SEI"). SEI opened its first site in August 1997 at the Mall of America in Bloomington, Minnesota, the largest mall in the United States. SEI raised large sums of initial capital, of which, according to SEI internal documents, approximately $6.5 million was utilized to create its proprietary software technology and approximately $25 million was utilized to produce approximately 170 SMS simulators and complete the build-out of 15 stores in high traffic malls. SEI was unable to secure additional long term financing to support its capital expansion, and was liquidated through Chapter 7 bankruptcy in April 2001. Perfect Line's assets were primarily acquired from creditors of SEI. As a result of SEI's bankruptcy, Perfect Line was able to purchase the assets of SEI at a price substantially below SEI's cost.

Perfect Line, LLC, a predecessor to Perfect Line, Inc., initially tested the mall-based business model by re-opening 12 of the SEI racing centers, which utilized 136 of the SMS simulators, between July 2001 and August 2002. The Company then warehoused 32 SMS simulators for future deployment and 2 SMS simulators were used for research and development purposes at the Company's technology center in Santa Clara, California. The proprietary technology includes two U.S. Patents, which combine to create what management believes to be one of the world's most realistic simulations of the sights, sounds and motions experienced by driving in an actual NASCAR race. The patented motion-based platform that the race car simulator is mounted on is among the other assets that were acquired and licensed as part of the SEI asset purchase.

In August 2002, Perfect Line became a wholly owned subsidiary of IMTS, through an exchange of shares that resulted in Perfect Line shareholders owning approximately 82% of IMTS equity. Simultaneous with this event, approximately $2.6 million in private equity financing was made available to Perfect Line. Approximately one-half of the funding was used to retire the Company's bank note and the balance was used for working capital.

In July of 2003, management began the process of revising the Company's business model, changing the focus from the inherited Company owned and operated mall-based racing centers to revenue share, leased and purchased simulators for mall merchandise retailers, family entertainment centers, amusement parks, casinos, trade shows, etc. and mobile lease programs such as the Nextel Experience and the DaimlerChrysler auto show exhibits. After testing the assignment of one mall lease to Checker Flag Lightning, LLC ("Checker Flag Lightning" or "CFL") of Grandville, Michigan in November of 2003, the Company assigned an additional six (6) mall leases to CFL in March of 2004.

While the Company was beginning to earn profits by late 2004, management decided it was necessary to generate cash to reduce debt and secure growth capital. As a result, on December 31, 2004 and on March 31 and April 15, 2005, the Company entered into three Asset Purchase Agreements pursuant to which it sold a total of forty-four (44) of its existing race car simulators in revenue producing sites to Race Car Simulation Corporation ("RCSC"), a wholly owned subsidiary of Dolphin Direct Equity Partners, LP ("Dolphin") for an aggregate purchase price of $2,856,600. The sale is accounted for as a borrowing in accordance with the guidance provided in paragraphs 21-22 of SFAS 13. While these transactions reduced debt and allowed the Company to begin building new simulators, it also reduced cash flow by approximately $1,000,000 on an annual basis until the Company could activate another forty-four (44) simulators into the market on a revenue share basis. This, coupled with the fact that Checker Flag Lightning stopped paying on its revenue share agreements (approximately $1,000,000 annually) created cash flow issues for the Company during 2005 and 2006. The sale of SMS simulators during this period helped to offset the cash flow problem.

8

The Company launched a new product in November of 2005 called the Reactor. It was designed to incorporate the patented motion platform and proprietary game engine software, but the size was reduced and the unit was more mobile and portable. This opened the door to more mobile marketing experience customers (including Dodge, Toyota and Sprint Nextel). This resulted in 29 Reactors sold in 2006 along with 15 of the original SMS simulators, giving the Company an operating loss of $41,909 in 2006, a decrease of $573,573 or 93%, compared to the $615,482 operating loss in 2005.

## The Company's Current Operations, Recent Developments and Plan for the Future

The Company's goal is to leverage its patented motion platform and proprietary game engine software, along with its embedded base of simulator assets, to be the world leader in the "out of home" interactive gaming market. The Company is currently leveraging its internationally unique, proprietary race car simulation technology with domestic focus on the NASCAR experience. The Company believes that this can be done profitably through a combination of owned and operated racing centers, third party revenue share locations (family entertainment centers, amusement parks, casinos, auto malls, etc.), mobile unit sales and leases and the domestic and international sales of its race simulator products.

NASCAR racing is currently the #1 spectator sport in America. The Company has an exclusive license agreement with NASCAR for location-based entertainment, which includes the right to use the NASCAR name within the Silicon Motor Speedway logo, on racing center signage, within collateral sales materials and on the NSMS web site, (see Note 6 to Consolidated Financial Statements). The Company has also secured licenses with many popular racetracks in the United States, and the cars driven by many of the race fans' favorite Nextel Cup drivers such as Dale Earnhardt, Jr., Tony Stewart and Jeff Gordon. These licensing agreements and the use of NASCAR related identities and marks provide immediate name recognition, credibility, and authenticity to the experience.

The Company has integrated these license agreements with sophisticated proprietary racing simulator technology to create one of the world's leading race car simulations. Simulator races take place on famous NASCAR Nextel Cup racetracks such as Daytona International Speedway, Indianapolis Motor Speedway, Lowe's (Charlotte) Motor Speedway, Atlanta Motor Speedway, Bristol Motor Speedway, and Richmond International Raceway.

The Company first tested the revenue share business model with the Burroughs and Chapin Company of Myrtle Beach, South Carolina, by installing 6 simulators at their Smokey Mountain NASCAR SpeedPark in April of 2003. Revenue share locations provide the Company the opportunity to install simulators in existing or planned entertainment venues and share proportionately in the sales generated with owner-operators. The Company provides the simulators at cost (expected to be financed through a third party leasing firm, although no agreements have been reached) and the host organization (owner-operator) provides the space, required site build-out, and day-to-day operations staffing. Minimum revenues are typically guaranteed to the Company within the revenue share agreements.

At the 2004 Daytona 500, Nextel debuted The Nextel Experience, a mobile fan interactive experience that featured six of the Company's SMS race simulators. The Nextel Experience continues to have a prominent location at each of the NASCAR Nextel Cup events. Nextel also featured SMS simulators within three mini Mobile Experiences that were used for promotional events around the country, each featuring two of the Company's SMS simulators. Beginning in 2006, the Company sold and leased simulators to DaimlerChrysler for their domestic and international trade show exhibits, and the Dodge division has exhibited two of the Company's simulators at selected NASCAR events. The SMS simulators continue to be featured in the world's largest auto shows, including Detroit, Chicago, New York, Paris, Frankfurt, Geneva and Shanghai.

9

In November of 2005, the Company introduced a prototype of the new Reactor simulator at the International Association of Amusement Parks and Attractions (IAAPA) convention in Atlanta. The Reactor features a smaller footprint (5 feet wide and 7.5 feet long) allowing for more simulators per square foot and thus greater throughput per hour. The Reactor is also on casters and collapses to a 3 foot wide unit so that it can be rolled into conference rooms, retail locations, race suites, trade shows, etc. Using the same software and game experience as in the SMS simulators, the Company reduced the size of the patented motion platform for the Reactor and reduced the number of projectors from three to two. The Reactor can be plugged into standard 110 power, and does not require 3 phase power as does the SMS. Both the lease price and purchase price of the Reactor are substantially lower than the SMS. Management believed that the combination of greater mobility, portability and a lower price point would broaden the market for simulator purchases and leases.

In February of 2006, the first Reactor Mobile Experience was introduced at Daytona Beach, Florida surrounding the Daytona 500 events. Four Reactor simulators were installed into a 48 foot Featherlite car trailer that was towed by a 2-ton pickup truck. By the third and fourth quarter of 2006, two Reactor Mobile Experience units were sold to Exhibit Enterprises, the operator for Dodge motorsports, and one Reactor Mobile Experience was sold to an operator in Florida. Sprint Nextel and Toyota placed their orders for a total of 10 Reactors that would be installed in time for their fan experiences at the Daytona 500 in February of 2007. A total of 29 Reactor simulators were sold in 2006.

Another major development in the works by the end of the 2006 year was the beginning of a licensing relationship with iRacing.com. iRacing.com was founded by well-known game developer David Kaemmer (co-founder of Papyrus Racing Games) and entrepreneur John Henry (principle owner of the Boston Red Sox among other properties). iRacing.com has signed a letter of intent to license to the Company certain gaming technology, and as iRacing.com develops new physics models for race circuits and race cars for the in-home online gaming market, the Company desires to license those properties for its customers in the out-of-home market, although there can be no assurances. The Company plans to have its engineers begin work on multi-site, virtual league play featuring additional NASCAR race tracks for our operators, but there can be no assurance that this will be completed soon or any time in the foreseeable future. Management believes that once completed, the multi-site, virtual league play will generate an additional revenue steam for the Company and the operators, although there can be no assurance.

The Company has made several technological improvements to the simulation in recent years, resulting in an enhanced racing experience. *MySpeedway* was introduced in 2003 on IMTS's website (www.smsonline.com) that allows customers to find their recent lap times, and analyze their results to improve their performance by comparing their times to those of other racers throughout the country. Car parameters were also introduced in 2003 allowing racers to set up their cars to their personal preferences. Adjustable parameters include traction control, anti-lock brakes, spoiler angle, steering ratio, front anti-roll bar, engine, transmission gearing, and rear end ratio. The operating system has been updated to a Linux platform, and beginning in 2006 was available as an upgrade to race simulator operators. The new operating system is incorporated in the new Reactor simulators, and will be incorporated into all future SMS simulators. The new platform allows for each simulator to operate on one computer as compared to six, and allows for improved graphics and game features as they are introduced in the future. New and improved projector technology has also been designed into all future SMS and Reactor simulators.

For the Sprint Nextel and Toyota fan experiences in 2007, the Company added the capability of showing a pre-race video along with the option of showing interstitial or commercial video between the races. For Sprint Nextel, the Company also streamlined the data acquisition process and added a Top Twelve leaderboard that updates every sixty seconds within the Nextel Experience.

10

Management is currently discussing with potential customers the opportunity to expand its patented motion platform to full size passenger vehicles, and creating customized experiences for each vehicle. This opportunity will likely begin with trade show and at-track experiences, and then potentially grow to local dealers, although there can be no assurance.

## ITEM 2. DESCRIPTION OF PROPERTIES

The Company is headquartered at 5624 West 73rd Street in Indianapolis, Indiana where the Company leases approximately 4,800 square feet. The facility consists primarily of office and storage areas and is leased from an unrelated third party. The headquarters' lease expires March 31, 2008, with an option for the Company to be released from the lease on September 30, 2007. The Company also maintains an engineering office at 2065 Martin Avenue in Santa Clara, California where it leases approximately 1,800 square feet of office space. The engineering office lease expires October 31, 2007. In addition, the Company has a warehouse in Concord, North Carolina that is currently on a month-to-month lease. The Company believes its headquarters and engineering space is adequate for the present time and is reviewing options for relocating or extending its leases at these locations.

The two NASCAR Silicon Motor Speedway racing centers owned and operated by the Company are:

| Location | Market | Square Footage |
|---|---|---|
| Mall of America | Minneapolis, Minnesota | 5,899 |
| Universal CityWalk | Los Angeles, California | 5,067 |

## ITEM 3. LEGAL PROCEEDINGS

From time to time, the Company may be party to various legal actions and complaints arising in the ordinary course of business. The Company's subsidiary Perfect Line, Inc. filed a complaint in the U.S. District Court, Southern District of Indiana on December 6, 2006 against Checker Flag Lightning, LLC and Mike Schuelke, seeking a Declaratory Judgment, Injunctive Relief and Damages for failing to make the required payments (at least $559,119) under certain lease agreements between Checker Flag Lightning and Perfect Line. The Company cannot be sure of the outcome of this litigation.

On September 6, 2006, Perfect Line and its lease assignee, Checker Flag Lightning, were served a complaint from Mall of Georgia for past due rent totaling $164,726 between the two parties of which $95,580 is directly attributable to past rent due by Perfect Line. The non-performance of CFL in paying either its rent obligations to Mall of Georgia under the assigned lease or the payments due to Perfect Line under their revenue share agreement has resulted in this complaint from Mall of Georgia. Perfect Line has agreed to the basic terms of a settlement agreement with Mall of Georgia and is waiting on the settlement agreement draft for review at the time of this filing. The terms of the settlement will allow Perfect Line the ability to remove the 8 SMS simulators at the Mall of Georgia location and permits Perfect Line a reasonable time period for the payment of its obligations to Mall of Georgia while it reactivates the simulators into the market. As of the filing of this Annual Report on Form 10-KSB, the Company is not aware of any material legal actions directed against the Company.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None, not applicable.

11

## PART II

### ITEM 5. MARKET FOR COMMON EQUITY; RELATED STOCKHOLDER MATTERS AND SMALL BUSINESS ISSUER PURCHASES OF EQUITY SECURITIES

**Dividend Policy**

To date, the Company has not paid dividends on its common stock. The payment of dividends, if any, is within the discretion of the Board and will depend upon the Company's earnings, capital requirements and financial condition, and other relevant factors. The Board does not intend to declare any dividends in the foreseeable future.

**Holders of Record**

As of March 21, 2007 there were approximately 272 holders of record of our Common Stock consisting of 96,397,506 shares issued and outstanding. The number of holders of record was calculated by reference to reports from the Company's stock transfer agent.

**Share Price History**

The Company's common stock (the "Common Stock") has traded on the over-the-counter market in what is commonly referred to as the "OTC Bulletin Board" or the "OTCBB" under the trading symbol "IMTS" since August 14, 2002. The following table sets forth the high and low bid prices of the Common Stock for the periods indicated. The price information contained in the table was obtained from the OTCBB web site and other sources we consider reliable. Note that such over-the-counter market quotations reflect inter-dealer prices, without retail mark-up, markdown or commission and the quotations may not necessarily represent actual transactions.

| Quarter Ended | | High | | Low | | Close |
|---|---|---|---|---|---|---|
| March 31, 2004 | $ | .24 | $ | .09 | $ | .10 |
| June 30, 2004 | | .14 | | .05 | | .07 |
| September 30, 2004 | | .07 | | .04 | | .05 |
| December 31, 2004 | | .09 | | .05 | | .07 |
| March 31, 2005 | | .12 | | .05 | | .06 |
| June 30, 2005 | | .09 | | .06 | | .07 |
| September 30, 2005 | | .07 | | .03 | | .04 |
| December 31, 2005 | | .04 | | .02 | | .02 |
| March 31,2006 | | .07 | | .03 | | .04 |
| June 30, 2006 | | .05 | | .02 | | .04 |
| September 30, 2006 | | .04 | | .02 | | .02 |
| December 31, 2006 | | .03 | | .01 | | .02 |

Heading above the High/Low/Close columns: **Common Stock Price**

12

**Recent Sale of Unregistered Securities**

On July 14, 2006, Interactive Motorsports and Entertainment Corp (the "Company") and its wholly owned subsidiary, Perfect Line, Inc. ("Perfect Line") entered into Note and Warrant Purchase and Security Agreements with ten (10) investors in a private placement which is exempt from the registration provisions of the Securities Act of 1933, as amended, pursuant to Reg. D and Rule 506 adopted thereunder. The Notes, totaling $950,000, were issued by Perfect Line, will be fully paid down July 17, 2010 and bear interest at a rate of 15% per annum for the total interest amount over the four year period of $314,988. Each note came with an option to purchase common shares of the Company equal to two and one half times the amount of notes purchased divided by the exercise price of the option. The principle and interest on the Notes are payable weekly over a four year term and are secured by a first security interest in 20 of the simulators owned by Perfect Line.

The Company issued Common Stock to Ropart Asset Management in 2006 in accordance with the terms of the 2003 Bridge Notes as described in this filing.

## ITEM 6. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion and analysis provides information that we believe is relevant to an assessment and understanding of the consolidated results of operations and financial condition of the Company. The terms "Company", "we", "our" or "us" are used in this discussion to refer to Interactive Motorsports and Entertainment Corp. along with Interactive Motorsports and Entertainment Corp.'s wholly owned subsidiary, Perfect Line, Inc., on a consolidated basis, except where the context clearly indicates otherwise. The discussion and information that follows concerns the Registrant as it exists today, as of this filing, including the predecessor of the Company's operations, Perfect Line, LLC.

### Overview

The Company generated its first quarterly operating profit and quarterly net profit in the third quarter of 2004, and again in the first and fourth quarters of 2006. The Company had an operating loss of $41,909 in 2006, a decrease of $573,573 or 93%, compared to the $615,482 operating loss in 2005. Since inception on May 31, 2001 and through December 31, 2006, the Company has accumulated aggregate losses totaling $9,363,302, which includes the net loss of $598,154 for the twelve months ended December 31, 2006, the net loss of $1,095,074 for the twelve months ended December 31, 2005, and the net loss of $7,670,074 for the period from inception to December 31, 2004.

The Company has funded its retained losses through the initial investment of $650,000 in May 2001, $400,000 of capital contributed in February 2002, approximately $2.6 million received in August 2002 from the sale of Preferred Stock, $700,000 borrowed in March 2003, $604,000 in net proceeds borrowed between February 2004 and June 2004, $1.257 million received in the form of deposits for the placement of race car simulators in revenue share locations, or for the future purchase by third parties of race car simulators, net proceeds of $855,000 borrowed in September of 2006 and $769,147 by delaying payments to its vendors. See further discussion under "Liquidity and Capital Resources" and "Risk Factors" below.

13

During the twelve months ended December 31, 2006, the Company had total revenues of $5,351,298 compared to $4,838,988 for the twelve months ended December 31, 2005. The 11% increase in revenue is due primarily to the final implementation of the Company's revised business model and the sale of new Reactor simulators during 2006. The sale of 29 new Reactor simulators along with the sale of 15 SMS simulators in 2006 helped to offset the revenue that was not generated from the Checker Flag Lightning sites (28 simulators) due to non-performance in paying the revenue share payments due, and the 21 simulators that are in inventory. Same store revenues in the Company's two owned and operated stores were down 28%, primarily due to the Company's inability to purchase sufficient merchandise inventory to generate past sales levels.

**Review of Consolidated Financial Position**

**Cash and Cash Equivalents**: The Company had $216,323 in cash as of December 31, 2006 compared with $353,180 at December 31, 2005, a decrease of $136,857. This decrease in cash for the year ended December 31, 2006 relates principally to the paydown of invoices to vendors in the second half of 2006.

**Trade Accounts Receivable**: The balance at December 31, 2005 of $212,156 increased by $17,350 in 2006 to $229,506 net of a $238,781 reserve for uncollectible accounts related to Checker Flag Lightning. Trade accounts receivable is primarily revenue share and credit card receivables. The increase is attributable to the addition of revenue share sites and sale of Reactors in the fourth quarter of 2006.

**Inventory**: At December 31, 2006, inventory of $254,322 consisted of merchandise inventory of $17,496, simulator inventory of $158,462 and manufacturing inventory of $82,364. In addition, the merchandise inventory has a very conservative $4,000 reserve against it. Merchandise inventory increased by $9,733 from December 31, 2005 due primarily to the placement of merchandise in the Company's two outlet stores. Inventory of manufactured simulators increased by $39,269 to build the new reactors at the Santa Clara, California location. December 31, 2006 simulator inventory available for placement in new revenue share sites, or available for sale, totaled four new simulators and seventeen refurbished simulators.

**Accounts Payable**: The balance of accounts payable of $581,281 at December 31, 2006 represents a decrease of $344,480 from the balance at December 31, 2005 of $925,761. This decrease is primarily attributable to the paydown of vendors' invoices.

**Accrued Liabilities**: The balance of accrued liabilities of $432,745 at December 31, 2006 represents an increase of $52,925 from the balance at December 31, 2005 of $379,820. This increase is primarily related to the cost to build Reactors at the end of the year.

**Notes Payable**: On December 31, 2006, the Company had balances of $96,000 on the 2004 Note Payable, $1,760,761 on the 2004 Race Car Simulator Corporation ("RCS") Borrowing, and $122,500 on the 2005 Agreement. The Company amortizes the RCS Borrowing and recognizes the associated revenue over the five year period of the borrowing. The Company decreased the RCS Borrowing by $408,382 and $305,407 in 2006 and 2005 respectively.

On March 29, 2006, Perfect Line and MOAC Mall Holdings, LLC, the Mall of America landlord, agreed to a stipulation agreement whereby Perfect Line signed a promissory note totaling $294,652 payable in five (5) quarterly installments, with the first payment of $78,471 made on February 28, 2006, and payments of $54,045 to be made beginning July 14, 2006 and ending July 15, 2007. The $54,045 payments for 2006 were made on July 14 and November 15.

14

On July 14, 2006, Interactive Motorsports and Entertainment Corp (the "Company") and its wholly owned subsidiary, Perfect Line, Inc. ("Perfect Line") entered into Note and Warrant Purchase and Security Agreements with ten (10) investors in a private placement which is exempt from the registration provisions of the Securities Act of 1933, as amended, pursuant to Reg. D and Rule 506 adopted thereunder. The Notes, totaling $950,000,were issued by Perfect Line, will be fully paid down July 17, 2010 and bear interest at a rate of 15% per annum for the total interest amount over the four year period of $314,988. Each note came with an option to purchase common shares of the Company equal to two and one half times the amount of notes purchased divided by the exercise price of the option. The principle and interest on the Notes are payable weekly over a four year term and are secured by a first security interest in 20 of the simulators owned by Perfect Line.

**Other Liabilities:** Accrued payroll and payroll taxes, sales taxes payable, unearned revenue, and other accrued expenses fluctuate with the volume of business, timing of payments, and the day of the week on which the period ends.

### Review of Consolidated Results of Operations

Sales for the twelve months ended December 31, 2006 were $512,310 higher than for the twelve month period ending December 31, 2005 due primarily to the final implementation of the Company's revised business model and the sale of the new Reactor simulators during 2006. All but two of the Company store locations at December 31, 2003 have been converted to Checker Flag Lightning revenue share locations, or closed as part of the Company's ongoing strategy of extricating itself from long-term leases. Revenue share and leasing revenue was primarily impacted by the sale of 44 revenue producing simulators at the end of 2004 and first quarter of 2005. Revenue was further impacted by the non-payment of revenue share income by the Checker Flag Lightning organization. This resulted in the Company experiencing cash flow shortages sufficient to hamper its ability to replenish its stock of merchandise inventory, and also impacted the Company's ability to replace the simulators sold, and the associated revenue, with new revenue producing simulators in new locations.

The resultant reduction in revenue from store sites and revenue share locations was offset in part by sales of simulators to third party operators. During 2006, the Company recorded the sale or partial sale of 44 simulators in 10 transactions totaling approximately $2.8 million, as compared to the approximately $1.8 million generated by the sale of 45 simulators in 6 transactions in 2005.

Operating expenses for the year ended December 31, 2006 declined by approximately 16% from the period ending December 31, 2005. These expenses represented approximately 77% of net sales and approximately 101% for the comparable period in 2005. Continued implementation of the Company's revised business model resulted in a reduction in operating expenses of approximately $775,233, with reductions occurring primarily in payroll of $426,300 and occupancy costs of $54,627, as the Company either converted company owned stores to revenue share locations, or closed locations with sub-par performance.

The increase in revenues and reduction in expenses has had a favorable effect on the Company's overall financial position. The Company had an operating loss of $41,909 in 2006, a decrease of $573,573 or 93%, compared to the $615,482 operating loss in 2005, and a net loss of $598,154, a decrease of $496,920 or 45%, compared to the $1,095,074 net loss in 2005.

Additionally, interest expense increased by approximately $50,089 as the Company increased the liability on notes payable.

15

**Qualitative and Quantitative Disclosures of Market Risk**

The fair value of the assets and liabilities comprising the Company's condensed consolidated balance sheet are not subject to an inordinate amount of market risk. The term market risk refers to the risk of loss arising from adverse changes in interest rates and other relevant market rates and prices. The Company's primary assets are the racing simulators and the software that runs them. As such, the Company does not believe it has any significant exposure to market risk, as defined.

**Critical Accounting Policies**

The Company's critical accounting policies, including the assumptions and judgments underlying them, are disclosed in the Notes to Consolidated Financial Statements for the year ended December 31, 2006 included in Item 7 in this Form 10-KSB. The Company has consistently applied these policies in the year ended December 31, 2006. Management does not believe that operations to date have involved uncertainty of accounting treatment, subjective judgment, or estimates, to any significant degree.

**Internal Controls**

Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, management has reviewed the Company's disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) as of a date within 90 days prior to this annual report (the "Evaluation Date"). Management believes that such disclosure controls and procedures as of the Evaluation Date were adequate to ensure that employees and others with material information relating to the Company make that information known to management. To management's knowledge, there were no significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the Evaluation Date.

**Liquidity and Capital Resources**

On December 31, 2004, and again on March 31 and April 15, 2005, the Company entered into an Asset Purchase Agreement pursuant to which it sold a total of forty-four (44) of its race car simulators to Race Car Simulation Corporation ("RCSC"), a wholly owned subsidiary of Dolphin Direct Equity Partners, LP ("Dolphin") for an aggregate purchase price of $2,856,600. The sale is accounted for as a borrowing in accordance with the guidance provided in paragraphs 21-22 of SFAS 13.

During the year ended December 31, 2006, the operating activities of the Company used net cash of $735,985 compared to net cash used of $1,267,100 for the comparable period in 2005. The drivers for the $531,115 decrease in net cash can be attributed to the increase in profitability, the decrease in simulator deposits, and the increase in accounts receivable. These requirements for cash were offset by decreases in accounts payable of $65,100, and increases in inventory related to the production and delivery of new race car simulators of approximately $45,869.

During the year ended December 31, 2006, the Company used $84,956 of net cash in investing activities compared with $821,980 of net cash used in investing activities during the comparable period in 2005. In both years, the net cash used relates primarily to the capitalization of the costs associated with the installation of simulators in new revenue share locations, and the costs of components for simulators currently in production.

16

During the year ended December 31, 2006, the Company generated $684,084 of cash from financing activities compared with $1,107,587 of cash generated during the comparable period in 2005. The Company was able to secure additional financing from the sale of $950,000 in new notes. This was offset by the decrease of $265,916 of the 2004 notes payable.

As of December 31, 2006, the Company had cash totaling $216,323 compared to $353,180 at December 31, 2005. Current assets totaled $726,018 at December 31, 2006 compared to $868,703 on December 31, 2005. Current liabilities totaled $3,843,284 on December 31, 2006 compared with $3,874,458 on December 31, 2005. As such, these amounts represent an overall decrease in working capital of $111,511 from December 31, 2005.

## Inflation

We do not expect the impact of inflation on our operations to be significant.

## Risk Factors

The Company is subject to certain risk factors due to the organization and structure of the business, the industry in which we compete and the nature of our operations. These risk factors include the following:

### Operating History, Operating Losses, and Accumulated Deficit

Perfect Line, LLC was formed in June 2001 for the purpose of acquiring certain of the assets of SEI, a bankrupt corporation, and modifying and improving the mall-based business model under which SEI operated, as more fully described under Overview above. While the concept was a modification and improvement upon the prior model, the modified mall-based business model was only in place for less than two full years, but also proved to be unprofitable. It is for that reason, among others, that the Company designed and implemented a revised business model focusing on revenue share and lease agreements with operators, and the sales of the race car simulators. Perfect Line is subject to numerous risks, expenses, problems, and difficulties typically encountered in establishing any business. For the five months ended December 31, 2001, Perfect Line had sales of $3,533,402, and a loss of $719,854. For the year ended December 31, 2002, Perfect Line generated net sales of $9,636,278, resulting in a net loss of $2,189,220. For the year ended December 31, 2003, Perfect Line had net sales of $7,557,978 generating a net loss of $3,525,581. For the year ended December 31, 2004, Perfect Line had net sales of $5,769,104 generating a loss of $1,235,419. For the year ended December 31, 2005, the Company had net sales of $4,838,988 generating a loss of $1,095,074. For the year ended December 31, 2006, the Company had net sales of $5,351,298 generating a loss of $598,154. This overall financial performance resulted in an accumulated deficit of $9,363,302 as of December 31, 2006 for the Company. Management believes the revenue from its two owned and operated sites, upcoming sales and licensing revenues from the new Reactor and Reactor Mobile Experience operators, upcoming new sales and installations in revenue share and lease sites and revenue from potential new revenue streams (multi-site leagues and full size vehicle simulation experiences), will return the Company to profitability in the future, although there can be no assurance.

17

**Dependence on Discretionary Consumer Spending and Competition**

Much of the revenue anticipated by the Company will ultimately be the result of discretionary spending by consumers and from experiential marketing budgets from major sponsors within NASCAR. If the current trepidation in the economy continues for an extended time or worsens, either overall or in the locations in which Company racing centers and revenue share sites are located, the amount of discretionary spending may be reduced which would have a negative effect on the Company results from operations and its financial position. In addition, if the popularity of NASCAR diminishes, or if experiential marketing budgets are reduced, it is likely that the Company will experience a similar reduction in simulator usage, merchandise sales and mobile Reactor purchases and leases that will have a negative impact on the Company and its future.

There is considerable competition for consumer entertainment dollars. The Company feels its patented technology, high-traffic, premium locations, licenses with popular NASCAR teams and tracks, and the ability to take its driving experience to the public through the activation of its new Reactor Mobile Experience, create significant points of difference between the Company and its competitors. However, there can be no assurance that these factors will be sufficient to assure successful product development into the marketplace.

**Significant Capital Requirements and Need for Additional Financing**

The Company has been and continues to build back the approximately $83,000 in monthly revenue share and lease payments that were given up as a result of the asset sale of 44 simulators to Race Car Simulation Corporation in three asset purchases totaling $2,856,600 in December, 2004 and March and April of 2005. The Company is both using its current inventory of used and new simulators and building new simulators to install within revenue share, leased or purchased racing center sites to meet the installation demand. At December 31, 2006, the Company had built, or partially built, 192 SMS simulators, of which 98 had been sold or were in the process of being sold, 24 were in company owned and operated sites, 45 were in revenue share or lease sites (includes Mobile Experiences). Of the remaining 27 (23 used or refurbished and 4 new) 3 were at corporate offices and 24 were at the Company's warehouse or at Elan being prepared to install into future asset purchase, revenue share or lease racing center sites. In addition, the Company had built and installed 30 Reactors and is in the process of building 14 new Reactor simulators to be installed in the first quarter of 2007. Reactors are typically purchased with advance payments that cover manufacturing costs so that no financing is required by the Company.

Going forward, asset purchases (both SMS and Reactor) require an advance that will cover the manufacturing costs, so no financing is required for these installations. Financing will be required to manufacture the revenue share simulators that will be owed by the Company and installed into a revenue share partner's site. The Company seeks financially viable revenue share and lease partners for financing these installations, secured by simulators as collateral and minimum guarantee contracts.

Management has been and plans to continue to sell SMS simulators from its inventory base if necessary to cover cash flow needs until cash is built back up from any combination of revenue share, lease or new Reactor and Reactor Mobile Experiences, although there can be no assurance that the demand will continue, or that the orders will come in a timely manner to meet the Company's cash needs. As an example, in order to re-capture the $83,000 per month as detailed above, the sale of one SMS and two Reactors per month would be required under current circumstances. The Company sold 15 SMS and 29 Reactors in 2006.

18

**Dependence on Revenue Share Operators For Timely Payments**

The Company relies on the timely payments from its revenue share operators in order to meet operational cash flow needs. The Company has also made certain guarantees to Race Car Simulation Corporation of minimum levels of revenue share payments from the revenue share and lease operators where the assets were sold to Race Car Simulation Corporation. At the year ending December 31, 2005, the allowance for bad debt was increased to cover the receivable from Checker Flag Lightning, who was in default on revenue share payments. The Company continues to review all its options, legal and otherwise, to try to resolve this situation in the most expedited manner possible. At the time of this filing, no resolution had occurred.

**Dependence on Updated Technology and Licenses/Leases**

The Company will likely have a need to routinely update and upgrade its simulation technology. If the Company is not able to retain appropriate personnel with the skills and ability to maintain its simulators, it will likely have a material adverse effect on the Company. The Company will also need to routinely upgrade the appearance of the simulators to closely approximate that of the then current NASCAR sponsors. This updating may involve significant time and expense and, in certain instances, require additional license agreements from new teams and/or sponsors. The Company will also need to renew existing licensing agreements with NASCAR teams and tracks. The Company currently has executed either contracts or term sheets with many of the prominent NASCAR Nextel Cup teams and race tracks. The Company has established licensing relationships with a significant number of racetracks at which NASCAR events are held. The Company has incorporated to date six NASCAR tracks and over 30 Nextel Cup car images into its proprietary software. The Company has the rights to many more prominent NASCAR tracks, and plans to add tracks to its software once funded. The Company has entered into an exclusive location based entertainment license agreement with NASCAR to utilize its logo. The license agreement permits the continued use of the NASCAR logo in the Las Vegas NASCAR Cafe and the Daytona USA simulator and provides that it is not a breach of the exclusivity clause for those two venues to continue to use their current simulator experiences. The license requires the Company to utilize its best efforts to maintain a minimum of eight entertainment stores. The Company's confidential licensing agreement with NASCAR required an annual royalty payment in 2002 and quarterly royalty payments commencing in 2003 through 2009 based on simulator, merchandise, food, beverage, sponsor, and remote site revenues at varying percentages. The licensing agreement was amended on December 31, 2004, and the Company was able to reduce its minimum royalty guarantees. The exclusivity is subject to a minimum guarantee by July of 2007, and the license is up for renewal on December 31, 2009 (see Note 6 to the Consolidated Financial Statements).

**Dependence on Small Number of Key Management Personnel**

We do not have employment agreements with any of our employees. Our future success depends, in part, on the continued service of our key executive, management, and technical personnel. If key officers or employees are unable or unwilling to continue in their present positions, our business and our ability to raise capital could be harmed.

Our business is especially dependent upon the continued services of our Chairman and Chief Executive Officer, William R. Donaldson. Should we lose the services of Mr. Donaldson, our operations will be negatively impacted. The loss of the services of Mr. Donaldson would have a material adverse effect upon our business.

19

**Officers and Directors Have Limited Liability and Indemnification Rights**

Our officers and directors are required to exercise good faith and high integrity in the management of our affairs. Our articles of incorporation and bylaws, however, provide, that the officers and directors shall have no liability to the stockholders for losses sustained or liabilities incurred which arise from any transaction in their respective managerial capacities unless they did not act in good faith, engaged in intentional misconduct or knowingly violated the law, approved an improper dividend or stock repurchase, or derived an improper benefit from the transaction. Our articles of incorporation and bylaws also provide for us to indemnify our officers and directors against any losses or liabilities they may incur as a result of the manner in which they operate our business or conduct our internal affairs, provided that the officers and directors reasonably believe such actions to be in, or not opposed to, our best interests, and their conduct does not constitute gross negligence, misconduct or breach of fiduciary obligations.

**Market and Capital Risks**

Future issuance of Common Stock of the Company, including the exercise of currently outstanding Warrants and the issuance of shares to Ropart Asset Management as part of their compensation for the 2003 Bridge Note, may lead to dilution in the value of our common stock, a reduction in shareholder voting power, and allow a change in control.

Stock issuances may result in reduction of market price of our outstanding shares of common stock. If we issue any additional shares of common or preferred stock, proportionate ownership of our common stock and voting power will be reduced. Further, any new issuance of common or preferred shares may prevent a change in our control or management.

Issuance of our preferred stock could depress the market value of current shareholders. We have 10,000,000 authorized shares of convertible preferred stock (with zero shares outstanding) that may be issued by action of our Board of Directors. Our Board of Directors may designate voting control, liquidation, dividend and other preferred rights to preferred stock holders. Our Board of Directors' authority to issue preferred stock without shareholder consent may have a depressive effect on the market value of our common stock. The issuance of preferred stock, under various circumstances, could have the effect of delaying or preventing a change in our control or other take-over attempt and could adversely affect the rights of holders of our shares of common stock.

**High-Risk Investment and Restrictions on Marketability**

Our common stock has traded on the Over-the-Counter Bulletin Board since August 2002. The bid price of our common stock has been less than $5.00 during this period. As such, our stock is subject to the penny stock rules adopted by the Securities and Exchange Commission that require brokers to provide extensive disclosure to its customers prior to executing trades in penny stocks. These disclosure requirements may cause a reduction in the trading activity of our common stock.

20

Broker-dealer practices in connection with transactions in penny stocks are regulated by certain penny stock rules adopted by the Securities and Exchange Commission. Penny stocks generally are equity securities with a price of less than $5.00. Penny stock rules require a broker dealer prior to a transaction in a penny stock not otherwise exempt from the rules, to deliver a standardized risk disclosure document that provides information about penny stocks and the risks in the penny stock market. The broker-dealer also must provide the customer with current bid and offer quotations for the penny stock, the compensation of the broker-dealer and its salesperson in the transaction, and monthly account statements showing the market value of each penny stock held in the customer's account. In addition, the penny stock rules generally require that prior to a transaction in a penny stock, the broker-dealer makes a special written determination that the penny stock is a suitable investment for the purchaser and receives the purchaser's written agreement to the transaction.

Because we are subject to the penny stock rules our shareholders may find it difficult to sell their shares.

21

## ITEM 7. FINANCIAL STATEMENTS

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders of
Interactive Motorsports and Entertainment Corp. and Subsidiaries
Indianapolis, Indiana

We have audited the accompanying consolidated balance sheet of Interactive Motorsports and Entertainment Corp. and Subsidiaries, as of December 31, 2006, and the related consolidated statements of operations, shareholders' equity (deficit) and cash flows for the years ended December 31, 2006 and 2005. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Interactive Motorsports and Entertainment Corp. and Subsidiaries, as of December 31, 2006, and the results of their operations and their cash flows for the years ended December 31, 2006 and 2005, in conformity with United States generally accepted accounting principles.

/s/ HJ & Associates, LLC
------------------------------------------------
HJ & Associates, LLC
Salt Lake City, Utah
February 27, 2007

22

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Consolidated Balance Sheet

## ASSETS

|  |  | For the Year Ended December 31, 2006 |
|---|---|---|
| CURRENT ASSETS |  |  |
| Cash | $ | 216,323 |
| Accounts Receivable, net |  | 229,506 |
| Inventory |  | 254,322 |
| Prepaid Expenses |  | 22,724 |
| Notes Receivable |  | 3,143 |
| Total Current Assets |  | 726,018 |
| TOTAL PROPERTY AND EQUIPMENT, NET (Note 4) |  | 885,711 |
| OTHER ASSETS |  |  |
| Deposits |  | 28,471 |
| Notes Receivable |  | 305,642 |
| Total Other Assets |  | 334,113 |
| Total Assets | $ | 1,945,842 |

The accompanying notes are an integral part of these consolidated financial statements.

23

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Consolidated Balance Sheet (Continued)

## LIABILTIES AND SHAREHOLDERS' EQUITY (DEFICIT)

|  |  | For the Year Ended December 31, 2006 |
|---|---|---:|
| **CURRENT LIABILITIES** |  |  |
| Accounts Payable | $ | 581,281 |
| Accrued Payroll Expense |  | 66,762 |
| Accrued Sales Tax Payable |  | 34,360 |
| Gift Certificates & Customer Deposits |  | 23,248 |
| Deposits on Simulator Sales (Note 13) |  | 1,019,093 |
| Accrued Liabilities (Note 12) |  | 432,745 |
| Notes Payable - Related Parties (Note 9) |  | 146,000 |
| Notes Payable – Current Portion (Note 5) |  | 1,539,795 |
| Total Current Liabilities |  | 3,843,284 |
|  |  |  |
| **LONG-TERM LIABILITIES** |  |  |
| Notes Payable – Long Term Portion (Note 5) |  | 1,957,471 |
|  |  |  |
| Total Liabilities |  | 5,800,755 |
|  |  |  |
| **COMMITMENTS AND CONTINGENCIES (Note 8)** |  |  |
|  |  |  |
| **SHAREHOLDERS' EQUITY (DEFICIT)** |  |  |
| Common stock, $0.0001 par value, 200,000,000 shares Authorized, 96,397,506 shares issued and outstanding |  | 9,640 |
| Additional Paid in Capital |  | 5,498,749 |
| Retained Deficit |  | (9,363,302) |
| Total Shareholders' Equity (Deficit) |  | (3,854,913) |
|  |  |  |
| Total Liabilities & Shareholders' Equity (Deficit) | $ | 1,945,842 |

The accompanying notes are an integral part of these consolidated financial statements.

24

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Consolidated Statements of Operations

|  |  | *For the Years Ended December 31* | | |
|---|---|---|---|---|
|  |  | 2006 |  | 2005 |
| **REVENUES** |  |  |  |  |
| Company Owned Stores | $ | 1,853,647 | $ | 2,363,740 |
| Revenue Share Revenues |  | 383,523 |  | 581,145 |
| Leasing Revenues |  | 69,667 |  | 57,000 |
| Sales of Simulator Systems |  | 2,827,451 |  | 1,837,103 |
| Special Events Sales |  | 217,010 |  | - |
| Total Revenues |  | 5,351,298 |  | 4,838,988 |
|  |  |  |  |  |
| **COST OF SALES** |  |  |  |  |
| COGS - Merchandise |  | 45,660 |  | 115,972 |
| Group Sales Expenses |  | 3,297 |  | 12,645 |
| COGS - Sale of Simulators |  | 1,052,481 |  | 418,617 |
| COGS – Special Events |  | 159,766 |  | - |
| Total Cost of Sales |  | 1,261,204 |  | 547,234 |
|  |  |  |  |  |
| **GROSS PROFIT** |  | 4,090,094 |  | 4,291,754 |
|  |  |  |  |  |
| **GENERAL & ADMIN. EXPENSES** |  |  |  |  |
| Payroll Related Expenses |  | 1,569,354 |  | 1,995,651 |
| Occupancy Expenses |  | 1,106,796 |  | 1,161,423 |
| Other Operating Expenses |  | 1,455,853 |  | 1,750,162 |
| Total Operating Expenses |  | 4,132,003 |  | 4,907,236 |
|  |  |  |  |  |
| **OPERATING LOSS** |  | (41,909) |  | (615,482) |
|  |  |  |  |  |
| **OTHER INCOME (EXPENSE)** |  |  |  |  |
| Interest Expense |  | (556,245) |  | (506,156) |
| Gain on Extinguishments of Debt |  | - |  | 26,564 |
| Total Other Income (Expense) |  | (556,245) |  | (479,592) |
|  |  |  |  |  |
| **LOSS BEFORE INCOME TAXES** |  | (598,154) |  | (1,095,074) |
|  |  |  |  |  |
| **INCOME TAX EXPENSE** |  | - |  | - |
|  |  |  |  |  |
| **NET LOSS** | $ | (598,154) | $ | (1,095,074) |
|  |  |  |  |  |
| **LOSS PER SHARE** | $ | (0.01) | $ | (0.01) |
|  |  |  |  |  |
| **WEIGHTED AVERAGE SHARES OUTSTANDING** |  | 94,378,209 |  | 90,278,841 |

The accompanying notes are an integral part of these consolidated financial statements.

25

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Statements of Shareholders' Equity (Deficit)

| | Common Stock | | Additional Paid-In Capital | Retained Deficit | Total Shareholders' Equity (Deficit) |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balance at December 31, 2004 | 87,715,910 | $ 8,772 | $ 4,810,767 | $ (7,670,074) | $ (2,850,535) |
| Common stock issued for payment of Loan Interest | 5,053,267 | 1,363 | 376,466 | - | 377,829 |
| Common stock issued for services | 1,000,000 | 100 | 69,900 | - | 70,000 |
| Warrant issued for Dolphin Asset Purchase | - | (858) | 87,250 | - | 86,392 |
| Cost of options for 2005 notes | - | - | 15,887 | - | 15,887 |
| Net loss for the year ended December 31, 2005 | - | - | - | (1,095,074) | (1,095,074) |
| Balance at December 31, 2005 | 93,769,177 | 9,377 | 5,360,270 | (8,765,148) | (3,395,501) |
| Common stock issued for payment of Loan Interest | 2,628,329 | 263 | 77,737 | - | 78,000 |
| Warrant issued for Dolphin Asset Purchase | - | - | 60,742 | - | 60,742 |
| Net loss for the year ended December 31, 2006 | - | - | - | (598,154) | (598,154) |
| Balance at December 31, 2006 | 96,397,506 | $ 9,640 | $ 5,498,749 | $ (9,363,302) | $ (3,854,913) |

The accompanying notes are an integral part of these consolidated financial statements.

26

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Consolidated Statements of Cash Flows

|  | | For the Years Ended December 31 | | |
|---|---|---|---|---|
|  | | 2006 | | 2005 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net Loss | $ | (598,154) | $ | (1,095,074) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Depreciation and amortization | | 388,797 | | 454,337 |
| Common stock issued for services and interest | | 78,000 | | 49,829 |
| Warrants issued related to sales agreements | | 60,742 | | 86,392 |
| Amortization of notes payable discount | | (45,953) | | 43,879 |
| Amortization of dolphin Financing Agreement | | (408,382) | | (311,944) |
| Gain on extinguishment of debt | | - | | (26,564) |
| Bad debt expense | | - | | 253,481 |
| Net changes in operating assets and liabilities: | | | | |
| Increase in trade accounts and other receivable | | (14,135) | | (348,910) |
| (Increase) decrease in inventory | | (45,869) | | 51,478 |
| (Increase) decrease in prepaid expenses and other assets | | 50,590 | | 45,706 |
| Decrease in intangibles | | - | | 12,927 |
| Increase (decrease) in accounts payable | | (65,100) | | 533,510 |
| Increase (decrease) in accrued payroll and payroll taxes | | 10,344 | | 114,804 |
| Increase (decrease) in sales tax payable | | 22,343 | | (14,705) |
| Increase (decrease) in gift certificates and customer deposits | | 624 | | (20,264) |
| Increase (decrease) in accrued expenses | | 68,176 | | (779,105) |
| Decrease in deposits on simulator sales | | (238,008) | | (316,877) |
| Net Cash Used by Operating Activities | | (735,985) | | (1,267,100) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Purchase of property and equipment | | (197,987) | | (1,024,410) |
| Sale of property and equipment | | 113,031 | | 202,430 |
| Net Cash Used by Investing Activities | | (84,956) | | (821,980) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Payments of notes payable | | (265,916) | | (540,171) |
| Proceeds from issuance of notes payable | | 950,000 | | 1,647,758 |
| Net Cash Provided by Financing Activities | | 684,084 | | 1,107,587 |
| INCREASE (DECREASE) IN CASH | | (136,857) | | (981,493) |
| CASH, BEGINNING OF YEAR | | 353,180 | | 1,334,673 |
| CASH, END OF YEAR | $ | 216,323 | $ | 353,180 |

The accompanying notes are an integral part of these consolidated financial statements.

27

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Consolidated Statements of Cash Flows (Continued)

|  | | For the Years Ended December 31 | | |
|---|---|---|---|---|
|  | | 2006 | | 2005 |
| SUPPLEMENTAL CASH FLOW DISCLOSURES: | | | | |
| Cash paid for interest | $ | 165,372 | $ | 87,455 |
| Cash paid for income taxes | $ | - | $ | - |
| SUPPLEMENTAL DISCLOSURE OF NON-CASH TRANSACTIONS: | | | | |
| Common stock issued for services and interest | $ | 78,000 | $ | 447,829 |
| Warrants sold | $ | 60,742 | $ | 86,392 |
| Options granted on notes payable | $ | - | $ | 15,887 |

The accompanying notes are an integral part of these consolidated financial statements.

28

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

## NOTE 1 - BASIS OF PRESENTATION

Interactive Motorsports and Entertainment Corp was incorporated in Indiana and began operations on August 3, 2002. Perfect Line, Inc. was also incorporated in Indiana, and began operations on August 2, 2002.

Interactive Motorsports and Entertainment Corp., through its wholly owned subsidiary, Perfect Line, Inc. (the "Company"), (1) owns and operates two NASCAR Silicon Motor Speedway stores offering licensed NASCAR-branded entertainment products, (2) has ongoing revenue share agreements with third parties allowing them use of our NASCAR racing simulators and proprietary software, (3) sells its simulators and licenses its proprietary software to third parties, and (4) leases its simulators and its proprietary software to third parties. The cornerstone of the Company's revised business model includes the expansion of the revenue share and lease base of operators, and the sale or lease of its new Reactor simulators for mobile marketing applications. In revenue sharing, the Company enters into an agreement whereby the Company is entitled to an agreed percentage of the revenue generated by the simulator, subject to a minimum due each month.

## NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### a. USE OF ESTIMATES

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

### b. SIGNIFICANT ESTIMATES

The most significant estimates made by management are determining the estimated useful lives of the fixed assets, determining the obsolescence of merchandise inventory, and assessing the realization of deferred tax benefits relating to the Company's net operating loss carry forwards.

### c. CONSOLIDATION

The consolidated financial statements at December 31, 2006 and 2005 include the accounts of the Company and its wholly owned operating subsidiaries, Perfect Line, Inc. and Race Car Simulators. Intercompany transactions and balances have been eliminated in consolidation.

### d. CASH AND CASH EQUIVALENTS

For purposes of the statement of cash flows, the Company considers all demand deposit balances and all highly liquid debt instruments purchased with maturity of three months or less to be cash equivalents.

29

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

e. CONCENTRATION OF RISK

The Company maintains a demand deposit account where the balance in the account may at times exceed the FDIC insurance limits of $100,000. At December 31, 2006, the amount exceeding the FDIC limit was $68,883.

f. ACCOUNTS RECEIVABLE

Account receivables are carried at original invoice amount less an estimate made for doubtful accounts based on a review of all outstanding amounts on a quarterly basis. Management determines the allowance for doubtful accounts by identifying troubled accounts and using historical experience applied to an aging of accounts. Account receivables are written off when deemed uncollectible. Recoveries of trade receivables previously written off are offset against the allowance when received. At December 31, 2006 the balance of Accounts Receivable of $229,506 is net of a $238,781 reserve for uncollectible accounts related to Checker Flag Lightning.

g. PROPERTY AND EQUIPMENT

The Company records its property and equipment at cost and once in service, depreciates it using the straight-line method over the estimated useful lives of the respective asset classes as follows:

Software 3 Years, Furniture, Fixtures, and Equipment 5 to 7 Years

h. LONG-LIVED ASSETS

Long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability is measured by comparison of the carrying amount to future net undiscounted cash flows expected to be generated by the related asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount exceeds the fair market value of the assets. To date, no adjustments to the carrying amount of long-lived assets have been required.

i. MERCHANDISE INVENTORY

Merchandise inventories are carried at the lower of cost or market as determined by the first-in, first-out (FIFO) method. The Company reduces the stated value of inventory for excess quantities or obsolescence in an amount equal to the difference between the cost of inventory and the estimated market value based upon assumptions about future demand and market conditions. If actual future demand or market conditions are less favorable than those projected by management, additional reductions in stated value may be required.

30

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### j. MANUFACTURING INVENTORY

Manufacturing inventories are carried at the lower of cost or market as determined by the first-in, first-out method. These inventories consist of completed simulators that are ready to be installed in a site, as well as various components of our simulation system that have not been allocated to a specific site.

### k. INVENTORY

At December 31, 2006, inventory consisted of the following:

| | | |
|---|---|---|
| Merchandise Inventory | $ | 17,496 |
| Simulators Inventory | | 158,462 |
| Manufacturing Inventory | | 82,364 |
| Inventory Reserve | | (4,000) |
| Total Inventory | $ | 254,322 |

### l. CONSTRUCTION IN PROGRESS

The Company records all costs associated with the acquisition of components and build out of new sites in Construction in Progress. Once the site build is completed, costs associated with the build are recognized as a cost of sale or capitalized as Property and Equipment, and are depreciated as noted in paragraph (f) above.

### m. DIVIDENDS

The Company has not paid any dividends and any dividends that may be paid in the future will depend upon the financial requirements of the Company and other relevant factors. The Company does not presently intend to pay dividends at any point in the foreseeable future.

### n. REVENUE RECOGNITION AND UNEARNED REVENUE

The Company recognizes revenue for its services at the time the services have been rendered. In the case of gift certificates and customer deposits for group events, these amounts are deferred and recognized when the associated services are rendered or upon expiration. During 2003 the Company began a program of selling some of its new or used simulators. The Company has outstanding as of December 31, 2006, deposits of $1,019,093 relating to these sales. The Company's policy is to recognize revenue on a percentage of completion basis throughout the procurement and installation process until all terms of the contract have been met and no obligations remain for the Company to perform. The percentage of completion for any given sales contract is determined by the ratio of costs incurred to date to the total estimated cost for each site build. Costs incurred consist of purchased components, outside services, and outside contract labor cost.

31

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

On December 31, 2004, March 31, 2005 and April 15, 2005, the Company and its two subsidiaries entered into an agreement to sell 44 of its race car simulators. The purchase price of $1,536,600, $720,000 and $600,000 respectively was paid in cash by the date of the agreement. In addition to transferring title to the simulators, the Company sold a management agreement to provide services for the term of the contract and sold 5,161,500, 1,080,000 and 900,000 common stock warrants, respectively, which are exercisable for 5 years at $0.10 per warrant. The purchase agreement is being treated as a borrowing in accordance with the guidance provided in paragraphs 21-22 of the Statement of Financial Accounting Standards No. 13 (SFAS 13). The purchase price is being amortized over a five year term with an annual rate of 15%. The annual amortization of the Dolphin borrowing decreased notes payable and increased net income by $408,382 and $305,407 for 2006 and 2005, respectively. The annual revenue recognized was $706,432 and $605,845 for 2006 and 2005, respectively, and was offset by an interest expense of $298,050 and $300,437 for 2006 and 2005, respectively.

o. NET LOSS PER SHARE

The computation of net loss per share of common stock is based on the weighted average number of shares outstanding during the periods presented. The Company calculates loss per share pursuant to Statement of Financial Accounting Standards No. 148 (SFAS 148), Earnings Per Share. Basic loss per share is computed based upon the weighted average number of common shares issued and outstanding during each year. Diluted loss per share amounts assumes conversion, exercise, or issuance of all potential common stock instruments (stock options, warrants and convertible preferred stock). Potentially dilutive securities including preferred stock, warrants and stock options are excluded from diluted loss per share during net loss periods because these securities would be anti-dilutive. The Company has excluded 9,666,500 of dilutive instruments at December 31, 2006.

p. CONSOLIDATION

The consolidated financial statements at December 31, 2006 and 2005 include the accounts of the Company and its wholly owned operating subsidiaries, Perfect Line, Inc. and Race Car Simulators. Intercompany transactions and balances have been eliminated in consolidation.

q. INCOME TAXES

The Company provides for income taxes based on the liability method, which requires recognition of deferred tax assets and liabilities based on differences between the financial reporting and tax bases of assets and liabilities measured using enacted tax rates and laws that are expected to be in effect when the differences are expected to reverse. At December 31, 2006, the Company's net deferred tax asset is fully offset by a valuation allowance.

32

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

   r. ADVERTISING

Advertising expenses were $57,751 and $75,702 for the years ended December 31, 2006 and 2005, respectively.

   s. WARRANTY POLICY DISCLOSURE

The Company accrues a liability on the warranty of simulators sold for the cost of future repairs. In general the warranty covers the cost of parts, labor and travel for a predetermined period of time ranging from six months to two years. The warranty is determined by the Company on a per contract basis.

| Warranty Period | | For the Year Ended December 3 | |
|---|---|---|---|
| | | 2005 | |
| 2006 | $ | 17,028 | |
| 2007 | | 9,274 | $ |
| 2008 | | | |
| Total | | 26,302 | |

33

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

NOTE 3 - EQUITY TRANSACTIONS AND COMMON STOCK WARRANTS

Preferred Stock

At June 30, 2002, Perfect Line placed with investors 4,745,456 shares of convertible preferred stock (the "Preferred Stock") for cash proceeds of $2,610,050 under a private placement memorandum dated May 10, 2002. These funds were to be held in escrow until the occurrence of certain events. The proceeds of this offering were used to pay down debt and other liabilities and to provide working capital funds for the business. The Preferred Stock is mandatorily convertible one year after issuance into one share of Common Stock or one dollar worth of Common Stock as of the conversion date, as calculated by the 10-day trailing average of the bid and ask price prior to conversion, whichever is more favorable to the shareholder. On July 31, 2003 the Company entered into an agreement with one preferred shareholder which extended the conversion date to January 1, 2004. These shares were subsequently converted into 11,363,640 Common Shares on January 29, 2004.

For every two shares of Preferred Stock, the investor received one warrant (the "Preferred Stock Warrants") to purchase Common Stock at a price of $1.50 per share expiring three years from the date of issuance. The Preferred Stock Warrants are callable by the Company for $0.10 per warrant at any time at the option of the Company. At December 31, 2006 all these warrants had expired.

Common Stock

In connection with a certain asset purchase agreement, the Company granted warrants to allow the seller to purchase up to $2 million in value of the Company's common stock at a price equal to the value per share at the time the warrants are exercised. The warrants are exercisable at any time prior to December 14, 2011, upon the occurrence of certain events. Management has determined the likelihood of occurrence of these certain events is remote and has therefore assigned no value to these warrants. No warrants have been exercised as of December 31, 2006.

On May 12, 2005, the Company issued 1,000,000 shares of common stock for consulting services that were rendered. Total consulting expense associated with this issuance was $70,000.

On July 26, 2005, the Company issued 4,100,000 shares of common stock for the repayment of a 2004 Note and Option Purchase Agreement. The value of the options were $328,000.

On November 10, 2005, the Company issued 953,267 shares of common stock per the terms of the Secured Bridge Notes due December 31, 2003 (Note 5). Total interest expense associated with this issuance was $49,829.

On September 11, 2006, the Company issued 1,818,484 shares of common stock per the terms of the Secured Bridge Notes due December 31, 2003 (Note 5). Total interest expense associated with this issuance was $60,000.

34

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

NOTE 3 - EQUITY TRANSACTIONS AND COMMON STOCK WARRANTS (Continued)

On December 9, 2006, the Company issued 809,845 shares of common stock per the terms of the Secured Bridge Notes initially due December 31, 2003 (Note 5). Total interest expense associated with this issuance was $18,000.

Warrants

On December 31, 2004, March 31, 2005 and April 15, 2005, the Company and its two subsidiaries entered into agreements to sell 44 of its race car simulators to a single buyer. Simultaneous to this transaction, the Company sold the buyer 5,161,500, 1,080,000 and 900,000 common stock warrants, respectively, which are exercisable for 5 years from the date of the transaction at $0.10 per warrant. Using the Black Scholes valuation model, the Company determined the value of these warrants to be $ 287,308, $47,123 and $39,269, respectively, assuming a risk-free interest rate of 3.95% over a period of 5 years.

On July 14, 2006, the Company entered into Note and Warrant Purchase and Security agreements to sell $950,000 15% notes in aggregate principal amount of its Secured Notes due August 1, 2010. Simultaneous to this transaction, the Company sold the buyer 2,375,000 common stock warrants, which are exercisable for four years from the date of the transaction at $0.10 per warrant. Using the Black Scholes valuation model, the Company determined the value of these warrants to be $60,742, assuming a risk-free interest rate of 4.96% over a period of four years.

NOTE 4 - PROPERTY AND EQUIPMENT

At December 31, 2006, property and equipment was comprised of the following:

| | | |
|---|---|---:|
| Furniture, Fixtures and Equipment | $ | 1,576,965 |
| Revenue share installation costs | | 289,339 |
| Construction in Progress | | 118,397 |
| Software | | 791,864 |
| Total Property and Equipment | | 2,776,565 |
| Less: Accumulated depreciation | | 1,890,854 |
| Property and Equipment, net | $ | 885,711 |

Depreciation expense for the years ended December 31, 2006 and 2005 was $388,797 and $454,337 respectively.

35

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

NOTE 5 - DEBT AND CREDIT ARRANGEMENTS

On March 7, 2003, Perfect Line, Inc. issued Secured Bridge Notes due December 31, 2003 (the "Bridge Notes") in the aggregate principal amount of $700,000 to one institutional investor and three related-party investors (Note 9). Under the terms of the agreement; Ropart Asset Management Fund, LLC ("Ropart"), Tampa Bay Financial, Inc. (related-party), William R. Donaldson (related-party) and Erik R. Risman (related-party at that time), were to receive the principal sum of $500,000, $100,000, $50,000 and $50,000, respectively, on December 31, 2003. Interest was to be paid on the unpaid principal balance existing prior to maturity at an annual rate of twelve percent (12%). Interest on the unpaid principal under the Notes was due and payable in arrears on the first day of each month, commencing April 1, 2003. Additionally, interest accrued at an annual rate of twelve percent (12%), which was to be repaid in shares of common stock. All amounts due under the notes were due and payable December 31, 2003. Ropart and Donaldson have signed amendments extending the note until an undetermined date in 2006, Tampa Bay Financial's balance was transferred to a third party controlled by a major Company shareholder, and along with an additional Company obligation, was rolled over to the Company's February 2, 2004 Note and Option and Security offering (below) and Risman was paid in full in 2004 by the Company.

Ropart and Risman also received warrants in the amounts of 2,941,176 and 294,118, respectively, entitling them to purchase from the Company, at an exercise price of $0.17, common shares of the Company at any time before the earlier of June 30, 2004 or six months following payment of the Bridge Note in full. The warrants expired unexercised in 2004.

Pursuant to the Note and Option Purchase Agreement and Security Agreement dated February 2, 2004 ("2004 Agreement"), the Company issued notes bearing an interest rate of 9.6% payable in the total amount of $750,000. These notes were issued between February 2, 2004 and June 6, 2004. Each note came with an option to purchase common shares of the Company equal to the amount of notes purchased divided by the fair market value of the Company's stock on the date of issuance. The notes became due on February 2, 2005, and $260,000 of the notes was paid in full at that time. A note holder of an additional $344,000 of the notes elected to receive a cash payment of $16,000 and exercise options granted with the note purchase for full payment of the note per the terms of the 2004 Agreement. The note holder of the final $146,000 in notes has been repaid $50,000, and has agreed to extend the maturity date of their note to an undetermined date in 2007, with the expiration of the accompanying option to follow 30 days past the maturity date.

The value of the options was amortized to interest expense over their original life which expired March 1, 2005. Amortization of option discount for the options related to the 2004 Agreement of $51,812 was included in interest expense for the twelve months ended December 31,2005.

Pursuant to the Note and Option Purchase Agreement and Security Agreement dated November 2005 ("2005 Agreement"), the Company issued notes bearing an interest rate of 12% payable in the total amount of $122,500. These notes were issued between October 13, 2005 and November 4, 2005. Each note came with an option to purchase common shares of the Company equal to the amount of notes purchased divided by the exercise price of the option. The notes are due on October 1, 2007.

36

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

NOTE 5 - DEBT AND CREDIT ARRANGEMENTS (Continued)

The value of the options will be amortized to interest expense over their life which expires on November 1, 2007. Amortization of option discount for the options related to the 2005 Agreement of $7,831 and $1,530 was included in interest expense for the twelve months ended December 31, 2006 and 2005, respectively.

On March 29, 2006, Perfect Line and MOAC Mall Holdings, LLC, the Mall of America landlord, agreed to a stipulation agreement whereby Perfect Line signed a promissory note totaling $294,652 payable in five (5) quarterly installments, with the first payment of $78,471 made on February 28, 2006, and payments of $54,045 to be made beginning July 14, 2006 and ending July 15, 2007. The $54,045 payments for 2006 were made on July 14 and November 15.

On July 14, 2006, Interactive Motorsports and Entertainment Corp. (the "Company") and its wholly owned subsidiary, Perfect Line, Inc. ("Perfect Line") entered into Note and Warrant Purchase and Security Agreements with ten (10) investors in a private placement which is exempt from the registration provisions of the Securities Act of 1933, as amended, pursuant to Reg. D and Rule 506 adopted thereunder. The Notes, totaling $950,000, were issued by Perfect Line, will be fully paid down July 17, 2010 and bear interest at a rate of 15% per annum for the total interest amount over the four year period of $314,988. Each note came with an option to purchase common shares of the Company equal to two and one half times the amount of notes purchased divided by the exercise price of the option.

The value of the options will be amortized to interest expense over their life which expires on July 13, 2010. Amortization of option discount for the options related to the 2006 Agreement of $6,598 was included in interest expense for the twelve months ended December 31, 2006.

37

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

NOTE 5 - DEBT AND CREDIT ARRANGEMENTS (Continued)

Notes Payable consisted of the following at December 31, 2006:

| | | |
|---|---|---:|
| Note payable to investor bearing interest at 12%, due at an undetermined date in 2007. Secured by certain simulators of the Company and a personal guaranty of the President of the Company. | $ | 600,000 |
| Note payable to individuals, bearing interest at 12%, due October 1, 2007. Secured by certain simulators of the Company. | | 122,500 |
| Note payable to a landlord, currently under negotiation | | 95,580 |
| Note payable to a landlord, bearing interest at 10.9%, due July 15, 2007, two payments of $54,045 are due March and July of 2007 | | 108,091 |
| Borrowing transaction with RCS bearing imputed interest at 15%, 5 year term. | | 1,760,761 |
| Note payable to individuals, bearing interest at 15%, due July 13, 2010. Secured by certain simulators of the Company. | | 870,644 |
| Less: unamortized discount | | (60,310) |
| Total Notes Payable | | 3,497,266 |
| Less: Current Portion | | (1,539,795) |
| Total Notes Payable – Long Term Portion | $ | 1,957,471 |

Future maturities of notes payable as of December 31,

| | | |
|---|---|---:|
| 2007 | $ | 1,539,795 |
| 2008 | | 787,253 |
| 2009 | | 909,189 |
| 2010 | | 261,029 |
| Total Notes Payable | $ | 3,497,266 |

38

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

## NOTE 6 - LICENSING AND CONSULTING AGREEMENTS

The Company has a licensing agreement with the National Association for Stock Car Auto Racing, Inc. ("NASCAR") for location-based entertainment, which allows the Company to use the NASCAR name and logo. The Company's confidential licensing agreement with NASCAR requires annual royalty payments in 2002 and quarterly royalty payments from 2003 through 2009 based on simulator, merchandise, food, beverage, sponsor, and remote site revenues at varying percentages. The licensing agreement is subject to renewal on December 31, 2009. The Company has been in discussions with NASCAR about terminating the license for the "NASCAR Silicon Motor Speedway" logo since management feels the license is expensive for use in only 2 sites (Mall of America and Universal CityWalk). Various options are being discussed with NASCAR currently, but the sites will all continue to use the licensed NASCAR tracks and teams in any scenario.

The Company also has licensing agreements with several NASCAR race teams, drivers, and racetracks that expire on various dates between December 31, 2005 and December 31, 2007.

## NOTE 7 - RENT COMMITMENTS

The Company rents various office and retail space under long-term, non-cancelable operating leases, some of which include renewal options, expiring on various dates through 2010. The Company also leases certain office equipment pursuant to a non-cancelable operating lease with terms of three years. Rent expense approximated $1,017,071, and $1,035,336 for the years ended December 31, 2006 and 2005, respectively. During 2004, the Company entered into various agreements with Checker Flag Lightning and the landlords of specific company stores whereby CFL assumed the operation of the store, and assumed primary responsibility for payments of the monthly rent. The first column below shows the full impact of all the rental agreements the Company is a party to. The second column shows the Company's rental obligations as a consequence of our agreements with CFL and various mall owners.

At December 31, 2006, the future minimum rental payments required under all non-cancelable operating leases were as follows:

| Payable In | All Rental Payments | | Net of CFL Rental Payme |
|---|---|---|---|
| 2007 | 977,021 | | 6 |
| 2008 | 754,602 | | 4 |
| 2009 | 703,677 | | 3 |
| 2010 | 379,944 | | 3 |
| Total Required Rental Payments | $ 2,815,244 | $ | 1,7 |

39

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

NOTE 8 - COMMITMENTS AND CONTINGENCIES

From time to time, the Company may be party to various legal actions and complaints arising in the ordinary course of business. The Company's subsidiary, Perfect Line, Inc., filed a complaint in the U.S. District Court Southern District of Indiana on December 6, 2006 against Checker Flag Lightning, LLC and Mike Schuelke, seeking a Declaratory Judgment, Injunctive Relief and Damages for failing to make the required payments (at least $559,119) under certain lease agreements between Checker Flag Lightning and Perfect Line. The Company cannot be sure of the outcome of this litigation.

On September 6, 2006, Perfect Line and its lease assignee, Checker Flag Lightning, were served a complaint from Mall of Georgia for past due rent totaling $164,726 between the two parties of which $95,580 is directly attributable past rent due by Perfect Line. The non-performance of CFL in paying either its rent obligations to Mall of Georgia under the assigned lease or the payments due to Perfect Line under their revenue share agreement has resulted in this complaint from Mall of Georgia. Perfect Line has agreed to the terms of a settlement agreement with Mall of Georgia and is waiting on the settlement agreement draft for review at the time of this filing. The terms of the settlement will allow Perfect Line the ability to remove the 8 SMS simulators at the Mall of Georgia location and permits Perfect Line a reasonable time period for the payment of its obligations to Mall of Georgia while it reactivates the simulators into the market.

The Company has a contractual obligation to Dolphin binding Perfect Line to a minimum payment of guaranteed revenue for the term of the existing lease/revenue share agreements or three years, whichever comes later as stated in the Asset Purchase Agreement. As of December 31, 2006, the Company was made aware of the default of $102,000 payments in arrears of one of the lease partners. At the time of this filing, Dolphin and the lease partner were negotiating payment terms for the amount of the default, but the Company cannot assure that the parties can come to an agreement on terms acceptable to both parties. .

As of the filing of this Annual Report on Form 10-KSB, the Company is not aware of any material legal actions directed against the Company.

NOTE 9 - RELATED PARTY NOTES PAYABLE

| | | |
|---|---|---|
| Note payable to the President of the Company, bearing interest at 12% per annum. Due December 31, 2007. Secured by certain assets of the Company. | $ | 50,000 |
| Note payable to an entity controlled by a major shareholder of the Company, bearing interest at 9.6% per annum, due February 2, 2007. Secured by certain simulators of the Company and personal guarantee of the President. | | 96,000 |
| Total Related Parties Notes Payable | $ | 146,000 |

40

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

NOTE 10 - INCOME TAXES

Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carryforwards and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Net deferred tax assets consist of the following components as of December 31, 2006 and 2005:

|  | | 2006 | | 2005 |
|---|---|---|---|---|
| Deferred tax assets: | | | | |
| NOL Carryover | $ | 2,623,550 | $ | 2,397,601 |
| Depreciation | | 66,550 | | 130,787 |
| Deferred tax liabilities: | | | | |
| Valuation allowance | | (2,690,100) | | (2,528,388) |
| Net deferred tax asset | $ | - | $ | - |

The income tax provision differs from the amount of income tax determined by applying the U.S. federal income tax rate of 39% to pretax income from continuing operations for the years ended December 31, 2006 and 2005 due to the following:

|  | | 2006 | | 2005 |
|---|---|---|---|---|
| Book loss | $ | (233,280) | $ | (230,715) |
| Loss on the Sale of Assets | | (4,705) | | (29,375) |
| Depreciation | | 19,735 | | 39,610 |
| Meals and Entertainment | | 1,450 | | 1,823 |
| Stock for services/options expense | | 30,320 | | 180,160 |
| Other | | - | | 4,145 |
| Valuation Allowance | | 225,950 | | 34,352 |
| Net Income tax provision | $ | - | $ | - |

At December 31, 2006, the Company had net operating loss carryforwards of approximately $5,447,000 that may be offset against future taxable income from the year 2006 through 2024. No tax benefit has been reported in the December 31, 2006 financial statements since the potential tax benefit is offset by a valuation allowance of the same amount.

41

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

NOTE 10 - INCOME TAXES (continued)

Due to the change in ownership provisions of the Tax Reform Act of 1986, net operating loss carryforwards for Federal income tax reporting purposes are subject to annual limitations. Should a change in ownership occur, net operating loss carryforwards may be limited as to use in the future years.

NOTE 11 -    RECENT ACCOUNTING PRONOUNCEMENTS

In May 2005, the FASB issued FASB Statement No. 154, "Accounting Changes and Error Corrections." This new standard replaces APB Opinion No. 20, "Accounting Changes," and FASB Statement No. 3, "Reporting Accounting Changes in Interim Financial Statements," and represents another step in the FASB's goal to converge its standards with those issued by the IASB. Among other changes, Statement 154 requires that a voluntary change in accounting principle be applied retrospectively with all prior period financial statements presented on the new accounting principle, unless it is impracticable to do so. Statement 154 also provides that (1) a change in method of depreciating or amortizing a long-lived non-financial asset be accounted for as a change in estimate (prospectively) that was effected by a change in accounting principle, and (2) correction of errors in previously issued financial statements should be termed a "restatement." The new standard is effective for accounting changes and correction of errors made in fiscal years beginning after December 15, 2005. Early adoption of this standard is permitted for accounting changes and correction of errors made in fiscal years beginning after June 1, 2005. The adoption of SFAS 154 did not have an impact to the Company's overall results of operations or financial position.

In February of 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments," which is intended to simplify the accounting and improve the financial reporting of certain hybrid financial instruments (i.e., derivatives embedded in other financial instruments). The statement amends SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," and SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities—a replacement of FASB Statement No. 125." SFAS No. 155 is effective for all financial instruments issued or acquired after the beginning of an entity's first fiscal year that begins after September 15, 2006. The Company is currently evaluating the impact SFAS No. 155 will have on its consolidated financial statements, if any.

42

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

NOTE 11 -    RECENT ACCOUNTING PRONOUNCEMENTS (continued)

In March of 2006, the FASB issued SFAS No. 156, "Accounting for Servicing of Financial Assets, an amendment of FASB Statement No. 140" (SFAS 156). SFAS 156 amends SFAS 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities a replacement of FASB Statement No. 125," with respect to the accounting for separately recognized servicing assets and servicing liabilities. SFAS 156 requires an entity to recognize a servicing asset or servicing liability each time it undertakes an obligation to service a financial asset by entering into a servicing contract in any of the following situations: (a) a transfer of the servicer's financial assets that meets the requirements for sale accounting, (b) a transfer of the servicer's financial assets to a qualifying special-purpose entity in a guaranteed mortgage securitization in which the transferor retains all of the resulting securities and classifies them as either available-for-sale securities or trading securities, and (c) an acquisition or assumption of an obligation to service a financial asset that does not relate to financial assets of the servicer or its consolidated affiliates. SFAS 156 is effective for all servicing assets and liabilities as of the beginning of an entity's first fiscal year that begins after September 15, 2006. The effect of adoption of SFAS 156 is not anticipated to have a material impact on the Company's consolidated financial statements.

In July 2006, the FASB issued FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes (FIN 48) – an interpretation of FASB Statement No. 109, Accounting for Income Taxes (SFAS No. 109)" (FIN 48). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in accordance with SFAS No. 109 and prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a return. Guidance is also provided on de-recognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 is effective for fiscal years beginning after December 15, 2006. The effect of adoption of FIN 48 is not anticipated to have a material impact on the Company's consolidated financial statements.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measurements" (SFAS 157). SFAS 157 defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. Where applicable, SFAS 157 clarifies and codifies related guidance within other generally accepted accounting principles. SFAS 157 is effective for fiscal years beginning after November 15, 2007. The effect of adoption of SFAS 157 is not anticipated to have a material impact on the Company's consolidated financial statements.

43

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

NOTE 11 -    RECENT ACCOUNTING PRONOUNCEMENTS (continued)

In September 2006, the FASB issued SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans—an amendment of FASB Statements No. 87, 88, 106, and 132(R)" (SFAS 158). SFAS 158 requires an employer to recognize the overfunded or underfunded status of a defined benefit postretirement plan as an asset or liability in its statement of financial position and to recognize changes in that funded status in the year in which the changes occur through comprehensive income. SFAS 158 also eliminates the option in SFAS 87 to measure plan assets and obligations up to three months prior to the financial statement date. SFAS 158 is effective for fiscal years ending after December 15, 2006. The adoption of SFAS 158 did not have an impact to the Company's overall results of operations or financial position.

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities, Including an Amendment to SFAS No. 115" (SFAS 159). SFAS 159 permits entities to elect to measure many financial instruments and certain other items at fair value. Upon adoption of SFAS 159, an entity may elect the fair value option for eligible items that exist at the adoption date. Subsequent to the initial adoption, the election of the fair value option should only be made at initial recognition of the asset or liability or upon a remeasurement event that gives rise to new-basis accounting. The decision about whether to elect the fair value option is applied on an instrument-by-instrument basis, is irrevocable and is applied only to an entire instrument and not only to specified risks, cash flows or portions of that instrument. SFAS 159 does not affect any existing accounting standards that require certain assets and liabilities to be carried at fair value nor does it eliminate disclosure requirements included in other accounting standards. SFAS 159 is effective for fiscal years beginning after November 15, 2007. The Company is currently evaluating the impact of adopting SFAS 159 on its consolidated financial position and results of operations.

44

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

## NOTE 12 - ACCRUED LIABILITIES

Accrued Liabilities consisted of the following at December 31, 2006

| | | |
|---|---|---|
| Back rent owed to various landlords on sites now operated by Checker Flag Lightning, Inc. The Company is in various stages of negotiation to resolve this liability. | $ | 12 |
| Vacation pay accrual | | 5 |
| Accrued warrant expenses on sold simulators | | 2 |
| Accrued licensing fees | | 11 |
| Accrued property taxes | | 2 |
| Accrued purchases | | 6 |
| Accrued miscellaneous expenses | | 2 |
| Total Accrued Liabilities | $ | 43 |

## NOTE 13 - DEPOSITS ON SIMULATOR SALES

Deposits on simulator sales consist of the following on December 31, 2006

| Company | Number of Units | | Amount |
|---|---|---|---|
| Roltex Group* | 8 Simulators | $ | 552,692 |
| Tonne Management* | 4 Simulators | | 222,000 |
| Bookstore Management | 3 Simulators | | 140,000 |
| DGI, Inc. | 6 Reactors | | 84,000 |
| Daytona USA | Computers only (8) | | 20,401 |
| Total deposits on simulator sales | | $ | 1,019,093 |

\* The Company has not been in recent communication with the principles of Roltex Group and Tonne Management in regards to the completion of the related contracts.

## NOTE 14 – CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

In December of 2006, DGI, Inc., an Indiana corporation managed by and under majority ownership of William R. Donaldson, purchased 10 Reactor simulators for $370,000 from Perfect Line and subsequently leased the simulators to Sprint Nextel (6) and Toyota (4). Mr. Donaldson is the Chairman and Chief Executive Officer of the Company.

45

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
December 31, 2006 and 2005

## NOTE 15 – SUBSEQUENT EVENTS

On February 7, 2007, the Company and iRacing.com Motorsport Simulations signed a Letter of Intent to enter into a licensing relationship for Perfect Line's exclusive use of iRacing.com's Sim Technology (as defined) within Perfect Line's motion platforms employed within their racing centers and mobile marketing units.

Perfect Line has contracted with DGI, Inc. for an additional 14 Reactor simulators, 12 of which will be installed in three separate Sprint Nextel mobile marketing experiences (4 in each experience) and 2 which will be installed in a Toyota interactive show car experience.

## NOTE 16 – LIQUIDITY

Since inception, the Company has financed its operations through debt financing and proceeds generated from public offerings of its common stock. The proceeds from these transactions have been used primarily to fund research and development costs, and selling, general and administrative expenses.

The Company has incurred substantial net operating losses since inception and negative cash flows from operating activities through December 31, 2006 resulting in an accumulated deficit of $9.3 million. During fiscal year 2006, cash decreased from $353,180 to $216,323, largely due the continued development of the new Reactor and interest paid on debt.

The Company recorded a net loss of $598,154 in fiscal year 2006. As of December 31, 2006, the Company had $216,323 in cash to fund operations.

The Company is dependent on available cash and operating cash flow to finance operations and meet its other capital needs. If such sources are not sufficient, alternative funding sources may not be available. The Company believes that cash on hand plus the additional liquidity that it expects to generate from operations will be sufficient to cover its working capital needs and fund expected capital expenditures over at least the next twelve months.

46

**ITEM 8. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 8A. CONTROLS AND PROCEDURES**

(a) Disclosure Controls and Procedures.

The Principal Executive Officer ("PEO"), who is also the Principal Financial Officer ("PFO") of the Company, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the fiscal period covered by this Annual Report on Form 10-KSB. Based upon such evaluation, the PEO/PFO has concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in ensuring that information required to be disclosed in this filing is accumulated and communicated to management and is recorded, processed, summarized and reported in a timely manner and in accordance with Securities and Exchange Commission rules and regulations.

47

# PART III

## ITEM 9. DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS; COMPLIANCE WITH SECTION 16(a) OF THE EXCHANGE ACT

The Board of Directors and Executive Officers of the Company consist of the persons named in the table below. Vacancies on the Board of Directors may only be filled by the Board of Directors by majority vote at a Board of Director's meeting, or at a shareholders' meeting at which stockholders holding a majority of the issued and outstanding shares of capital stock are present. Each director shall be elected for the term of one year, and until his or her successor is elected and qualified, or until his or her earlier resignation or removal. The bylaws provide that we have at least one director. The directors and executive officers of the Company are as follows:

| Name | Age | Position |
|------|-----|----------|
| William R. Donaldson | 50 | Chairman, Chief Executive Officer and Secretary |
| Carl L. Smith, Sr. | 65 | Director |
| Cary Agajanian | 64 | Director |

Mr. Donaldson has been a major influence in the international racing industry for over 25 years. He served as the Executive Vice President of the Indianapolis Motor Speedway ("IMS"), the largest spectator stadium in the world, and concurrently served as President of IMS subsidiaries, IMS Properties and IMS Events. At IMS, he was on the executive management team that initiated such events as the NASCAR Brickyard 400, Indy FanFest, the Senior PGA Tournament held at Brickyard Crossing, the Indy 200 at Walt Disney World, and the launch of the Indy Racing League. Mr. Donaldson also managed the Inaugural NASCAR Winston Cup event at Las Vegas Motor Speedway, and he managed the launch of the Petit Le Mans at Road Atlanta, and the American and European Le Mans Series. He has extensive experience with domestic and international television broadcasting. He has a Bachelor of Arts degree from DePauw University in Greencastle, Indiana.

Mr. Smith is a successful entrepreneur, whose business interests and ownerships have over his professional life, spanned a wide variety of products and services. With over 38 years of experience in business development, marketing, sales and finance, he provides a diverse level of knowledge and expertise to the Company. He was the founder of Catalyst Marketing Corporation, a public company that, under his leadership, grew to become one of the most successful telecommunications marketing agencies for products and services of industry giant, MCI, which was later acquired by WorldCom. In 1991, he co-founded Tampa Bay' Financial, Inc., a former venture capital firm that specialized in micro-cap, first stage corporate investments and, one year later, was selected as a member of the prestigious "Who's Who of American Business Executives." Mr. Smith has successfully engineered the turn around and revitalization of several troubled public companies and has also been involved in capitalizing and taking many young private companies public through a reverse merger strategy.

Mr. Agajanian literally grew up in the sport of auto racing, with his family running racing teams and racetracks. He now owns Motorsports Management International, a multi-faceted company that is an industry leader in the areas of event representation, corporate consulting, and sponsorship negotiation. For the past 10 years, Mr. Agajanian has served on motorsports boards such as the Automobile Competition Committee of the United States (ACCUS), the American Motorcyclist Association (AMA, Vice-Chairman) and United States Auto Club (USAC) Properties. Mr. Agajanian's company has been involved in securing hundreds of sponsorship arrangements and is the only company in the United States to offer star race drivers premium representation services in corporate structures, pension benefits, trusts and estates and contract negotiation. NASCAR Nextel Cup star Tony Stewart has been represented by Motorsports Management International, and Mr. Agajanian also previously represented Jeff Gordon. Mr. Agajanian's car ownership division has entered cars in the Indianapolis 500 for 36 consecutive years and now owns one of the premier teams in the NASCAR Busch Series.

48

The Company has no standing or separate audit committee, but rather the entire Board of Directors functions as the audit committee. The Board of Directors has determined that due to the size of the board of directors, and the limited resources of the Company, it is in the Company's best interest to have the entire Board function as the audit committee.

Our Executive Officers are elected by the Board on an annual basis and serve at the discretion of the Board.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Securities Exchange Act of 1934 requires that our executive officers, directors and persons who beneficially own more than 10% of the Company's Common Stock to file initial reports of ownership and reports of changes in ownership with the SEC. Such persons are required by SEC regulations to furnish us with copies of all Section 16(a) forms filed by such persons.

Based solely on our review of such forms furnished to us and representations from certain reporting persons, filing requirements applicable to our executive officers, directors and more than 10% stockholders have been complied with during the twelve months ending December 31, 2006

**Code of Ethics**

The Company has adopted a Code of Ethics which is applicable to all officers, directors and employees of the Company. A copy of the Code of Ethics is available on the Company's website which is www.smsonline.com under the investor relations button. The Company will forward, without charge, a copy of the Code of Ethics to any person requesting a copy. Requests should be directed to Interactive Motorsports and Entertainment Corp. Attn: Code of Ethics at 5624 West 73rd Street, Indianapolis, Indiana, 46278.

49

## ITEM 10. EXECUTIVE COMPENSATION

The following table sets forth information concerning the compensation paid to all persons serving as the Company's chief executive officer and the Company's most highly compensated executive officers other than its chief executive officer who were serving as executive officers at December 31, 2006 and whose annual compensation exceeded $100,000 during such year (collectively, the "Named Executive Officers").

| | | Annual Compensation | | | Long-Term Compensation Awards | | | |
| Name and Principal Position | Year/ Period | Salary | Bonus | Other Annual Compensation (2) | Restricted Stock Awards | Securities Underlying Options/SARs | LTIP Payouts | All Other Compensation |
|---|---|---|---|---|---|---|---|---|
| William R. Donaldson, Chairman and CEO | 2006 | $150,000 | - | $7,513 | - | - | - | - |
| | 2005 | $150,000 | - | $7,055 | - | - | - | - |
| | 2004 | $150,000 | - | $6,659 | - | - | - | - |

(2)  Includes cost of medical and life insurance.

Because the Company has not granted stock options or other equity awards to employees to date, the equity awards table is not included in this document.

**Director Compensation**

Directors of the Company are currently not paid for their services; however, the Company is considering establishing a compensation plan utilizing stock awards versus cash payments in 2007.

Because the Company has not compensated directors to date, the equity awards table is not included in this document.

**Indemnification for Securities Act Liabilities**

Indiana law authorizes, and the Company's Bylaws and Indemnity Agreements provide for, indemnification of the Company's directors and officers against claims, liabilities, amounts paid in settlement and expenses in a variety of circumstances. Indemnification for liabilities arising under the Act may be permitted for directors, officers and controlling persons of the Company pursuant to the foregoing or otherwise. However, the Company has been advised that, in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable.

**Stock Options and Warrants**

The Company does not currently have a stock option plan.

**Compensation Committee Interlocks and Insider Participation**

No executive officers of the Company serve on the Compensation Committee (or in a like capacity) for the Company or any other entity.

50

## ITEM 11. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

**Security Ownership of Certain Beneficial Owners**

The following table sets forth certain information with respect to the beneficial ownership of our Common Stock as of March 21, 2007 for each person or entity that is known by us to beneficially own more than 5% of our Common Stock. As of March 21, 2007, the Company had 96,397,506 shares of Common Stock outstanding.

| Name and Address of Beneficial Owner | Amount of Beneficial Ownership | Nature of Ownership | Percent of Class |
|---|---|---|---|
| William R. Donaldson, Carmel, IN | 17,736,450 | Direct | 18.40% |
| Vikki Cook, Sarasota, FL | 10,104,422 | Direct | 10.48% |
| James Matheny, Cary, NC | 8,691,151 | Direct | 9.02% |
| Dolphin Direct Equity Partners, LP (a) | 7,141,500 | Direct | 7.41% |
| Alliance Investment Management, LTD, Nassau, Bahamas | 6,337,846 | Direct | 6.57% |
| Total | 50,011,369 | | 51.88% |

(a)  Dolphin Direct Equity Partners, LP ("Dolphin") is the beneficial owner of 5,161,500 and 1,980,000 warrants that expire December 31, 2009 and March 31, 2010, respectively, and are exercisable at any time prior to expiration. The calculation used to determine the Percent of Class attributable to Dolphin assumes all the warrants held by Dolphin are exercised. The totals include Dolphin's beneficial ownership of shares pursuant to the Warrants which are exercisable within 60 days.

**Security Ownership of Management**

The following table sets forth certain information with respect to the beneficial ownership of our Common Stock as of March 21, 2007 for each of our directors and each of our Named Executive Officers, and all directors and executive officers as a group. As of March 21, 2007, the Company had 96,397,506 shares of Common Stock outstanding.

| Name, Position and Address of Beneficial Owner | Amount of Beneficial Ownership (1) | Nature of Ownership | Percent of Class |
|---|---|---|---|
| William R. Donaldson, Chairman, Chief Executive Officer, and Secretary; Carmel, Indiana | 17,736,450 | Direct | 18.40% |
| Carl L. Smith, Director; Sarasota, Florida | - | n/a | - |
| Cary Agajanian, Director; Los Angeles, California | - | n/a | - |
| Total | 17,736,450 | | 18.40% |
| All Executive Officers & Directors as a Group (3 persons) | 17,736,450 | | 18.40% |

(1) Beneficial ownership is determined in accordance with SEC rules and generally includes holding voting and investment power with respect to the securities. Shares of Common Stock subject to options or warrants currently exercisable, or exercisable within 60 days, are deemed outstanding for computing the percentage of the total number of shares beneficially owned by the designated person, but are not deemed outstanding for computing the percentage for any other person.

**Change in Control**

We are not currently engaged in any activities or arrangements that we anticipate will result in a change in control of the Company.

51

**ITEM 12. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS**

On March 10, 2003, the Company issued to three related parties a total of $200,000 of Secured Bridge Notes as previously disclosed in that Form 8-K filed on March 13, 2003. These notes were issued to Tampa Bay Financial and Mr. William R. Donaldson in the amounts of $100,000 and $50,000, respectively. The Chairman and Chief Executive Officer of Tampa Bay Financial, Mr. Carl L. Smith, is also a director of the Company. Mr. Donaldson is the Chairman and Chief Executive Officer of the Company. On February 17, 2004, at the direction of Mr. Smith, the note was transferred to a third party controlled by a major Company shareholder.

In December of 2006, DGI, Inc., an Indiana corporation managed by and under majority ownership of William R. Donaldson, purchased 10 Reactor simulators for $370,000 from Perfect Line and subsequently leased the simulators to Sprint Nextel (6) and Toyota (4). Mr. Donaldson is the Chairman and Chief Executive Officer of the Company.

52

## ITEM 13. EXHIBITS AND REPORTS ON FORM 8-K

A.    Exhibits.

| | |
|---|---|
| 3(i) | Articles of Incorporation [1] |
| 3(ii) | ByLaws[1] |
| 10.1 | Form of Secured Bridge Notes [2] |
| 10.2 | Form of Procurement Contract [3] |
| 10.3 | Form of Master Revenue Sharing Agreement [3] |
| 10.4 | Asset Purchase Agreement with Race Car Simulation Corporation, a portfolio company of Dolphin Direct Equity Partners, LP [4] |
| 10.5 | Asset Purchase Agreement with Checker Flag Lightning, LLC, a Michigan limited liability company [5] |
| 11.1 | Computation of Earnings (Loss) Per Share |
| 14.1 | Code of Ethics |
| 21.1 | Subsidiaries |
| 31.1 | Certification of William R. Donaldson as Chief Executive Officer and Chief Financial Officer pursuant to Rule 13a-14 of the Security Exchange Act of 1934 |
| 32.1 | Certification of William R. Donaldson as Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of William R. Donaldson as Chief Financial Officer and Treasurer pursuant to 18 U.S.C. Section 1350 |

1) Incorporated by reference from Form 10-QSB filed on November 14, 2002
2) Incorporated by reference from Form 8-K filed on March 13, 2003
3) Incorporated by reference from Form 10-QSB filed on May 17, 2004
4) Incorporated by reference from Form 8-K filed on January 6, 2005
5) Incorporated by reference from Form 8-K filed on January 6, 2006

B.    Reports on Form 8-K.

| | | | |
|---|---|---|---|
| 1. | Form 8-K | Filed January 6, 2006 | Entered into an Asset Purchase Agreement pursuant to which it sold twenty-eight (28) of its race car simulators to Checker Flag Lightning, LLC, a Michigan limited liability company. |
| 2. | Form 8-K | Filed July 20, 2006 | Announcement of note, warrant, and security agreements with investors in a private placement. |
| 3. | Form 8-K | Filed August 21, 2006 | Company management made the decision to restate the Company's financials from the period beginning with Form 10-KSB for the year ended December 31, 2004 to the current date in order to account for the transactions with Race Car Simulator Corporation as a borrowing rather than an asset purchase in accordance with the guidance provided in paragraphs 21-22 of the Statement of Financial Accounting Standards No. 13 (SFAS 13). |

53

## ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

**Audit Fees**

Fees for audit services from HJ and Associates totaled $43,491 for the year ended December 31, 2005. Fees for audit services from HJ and Associates totaled $55,000 for the year ended December 31, 2006. Those auditing fees included fees associated with the annual audit, reviews of quarterly reports on Form 10-Q and procedures required by GAAP and GAAS.

**Audit-Related Fees**

Fees for audit-related services from HJ and Associates totaled $6,320 for the year ended December 31, 2005. There were no fees for audit-related services from HJ and Associates for the year ended December 31, 2006. These auditing services consisted of assistance related to SEC staff comment letter responses.

**Tax Fees**

Fees from HJ and Associates for tax services, including fees for review of the consolidated federal income tax return, totaled $62 for the year ended December 31, 2005. Fees from HJ and Associates for tax services, including fees for review of the consolidated federal income tax return, totaled $6,155 the year ended December 31, 2006.

**All Other Fees**

No fees were billed by HJ and Associates for the fiscal year ending December 31, 2005 and for the fiscal year ending December 31, 2006 other than those specified above.

54

PRE-APPROVAL POLICY FOR AUDIT AND NON-AUDIT SERVICES

The Company does not have a standing audit committee, and the full Board of Directors performs all functions of an audit committee, including the pre-approval of all audit and non-audit services before the Company engages an accountant. All of the services rendered to the Company by HJ & Associates, LLC after March 18, 2004 were pre-approved by the Board of Directors of the Company.

The Company contemplates working with its legal counsel to establish formal pre-approval policies and procedures for future engagements of the Company's accountants. The new policies and procedures will be detailed as to the particular service, will require that the Board or an audit committee thereof, if one is established, be informed of each service, and will prohibit the delegation of pre-approval responsibilities to management. It is currently anticipated that the Company's new policy will provide (i) for an annual pre-approval, by the Board or audit committee, of all audit, audit-related and non-audit services proposed to be rendered by the independent auditor for the fiscal year, as specifically described in the auditor's engagement letter, and (ii) that additional engagements of the auditor, which were not approved in the annual pre-approval process, and engagements that are anticipated to exceed previously approved thresholds, will be presented on a case-by-case basis, by the Chairman of the Board of Directors, for pre-approval by the Board or audit committee, before management engages the auditors for any such purposes. The new policy and procedures may authorize the Board or audit committee to delegate, to one or more of its members, the authority to pre-approve certain permitted services, provided that the estimated fee for any such service does not exceed a specified dollar amount (to be determined). All pre-approvals shall be contingent on a finding, by the Board, audit committee, or delegate, as the case may be, that the provision of the proposed services is compatible with the maintenance of the auditor's independence in the conduct of its auditing functions. In no event shall any non-audit related service be approved that would result in the independent auditor no longer being considered independent under the applicable rules and regulations of the Securities and Exchange Commission.

There were no fees in 2006 which were not pre-approved by the Board of Directors. All services described above under the captions "Audit Fees," "Audit Related Fees" and "Tax Fees" were approved by the Board of Directors pursuant to SEC Regulation S-X, Rule 2-01(c)(7)(i).

# SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

## INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP.

Date: March 28, 2007            By:     */s/ William R. Donaldson*
                                        ------------------------------------------
                                        William R. Donaldson
                                        Chairman of the Board and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

Date: March 28, 2007            By:     */s/ William R. Donaldson*
                                        ------------------------------------------
                                        William R. Donaldson
                                        Chairman of the Board and Chief Executive Officer
                                        (Principal Executive Officer)

Date: March 28, 2007            By:     */s/ William R. Donaldson*
                                        ------------------------------------------
                                        William R. Donaldson
                                        Chief Financial Officer and Treasurer
                                        (Principal Financial Officer)

Date: March 28, 2007            By:     */s/ Carl L. Smith*
                                        ------------------------------------------
                                        Carl L. Smith
                                        Director

Date: March 28, 2007            By:     */s/ Cary Agajanian*
                                        ------------------------------------------
                                        Cary Agajanian
                                        Director

56

## EXHIBIT INDEX

EXHIBITS:

Exhibits:

| | |
|---|---|
| 3(i) | Articles of Incorporation [1] |
| 3(ii) | ByLaws[1] |
| 10.1 | Form of Secured Bridge Notes [2] |
| 10.2 | Form of Procurement Contract [3] |
| 10.3 | Form of Master Revenue Sharing Agreement [3] |
| 10.4 | Asset Purchase Agreement with Race Car Simulation Corporation, a portfolio company of Dolphin Direct Equity Partners, LP [4] |
| 10.5 | Asset Purchase Agreement with Checker Flag Lightning, LLC, a Michigan limited liability company [5] |
| 11.1 | Computation of Earnings (Loss) Per Share |
| 14.1 | Code of Ethics |
| 21.1 | Subsidiaries |
| 31.1 | Certification of William R. Donaldson as Chief Executive Officer and Chief Financial Officer pursuant to Rule 13a-14 of the Security Exchange Act of 1934 |
| 32.1 | Certification of William R. Donaldson as Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of William R. Donaldson as Chief Financial Officer and Treasurer pursuant to 18 U.S.C. Section 1350 |

1) Incorporated by reference from Form 10-QSB filed on November 14, 2002
2) Incorporated by reference from Form 8-K filed on March 13, 2003
3) Incorporated by reference from Form 10-QSB filed on May 17, 2004
4) Incorporated by reference from Form 8-K filed on January 6, 2005
5) Incorporated by reference from Form 8-K filed on January 6, 2006

Exhibit B

RECYCLED

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of December 31, 2004, is entered into by and among Dolphin Direct Equity Partners, LP, a Delaware limited partnership ("Dolphin"), Race Car Simulation Corp., a New York corporation affiliated with Dolphin ("Buyer"), and Interactive Motorsports and Entertainment Corporation, an Indiana corporation ("IMTS"), Perfect Line, Inc., an Indiana corporation wholly owned by IMTS ("PL") and Race Car Simulators, Inc., an Indiana corporation wholly owned by IMTS ("RC" and together with IMTS and PL, "Sellers").

On the terms and subject to the conditions set forth in this agreement, Sellers desire to sell to Buyer and Buyer desires to purchase from Sellers, the assets identified on Schedule A hereto (the "Assets").

Therefore, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## Article I
### Purchase and Sale of the Assets

Subject to the terms set forth in this Agreement, Sellers hereby sell, convey, transfer, assign and deliver to Buyer and Buyer hereby purchases and acquires from Sellers, all of the Assets for the aggregate purchase price of $1,536,600 (the "Purchase Price"), payable on the date hereof as follows: (i) $600,000 by cancellation of that certain Secured Promissory Note, dated November 29, 2004, of IMTS in favor of Dolphin (the "Secured Note") and (ii) $936,600 in immediately available funds to PL.

## Article II
### Representations and Warranties of Sellers

The Sellers, jointly and severally, represent and warrant to each of Dolphin and Buyer that as of the date hereof:

Section 2.1    Corporate Organization.    Each Seller is a corporation duly organized and validly existing under the laws of the State of Indiana. Each Seller is qualified or licensed to conduct its business, including as relates to the Assets, and is in good standing where the nature of its activities, including as relate to the Assets, or the character of the properties, including the Assets, utilized in its business make such qualification or licensing necessary.

NY 911717_4.DOC i

Section 2.2    <u>Power and Authority; Authorization; Enforceability; No Conflicts;</u> <u>Etc.</u>

(a)    Each Seller has all requisite corporate power and authority to own its assets and to carry on its business as it is now being conducted.  Each Seller has all requisite corporate power and authority to execute and deliver this Agreement and each other agreement, certificate and document contemplated hereby (collectively, including without limitation this Agreement and the Warrant, the Management Agreement, the Conditional License Agreement and the Escrow Agreement, in each case as defined herein, the "Transaction Documents") to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

(b)    The execution, delivery and performance by each Seller of each Transaction Document to which it is a party and the consummation by such Seller of the transactions contemplated thereby has been duly authorized by all requisite action of such Seller.

(c)    Each Transaction Document to which a Seller is a party has been duly and validly executed and delivered by such Seller and constitutes the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its terms.

(d)    The execution and delivery by each Seller of each Transaction Document to which it is a party, the performance by such Seller of its obligations hereunder and thereunder and the consummation by such Seller of the transactions contemplated hereby and thereby do not and will not:

(i)    violate any provision of the Articles of Incorporation or the By-Laws of such Seller;

(ii)    result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, amendment, cancellation or acceleration) under, any of the terms, conditions or provisions of any written or oral material note, bond, mortgage, indenture, guarantee, lease, contract, agreement or other instrument (each, a "Contract") to which such Seller is a party or by which any of the Assets may be bound or otherwise subject or result in a lien, claim or other encumbrance (a "Lien") on any of the Assets; or

(iii)    contravene or violate any order, writ, judgment, injunction, decree, law, statute, rule or regulation (each, a "Law") applicable to such Seller or any of the Assets.

(e)    Except as may be required by the Securities Exchange Act of 1934, as amended (including the rules and regulations of the Securities and Exchange Commission promulgated thereunder, the "Exchange Act"), no prior or subsequent filing or registration with, notification to, or authorization, consent or approval of (each of the foregoing, a "Consent"), any individual or entity (a "Person"), including, without limitation, any foreign, provincial, United States federal, state, county, municipal or other local jurisdiction, political entity, body, organization, subdivision or branch, legislative or executive agency or department or other regulatory service, authority or agency (a "Governmental Entity") is required to be made or

2

obtained by any Seller in connection with (A) the execution, delivery and performance by such Seller of any of the Transaction Documents to which such Seller is a party or the consummation by such Seller of the transactions contemplated thereby, or (B) the ownership and operation of the Assets as contemplated hereunder following the Closing.

Section 2.3    Title to Simulators.    Each Seller has good, indefeasible and merchantable title to and ownership of the racecar simulators included in the Assets (the "Simulators") set forth opposite such Seller's name on Schedule A hereto, free and clear of all Liens, except those of Dolphin (which are being terminated concurrently herewith).

Section 2.4    Location of Simulators.    On the date hereof, each Simulator is located at the location set forth next to its serial number on Schedule A hereto.

Section 2.5    Proprietary Software.    Any and all software not owned by Sellers, including without limitation software incorporating marks licensed from NASCAR, NASCAR teams and/or NASCAR tracks (the "Third Party Software"), used in connection with any of the Simulators is replaceable by the software subject of the Conditional Software License Agreement attached hereto as Exhibit A (the "Conditional License Agreement"), which software has been deposited into escrow under the Software Escrow Agreement attached hereto as Exhibit B (the "Escrow Agreement"), without any material adverse effect on the value of any of the Simulators.

Section 2.6    Copies of Agreements.    The Sellers have provided to Buyer or Dolphin copies of each agreement relating to the present or proposed lease and/or operation of each Simulator, as described on Schedule A.

Section 2.7    Good Condition.    Each Simulator is revenue-producing and in operation and use in the ordinary course of the applicable Seller's business and is in good condition and repair and fully operational and is suitable for the purposes for which it is currently used or proposed to be used.  The Assets include all assets, properties and interests in properties used or usable in the current or proposed operation of the Assets, other than Sellers' rights under Third Party Software.

Section 2.8    Operator Certifications.    There exists no outstanding liability of any Seller under, nor is any Seller in default under or in breach of, any revenue sharing or lease arrangement ("Lease") relating to any Simulator.

Section 2.9    Financial Statements.    Any and all (i) historical financial information provided by any Seller to Buyer or Dolphin regarding any Seller or any of the Assets fairly presents in all material respects the financial condition, results of operations, and cash flows which they purport to present as of the dates thereof and for the periods indicated thereon and (ii) all financial projections provided by any Seller to Buyer or Dolphin regarding any Seller or any of the Assets have been prepared in good faith by Sellers' management and all material assumptions relating thereto are as disclosed therein.

Section 2.10    Events Subsequent to December 31, 2003.    Since December 31, 2003, each Seller has placed into operation, and maintained, the Assets in the ordinary course of business and no Asset (including, without limitation, each Lease) has suffered any material adverse change in its condition, operability or value.  Since that date:

3

(a)    No Seller, or any other party thereto, has accelerated, terminated, modified or canceled any agreement, contract, document, lease, or license (or series of related agreements, contracts, Leases, and licenses) to which any Seller is a party or by which it or any Assets is bound;

(b)    No Seller has experienced any material damage, destruction, or loss (whether or not covered by insurance) to any of the Assets;

(c)    Except as disclosed in reports already filed by IMTS under the Exchange Act, no Seller has incurred any debt, granted any Lien upon its assets, including the Assets, or increased the amount payable by it, under any credit or loan agreement to which it is a party, other than the $600,000 bridge financing to IMTS dated as of November 29, 2004, including the $600,000 Secured Promissory Note (the "Secured Note") delivered to Dolphin in connection therewith;

(d)    No Seller has sold, leased, transferred, or assigned any of the Assets other than (except with respect to the Assets) in the ordinary course of business; and

(e)    The Company has not committed to do any of the foregoing.

Section 2.11    Absence of Undisclosed Liabilities.    No Seller has any liabilities relating to or which may have any impact on the ownership or operation of the Assets as contemplated by this Agreement.

Section 2.12    Creditors; Bankruptcy, Etc.    No Seller is involved in any proceeding by or against it as a debtor in any court under Title 11 of the United States Bankruptcy Code or any other insolvency or debtors' relief act, whether state or Federal, or for the appointment of a trustee, receiver, liquidator, assignee, sequestrator or other similar official of any Seller.

Section 2.13    Legal Compliance.    Except in each case as would not be reasonably likely to result in a material adverse effect on any Seller or any Asset, each Seller (i) has complied with and is in compliance with all applicable Laws as apply to or may have any impact on the operation or ownership of the Assets, and (ii) and no legal proceeding of any kind is pending or threatened alleging any failure to so comply.    All material permits under which each Seller is operating or bound (a) constitute all the material permits used or required in the conduct of its business, including the Assets, as presently conducted, (b) are in full force and effect, and (c) are not subject to any pending or threatened legal proceeding of any kind seeking their revocation or limitation.

Section 2.14    Intellectual Property.

(a)    Schedule 2.14 sets forth all licenses and other written agreements relating to the Assets to which any Seller is a party or by which any Seller or Asset is bound. There are no outstanding nor threatened disputes or disagreements involving any Seller with respect to the licenses or other agreements set forth on Schedule 2.14.

4

(b)     No Seller is infringing, misappropriating or making any unlawful use of, and no Seller has at any time infringed, misappropriated or made any unlawful use of, or received any notice or other communication of any actual or alleged infringement, misappropriation or unlawful use of, any intellectual property owned or used by any other Person. No other Person is infringing, misappropriating or making any unlawful use of, and no intellectual property owned or used by any other infringes, any Asset.

(c)     The Assets include all the intellectual property other than Third Party Software and other than any NASCAR trademarks, including team and track trademarks ("NASCAR Marks") used for the operation of the Assets as it is currently conducted or contemplated. The Sellers are (i) the owners of all right, title, and interest in and to each of the intellectual property subject to the Conditional License Agreement or included in the Assets, free and clear of all Liens, and have the right to use all such intellectual property as currently used and as contemplated by the Transaction Documents, or (ii) with respect to Third Party Software and NASCAR Marks, possess all necessary licenses permitting such use.

(d)     Schedule 2.14 contains a complete and accurate list of all trademarks and service marks used and owned by any Seller in connection with any Asset. The Sellers are the owners of all right, title, and interest in and to each of such marks, free and clear of Liens, or possesses a license therefor. No such mark is being infringed, and no such mark has been challenged or threatened to be challenged with regard to its validity or any Seller's right to use the same. None of such marks infringes or has been alleged to infringe any trade name, trademark or service mark of any third party.

(e)     The Sellers have taken all reasonable precautions to protect the secrecy, confidentiality and value of the intellectual property comprising the Assets that constitutes trade secrets under applicable law. The Sellers have the right to use such trade secrets. Such trade secrets have not been used, divulged, or appropriated either for the benefit of any Person or to the detriment of any Seller. No such trade secret is subject to any adverse claim or has been challenged or threatened to be challenged as to its validity or the right of any Seller to use the same.

Section 2.15   Contracts. Each agreement, lease, license, contract or commitment disclosed on Schedule A is valid and enforceable against each Seller as contemplated thereby and the other parties thereto. Each Seller has performed all obligations required to be performed by it and is not in default under or in breach of or in receipt of any claim of default or breach under any such agreement, lease, license, contract or commitment disclosed on Schedule A; and no event has occurred which with the passage of time or the giving of notice or both would result in a default or breach under any such document. No other party to any agreement, lease, license, contract, or commitment disclosed on Schedule A is in default under or in breach of such document and no event has occurred which with the passage of time or giving of notice or both would result in a default or breach under any such document. The Sellers have supplied Buyer with true, correct and complete copies of each of the documents listed on Schedule A, together with all amendments, waivers or other changes thereto.

Section 2.16   Litigation. There are no legal or administrative proceedings of any kind pending or threatened against any Seller.

NY 911717_4.DOC i

Article III
Representations and Warranties of Dolphin and Buyer

Each of Dolphin and Buyer represents and warrants to Sellers that as the date hereof:

Section 3.1    Organization.   It is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

Section 3.2    Power and Authority; Authorization; Enforceability; No Conflicts; Etc.

(a)    It has all requisite power and authority to execute and deliver each Transaction Document to which it is a party and to perform its obligations thereunder and to consummate the transactions contemplated thereby.

(b)    The execution, delivery and performance by it of each Transaction Document to which it is a party and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all requisite action.

(c)    Each Transaction Document to which it is a party has been duly and validly executed and delivered by it and constitutes the legal, valid and binding obligations of it, enforceable against it in accordance with its respective terms.

(d)    The execution and delivery by it of each Transaction Document to which it is a party, the performance by it of its obligations thereunder and the consummation by it of the transactions contemplated thereby do not and will not:

(i)    violate any provision of its limited partnership agreement;

(ii)    result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, amendment, cancellation or acceleration) under any of the terms, conditions or provisions of any Contract to which it is a party or by which its properties or assets may be bound or otherwise subject; or

(iii)    contravene or violate any Law applicable to it.

(e)    No prior or subsequent filing or registration with, notification to, or authorization, consent or approval of, any Governmental Entity is required to be made or obtained by it in connection with the execution, delivery and performance of any Transaction Document to which it is a party or the consummation by it of the transactions contemplated thereby.

6

NY 911717_4.DOC i

Article IV
Additional Agreements

Section 4.1    No Assumption of Liabilities.    Except only as relates to the obligation to leave Simulators in place under Leases, neither Dolphin nor Buyer shall assume or be bound by or be obligated or responsible for any duties, responsibilities, commitments, expenses, obligations or liabilities of any Seller or relating to any Assets (or which may be asserted against or imposed upon Dolphin or Buyer as a successor or transferee of any Seller or as an acquirer of the Assets or otherwise as a matter of law) of any kind or nature (fixed or contingent, known or unknown, warranties, obligations or claims).    For the avoidance of doubt and without limiting the generality of the foregoing, neither Dolphin nor Buyer shall have any liabilities or obligations of any kind under Leases (except only as relates to the obligation to leave Simulators in place) and other agreements included in the Assets; Sellers hereby specifically agree to retain all such liabilities and obligations.

Section 4.2    Consent of Third Parties.    Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Assets if an attempted assignment thereof, without the consent of a third Person, would constitute a breach or other contravention thereof or in any way adversely affect the rights of Buyer thereunder.    Each Seller will use its reasonable best efforts to obtain the consent of any such Person for the assignment to Buyer of any such Assets.    If such consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of Sellers thereunder so that Buyer would not in fact receive all such rights, Sellers and Buyer will cooperate in a mutually agreeable arrangement under which Buyer would obtain all of the benefits thereunder from and after the date hereof in accordance with this Agreement.    Sellers will pay promptly to Buyer when received all monies received by them after the date hereof, to the extent earned or otherwise accrued from and after the date hereof, with respect to any of the Assets.

Section 4.3.    Allocation of Consideration.    Buyer and Sellers shall allocate the Purchase Price among the Simulators for all purposes in accordance with Schedule A (the "Allocation").    Buyer and Sellers shall each report the federal, state and local income and other tax consequences of the transactions contemplated by this Agreement in a manner consistent with the Allocation and cooperate in the preparation and filing of Form 8594 under Section 1060 of the Code (or any successor form or successor provision of any future tax law, or any comparable provisions of state, or local tax law), with their respective federal, state and local income tax returns for the taxable year that includes the date hereof.

Section 4.4    Taxes.    Buyer and Sellers shall (a) each provide the other with such assistance as may reasonably be requested by either of them in connection with the preparation of any tax return, any audit or other examination by any taxing governmental entity or any judicial or administrative proceeding with respect to taxes, (b) each retain and provide the other with any records or other information which may be relevant to such return, audit, examination or proceeding, and (c) each provide the other with any final determination of any such audit or examination, proceeding or determination that affects any amount required to be shown on any tax return of the other for any period (which shall be maintained confidentially).    For the avoidance of doubt, Buyer shall obtain the tax benefit of any and all depreciation of the

7

Assets accruing hereafter, notwithstanding that Sellers shall retain all liabilities relating to the Assets in accordance with Section 4.1.

Section 4.5.    Board Observer.  IMTS shall, until such time as Sellers exercise and fully satisfy their obligations under Section 4.11, allow Carlos Salas (or any other person designated by Buyer in lieu of Mr. Salas, the "Observer") to attend and fully participate at all regular and special meetings of its Board of Directors and all Committees thereof, whether in person or by telephone, and shall provide notice thereof, all materials relating thereto and reimbursement of all travel and other expenses incurred in connection therewith on the same terms as if the Observer were a member of the Board or applicable Committee; provided, however, that nothing herein shall (i) obligate the Observer to so attend or participate, (ii) be deemed to create any duty of the Observer to IMTS or (iii) result in any disclosure by IMTS relating to the Observer (in his capacity as such) in any public announcement or filing under the Exchange Act.

Section 4.6.    Finder's Fees.  Each party hereto represents and warrants to each other party hereto that, except for Northeast Securities, whose fee equals $84,000 in cash and warrants to purchase 150,000 shares of common stock of IMTS, par value $0.0001 per share (the "Common Stock"), and which shall be the sole responsibility of the Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transaction Documents or the transactions contemplated hereby or thereby based upon any agreements, written or oral, made by or on behalf of such party.

Section 4.7.    Software; Marks.  In the event and during such time, if any, as Sellers or any operators under the Leases are prohibited from or unable to utilize any Third Party Software utilized on the date hereof, on terms no less favorable to IMTS or to the operators under the Leases than the license terms in effect on the date hereof, for the operation of any or all of the Simulators, Sellers shall obtain, and put or cause to be put into place (in each case at their sole cost and expense, and without any payment of royalties by, or other obligations of any kind on the part of, Buyer with respect thereto) substitute software sufficient to operate each and every Simulator to the effect that there shall be no lapse greater than six business days in the utilization of, no difference in the end-user experience of (except for the absence of NASCAR Marks), nor any other adverse effect on the value of, such Simulator or any Lease or potential Lease thereof.  In the event that Sellers fail to timely comply with the provisions of this Section 4.7, the software that is subject of the Conditional Licensing Agreement shall be released to Buyer from escrow and Buyer may, at Sellers' sole cost and expense, and without any payment of royalties by, or other obligations of any kind on the part of, Buyer with respect thereto, put or cause to be put into place such software to operate each and every Simulator.

Section 4.8.    Dolphin Advisors.  The Sellers hereby agree that Dolphin may pay to Dolphin Advisors, LLC a closing fee of $40,000 and hereby offset such amount against the amount payable hereunder to any or all Sellers.

Section 4.9.    Maintenance of Policies.  Until the Closing, Sellers agree to maintain all existing insurance policies insofar as they cover the Assets.

NY 911717_4.DOC i

Section 4.10. <u>Warrant and Management Agreement</u>.    In addition to the Conditional Licensing Agreement, the parties are executing and delivering that certain Warrant (the "Warrant") and Management Agreement (the "Management Agreement"), in each case of even date herewith, the latter of which are attached hereto as Exhibits C and D, respectively.

Section 4.11. <u>Repurchase Option</u>. At any time prior to the seventh anniversary of the date of this Agreement, Sellers may, by notice (the "Purchase Notice") of its election to Dolphin and on the terms set forth below, acquire all of the equity interests in Buyer.  The aggregate purchase price payable by Sellers for such interests shall be an amount equal to (i) 20% of the Purchase Price, as Adjusted (as defined below), plus (ii) the Aggregate Investment Amount (as defined below), plus (iii) the excess of the current assets (including without limitation all revenue earned through the date of the consummation of such acquisition) of Buyer over its current liabilities (other than indebtedness to be cancelled as provided below), plus (iv) the aggregate amount of unsatisfied claims that Dolphin or Buyer may have against Sellers for any breach of any representation, warranty or covenant contained in any Transaction Document, including as contemplated in Section 5.1 hereof, as reasonably described by Dolphin in the Sale Notice (as defined below), and subject to subsequent adjustment and reimbursement to the extent that any such claims are determined by a court of competent jurisdiction or other mutually agreeable dispute resolution procedure, in each case not subject to further appeal, to be without merit.  Any indebtedness owing by Buyer to Dolphin or any of its affiliates shall be cancelled immediately prior to the consummation of the acquisition contemplated by this Section 4.11. Dolphin may, by notice (the "Sale Notice") to Sellers within 10 business days of receipt by Dolphin of the Purchase Notice, elect to receive such purchase price in cash, shares of freely tradable Common Stock valued at the Discounted Market Price (as defined below), or any combination thereof in its sole discretion as described in the Purchase Notice.

"Aggregate Investment Amount" means (X) the sum of (i) the Purchase Price, as Adjusted, (ii) the Deposit (as defined below), without duplication, regardless of whether Buyer has or has not exercised its option to purchase any or all of the Additional Assets, (iii) the aggregate amount of all contributions made pursuant to Section 2 of the Management Agreement, (iv) an annualized 13.5% return on the amounts described in clauses (i), (ii) and (iii) above, accruing on a daily basis and compounded monthly; provided, that for purposes of this calculation the cancellation of the Secured Note shall be deemed to have occurred, and thus $600,000 shall be deemed to have been paid to the Sellers, as of November 29, 2004 and (v) $3,000 per month, accruing on a daily basis <u>minus</u> (Y) 75% of the aggregate cash payments actually received by Buyer under the Leases, net of all operating, administrative and other expenses of Buyer.

"Discounted Market Price" means (i) if the Common Stock is listed or quoted on NYSE, NASDAQ, AMEX or any other national securities exchange, 80% of the Average Market Price and (ii) otherwise, 65% of the Average Market Price.

"Average Market Price" means the average of the Market Price for each of the 30 trading days immediately preceding delivery by Dolphin of a Sale Notice.

"Market Price" has the meaning given to such term in the Warrant, equitably adjusted for stock splits, stock dividends, recapitalizations and similar events.

9

"Adjusted" means adding an amount equal to (a) in the case of clause (i) of Section 4.11 of this Agreement, (x) 20% of the aggregate cash consideration paid (if any) by Buyer for the Additional Assets (as defined below) purchased by Buyer minus (y) the amount, if any, of the Deposit applied to the purchase of such Additional Assets and (b) in every other case, 100% of the aggregate cash consideration paid (if any) by Buyer for the Additional Assets.

Section 4.12.  Performance Guarantee.  Each of the Sellers hereby absolutely and unconditionally guarantees to Buyer, with respect to each Lease in effect on the date hereof and the Nextel 6 Lease (as defined below), that Buyer shall receive an amount at least equal to the minimum payments to Sellers provided for therein as in effect on the date hereof (or, in the case, of the Nextel 6 Lease, provided for in the Form of Simulation Lease Agreement attached hereto as Exhibit E (the "Form Simulation Lease"), without offset, reduction or other claim of any kind, no later than (x) the respective times provided for therein as in effect on the date hereof (or, in the case, of the Nextel 6 Lease provided for in the Form Simulation Lease) or (y) in the event such Lease has expired or otherwise terminated, on the same payment schedule as in effect under such Lease on the date hereof (or, in the case, of the Nextel 6 Lease as set forth in Form Simulation Lease), until no earlier than the later of (i) the end of the term provided for therein as in effect on the date hereof (or, in the case, of the Nextel 6 Lease provided for in the Form Simulation Lease) or (ii) the third anniversary of the date the Simulators relating to such Lease are purchased from the Sellers by Buyer.  The foregoing is a guarantee of payment and not of collection, and each Seller shall make payment to Buyer as provided in this Section from time to time within ten business days' notice from Buyer of its failure to receive any amount contemplated in the first sentence of this 4.12.

Section 4.13.  Payment in Kind.  Without limiting Buyer's or Dolphin's remedies under any Transaction Document, including Section 5.1 hereof, which shall be all remedies as may be available in law or equity, each of Buyer and Dolphin shall have the right to receive any and all amounts due to it as a result of any breach of any representation, warranty or covenant contained in any Transaction Document in cash or in shares of Common Stock with the same registration rights that are described in the Warrant, or in any combination thereof in its sole discretion.  To the extent that Buyer or Dolphin elects to receive such amounts in shares of Common Stock, such shares shall be valued at the Discounted Market Price (substituting the date of either (i) delivery of such election notice by Buyer or Dolphin or (ii) the trading day immediately preceding the date of issuance of such shares, for the date of delivery by Dolphin of a Sale Notice in the calculation set forth in the definition of Average Market Price, depending on which date would result in a lower calculation thereof and utilizing such date).

Section 4.14   Additional Closing.  At Buyer's sole and absolute discretion, exercisable for a period of 30 days immediately subsequent to its receipt from Sellers of an Additional Closing Notice (as defined below), Buyer may purchase any or all of the Simulators listed on Schedule 4.14 together with all Leases and other assets relating thereto, including without limitation the Leases listed on Schedule 4.14 (the "Additional Assets"), and identified in such Additional Closing Notice for the cash purchase price indicated on such Schedule for such Simulators.  On the date of this Agreement Buyer shall pay a $528,000 non-refundable deposit (the "Deposit") toward the cash purchase price of the Additional Assets in immediately available funds to PL.  The Deposit shall be applied toward the cash purchase price of any or all of the Additional Assets which Buyer elects to purchase and Buyer shall pay the balance, if any, of the

10

cash purchase price for such Additional Assets upon delivery by Sellers of such Additional Assets. Buyer acknowledges and agrees that it shall forfeit any portion of the Deposit that is not so applied towards the purchase of the Additional Assets. Upon the consummation of any such purchase, IMTS shall issue an additional warrant to Buyer, in the same form as the Warrant, exercisable for a number of shares of Common Stock equal to (i) the sum of the (x) the aggregate cash purchase price for the Additional Assets purchased minus (y) the amount, if any, of the Deposit applied to the purchase of such Additional Assets times (ii) 2.5. Sellers shall deliver an Additional Closing Notice with respect to each Simulator listed on Schedule 4.14 no later than 10 days prior the installation of such Simulator and, in any event, no later than May 31, 2005, and Sellers acknowledge that any failure to do so would result in a loss to Buyer subject to indemnification under Section 4 in an amount equal to Buyer's reasonable anticipated profits from the Additional Assets. To the extent that Buyer elects not to purchase any Additional Assets, and Sellers enter into more favorable Leases (by amendment or otherwise) with respect thereto prior to the stated termination of the Leases described in any Additional Closing Notice or Notices, Sellers shall promptly pay to Buyer an amount equal to the present value of any such favorable difference in economic terms.

"Additional Closing Notice" shall mean a notice, certified by the Chief Executive Officer of IMTS, (i) attaching true and correct copies of all Leases included in the Additional Assets identified in such notice, (ii) containing a representation and warranty to the effect that all representations and warranties contained herein with respect to the Sellers and the Assets are true and correct with respect to the Sellers and the Additional Assets identified in such notice as of the date of such notice (and will so be as of the date of the consummation of any purchase contemplated by such notice and this Section 4.14), except in each case as disclosed therein, (iii) containing a representation and warranty to the effect that the Simulator or Simulators identified in such notice are newly constructed and have not been previously put into service and (iv) containing an agreement to deem such notice a Transaction Document, deem all Additional Assets identified in such notice that Buyer elects to purchase as "Assets" for all purposes under Articles 4, 5 and 6 hereof, and in all other respects deem this Agreement to apply to the purchase of such Additional Assets *mutatis mutandis*.

Section 4.15   Nextel 6 Lease.  PL shall, and Sellers shall cause National Tour, Inc., a California corporation, or another third party reasonably satisfactory to Buyer to, execute and deliver to Buyer a Lease (the "Nextel 6 Lease") either (x) in substantially the same form as the Form Simulation Lease or (y) in form and substance reasonably satisfactory to Buyer no later than January 15, 2005.

Article V
Additional Agreements

Section 5.1   Indemnification.

(a)     The Sellers shall jointly and severally indemnify, defend and hold harmless Dolphin, Buyer and their respective officers, directors, employees, and agents (collectively, the "Buying Indemnitees" and individually each a "Buying Indemnitee") from and against, and shall reimburse each of the Buying Indemnitees for, any adverse consequences which are suffered or incurred by any of the Buying Indemnitees (regardless of whether or not

11

such adverse consequences relate to any third party claim) and which are the direct and proximate result of:

        (i)     any breach of any representation or warranty made by any Seller in this Agreement or other Transaction Agreement; and

        (ii)    any breach of any covenant or obligation of any Seller in this Agreement or other Transaction Agreement.

        (b)    Buyer shall indemnify, defend and hold harmless each Seller and each of their respective officers, directors, employees, and agents (collectively, the "Selling Indemnitees" and individually each an "Selling Indemnitee") from and against, and shall reimburse each of the Selling Indemnitees for, any adverse consequences which are suffered or incurred by any of the Selling Indemnitees (regardless of whether or not such adverse consequences relate to any third party claim) and which are the direct and proximate result of:

        (i)    any breach of any representation or warranty made by Buyer in this Agreement or other Transaction Agreement; and

        (ii)    any breach of any covenant or obligation of Buyer in this Agreement or other Transaction Agreement.

Section 5.2    Indemnification Procedures.

        (a)    As used herein, "Indemnified Party" shall mean (i) each Selling Indemnitee when being indemnified by Buyer pursuant to Section 5.1(b), and (ii) each Buying Indemnitee when being indemnified by Sellers pursuant to Section 5.1(a); and "Indemnifying Party" shall mean (x) Sellers when indemnifying any Buying Indemnitee pursuant to Section 8.1(a), and (y) Buyer when indemnifying any Selling Indemnitee pursuant to Section 8.1(b).

        (b)    The obligations of an Indemnifying Party under this Article V with respect to adverse consequences arising from claims or demands of any third party which are subject to the indemnification provided for under Section 5.1 ("Third Party Claims") shall be governed by and contingent upon the following terms and conditions: if an Indemnified Party shall receive written or other definitive notice of any Third Party Claim, the Indemnified Party shall notify each Indemnifying Party promptly of such Third Party Claim, stating the amount of the adverse consequences, if known, and method of computation thereof, a brief description of the facts upon which such Third Party Claim is based and containing a reference to the provisions of this Agreement in respect of which the Indemnified Party's right of indemnification is claimed or arises; provided, however, that the delay or failure to provide such notice shall not release the Indemnifying Party from any of its obligations under this Article V unless (and then solely to the extent) the Indemnifying Party is prejudiced by the delay or failure. Any Indemnifying Party will have the right to assume sole control over the defense and settlement of the Third Party Claim with counsel selected by the Indemnified Party, which may, at its own expense, participate in the defense of such claim. Notwithstanding the foregoing, if, within ten (10) days after its receipt of the aforesaid notice from the Indemnified Party, the Indemnifying Party does not assume the defense of such matter, the Indemnified Party may defend against the matter in any manner that it reasonably may deem appropriate and the

Indemnifying Party will reimburse the Indemnified Party promptly and periodically for the costs of defending against such claim (including reasonable attorneys' fees and expenses). In the event the Indemnifying Party assumes the defense of any Third Party Claim as provided above, the Indemnified Party shall cooperate with the Indemnifying Party in such defense and make available to the Indemnifying Party on a timely basis, at the Indemnifying Party's expense, all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto as is reasonably requested by the Indemnifying Party. Similarly, in the event the Indemnifying Party does not assume the defense of such Third Party Claim and the Indemnified Party is defending against such matter as provided above, the Indemnifying Party shall cooperate with the Indemnified Party in such defense and make available to the Indemnified Party on a timely basis, at the Indemnifying Party's expense, all such witnesses, records, materials and information in the Indemnifying Party's possession or under the Indemnifying Party's control relating thereto as is reasonably requested by the Indemnified Party.

(c)    An Indemnified Party shall give each Indemnifying Party notice of any matter (other than a Third Party Claim) which an Indemnified Party has determined has given rise to a right of indemnification under Section 5.1, stating the amount of the adverse consequences, if known, and method of computation thereof, a brief description of the facts upon which such claim is based and containing a reference to the provisions of this Agreement or other Transaction Agreement in respect of which such right of indemnification is claimed or arises; provided, however, that the delay or failure to provide such notice shall not release the Indemnifying Party from any of its obligations under this Article V unless the Indemnifying Party is prejudiced by the delay or failure.

Section 5.3    <u>Non-Competition; Non-Solicitation.</u>

(a)    For so long as and at all times until IMTS shall have exercised in full its repurchase option as contemplated by Section 4.11 hereof, Sellers shall not and shall cause their respective affiliates not to, without the prior written consent of Buyer, directly or indirectly, own, manage, control, participate in, consult with, render services for, or in any manner engage in or represent any business involving, directly or indirectly, racecar simulators; provided that actions or inactions prohibited by the foregoing shall not constitute a violation of this Section 5.3(a) so long as such actions or inactions do not favor or result in more favorable treatment to the operation and maintenance of other racecar simulators and related assets over the operation and maintenance of the Assets.

(b)    To the extent that any court concludes that any provision of this Section 5.3 is void or voidable, the court shall reform such provision(s) to render the provision(s) enforceable, but only to the extent necessary to render the provision(s) enforceable and only in view of the parties' express desire that Buyer be protected to the greatest extent possible under applicable law from improper competition and/or the misuse or disclosure of trade secrets and/or confidential information in light of the initiation of Buyer to purchase the business comprising the Assets.

Article VI
Miscellaneous

Section 6.1    Publicity.  No party hereto will issue any press release or make any other public announcement relating to the transactions contemplated hereby without the prior written consent of the other parties hereto, except that any party hereto may make any disclosure required to be made by it under applicable law or stock exchange or national automated quotation system rules if it determines in good faith that it is necessary to do so, provides a copy to the other parties hereto of the proposed press release or public announcement, giving such other parties an opportunity to review and comment thereon prior to the release thereof, and makes such changes thereto as such parties shall reasonably request to the extent that such proposed press release or public announcement mentions such parties.

Section 6.2    Fees and Expenses.  Except as contemplated by Section 4.8, each party hereto shall pay the direct and indirect expenses (including, without limitation, the fees and expenses of their legal, tax and accounting counsel and advisors) incurred by it in connection with the negotiation and preparation of the Transaction Documents and the consummation of the transactions contemplated thereby.

Section 6.3    Notices.  All notices, consents, demands, instructions, requests and other communications required or permitted hereunder must be in writing and shall be deemed to have been duly given only if delivered personally, by facsimile transmission, by first-class mail (postage prepaid, return receipt requested), or by delivery by a recognized overnight courier service (all costs prepaid) to the parties at the following addresses or facsimile numbers:

If to any Seller, to:

Interactive Motorsports and Entertainment Corporation
5624 West 73rd Street
Indianapolis, Indiana  46278
Attention:  Chief Executive Officer
Telecopier No.:  (317) 298-8924

and a copy to:

Bose McKinney & Evans LLP
2700 First Indiana Plaza
135 N. Pennsylvania Street
Indianapolis, IN  46204
Attention:  Jeffrey B. Bailey
Telecopier. No.:  (317) 223-0311

14

If to Dolphin or Buyer, to:

Dolphin Advisors, LLC
c/o Dolphin Asset Management Corp.
129 East 17th Street
New York, NY 10003
Attention: Carlos Salas
Telecopier No.: (212) 202-3817

and a copy to:

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
Attention: Gary J. Simon
Telecopier No.: (212) 299-6770

All such notices, requests and other communications will be deemed delivered upon receipt thereof. Any party may from time to time change its address, facsimile number or other information for purposes of notices to that party by giving like notice specifying such change to the other parties hereto.

Section 6.4. <u>Survival</u>. All of the representations, warranties, covenants and agreements of the parties contained in any Transaction Document shall survive (and not be affected in any respect by) the purchase and sale hereunder or any investigation conducted by any party hereto and any information which any party may receive.

Section 6.5. <u>Bulk Transfer</u>. The parties hereto hereby waive compliance with the provisions of any applicable bulk sales Law of any jurisdiction in connection with the transactions contemplated hereby and no representation, warranty or covenant contained in this Agreement shall be deemed to have been breached as a result of such non-compliance.

Section 6.6 <u>Further Assurances</u>. The parties hereto will, without further consideration, execute and deliver such further documents and instruments and take such other actions as may be necessary or desirable to perfect the transactions contemplated hereby.

Section 6.7 <u>No Waiver</u>. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

Section 6.8 <u>Entire Agreement</u>. The Transaction Documents supersede all prior and/or contemporaneous negotiations, understandings, discussions and agreements (written or oral) between the parties with respect to the subject matter hereof (all of which are merged herein and therein) and contain the sole and entire agreement among the parties hereto with respect to the subject matter hereof.

15

Section 6.9    Governing Law.  This Agreement shall be construed, interpreted and enforced in accordance with, and shall be governed by, the laws of the state of New York applicable to contracts made and to be performed wholly therein.

Section 6.10    Jurisdiction.    Each of the parties hereto hereby irrevocably consents and submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York in connection with any dispute arising out of or relating to this agreement or the transactions contemplated hereby, waives any objection to venue in such District (unless such court lacks jurisdiction with respect to such dispute, in which case, each of the parties hereto irrevocably consents to the jurisdiction of the courts of the State of New York located in New York County in connection with such dispute and waives any objection to venue in the County of New York), and agrees that service of any summons, complaint, notice or other process relating to such dispute may be effected in the manner provided by Section 5.3.

Section 6.11    Waiver of Jury Trial.  EACH PARTY HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING RELATING TO ANY AND ALL TRANSACTION DOCUMENTS AND ANY AND ALL TRANSACTION CONTEMPLATED THEREBY.

Section 6.12    Assignment.    Neither IMTS, PL nor RC may assign any Transaction Document or any of its rights, interests or obligations thereunder without the prior written consent of Dolphin.  So long as (i) no Seller is in violation of any Transaction Document and (ii) Buyer is timely receiving all minimum payments under the Leases, neither Buyer nor Dolphin may assign any Transaction Document or any of its rights, interests or obligations thereunder to any person other than an affiliate of Dolphin without the prior written consent of Sellers.

Section 6.13    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

Section 6.14    No Third Party Beneficiaries.    Nothing contained in this Agreement, whether express or implied, is intended, or shall be deemed, to create or confer any right, interest or remedy for the benefit of any Person not a party hereto.

Section 6.15    Amendment and Waiver.  Any term of this Agreement may be amended only by the written consent of all parties hereto.  The observance of any term of this Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively, and either for a specified period of time or indefinitely), only by a writing signed by the party for whose benefit such term is to be performed.  Any agreement on the part of a party to any extension or waiver shall only be valid if set forth in an instrument in writing signed on behalf of such party.  Any such waiver or extension shall not operate as waiver or extension of any other subsequent condition or obligation.

Section 6.16    Severability.  If any provision of this Agreement is found to be void or unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement shall nevertheless be binding upon the parties with the same force and effect as though the unenforceable part had been severed and deleted.

NY 911717_4.DOC i

Section 6.17    <u>Conventions</u>.

(a) .    Whenever the context so requires, each pronoun or verb used herein will be construed in the singular or the plural sense and each capitalized term defined herein and each pronoun used herein will be construed in the masculine, feminine or neuter sense. The terms "herein," "hereto," "hereof," "hereby," and "hereunder," and other terms of similar import, refer to this agreement as a whole, and not to any section or other part hereof.

(b)    The term "include" and its forms shall be construed as if followed by the phrase "without limitation."

Section 6.18    <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original.

[The next page is the signature page]

NY 911717_4.DOC i

The parties have executed this Asset Purchase Agreement as of the date first written above.

INTERACTIVE MOTORSPORTS AND
ENTERTAINMENT CORPORATION

By: _____
    Name: WILLIAM R. DONALDSON
    Title: CEO

PERFECT LINE, INC.

By: _____
    Name: WILLIAM R. DONALDSON
    Title: CEO

RACE CAR SIMULATORS, INC.

By: _____
    Name: WILLIAM R. DONALDSON
    Title: CEO

DOLPHIN DIRECT EQUITY PARTNERS, LP
By: Dolphin Advisors, LLC, its managing
general partner

By: _____
    Name:
    Title:

RACE CAR SIMULATION CORP.

By: _____
    Name:
    Title:

Acknowledged:

DOLPHIN ADVISORS, LLC

By: _____
    Name:
    Title:

The parties have executed this Asset Purchase Agreement as of the date first written above.

INTERACTIVE MOTORSPORTS AND
ENTERTAINMENT CORPORATION

By: _____
    Name:
    Title:

PERFECT LINE, INC.

By: _____
    Name:
    Title:

RACE CAR SIMULATORS, INC.

By: _____
    Name:
    Title:

DOLPHIN DIRECT EQUITY PARTNERS, LP
By: Dolphin Advisors, LLC, its managing
general partner

By: _____
    Name: Peter E. Salas
    Title: President, Dolphin Management Inc.,
       Managing Member

RACE CAR SIMULATION CORP.

By: _____
    Name: Peter E. Salas
    Title: President

Acknowledged:

DOLPHIN ADVISORS, LLC

By: _____
    Name: Peter E. Salas
    Title: President, Dolphin Management Inc.,
       Managing Member

NY 911717_3.DOC i

Schedule A

       The "Assets" consist of all right, title and interest in and to the following: (i) the Racecar Simulators, the Serial Numbers of which are listed below together with all after-acquired replacement equipment, all accessions and additions to any of the foregoing and all tools, parts, accessories and attachments used in connection with any of the foregoing, whether purchased new or in substitution or trade in; (ii) all inventory, goods, accounts, general intangibles, leases (including all amendments, extensions and renewals thereof), supporting obligations, payment intangibles, indemnities, instruments, documents, chattel paper and contract rights arising from or relating to the Racecar Simulators, including, without limitation, the Leases (including all amendments, extensions and renewals thereof) between each of the respective parties thereto and Perfect Line, Inc., with respect to each of the Racecar Simulators as specified below and all advance payments with respect to all periods from and after the date hereof, security deposits and deposits held by Sellers relating to the Racecar Simulators subject to the terms and conditions with respect thereto; and (iii) all insurance proceeds relating to any of the foregoing.

## LOCATION AND SERIAL NUMBERS OF SIMULATORS

| Location | Serial Number | Name of Seller | Purchase Price |
|---|---|---|---|
| | *NEXTEL 2* | | |
| National Tour, Inc. | 990881 | Perfect Line, Inc. | $64,000 |
| 7275 West Winds Blvd. | 990883 | Perfect Line, Inc. | $64,000 |
| Concord, NC 28027 | | | |
| | | | |
| | *NEXTEL 6* | | |
| | 9912130-4 | Perfect Line, Inc. | $64,000 |
| | 9912129-3 | Perfect Line, Inc. | $64,000 |
| | 9912128-2 | Perfect Line, Inc. | $64,000 |
| | 9912135-8 | Perfect Line, Inc. | $64,000 |
| | 9912132-6 | Perfect Line, Inc. | $64,000 |
| | 9912127-1 | Perfect Line, Inc. | $64,000 |
| | | | |
| Burroughs & Chapin | 9911123 | Perfect Line, Inc. | $32,100 |
| NASCAR SpeedPark, | 9911126 | Perfect Line, Inc. | $32,100 |
| Tennessee | 9911121 | Perfect Line, Inc. | $32,100 |
| 1545 Parkway | 9911122 | Perfect Line, Inc. | $32,100 |
| Sevierville, TN 37862 | 9911120 | Perfect Line, Inc. | $32,100 |
| | 9911125 | Perfect Line, Inc. | $32,100 |
| | | | |
| Burroughs & Chapin | 990577 | Perfect Line, Inc. | $40,000 |
| NASCAR SpeedPark, St. | 990579 | Perfect Line, Inc. | $40,000 |
| Louis | 990580 | Perfect Line, Inc. | $40,000 |
| 5555 St. Louis Mills Blvd | 990581 | Perfect Line, Inc. | $40,000 |
| Hazelwood, MO 63042 | 990582 | Perfect Line, Inc. | $40,000 |

NY 911717_4.DOC i

| | 990583 | Perfect Line, Inc. | $40,000 |
|---|---|---|---|
| Burroughs & Chapin | 0007172 | Perfect Line, Inc. | $32,000 |
| NASCAR SpeedPark, | 0007167 | Perfect Line, Inc. | $32,000 |
| Ontario | 0007171 | Perfect Line, Inc. | $32,000 |
| Highway 400 & Rutherford | 0007165 | Perfect Line, Inc. | $32,000 |
| Rd. | 0007177 | Perfect Line, Inc. | $32,000 |
| Vaughan, Ontario LK42M9 | 0007161 | Perfect Line, Inc. | $32,000 |
| RLB Development, LLC | 9800727 | Perfect Line, Inc. | $50,000 |
| Burdick Driver's Village | 9911118 | Perfect Line, Inc. | $50,000 |
| 5885 East Circle Drive | 990892 | Perfect Line, Inc. | $50,000 |
| Cicero, NY 13039 | 990895 | Perfect Line, Inc. | $50,000 |
| | 990896 | Perfect Line, Inc. | $50,000 |
| | 9912133-7 | Perfect Line, Inc. | $50,000 |
| | 9912131-5 | Perfect Line, Inc. | $50,000 |
| | 990887 | Perfect Line, Inc. | $50,000 |

| Description |
| --- |
| Racecar systems including cars, motion bases, projectors, screens, sound, safety systems, and environs (cages that enclose the car area and support the projectors). |
| Rear view mirror computers (one per car) |
| Car computers that control sound within the car and violations (one per car) |
| Computers to control the center screen images (one per car) |
| Computers to control the left screen images (one per car) |
| Computers to control the right screen images (one per car) |
| Computers to control the vehicle dynamics (one per car) |
| Hydraulic pumps to provide the car motion |
| Track Official computer to start & stop races |
| SMS Computer that controls the Live video |
| AV Computer that controls the audio and the training video |
| Drone Computer that controls the drone cars on the track |
| DFB Computer that controls car collisions |
| Amplifier that controls the speakers |
| Server computer to manage database functions and software management |
| Belkin Switch that connects monitors to PC's |
| Amplifiers for the training video and spectator speakers |
| Router |
| Keyboards, monitors and mice for the Track Official/Race Registration area |
| Deadstop box that allows the Track Official to stop vehicle motion in case of an emergency |
| Printer for producing race results |
| Network Hub |
| TV for viewing SMS Live (races) |
| TV for viewing the training film |

## LEASES AND REVENUE SHARING AGREEMENTS

1.    Master Revenue Sharing Agreement, dated as of April 20, 2004, as amended on December 29, 2004, with RLB Development, LLC, relating to Simulators nos. 9800727, 9911118, 990892, 990895, 990896, 9912133-7, 9912131-5 and 990887.

2.    Master Revenue Sharing Agreement, dated as of December 6, 2004, with Speed Parks of Pigeon Forge, LLC, relating to Simulators nos. 9911123, 9911126, 9911121, 9911122, 9911120 and 9911125.

3.    Master Revenue Sharing Agreement, dated as of December 6, 2004, with Speed Parks of Ontario, Inc., relating to Simulators nos. 0007172, 0007167, 0007171, 0007165, 0007177 and 0007161.

4.    Master Revenue Sharing Agreement, dated as of December 6, 2004, with Speed Parks of St. Louis, LLC, relating to Simulators nos. 9905577, 990579, 990580, 990581, 990582 and 990583.

5.    Simulator Lease Agreement, dated as of January 1, 2004, with National Tour, Inc., relating to Simulators nos. 9912130-4, 9912129-3, 9912128-2, 9912135-8, 9912132-6 and 9912127-1.

6.    Simulator Lease Agreement, dated as of January 1, 2005, with National Tour, Inc. relating to simulators nos. 990881 and 990883.

Schedule 2.14

1. License Agreement by and among National Association for Stock Car Racing, Inc. and Perfect Line, Inc. for trademark NASCAR Silicon Motor Speedway.
2. License Agreement by and among International Speedway Corporation and Perfect Line, Inc. for trademarks and images of Daytona International Speedway and Richmond International Speedway.
3. License Agreement by and among Speedway Motorsports Incorporated and Perfect Line, Inc. for trademarks and images of Lowes Motor Speedway, Atlanta Motor Speedway and Bristol Motor Speedway.
4. License Agreement by and among Indianapolis Motor Speedway and Perfect Line, Inc. for trademarks and images of Indianapolis Motor Speedway.
5. License Agreement by and among Roush Racing and Perfect Line, Inc. for Car # 6, Car #17 and Car #97.
6. License Agreement by and among Redline Sports Marketing (Gibbs Racing) and Perfect Line, Inc. for Car #20 and Car #18.
7. License Agreement by and among Hendrick Motorsports and Perfect Line, Inc. for Car # 5.
8. License Agreement by and among Penske Racing and Perfect Line, Inc. for Car #12.
9. License Agreement by and among Master Foods USA and Perfect Line, Inc. for Car #38.
10. License Agreement by and among MB2 Motorsports and Perfect Line, Inc. for Car # 01.
11. License Agreement by and among MBV Motorsports and Perfect Line, Inc. for Car #10.

Schedule 4.14

## ADDITIONAL SIMULATORS[1]

| Location | Serial Number | Name of Seller | Purchase Price |
|---|---|---|---|
| | *NEXTEL 4* | | |
| National Tour, Inc. | 0412210 | Perfect Line, Inc. | $180,000 |
| 7275 West Winds Blvd. | 0412211 | Perfect Line, Inc. | $180,000 |
| Concord, NC 28027 | 0501212 | Perfect Line, Inc. | $180,000 |
| | 0501213 | Perfect Line, Inc. | $180,000 |
| | | | |
| Burroughs & Chapin | TBD | Perfect Line, Inc. | $100,000 |
| NASCAR SpeedPark, | TBD | Perfect Line, Inc. | $100,000 |
| Myrtle | TBD | Perfect Line, Inc. | $100,000 |
| Beach | TBD | Perfect Line, Inc. | $100,000 |
| 1820 21st Ave. N. Ext. | TBD | Perfect Line, Inc. | $100,000 |
| MyrtleBeach, SC 29578 | TBD | Perfect Line, Inc. | $100,000 |

## LEASES AND REVENUE SHARING AGREEMENTS

1.    Master Revenue Sharing Agreement, dated as of December 6, 2004, with Speed Parks of Myrtle Beach, LLC.

2.    Simulator Lease Agreement, dated as of January 1, 2005, with National Tour, Inc. relating to simulators nos. 0412210, 0412211, 0501212 and 0501213.

---

1.    Each of the additional simulators shall be substantially the same as the simulators purchased by Buyer from Sellers on the date of this Agreement.

## CONDITIONAL SOFTWARE LICENSE AGREEMENT

Race Car Simulation Corp., a New York corporation ("RCS") and Perfect Line, Inc., an Indiana corporation ("Perfect Line"), hereby agree to the following.

### WITNESSETH:

WHEREAS, RSC and Perfect Line have entered into that certain Asset Purchase Agreement and that certain Management Agreement, both dated December 31, 2004; and,

WHEREAS, Perfect Line has sold and conveyed thirty four (34) race car simulators to RSC, and may sell and convey up to an additional ten (10) under the terms of the Asset Purchase Agreement; and,

WHEREAS, Perfect Line and RSC have entered into a Management Agreement which generally provides for Perfect Line to operate, manage, maintain and generally service the race car simulators purchased by RSC under the terms of the Asset Purchase Agreement (the "Simulators"); and,

WHEREAS, Perfect Line has granted a license to certain software to RSC, which software contains certain proprietary trademarks which Perfect Line has licensed and has the right to utilize, but does own; and,

WHEREAS, Perfect Line owns "generic" software which can be utilized to operate the simulators but does not contain the above reference proprietary trademarks and tradenames; and,

WHEREAS, the parties wish to assure that the Simulators may be operated in the manner presently intended, without infringing on any trademarks in the event that Perfect Line should suffer any of the Conditions of Release specified in Article 5 of the Software Escrow Agreement between the parties of even date herewith.

NOW, THEREFORE, in consideration of the foregoing, and the mutual covenants herein contained and each act performed hereunder by the parties, RSC and Perfect Line hereby agree to the following:

(a)  Perfect Line hereby grants to RSC, and its successors and assigns, a worldwide, royalty free, non-exclusive license to use Perfect Line's proprietary software (including the generic track and team version of the software and any modifications, enhancements or releases thereto) that is loaded into the simulators listed as the Assets in Schedule A of the Asset Purchase Agreement, and any amendments to that Schedule A or any additional Simulators which RCS may purchase from Perfect Line (collectively, the "**Operation Software**") only in event Perfect Line fails to timely comply with the provisions of Section 4.7 of the Asset Purchase Agreement and RSC elects to put or cause to be put into place the Software to operate any or all of the Simulators specified on Schedule A of the Asset Purchase Agreement or any

additional Simulators which RCS may purchase from Perfect Line. The Operation Software may only be used by RSC in conjunction with the Assets listed on Schedule A or on any additional Simulators which RCS may purchase from Perfect Line and on which the Operation Software has been loaded. RSC may not transfer or assign the Operation Software to any person except in connection with the sale or conveyance of its ownership interest in all or any of the Simulators purchased from Perfect Line. RSC agrees that it shall not, and shall not permit any person to alter, modify or adapt the Operation Software in any manner including, but not limited to, translating, decompiling, disassembling or attempting to create derivative works. RSC agrees that it shall not, and shall not permit any other person to, attempt to reverse engineer the Operation Software. This license and RSC's right to use the Software as provided herein automatically terminates if: (i) RSC fails to comply with any of the foregoing provisions and (ii) RCS fails to take such steps as are necessary to return to full compliance with this agreement within fourteen (14) days of written notice of such non-compliance from Perfect Line to RCS.

(b)    Perfect Line retains all rights not expressly granted and nothing in this agreement constitutes a waiver of the Perfect Line's rights under the United States copyright laws or any other federal or state law.

(c)    All rights and licenses granted under or pursuant to this Conditional Software License Agreement by Perfect Line to RSC are, and shall otherwise be deemed to be, for the purposes of Section 365(n) of the United States Bankruptcy Code (the "**Bankruptcy Code**"), "licenses or rights to intellectual property" as defined under Section 101(52) of the Bankruptcy Code.

Executed this 31st day of December, 2004.

**Race Car Simulation Corp.**

By: _____

Title: _____

**Perfect Line, Inc.**

By: _____

Title: _____

587286_4

2

additional Simulators which RCS may purchase from Perfect Line. The Operation Software may only be used by RSC in conjunction with the Assets listed on Schedule A or on any additional Simulators which RCS may purchase from Perfect Line and on which the Operation Software has been loaded. RSC may not transfer or assign the Operation Software to any person except in connection with the sale or conveyance of its ownership interest in all or any of the Simulators purchased from Perfect Line. RSC agrees that it shall not, and shall not permit any person to alter, modify or adapt the Operation Software in any manner including, but not limited to, translating, decompiling, disassembling or attempting to create derivative works. RSC agrees that it shall not, and shall not permit any other person to, attempt to reverse engineer the Operation Software. This license and RSC's right to use the Software as provided herein automatically terminates if: (i) RSC fails to comply with any of the foregoing provisions and (ii) RCS fails to take such steps as are necessary to return to full compliance with this agreement within fourteen (14) days of written notice of such non-compliance from Perfect Line to RCS.

(b)     Perfect Line retains all rights not expressly granted and nothing in this agreement constitutes a waiver of the Perfect Line's rights under the United States copyright laws or any other federal or state law.

(c)     All rights and licenses granted under or pursuant to this Conditional Software License Agreement by Perfect Line to RSC are, and shall otherwise be deemed to be, for the purposes of Section 365(n) of the United States Bankruptcy Code (the "**Bankruptcy Code**"), "licenses or rights to intellectual property" as defined under Section 101(52) of the Bankruptcy Code.

Executed this _3/st_ day of December, 2004.

Race Car Simulation Corp.                    Perfect Line, Inc.

By:_____          By:_____

Title:_____          Title:____CEO_____

587286_4

Exhibit B
Final Execution Copy

<h1 style="text-align:center">SOFTWARE ESCROW AGREEMENT</h1>

This SOFTWARE ESCROW AGREEMENT (this "**Agreement**") is made and entered into this 31st day of December, 2004, by and among PERFECT LINE, INC., an Indiana corporation ("**Perfect Line**"), whose address is 5624 W. 73rd Street, Indianapolis, Indiana 46278, RACE CAR SIMULATION CORPORATION ("**RSC**"), a New York corporation, and BOSE MCKINNEY & EVANS LLP, an Indiana limited liability partnership ("**Escrow Agent**"), whose address is 2700 First Indiana Plaza, 135 N. Pennsylvania Street, Indianapolis, Indiana 46204.

<strong>WITNESSETH:</strong>

WHEREAS, Perfect Line and RSC have entered into a Conditional Software License Agreement (the "**License Agreement**"), whereby Perfect Line has conditionally agreed to license to RSC certain software products (the "**Operation Software**") as described in *Exhibit A* attached hereto on the terms and conditions set forth in such License Agreement; and

WHEREAS, RSC has requested that Perfect Line deposit with Escrow Agent the Operation Software; and

WHEREAS, Perfect Line will deposit with Escrow Agent, subject to the terms and conditions hereof, the Operation Software and provide for Escrow Agent's retention of the Operation Software until RSC's right to access thereof may arise pursuant to the conditions specified herein.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, and in consideration of the promises and mutual covenants contained in this Agreement, and upon and subject to the terms and conditions set forth in this Agreement, Perfect Line, RSC, and Escrow Agent hereby agree as follows:

## Article 1.    ESCROW AGENT

Perfect Line and RSC do hereby appoint Escrow Agent as escrow agent for the purposes herein set forth, and Escrow Agent hereby accepts such appointment and agrees to be bound by the terms and provisions of this Agreement.

## Article 2.    DEPOSIT OF OPERATION SOFTWARE

Section 2.1 **Initial Deposit**.   Upon the execution by Perfect Line of this Agreement, Perfect Line shall deposit with Escrow Agent the Operation Software and any documentation related thereto (the "**Documentation**") (the Operation Software and the Documentation are hereinafter collectively referred to as the "**Deposit**").   Perfect Line and Escrow Agent shall give prompt notice to RSC of such Deposit.

Section 2.2 **Deposit of Revisions**.   In the event of any modification, enhancement, or new release made to the Operation Software or Documentation by Perfect Line, Perfect Line shall deposit with Escrow Agent as provided herein a revision of the Deposit encompassing all such modifications, enhancements, or new releases, including a description of the scope and application of the changes.   Modifications, enhancements and new releases shall be deposited contemporaneously with their delivery to the first customer to receive them.

Section 2.3 **Deposit Acceptance.** Escrow Agent agrees to accept all such Deposits from Perfect Line and shall issue a written receipt to Perfect Line and to RSC for the initial and all subsequent Deposits.

## Article 3.    DUTIES OF ESCROW AGENT

Section 3.1 **Limitations.** The duties and responsibilities of Escrow Agent shall be limited to those expressly set forth in this Agreement. Escrow Agent shall not be subject to, nor obligated to recognize, refer to, or interpret any other agreement between any or all of the parties hereto even if reference is made to such agreements herein.

Section 3.2 **Nondisclosure.** Escrow Agent acknowledges that the Deposit is the property of Perfect Line and constitutes trade secrets and confidential and proprietary information of Perfect Line and that any transfer, publication, or disclosure to third parties, or use by Escrow Agent other than as provided herein, of the Deposit will cause immediate and irreparable harm to Perfect Line. Escrow Agent shall maintain the confidentiality of the Deposit and shall limit the use of and access to the Deposit to its bona fide employees whose use or access is necessary in connection with Escrow Agent's performance under this Agreement. Escrow Agent shall notify each employee to whom access or disclosure is made that such access or disclosure is made in confidence and that the Deposit shall be kept in confidence.

Section 3.3 **Revision.** Each time that Escrow Agent receives an upgraded version of a new Deposit made by Perfect Line under Section 2.2, Escrow Agent shall promptly return the superseded Deposit to Perfect Line, except that, should Escrow Agent reasonably question the suitability or condition of the Deposit media or the completeness of the Deposit, return of the superseded Deposit may be delayed until Escrow Agent's questions have been resolved.

Section 3.4 **Hold Harmless and Indemnification.** Perfect Line and RSC hereby jointly and with a right of contribution agree to hold Escrow Agent harmless and to indemnify it for any claims arising against Escrow Agent in conjunction with Escrow Agent's performance of its duties hereunder; provided however, such indemnification shall not apply with respect to claims resulting from any act or acts found by a court of competent jurisdiction to constitute gross negligence or willful misconduct on the part of the Escrow Agent.

## Article 4.    DELIVERY TO RSC

Section 4.1 **Release Notice.** In the event of the occurrence of a Condition of Release as defined in Article 5, RSC shall provide written notice of such event to both Escrow Agent and Perfect Line specifying the nature of such event and demanding the release of the Deposit (the "Notice"). Unless within seven (7) days after Perfect Line has received Notice from RSC, Perfect Line provides written notice to Escrow Agent that (i) a Condition of Release has not occurred or has been cured and is no longer continuing and/or (ii) that a condition precedent specified at Section 4.3 below has not occurred ("Counter-Notice"), Escrow Agent shall deliver the current Deposit to RSC. In the event Perfect Line submits such a Counter-Notice, then Escrow Agent shall not deliver the Deposit to RSC unless and until Escrow Agent is ordered to do so by a court of competent jurisdiction, or by joint written instruction from RSC and Perfect Line.

Section 4.2 **Joint Request**. Notwithstanding anything contained in Section 4.1 to the contrary, Escrow Agent shall deliver the Deposit to RSC at any time that Escrow Agent is directed to do so by joint written instructions from RSC and Perfect Line.

Section 4.3 **Conditions Precedent**. It is expressly a condition precedent to any right of RSC to receive delivery of the Deposit that (i) Perfect Line or IMTS shall be in default with respect to its obligations under the Management Agreement related to the Assets purchased pursuant to the Asset Purchase Agreement, both of even date herewith, except if the event of default is disputed by Perfect Line and notice of such dispute has been communicated to RSC; and (ii) at least one of the event specified in Article 5 of this Agreement shall have occurred.

## Article 5.    CONDITIONS OF RELEASE

A Condition of Release exists upon the occurrence of any one of the following events:

(a)    the commencement of a proceeding in bankruptcy initiated either by Perfect Line or any third party in which Perfect Line is the named debtor;

(b)    the making by Perfect Line of a general assignment for the benefit of Perfect Line's creditors;

(c)    the appointment of a general receiver or trustee in bankruptcy of Perfect Line's business or property; or

(d)    action by Perfect Line under any state insolvency law for the purpose of its bankruptcy, reorganization, or liquidation; or

(e)    Perfect Line fails to make a Deposit of the current version of the Operation Software under Section 2.2;

(f)    RCS provides Notice to Escrow Agent, with a copy to Perfect Line, of a default by Perfect Line in any proprietary trademark licensing agreement to which Perfect Line is a party that precludes the operation of the race car simulators acquired by RCS from Perfect Line pursuant to the Asset Purchase Agreement dated December 31, 2004, (the "Simulators") utilizing the software containing proprietary trademarks which Perfect Line has licensed, and Perfect Line does not provide a Counter-Notice providing reasonable information indicating that the alleged default either does not exist or has been cured within seven (7) days of receipt of the Notice by Perfect Line;

(g)    any other event occurs which demonstrates with reasonable certainty Perfect Line's or IMT's inability or unwillingness to fulfill their obligations to RSC or its successors or assigns under this Agreement or the Asset Purchase Agreement.

## Article 6.    OBLIGATIONS AND RESTRICTIONS ON CUSTOMERS

Release to and use of the Operation Software by RSC hereunder is expressly subject to the terms, conditions and restrictions of the Software License Agreement and all amendments thereto and the terms of this Agreement, including but not limited to Article 7.

## Article 7.    OPERATION SOFTWARE LICENSE

In the event that a copy of the Operation Software is authorized hereunder to be delivered out of escrow to RSC, RSC shall immediately obtain, without any further action, authorization,

or instrument, a paid-up, irrevocable, perpetual, nonexclusive, nontransferable license from Perfect Line to use, modify, reproduce, distribute, maintain, and update the Operation Software in any manner that may be necessary or appropriate to enable RSC to use the Operation Software for its intended purposes and the purposes set forth in the License Agreement.

## Article 8.   TERM OF AGREEMENT

This Agreement shall commence on the date upon which Perfect Line executes this Agreement and shall continue until the first in time to occur of any of the following:

(a)    written agreement signed by RSC and Perfect Line to terminate this Agreement,

(b)    delivery of the Deposit of all Operation Software to RSC, or

(c)    until such time, if any, as Perfect Line or IMTS shall have exercised and fully performed the repurchase option under Section 4.11 of the Asset Purchase Agreement.

## Article 9.   PAYMENT

No fee shall be paid to Escrow Agent.

## Article 10.   SUPPLEMENTARY RIGHTS

Section 10.1 **Incorporation**. This Agreement is incorporated by reference, and forms a part of, the License Agreement.

Section 10.2 **Bankruptcy Code**. RSC acknowledges that if Perfect Line, as debtor-in-possession or a trustee in bankruptcy in a case under the United States Bankruptcy Code, rejects this Agreement or any agreement supplementary hereto, RSC may elect to retain their rights under the License Agreement, this Agreement or any agreement supplementary thereto as provided in Section 365(n) of the Bankruptcy Code. Upon written request of Perfect Line or the Bankruptcy Trustee, Perfect Line or such Bankruptcy Trustee shall not interfere with the rights of RSC as provided in the License Agreement, this Agreement or any agreement supplementary thereto to obtain the Deposit from Escrow Agent, or to obtain the Operation Software directly from the Bankruptcy Trustee and shall, if requested, cause a copy of the Operation Software to be available to RSC.

Section 10.3 **Characterization of Agreement**. Perfect Line and RSC acknowledge that if, for any reason, under the Bankruptcy Code or any other law, this Agreement is not considered to be incorporated by reference into the Asset Purchase Agreement and/or the License Agreement, then this Agreement is an "agreement supplementary to" the Asset Purchase Agreement and/or the License Agreement as provided in Section 365(n) of the Bankruptcy Code, and the rights described in Section 10.2 remain available to RSC.

## Article 11.   MISCELLANEOUS

Section 11.1 **Notices**.   Except as otherwise specifically provided herein, all notices, requests, consents, and other communications hereunder shall be in writing and shall be personally delivered or mailed first class or certified mail, return receipt requested, postage prepaid.

If to Perfect Line as follows:

Perfect Line, Inc.
5624 W. 73rd Street
Indianapolis, Indiana 46278
Attn: William Donaldson
Telecopier No.: (317) 298-8924

and a copy to:

Bose McKinney & Evans LLP
2700 First Indiana Plaza
135 N. Pennsylvania Street
Indianapolis, Indiana 46204
Attn: Jeffrey B. Bailey
Telecopier No.: (317) 223-0311

If to Escrow Agent as follows:

Bose McKinney & Evans LLP
2700 First Indiana Plaza
135 N. Pennsylvania Street
Indianapolis, Indiana 46204
Attn: Jeffrey B. Bailey
Telecopier No.: (317) 223-0311

If to RSC as follows:

Racecar Simulation Corp.
c/o Dolphin Advisors, LLC
129 E. 17th Street
New York, NY 10003
Attn: Carlos Salas
Telecopier No.: (212) 202-3817

and a copy to:

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
Attn: Gary J. Simon
Telecopier No.: (212) 299-6770

Notice shall be deemed given when deposited with the United State Post Office. Each party, by notice duly given in accordance herewith, may specify a different address for the giving of any notice hereunder.

Section 11.2  **Waiver.**  No delay on the part of RSC or Perfect Line in the exercise of any right, power, privilege, or remedy hereunder shall operate as a waiver thereof, nor shall any

exercise or partial exercise of any such right, power, privilege, or remedy preclude any further exercise thereof or the exercise of any other right, power, privilege, or remedy. No modification or waiver of any provision of this Agreement shall be effective in any event unless in writing, and then only in the specific instance and for the purpose for which given.

Section 11.3 **Assignment.** Neither RSC nor Escrow Agent may assign its rights or delegate its obligations under this Agreement without the express written consent of Perfect Line; provided, however, RSC may assign it rights and delegate its obligations in connection with and as a part of the sale, transfer or conveyance of all or any of the Simulators acquired from Perfect Line. Perfect Line may transfer or assign its rights and delegate its obligations hereunder, to which assignment and delegation RSC hereby expressly consents, to a purchaser of substantially all of the capital stock of Perfect Line or to a purchaser of all or substantially all of the assets of Perfect Line.

Section 11.4 **Ownership.** Ownership of all Operation Software, Documentation, and all intellectual property rights including patent, trademark, copyright, and trade secret rights therein shall at all times remain in Perfect Line.

Section 11.5 **Law Governing.** This Agreement shall be construed and enforced in accordance with, and governed by, the laws of the State of Indiana.

Section 11.6 **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

Section 11.7 **Severability.** Any provision of this Agreement or any other agreement executed pursuant hereto which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or such other agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 11.8 **Headings.** The various headings of this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provisions hereof.

Section 11.9 **Amendment.** This Agreement may only be amended by a written agreement executed by all of the parties hereto. No waiver by any party of any of its rights hereunder shall be effective unless express and in writing.

Section 11.10 **Succession.** The rights and obligations hereunder shall inure to the benefit of and become the responsibility of the successors and assigns of the parties.

Section 11.11 **Definitions.** All capitalized terms used throughout this Agreement are defined terms. They shall have the meanings ascribed to them in this Agreement.

The undersigned each represent and warrant that s/he is authorized to execute this document on behalf of the respective party and any and all actions necessary for this to constitute the valid and binding act of the respective party have occurred.

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates indicated below.

**Escrow Agent**
BOSE MCKINNEY & EVANS LLP

**Perfect Line**
PERFECT LINE, INC.

By: *Jffy B Bailey*

By: _____

Printed: *JEFFREY B BAILEY*

William Donaldson, President

Title: *PARTNER*

Date: _____

Date: *DECEMBER 31, 2004*

**RSC**
Race Car Simulation Corporation

By: _____

Printed: _____

Title: _____

Date: _____

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates indicated below.

**Escrow Agent**
BOSE MCKINNEY & EVANS LLP

**Perfect Line**
PERFECT LINE, INC.

By: _____

Printed: _____

Title: _____

Date: _____

By: _William R. Donaldson_____

      William Donaldson, President

Date: _December 31, 2004_____

**RSC**
Race Car Simulation Corporation

By: _____

Printed: _____

Title: _____

Date: _____

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates indicated below.

**Escrow Agent**
BOSE MCKINNEY & EVANS LLP

**Perfect Line**
PERFECT LINE, INC.

By: _____

Printed: _____

Title: _____

Date: _____

By: _____
        William Donaldson, President

Date: _____


**RSC**
Race Car Simulation Corporation

By: _____

Printed: _____ Pete – E. Sola _____

Title: _____ President _____

Date: _____ 12 / 31 / 04 _____

## EXHIBIT A

Execution software that operates Perfect Line's race car simulators that features generic cars and race tracks with no third party licensed properties.

Exhibit C

NEITHER THIS WARRANT NOR ANY SHARES THAT MAY BE ACQUIRED UPON THE EXERCISE OF THIS WARRANT HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. THEY MAY NOT BE SOLD, OFFERED FOR SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT EXCEPT PURSUANT TO AN EXEMPTION FROM REGISTRATION AVAILABLE UNDER SUCH ACT AND, IF REQUESTED, DELIVERY OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

## INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORPORATION

### COMMON STOCK PURCHASE WARRANT

No. 1                                                     Dated: December 31, 2004

Interactive Motorsports and Entertainment Corporation, an Indiana corporation (the "Company," which term includes any corporation which shall succeed to or assume the obligations of the Company hereunder), for value received, hereby certifies that Dolphin Direct Equity Partners, LP, a Delaware limited partnership (the "Purchaser"), and its registered successors and permitted assigns (each such successor and assignee, together with the Purchaser, the "Holder"), is entitled to purchase from the Company up to an aggregate number of duly authorized, validly issued, fully paid and nonassessable shares of Common Stock, par value $0.001 per share, of the Company ("Common Stock") equal to the Warrant Shares Amount at a purchase price per share (the "Warrant Price") equal to $0.10, subject to the terms, conditions and adjustments set forth below. This Common Stock Purchase Warrant (this "Warrant," which term includes all other Common Stock Purchase Warrants issued in substitution therefor) is being issued to the Purchaser in connection with the Asset Purchase Agreement. Capitalized terms used in this Warrant and not otherwise defined herein are defined in Section 15 hereof.

1.       Exercise of Warrant.

1.1      Time and Manner of Exercise.

(a)      This Warrant shall be exercisable, in whole or in part, at any time, and from time to time, following the date hereof up until 11:59 p.m., New York time, on the fifth (5th) anniversary of the date hereof (such time and date, the "Expiration Date").

(b)      Subject to the terms and conditions set forth herein, this Warrant may be exercised by the Holder, to the extent then exercisable, in whole or in part, during normal business hours on any Business Day, by surrender of this Warrant to the Company at its principal office, accompanied by a subscription in substantially the form attached to this Warrant as

Exhibit A duly executed by the Holder and accompanied by payment, by check payable to the order of the Company or by wire transfer to such account of the Company as the Company shall direct, in the amount obtained by multiplying (i) the number of shares of Common Stock designated in such subscription (up to the amount of shares to which the Holder is entitled to receive at such time upon exercise of this Warrant) by (ii) the Warrant Price, and the Holder shall thereupon be entitled to receive the full number of duly authorized, validly issued, fully paid and nonassessable shares of Common Stock so purchased upon such exercise.

(c)    Alternatively, this Warrant may be exercised in the manner set forth in the preceding paragraph by surrendering this Warrant in exchange for such number of shares of Common Stock equal to the product of (i) the number of shares of Common Stock as to which this Warrant is being exercised, multiplied by (ii) a fraction, the numerator of which is the Market Price (as defined below) of a share of Common Stock minus the Warrant Price and the denominator of which is the Market Price for a share of Common Stock (a "Cashless Exercise"). Solely for the purposes of this Section 1, the "Market Price" shall be calculated either (A) on the date on which the form of subscription attached hereto is deemed to have been given to the Company (the "Notice Date") or (B) as the average of the Market Price for each of the five trading days immediately preceding the Notice Date, whichever of (A) or (B) results in a greater Market Price; provided, however, that a Cashless Exercise may only be employed by the Holder if the Common Stock shall then be publicly quoted in the manner contemplated in the next sentence. As used herein, the phrase "Market Price" at any date shall be deemed to be the last reported sale price, or, in case no such reported sale takes place on such day, the average of the last reported sale prices for the last three trading days, in either case as officially reported by the principal securities exchange on which the Common Stock is listed or admitted to trading, or, if the Common Stock is not listed or admitted to trading on any national securities exchange, the average closing sale price as furnished by the NASD through The Nasdaq Stock Market, Inc. ("Nasdaq") or by the OTC Electronic Bulletin Board or similar organization if Nasdaq is no longer reporting such information or if the Common Stock is not publicly quoted, as determined in good faith by resolution of the Board of Directors of the Company, based on the best information available to it.

1.2    When Exercise Effective. Each exercise of this Warrant shall be deemed to have been effected immediately prior to the close of business on the Business Day on which this Warrant shall have been surrendered to the Company as provided in Section 1.1 hereof. At such time, the Person or Persons, in whose name or names any certificate or certificates for shares of Common Stock shall be issuable upon such exercise as provided in Section 1.3 hereof, shall be deemed to have become the Holder or Holders of record thereof.

1.3    Delivery of Stock Certificates, Etc. As soon as practicable after each exercise of this Warrant, in whole or in part, and in any event within five Business Days thereafter, the Company, at its expense (including the payment by it of any applicable issue taxes), will cause to be issued in the name of, and delivered to, the Holder or as such Holder (upon payment by such Holder of any applicable transfer taxes) may direct,

(a)    a certificate or certificates for the number of duly authorized, validly issued, fully paid and nonassessable shares of Common Stock to which such Holder shall be entitled upon such exercise plus, in lieu of any fractional share to which such Holder would

-2-

otherwise be entitled, cash in an amount determined in accordance with the provisions of Section 4 hereof, and

(b)     in case such exercise is in part only, a new Warrant of like tenor, calling in the aggregate on the face thereof for the number of shares of Common Stock equal to the number of such shares which such Holder would be entitled to receive at such time upon exercise of this Warrant, after giving effect to such recent exercise.

2.      <u>Adjustments.</u>

2.1     <u>Change in Warrant Shares Amount and Warrant Price.</u>   The Warrant Shares Amount and the Warrant Price shall be subject to adjustment from time to time as follows:

(a)     The "<u>Warrant Shares Amount</u>" shall initially equal 5,161,500.

(b)     In case at any time or from time to time the Company shall (i) take a record of the holders of its Common Stock for the purpose of entitling them to receive a dividend payable in, or other distribution of, its Common Stock, (ii) subdivide its outstanding shares of any class or series of Common Stock into a larger number of any class or series of shares of Common Stock, or (iii) combine its outstanding shares of any class or series of Common Stock into a smaller number of shares of any class or series of Common Stock, or (iv) increase or decrease the number of shares of its capital stock in a reclassification of the Common Stock (including any such reclassification in connection with a merger, consolidation or other business combination in which the Company is the surviving corporation), then in each instance (A) the Warrant Shares Amount in effect immediately prior to the record date for such dividend or the effective date of such subdivision or combination shall be adjusted so that the Holder of this Warrant shall thereafter be entitled to receive the kind and number of shares of Common Stock that the Holder would have owned or have been entitled to receive after the happening of any of the events described above, had this Warrant been exercised immediately prior to the happening of such event or any record date with respect thereto and (B) the Warrant Price shall be adjusted so that the aggregate amount payable by the Holder to the Company upon exercise of this Warrant in full immediately prior to such event shall equal the aggregate amount payable by the Holder to the Company upon exercise of this Warrant in full immediately after such event. An adjustment made pursuant to this Section 2.1(b) shall become effective immediately after the effective date of such event.

(c)     Except as provided herein, if the Company shall consolidate or merge with another corporation, and the Company is the surviving corporation, then the Holder of this Warrant shall have the right to receive upon exercise of this Warrant, the number of shares of Common Stock and other property that such Holder would have been entitled to receive upon or as a result of such consolidation or merger had this Warrant been exercisable and exercised immediately prior to such event.

(d)     The adjustments required by the preceding subsections of this Section 2.1 shall be made whenever and as often as any specified event requiring an adjustment

-3-

shall occur. For the purpose of any adjustment, any specified event shall be deemed to have occurred at the close of business on the date of its occurrence.

       (e)     In computing adjustments under this Section 2, fractional interests in Common Stock shall be taken into account to the nearest one-thousandth of a share.

       (f)     If the Company shall take a record of the holders of its Common Stock for the purpose of entitling them to receive a dividend or distribution or subscription or purchase rights and shall, thereafter and before the distribution to stockholders thereof, legally abandon its plan to pay or deliver such dividend, distribution, subscription or purchase rights, then thereafter no adjustment shall be required by reason of the taking of such record and any such adjustment previously made in respect thereof shall be rescinded and annulled.

       2.2     <u>Notice of Adjustment</u>.  Whenever the Warrant Shares Amount is adjusted, as provided in Section 2.1, the Company shall promptly mail to the Holder written notice of such adjustment or adjustments and shall deliver to the Holder a certificate of the chief executive officer or chief financial officer of the Company setting forth the number of shares of Common Stock issuable, and the Warrant Price payable, upon the exercise of this Warrant after such adjustment, setting forth a brief statement of the facts requiring such adjustment and setting forth the computation by which such adjustment was made; <u>provided</u> that in the case of any increase in the Warrant Shares Amount pursuant to Section 2.1(a), such written notice of such adjustment and related officer's certificate shall be delivered to the Holder within five (5) Business Days following the end of the month with respect to which such adjustment occurred.

       2.3     <u>Notice of Certain Corporate Action</u>.  In case the Company shall propose (a) to pay any dividend payable in securities of any class to the holders of the Common Stock or to make any other distribution to the holders of the Common Stock, or (b) to offer the holders of the Common Stock rights to subscribe for or to purchase any securities convertible into shares of Common Stock or shares of stock of any class or any other securities, rights or options, or (c) to effect any capital reorganization, consolidation or merger, then, in each such case, the Company shall give the Holders of this Warrant a written notice of such proposed action, which shall specify the date on which a record is to be taken for the purposes of such dividend, distribution or rights, or the date such issuance is to take place and the date of participation therein by the holders of Common Stock, if any, is to be fixed, and shall be reasonably necessary to indicate the effect of such action on the Common Stock and the number and kind of any other shares of stock and other property, if any, after giving effect to any adjustment which will be required as a result of such action.  Such notice shall be so given in the case of any action covered by clause (a) or (b) above at least ten (10) days prior to the record date for determining holders of the Common Stock for purposes of such action and, in the case of any other such action, at least twenty (20) Business Days prior to the date of the taking of such proposed action or the date of participation therein by the holders of Common Stock, whichever shall be the earlier.

       2.4     <u>Statement on Warrant Certificates</u>.  Irrespective of any adjustment in the number or kind of shares issuable upon the exercise of this Warrant, Warrant certificates theretofore or thereafter issued may continue to express the same number and kind of shares as are stated in the Warrant certificates initially issued.

-4-

2.5    <u>Notice to Holders of Dissolution, Liquidation or Winding Up</u>. Notwithstanding any other provision herein, in the event that, at any time after the date hereof and prior to the expiration of this Warrant and the termination of the rights of the Holder, there shall be a voluntary or involuntary dissolution, liquidation or winding up of the Company, then the Company shall mail to the Holder at the earliest practicable time (and, in any event, not less than ten (10) days before any date set for definitive action) written notice of the date on which such dissolution, liquidation or winding up shall take place, as the case may be. Such notice shall also specify the date as of which the holders of the shares of record of Common Stock issuable upon exercise of this Warrant shall be entitled to exchange their shares for securities, money or other property deliverable upon such dissolution, liquidation or winding up, as the case may be, on which date the Holder shall be entitled to receive upon surrender of this Warrant, the cash or other property that the Holder would have been entitled to receive had this Warrant been exercisable and exercised immediately prior to such dissolution, liquidation or winding up and any and all rights of the Holder to exercise this Warrant shall terminate. In case of any such voluntary or involuntary dissolution, liquidation or winding up of the Company, the Company shall, after receipt of the surrendered Warrant, make payment in appropriate amount to such Person or Persons as it may be directed in writing by the Holder surrendering the Warrant.

3.    <u>No Dilution or Impairment</u>. The Company will not, by amendment of its certificate of incorporation or through any consolidation, merger, reorganization, transfer of assets, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be reasonably necessary or appropriate in order to protect the rights of the holder of this Warrant against dilution or other impairment. Without limiting the generality of the foregoing, the Company (a) will not permit the par value of any share of stock receivable upon the exercise of this Warrant to exceed the amount payable therefor upon such exercise, and (b) will take all such action as may be necessary or appropriate (including, without limitation, making appropriate transfers from the Company's additional paid-in capital to its stated capital) in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock upon the exercise of this Warrant.

4.    <u>Fractional Interests</u>. The Company shall not be required to issue fractional shares of Common Stock upon the exercise of this Warrant. If any fraction of shares of Common Stock would be issuable upon the exercise of this Warrant (or specified portion thereof), the Company shall pay an amount in cash equal to the fair market value (as determined in good faith by the Company's Board of Directors) of one (1) share of Common Stock on the Business Day immediately preceding the date this Warrant is presented for exercise, multiplied by such fraction.

5.    <u>Reservation of Stock, Etc</u>. The Company shall at all times reserve and keep available, solely for issuance and delivery upon exercise of this Warrant, the number of shares of Common Stock from time to time issuable upon full exercise of this Warrant. All shares of Common Stock issuable upon exercise of this Warrant shall be duly authorized and, when issued upon such exercise, shall be validly issued, fully paid and nonassessable with no liability on the part of the holder thereof.

-5-

6.    Registration and Transfer of Warrants, Etc.

6.1    Restrictions on Transfer of Warrants and Common Stock. This Warrant and the Common Stock issuable upon exercise hereof may not be sold, transferred or otherwise disposed of unless registered under the Securities Act of 1933 (the "Securities Act"), and any applicable state securities laws or pursuant to available exemptions from such registration, provided that the seller, if requested by Company, delivers to the Company an opinion of counsel reasonably satisfactory to the Company confirming the availability of such exemption. Unless the shares of Common Stock issuable upon exercise hereof have been registered under the Securities Act, upon exercise of this Warrant and the issuance of any of the shares of Common Stock, all certificates representing such securities shall bear on the face thereof substantially the following legend:

> "THESE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. THEY MAY NOT BE SOLD, OFFERED FOR SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT EXCEPT PURSUANT TO AN EXEMPTION FROM REGISTRATION AVAILABLE UNDER SUCH ACT AND, IF REQUESTED, DELIVERY OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED."

6.2    Warrant Register; Ownership of Warrants. The Company shall keep at its principal office a register in which the Company shall provide for the registration of this Warrant and the registration of transfers of this Warrant. The Company may treat the Person in whose name this Warrant is registered on such register as the owner thereof for all other purposes, and the Company shall not be affected by any notice to the contrary, except that, if and when this Warrant is accompanied by an instrument of assignment in substantially the form attached hereto as Exhibit B, the Company may (but shall not be obligated to) treat the bearer thereof as the owner of this Warrant for all purposes. This Warrant, if properly assigned, may be exercised by a new Holder without a new Warrant first having been issued.

6.3    Transfer and Exchange of Warrants. Upon surrender of this Warrant for registration of transfer or for exchange to the Company at its principal office, the Company at its expense shall execute and deliver in exchange therefor a new Warrant or Warrants of like tenor, in the name of the Holder or as the Holder (upon payment by the Holder of any applicable transfer taxes) may direct, calling in the aggregate on the face or faces thereof for the number of shares of Common Stock called for on the face or faces of the Warrant or Warrants so surrendered.

6.4    Replacement of Warrants. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant, and upon delivery to the Company of an indemnity agreement reasonably acceptable to the Company, the Company at its expense shall execute and deliver, in lieu thereof, a new Warrant of like tenor.

NY 911672_2.DOC i

7.    <u>Remedies</u>.  The Company stipulates that the remedies at law of the Holder of this Warrant, in the event of any default or threatened default by the Company in the performance of or compliance with any of the terms of this Warrant, are not and will not be adequate and that, to the fullest extent permitted by law, such terms may be specifically enforced by a decree for the specific performance of any agreement contained herein or by an injunction against a violation of any of the terms hereof or otherwise.

8.    <u>No Rights or Liabilities as Stockholder</u>.   Nothing contained in this Warrant shall be construed as (a) conferring upon the Holder hereof any rights as a stockholder of the Company (including, without limitation, any right to vote or to receive dividends or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or any other matter, or any right whatsoever as a stockholder of the Company (except for those notices and other matters expressly set forth herein)), or (b) imposing any obligation on such Holder to purchase any securities or as imposing any liabilities on such Holder as a stockholder of the Company, whether such obligation or liabilities are asserted by the Company or by creditors of the Company.

9.    <u>Piggyback Registrations</u>.

9.1    <u>Right to Include Registrable Securities</u>. If at any time the Company shall propose to register any Common Stock, whether or not for sale for its own account, under the Securities Act of 1933 or any subsequent similar federal statute and the rules and regulations thereunder (the "<u>Securities Act</u>"), by registration on Form SB-2, S-1, S-2 or S-3 (but not Form S-4 or S-8) or any successor or similar forms (except for any registrations in connection with (x) an employee benefit plan or dividend reinvestment plan or a merger, consolidation or other business combination or (y) debt securities that are not convertible into Common Stock) it shall give written notice to the holders (the "<u>Holders</u>") of the shares of Common Stock issuable pursuant to the exercise hereof that (i) have not been previously registered pursuant to a registration statement that shall have become effective under the Securities Act and (ii) may not be disposed of as permitted by, and in compliance with, Rule 144 or Rule 145 (or successor provisions) under the Securities Act (the foregoing shares, together with any additional shares of Common Stock issued in a stock split or stock dividend are "<u>Registrable Securities</u>") of its intention to do so and of the Holders' rights under this Section 9 at least 30 days prior to the filing of a registration statement with respect to such registration with the Securities and Exchange Commission (the "<u>SEC</u>").  Upon the written request of any Holder made within 20 days after the receipt of that notice, which request shall specify the Registrable Securities intended to be registered and disposed of by such Holder, the Company shall, subject to the provisions hereof, use its commercially reasonable efforts to include in such registration statement all Registrable Securities that the Company has been so requested to register by such Holder.  If a Holder decides not to include all of its Registrable Securities in any registration statement thereafter filed by the Company, such Holder shall nevertheless continue to have the right pursuant to this Section 9.1 to include any Registrable Securities in any subsequent registration statement or registration statements as may be filed by the Company with respect to offerings of its securities, upon all the terms and conditions set forth herein.

9.2    <u>Right to Abandon or Delay Registration</u>.  If, at any time after giving written notice of its intention to register any securities and prior to the effective date of the

-7-

registration statement filed in connection with such registration, the Company shall determine for any reason not to register or to delay registration of such securities, the Company may, at its election, give written notice of such determination to each Holder and upon giving that notice (i) in the case of a determination not to register, the Company shall be relieved of its obligation to register any Registrable Securities in connection with such registration without prejudice and (ii) in the case of a determination to delay registering, the Company shall be permitted to delay registering any Registrable Securities for the same period as the delay in registering such other securities.

10.  Registration Procedures; Other Obligations of the Parties.

10.1  Obligations of the Company.  In connection with the registration of any Registrable Securities under the Securities Act as provided in Section 9, the Company shall:

(a)  use its commercially reasonable efforts to prepare and file with the SEC the requisite registration statement to effect such registration and thereafter use its commercially reasonable efforts to cause such registration statement to become and remain effective (subject to clause (b) below); provided, however, that the Company may discontinue any registration of its securities that are not Registrable Securities at any time prior to the effective date of the registration statement relating thereto;

(b)  use its commercially reasonable efforts to prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective and to comply with the provisions of the Securities Act with respect to the disposition of all Registrable Securities covered by such registration statement for such period as shall be required for the disposition of all of such Registrable Securities; provided, however, that such period need not exceed 90 days from the effective date thereof;

(c)  furnish to the Holders such number of conformed copies of such registration statement and of each such amendment and supplement thereto (in each case including all exhibits), such number of copies of the prospectus contained in such registration statement (including each preliminary prospectus and any summary prospectus) and any other prospectus filed under Rule 424 under the Securities Act, in conformity with the requirements of the Securities Act, and such other documents, as the Holders may reasonably request;

(d)  use its commercially reasonable efforts (x) to register or qualify all Registrable Securities and other securities covered by such registration statement under such other securities or blue sky laws of such states of the United States of America where an exemption is not available and as the Holders shall reasonably request, (y) to keep such registration or qualification in effect for so long as such registration statement remains in effect, and (z) to take any other action that may reasonably be necessary or advisable to enable the Holders to consummate the disposition in such jurisdictions of the securities to be sold by the Holders, except that the Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not, but for the requirements of this paragraph (d), be obligated to be so qualified or to so consent to general service of process in any such jurisdiction;

-8-

(e)     notify the Holders when a prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading, in the light of the circumstances under which they were made, and at the request of the Holders promptly prepare and furnish to them a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made; and

(f)     cause the Registrable Securities to be listed on a national securities exchange or on the Nasdaq Stock Market, if any of the Common Stock is traded or listed thereon.

10.2    Obligations of the Holders.

(a)     The Company may require the Holders, after receipt thereby of a written request from Holders pursuant to Section 9.1, to furnish the Company such information regarding the Holders and the distribution of the Holders' Registrable Securities as the Company may from time to time reasonably request in writing, based on its reasonable belief that such information is required to be disclosed in the Registration Statement pursuant to the Securities Act and applicable state securities laws.

(b)     Upon receipt of any notice from the Company of the happening of an event of the kind described in Section 10.1(e), the Holders shall forthwith discontinue their disposition of Registrable Securities pursuant to the registration statement relating to such Registrable Securities until the Holders' receipt of the copies of the supplemented or amended prospectus contemplated by Section 10.1(e) and, if so directed by the Company, the Holders shall deliver to the Company all copies, other than permanent file copies, then in the Holders' possession, of the prospectus relating to such Registrable Securities current at the time of receipt of such notice.

10.3    Expenses.   All expenses incurred in connection with a registration statement pursuant to Section 9, including, without limitation, all federal and "blue sky" registration, filing and qualification fees, printer's and accounting fees, and fees and disbursements of counsel for the Company, shall be borne by the Company.  Each Holder participating in a registration pursuant hereto shall bear such Holder's proportionate share (based on the total number of shares sold in such registration other than for the account of the Company) of all discounts, commissions or other amounts payable to underwriters or brokers in connection with such offering by the Holders.

11.     Underwritten Offerings.

11.1    Underwriter Cutbacks.  If any managing underwriter for a public offering contemplated by Section 9 advises the Company of its belief that the number or type of

-9-

Registrable Securities to be included in such offering would adversely affect such offering, then the Company shall include in such registration, to the extent of the number and type that the Company is so advised can be sold in (or during the time of) such offering:

(a)    first, all securities proposed by the Company to be sold for its own account;

(b)    then, Registrable Securities to be sold by the holders of Common Stock that constitute "registrable securities" that were received upon exercise hereof;

(c)    then, Registrable Securities to be sold by the Holders and all other shares of Common Stock outstanding on the date hereof or subsequently acquired by the holders thereof or that constitute "Registrable Securities" under and as defined in registration rights agreements containing piggyback registration rights intended to have the same priority as those provided in this Section 11.1 to be sold by the holders thereof; and

(d)    finally, other securities to be sold by other holders of securities in proportion to the respective numbers of securities proposed to be sold in such offering by such holders.

11.2    <u>Underwriting Agreement</u>.    The Holders shall become a party to any underwriting agreement negotiated between the Company and the underwriters in any underwritten public offering hereunder and shall make all representations and warranties to and shall enter into all agreements with the Company and the underwriters and shall deliver all opinions of counsel and other documents as shall be reasonably requested of them and shall make all representations and warranties required by law, customarily given or reasonably requested of selling shareholders by an underwriter in an underwritten public offering.

11.3    <u>Holdback Agreements</u>.    If the Company, in connection with an underwritten offering of securities for its own account, at any time shall register shares of Common Stock under the Securities Act for sale to the public (other than on Forms S-4 or S-8 or a shelf registration), the Holders shall not directly or indirectly sell, transfer or otherwise dispose of or encumber any shares of Common Stock or enter into any swap or other arrangement that transfers to another all or part of the economic consequences of ownership of the shares of Common Stock (other than those shares included in such registration pursuant to Section 9) without the prior written consent of the managing underwriter for a period required by the underwriters and designated by the Company, which period shall begin not more than 30 days prior to the effectiveness of the registration statement pursuant to which such public offering shall be made and shall last not more than 180 days after the effective date of such registration statement in the case of the Company's initial public offering, or 90 days after the effective date of such registration statement in the case of any such other offering. The Company may legend and impose stop transfer instructions on any certificate evidencing Registrable Securities relating to the restrictions provided in this Section 11.3.

12.    <u>Indemnification</u>.

12.1    <u>Indemnification by the Company</u>.    In the event of any registration statement filed pursuant to Sections 9, the Company shall indemnify and hold harmless the

-10-

Holders and their respective directors, officers and affiliates and each other individual or entity, if any, who controls (within the meaning of the Securities Act) any Holder (each of the foregoing, a "Holder Indemnitee"), insofar as losses, claims, damages, or liabilities (or actions or proceedings, whether commenced or threatened, in respect thereof) ("Losses") to a Holder Indemnitee arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any such registration statement, any preliminary prospectus, final prospectus, or summary prospectus contained therein, or any amendment or supplement thereto, or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein in light of the circumstances in which they were made not misleading, and the Company shall reimburse each Holder Indemnitee for any legal or any other fees, costs and expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, liability, action or proceeding; provided, however, that the Company shall not be liable in any such case to the extent that any such loss, claim, damage, liability (or action or proceeding in respect thereof) or expense arises out of or is based upon an untrue statement or omission made in reliance upon and in conformity with information furnished to the Company by or on behalf of a Holder or such underwriter, as the case may be, for use in the preparation thereof; and provided, further, however, that the Company shall not be liable to any Holder Indemnitee in any such case to the extent that any such loss, claim, damage, liability (or action or proceeding in respect thereof) or expense arises out of such Person's failure to send or give a copy of the final prospectus, as the same may be then supplemented or amended, to the Person asserting an untrue statement or alleged untrue statement or omission or alleged omission at or prior to the written confirmation of the sale of Registrable Securities to such Person if such statement or omission was corrected in such final prospectus so long as such final prospectus, and any amendments or supplements thereto, have been furnished to such underwriter or any Holder, as applicable.

   12.2 <u>Indemnification by the Holders</u>.  If any Registrable Securities are included in any registration statement, the Holders of such Registrable Securities so registered shall, severally and not jointly, indemnify and hold harmless the Company and each director, officer and affiliate of the Company, and each other individual or entity, if any, who controls (within the meaning of the Securities Act) the Company (each of the foregoing, a "Company Indemnitee") insofar as Losses to a Company Indemnitee arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in such registration statement, any preliminary prospectus, final prospectus or summary prospectus contained therein, or any amendment or supplement thereto, or an omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, if such statement or alleged statement or omission or alleged omission was made in reliance upon and in conformity with written information pertaining to such Holder and furnished to the Company by such Holder for use in the preparation of such registration statement, preliminary prospectus, final prospectus, summary prospectus, amendment or supplement, provided, however, that no Holder shall have any liability under this Section 12.2 for any amount in excess of the net proceeds actually received by such Holder from the sale of the Registrable Securities included in such registration statement.

NY 911672_2.DOC i

12.3    Notice of Claims, Etc.

(a)    Promptly after receipt by an indemnified party of notice of the commencement of any action or proceeding involving a claim referred to in Sections 12.1 or 12.2, such indemnified party will, if a claim in respect thereof is to be made against an indemnifying party, immediately give written notice to the latter of the commencement of such action; provided, however, that the failure of any indemnified party to give notice as provided herein shall not relieve the indemnifying party of its indemnity obligations, except to the extent that the indemnifying party is actually prejudiced by such failure to give notice. In case any such action is brought against an indemnified party, unless in the reasonable judgment of counsel for such indemnified party, a conflict of interest between such indemnified and indemnifying parties may exist in respect of such claim (in which case the indemnified party shall be entitled to retain separate counsel as provided below), the indemnifying party shall be entitled to participate in and to assume the defense thereof, jointly with any other indemnifying party similarly notified to the extent that it may wish and at any time, with counsel reasonably satisfactory to such indemnified party, and after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal or other expenses subsequently incurred by the indemnified party in connection with the defense thereof other than reasonable costs related to the indemnified party's cooperation with the indemnifying party; provided, however, that the indemnified party may, at its own expense, retain separate counsel to participate in such defense

(b)    No indemnifying party shall be liable for any settlement of any action or proceeding effected without its written consent, which consent shall not be unreasonably withheld. No indemnifying party shall, without the consent of the indemnified party, consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

12.4    Contribution. If indemnification shall for any reason be held by a court to be unavailable to an indemnified party in respect of any loss, claim, damage or liability, or any action in respect thereof, then, in lieu of the amount paid or payable under Section 12.1 or Section 12.2, as applicable, the indemnified party and the indemnifying party shall contribute to the aggregate losses, claims, damages and liabilities (including legal or other expenses reasonably incurred in connection with investigating the same), (a) in such proportion as is appropriate to reflect the relative fault of the Company on the one hand and the Holders on the other hand that resulted in such loss, claim, damage or liability, or action in respect thereof, with respect to the statements or omissions that resulted in such loss, claim, damage or liability, or action in respect thereof, as well as any other relevant equitable considerations or (b) if the allocation provided by item (a) above is not permitted by applicable law, in such proportion as shall be appropriate to reflect the relative benefits received by the Company on the one hand and the Holders on the other, as determined by a court of competent jurisdiction. No individual or entity guilty of fraudulent misrepresentation (within the meaning of the Securities Act) shall be entitled to contribution from any individual or entity who was not guilty of such fraudulent misrepresentation. In addition, no individual or entity shall be obligated to contribute hereunder any amounts in payment for any settlement of any action or claim, effected without such individual or entity's consent, which consent shall not be unreasonably withheld.

-12-

13.  Rule 144 Reporting.  With a view to making available the benefits of certain rules and regulations of the SEC which may permit the sale of the Registrable Securities to the public without registration, after such time as a public market exists for the Common Stock of the Company, the Company agrees to:

(a)  make and keep public information available, as defined for purposes of Rule 144(c) under the Securities Act;

(b)  use its best efforts to file with the SEC in a timely manner all reports and other documents required of the Company to be filed under the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements); and

(c)  so long as a holder owns any Registrable Securities, furnish to the holder forthwith upon request, a written statement by the Company as to its compliance with the reporting requirements of Rule 144 (at any time after 90 days following the close of the first sale of securities by the Company pursuant to a registration statement), and of the Securities Act and the Exchange Act (at any time after it has become subject to the reporting requirements of the Exchange Act), a copy of the most recent annual or quarterly report of the Company, and such other reports and documents of the Company as such holder may reasonably request in availing itself of any rule or regulation of the Commission allowing a holder to sell any such securities without registration (at any time after the Company has become subject to the reporting requirements of the Exchange Act).

14.  Mergers, Etc.  The Company shall not, directly or indirectly, enter into any merger, consolidation, or reorganization in which the Company shall not be the surviving corporation unless the proposed surviving corporation shall, prior to such merger, consolidation, or reorganization, agree in writing to assume the obligations of the Company under this Agreement, and for that purpose references hereunder to "Registrable Securities" shall be deemed to be references to the securities that the Stockholders would be entitled to receive in exchange for Registrable Securities under any such merger, consolidation, or reorganization; provided, however, that the provisions of this Agreement shall not apply in the event of any merger, consolidation, or reorganization in which the Company is not the surviving corporation if all Holders holding Registrable Securities are entitled to receive in exchange for their Registrable Securities consideration consisting solely of (i) cash, (ii) securities of the acquiring corporation that may be immediately sold to the public without registration under the Securities Act, or (iii) securities of the acquiring corporation that the acquiring corporation has agreed to register within 120 days of completion of the transaction for resale to the public pursuant to the Securities Act.

15.  Notices.  All notices and other communications by the Company or by any Holder to the Company under this Warrant shall be deemed to have been sufficiently given and received for all purposes when delivered in person, by facsimile transmission or by air courier, or five days after being sent by registered or certified mail, return receipt requested, postage prepaid, addressed in each case (a) if to any Holder of this Warrant, at the registered address of such Holder as set forth in the register kept at the principal office of the Company, or (b) if to the Company, to the attention of its chief executive officer at its principal office. Each party hereto

-13-

may from time to time change the address to which notices to it are to be delivered or mailed hereunder by notice to the other party.

16.    Amendments.    This Warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

17.    Descriptive Headings.    The headings in this Warrant are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

18.    Severability.    The invalidity or unenforceability of any provision of this Warrant in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Warrant in such jurisdiction or the validity, legality or enforceability of this Warrant, including any such provision, in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

19.    Governing Law; Jurisdiction; Venue.    This Warrant shall be governed by, and construed and enforced in accordance with, the laws of the State of Indiana, without regard to the conflicts of law rules thereof.    The state and federal courts of the State of New York located in New York City shall have jurisdiction to hear and determine any claims or disputes between the parties hereto pertaining directly or indirectly to this Warrant and all documents, instruments and agreements executed pursuant hereto, or to any matter arising therefrom (unless otherwise expressly provided for therein).    The exclusive choice of forum set forth in this Section 13 shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce the same in any other appropriate jurisdiction.

20.    Entire Understanding.    This Warrant contains, and is intended as, a complete statement of all the terms of the arrangements between the Company and the Holder with respect to the matters set forth herein, and supersedes any previous agreements and understandings between the parties with respect to those matters.    There are no promises, representations, warranties, covenants or undertakings other than those set forth herein.

21.    Definitions.    As used herein, unless the context otherwise requires, the following terms have the following respective meanings:

"Asset Purchase Agreement" means the Asset Purchase Agreement of even date herewith by and among the Purchaser, Race Car Simulation Corp., a New York corporation affiliated with the Purchaser, the Company, Perfect Line, Inc., an Indiana corporation wholly owned by the Company, and Race Car Simulators, Inc., an Indiana corporation wholly owned by the Company.

"Business Day" means any day other than a Saturday, Sunday or a day on which commercial banking institutions in New York City are authorized by law to be closed.

"Common Stock" as defined in the introduction to this Warrant, shall include (a) any stock into which such Common Stock shall have been changed or any stock resulting from

-14-

NY 911672_2.DOC i

any reclassification of such Common Stock, and (b) any stock and other securities of the Company or any other Person (corporate or otherwise) which the Holder of this Warrant at any time shall be entitled to receive, or shall have received, upon the exercise of this Warrant, in lieu of or in addition to Common Stock, or which at any time shall be issuable or shall have been issued in exchange for or in replacement of Common Stock pursuant to Section 2 hereof or otherwise.

"Company" as defined in the introduction to this Warrant, such term to include any corporation which shall succeed to or assume the obligations of the Company hereunder.

"Person" means a corporation, an association, a partnership, an organization, a business, an individual, a government or political subdivision thereof or a governmental agency.

*[The next page is the signature page]*

NY 911672_2.DOC i

The Company has caused this Warrant to be duly executed and delivered as of the date first written above.

INTERACTIVE MOTORSPORTS AND
ENTERTAINMENT CORPORATION

By: _William R. Donaldson_
Name: WILLIAM R. DONALDSON
Title: CEO

Attest:

_Ellen K. Epley_

<u>Exhibit A</u>

<u>FORM OF SUBSCRIPTION</u>

[To be executed only upon exercise of Warrant]

To:    Interactive Motorsports and Entertainment Corporation

The undersigned registered holder of the within Warrant hereby irrevocably exercises such Warrant for, and purchases thereunder, _____ shares of Common Stock, par value $0.001 per share, of Interactive Motorsports and Entertainment Corporation, an Indiana corporation, and herewith makes payment of $_____ therefor, and requests that the certificates for such shares be issued in the name of, and delivered to, _____, whose address is _____.

Dated:_____

_____
(Signature must conform in all respects to name of holder as specified on the face of Warrant)

_____
(Street Address)

_____
(City, State and Zip Code)

<u>Exhibit B</u>

<u>FORM OF ASSIGNMENT</u>

[To be executed only upon transfer of Warrant]


      For value received, the undersigned registered holder of the within Warrant hereby sells, assigns and transfers unto _____ the right represented by such Warrant to purchase _____ shares of Common Stock, par value $0.001 per share, of Interactive Motorsports and Entertainment Corporation, an Indiana corporation, to which such Warrant relates, and appoints _____ as attorney to make such transfer on the books of Interactive Motorsports and Entertainment Corporation maintained for such purpose, with full power of substitution in the premises.

Dated:_____

                                         _____

                                         (Signature must conform in all respects to name of holder as specified on the face of Warrant)


                                       _____

                                             (Street Address)


                                       _____

                                       (City, State and Zip Code)

Signed in the presence of:

_____

Exhibit D
Final Execution Copy

## MANAGEMENT AGREEMENT

This MANAGEMENT AGREEMENT (this "Agreement"), dated as of December 31, 2004 (the "Effective Date"), is entered into by and between Dolphin Direct Equity Partners, LP, a Delaware limited partnership ("Dolphin"), Race Car Simulation Corp., a New York corporation affiliated with Dolphin (the "Company"), and Interactive Motorsports and Entertainment Corporation, an Indiana corporation (together with its subsidiaries, the "Manager").

WHEREAS, the Company desires to receive certain management services from the Manager;

WHEREAS, the Manager desires to provide such services to the Company pursuant to the terms of this Agreement;

WHEREAS, the compensation arrangements set forth in this Agreement are designed to compensate the Manager for providing such services to the Company; and

WHEREAS, the Company and the Manager are entering into an Asset Purchase Agreement of even date herewith (the "Asset Purchase Agreement").

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, the parties hereto agree as follows:

1.      Services.

(a)      The Company hereby retains the Manager to, and the Manager hereby agrees to be retained to (i) accept and perform, on behalf of the Company, each and all of the Company's obligations of any kind (other than the obligation to leave Simulators in place) under all Leases whether now existing or entered into after the date hereof, (ii) if any Simulators are not, at any time, being utilized to generate revenue for the Company, place such Simulators into service under Leases with operators prior to placing any of its own or any competing racecar simulators into any such arrangements; provided, however, that the Company may reject any such arrangement in its sole discretion, and thereafter the Manager may place its own or any competing racecar simulators into such arrangement if the terms thereof are no more favorable to the Manager than the rejected terms would have been to the Company, (iii) use its best efforts to market and negotiate competitive terms for the placement of Simulators, and bear all costs of relocation and refurbishment of such Simulators, (iv) in every manner maintain, protect and enhance the value of all Simulators and all Leases, and perform the Company's and the Manager's obligations under all Leases, with the highest standard of care and with the highest commitment of financial, personnel, marketing, time and other resources as Manager applies with respect to its own racecar simulators and leases or other revenue sharing arrangements; (v) otherwise advise the Company with respect to the utilization of all Simulators, and perform such additional services relating thereto, as reasonably requested by the Company from time to time, in every case diligently, promptly and at the Manager's sole expense; and (vi) maintain, on

terms no less favorable to the Company and to the operators under the Leases than the existing arrangement, the ability of the Company and to the operators under the Leases to utilize the marks subject of the license agreement by and among National Association for Stock Car Racing, Inc. and PL, effective as of June 1, 2001, as the same may be amended from time to time.

(b)    If the Manager is unable to place any of the Company's Simulators into service pursuant to Section 1(a) within sixty (60) days of such Simulator being taken out of service, the Company may elect to exchange any such Simulator for a simulator of the Company's choosing owned by the Manager that has been placed into a revenue-generating arrangement with a third party within the six (6) month period immediately preceding the date that the Company's Simulator was taken out of service. The Manager will assign to the Company its rights under any operating lease or revenue sharing agreement to which any such exchanged Simulator is subject, and such arrangement will be considered a Lease under this Agreement.

2.    Additional Funding; Issuance of Warrants.

(a)    If (i) the Manager and Dolphin mutually agree that Dolphin will contribute additional funds to the Company or (ii) Dolphin or the Company receives any claim, invoice or other notice from a third party alleging or otherwise indicating that Dolphin or the Company is required to make any payment or take any action, and Dolphin reasonably believes that the Company requires additional funding in order to make such payment, take such action or defend itself in connection with such claim, invoice or notice, Dolphin (X) in the case of clause (i) above, shall and (Y) in the case of clause (ii) above, may contribute such funds (in debt, equity or any combination thereof at its sole discretion), to such extent, from time to time and up to $2 million in the aggregate. As conditions precedent to Dolphin's obligation to make any such contribution contemplated by clause (i) above, the Manager shall (i) issue to Dolphin a warrant pursuant to Section 2(b) and (ii) have fully performed all obligations to be performed by it under the Transaction Documents.

(b)    In the event of any additional funding of the Company pursuant to Section 2(a), Manager shall issue to Dolphin a warrant simultaneously with Dolphin's funding of each such contribution in form and substance as set forth on Exhibit A hereto, to purchase a number of shares of common stock of the Manager, par value $0.0001 per share, equal to 2.5 shares for each $1 of equity or principal amount of debt of such contribution. Any contribution made by Dolphin to the Company prior to the issuance by Manager of such warrant shall not be deemed a waiver of Manager's obligation to issue such warrant.

3.    Term.  The term of this Agreement shall commence as of the Effective Date and shall continue until terminated by mutual agreement of the parties.

4.    Compensation.

(a)    As sole consideration for the services to be rendered by the Manager hereunder, and commencing with the first (if any) full month at the beginning of which (i) the Aggregate Investment Amount equals zero ($0.00) and (ii) Dolphin does not reasonably believe

NY 911719_2.DOC i

that the Company will require additional funding in order to meet its obligations under the Leases or any other legal obligations, the Manager shall accrue a monthly fee (the "Management Fee") equal to the excess of (X) 75% of the aggregate cash payments actually received by the Company under the Leases, computed without taking into consideration the fees payable under this Section 4, as determined by the Company's regular auditors, or in the absence thereof, by the Company, with respect to each full month <u>over</u> (Y) (1) $3,000 (2) without duplication, all amounts that the Company has been required to refund or otherwise pay under or in connection with the Leases, all amounts owing to the Company or Dolphin under the Transaction Documents and all operating and administrative expenses of the Company, including any and all legal expenses of the Company and Dolphin incurred in connection with any such refund, payment or expenses (in each case to the extent not already deducted from a prior payment of the Management Fee or otherwise reimbursed or paid by the Manager). The Management Fee shall be payable quarterly in arrears, and shall be payable with respect to full months only without pro-ration for any shorter period.

(b)    If for any reason the Company is unable to pay any or all of the amounts otherwise owed to the Manager pursuant to this Agreement, the Company shall make such payments as soon as the Company is able to do so, together with interest thereon at the rate of 1.5% of the unpaid amount per month.

5.    <u>Relationship of the Parties</u>. The Manager is providing services hereunder as an independent contractor, retaining control and responsibility for its operations and personnel. Nothing in this Agreement shall be deemed to constitute the parties hereto joint venturers, partners or participants in an unincorporated business or other separate entity, nor in any manner create any employer-employee relationship between the Company on the one hand, and the Manager or any of the Manager's employees on the other hand.

6.    <u>Control</u>. The activities of the Company shall at all times be subject to the control and direction of its manager. The Company reserves the right to make all decisions with regard to any matter upon which the Manager has rendered its services hereunder.

7.    <u>Indemnification</u>. (a) The Manager shall reimburse, defend, indemnify and hold the Company and its affiliates, members, partners, managers, officers, employees and agents, harmless from and against any damage, loss, liability, deficiency, diminution in value, action, suit, claim, proceeding, investigation, audit, demand, assessment, fine, judgment, cost and other expense (including, without limitation, reasonable legal fees and expenses) arising out of, related to or in connection with any act or omission of, or on behalf of, the Manager in carrying out its duties hereunder to the extent resulting in whole or in part from the Manager's failure to perform its duties under Section 1, including by breach of any of the Manager's obligations to the operators under the Leases. Without limiting the generality of the foregoing, the Manager acknowledges that the Company is relying entirely on the Manager to protect all relationships with operators and lessees under the Leases, and the Manager acknowledges that indemnification shall be due hereunder to the extent that the Company experiences a loss or diminution in value of any Lease. (b) The Company shall reimburse, defend, indemnify and hold the Manager and its affiliates, members, partners, managers, officers, employees and agents, harmless from and against any damage, loss, liability, deficiency, diminution in value, action, suit, claim, proceeding, investigation, audit, demand, assessment, fine, judgment, cost and other expense

-3-

(including, without limitation, reasonable legal fees and expenses) arising out of, related to or in connection with the Company's failure to leave the Simulators in place under the Leases.

8.    Assignment; Successors and Assigns. This Agreement and the rights, duties and obligations of the Manager hereunder may not be assigned or delegated by the Manager without the prior written consent of the Company. All covenants, promises and agreements by or on behalf of the parties contained in this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and permitted assigns.

9.    Amendments. No amendment, supplement or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Manager and the Company (in the case of an amendment or supplement) or by the waiving party (in the case of a waiver).

10.    Applicable Law. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to principles of conflicts of law or choice of law that would compel the application of the substantive laws of any other jurisdiction.

11.    Section Headings. The headings of each section are contained herein for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

12.    Entire Agreement. This Agreement sets forth the entire agreement of the parties hereto with regard to the subject matter hereof and supersedes and replaces all prior agreements, understandings and representations, oral or written, with regard to such matters.

13.    Severability. If any provision of this Agreement or application thereof under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction. If any provision is held void, invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances.

14.    Counterparts. This Agreement may be executed in counterparts, each of which shall be an original, and both of which together shall constitute one and the same document. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

15.    Defined Terms. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Asset Purchase Agreement.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties have executed this Management Agreement as of the date first above written.

DOLPHIN DIRECT EQUITY
PARTNERS, LP
By: Dolphin Advisors, LLC,
its Managing General Partner

By: _____
    Name: Peter E. Salas
    Title: President, Dolphin Management Par..
        Managing Member

RACE CAR SIMULATION CORP.

By: _____
    Name: Peter E. Salas
    Title: President

INTERACTIVE MOTORSPORTS
AND
ENTERTAINMENT
CORPORATION

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties have executed this Management Agreement as of the date first above written.

DOLPHIN DIRECT EQUITY
PARTNERS, LP
By: Dolphin Advisors, LLC,
its Managing General Partner

By: _____
    Name:
    Title:

RACE CAR SIMULATION CORP.

By: _____
    Name:
    Title:

INTERACTIVE MOTORSPORTS
AND
ENTERTAINMENT
CORPORATION

By: _____
    Name: *William R. Donaldson*
    Title: *CEO*

NY 911719_2.DOC i

## SIMULATOR LEASE AGREEMENT

THIS SIMULATOR LEASE AGREEMENT, as amended, supplemented and/or modified from time to time in accordance with the terms and provisions hereof, and together with all Exhibits and/or other Schedules hereto (collectively the **"Agreement"**), is entered into as of January 1, 2004, by and among National Tour, Inc., a California company having an address of 7275 West Winds Blvd., Concord, NC 28075 **("Operator")**, Perfect Line, Inc., an Indiana company, having an address of 5624 W. 73rd Street, Indianapolis, IN 46278 **("Licensor")** and Racecar Simulation Corporation, a New York corporation **("Owner")**.

### WITNESSETH:

WHEREAS, Operator desires to lease six of Owner's Motion-based Race Car Simulator Attractions and related assets (the **"Equipment"**) within The Nextel Experience trailers set forth and defined below; and

For the purposes of this Agreement, the Premises shall be defined as the following location:

The Nextel Experience  (3 Simulators in each of two trailers)

WHEREAS, the parties desire to set in writing their mutual understanding and agreement in connection with the leasing of the Equipment at the Premises described above,

NOW THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### ARTICLE 1

### BASIC TERMS

| Item # | | OWNER TO PROVIDE |
|---|---|---|
| 1. | Hardware: | 6 Race Car Systems complete with all equipment, motion base, projectors, screen, spectator monitor system, and sound (exclusive of light show). |
| 2. | Enclosures: | 6 Prefabricated enclosures with safety rails, gates, and |

1

| | | |
|---|---|---|
| | | projector mount.  Footprint for each garage is 10' wide x 13'6" deep x 10' high. |
| 3. | Race Control: | The operating system that controls the operation of each Racing Simulator.  Starts and stops races and configures each race (programs the racing circuit desired, time race or lap race, etc.). |
| 4. | Software Description: | Owner's software to include image generator, race control, and 6 race track databases: Indianapolis Motor Speedway, Bristol Motor Speedway, Richmond International Raceway, Atlanta Motor Speedway, Daytona International Speedway, and Lowe's Motor Speedway.  Special software for the "Daytona Rookie Challenge" is also included as a training experience for new drivers. |
| 5. | Licenses: | For the use of the software and for the use of the attraction in connection with Nextel's mobile display at NASCAR Nextel Cup events. |
| 6. | Installation: | Installation within 21 days of delivery to be accomplished by at least 2 of Owner's technicians, by Operator's senior technician and labor supplied by Operator. |
| 7. | Training and Maintenance: | Prior to installation, Owner will train Operator's senior technician for a minimum of 3 days at one of the NASCAR Silicon Motor Speedway stores operated by Owner's parent company.  Operator to bear cost of transportation, hotel and associated travel expenses.  During installation, training of chief technician will continue as he/she assists Owner's installation team.  During installation, Owner will train attendants and other key personnel in ride operation, guest relations, and safety. |
| 8. | Project Plan and Schedule: | Owner, in conjunction with Operator, will develop and distribute a detailed project plan and schedule. |
| 9. | Warranty: | Owner will provide warranty on all parts and labor during the Term of this agreement. |

| Item # | | OPERATOR TO PROVIDE |
|---|---|---|
| 1. | Facility and Operations: | Operator will provide the mobile trailers, installation labor and support, and operations (including but not limited to staff, ticketing, electrical, HVAC, dedicated phone line, walls, spectator walls, electrical systems, generators, data lines,etc.).  The attraction requires  a minimum of one attendant for each trailer of three cars, and one or more schedulers depending on traffic volume.  Operator will provide full-time uniformed attendants during all hours the facility is open.  After initial training of staff and supervisors by Owner, Operator will warrant that all future attendants will be fully trained in ride operation, guest relations, and |

2

| | | |
|---|---|---|
| | | safety. |
| 2. | Maintenance: | Senior tech is responsible for ongoing maintenance, operation and quality control.  Operator will have on staff a technician(s) competent to service computer-controlled amusement attractions who has been trained directly by Owner or in the future, by another qualified employee. Operator certifies that daily, weekly and monthly maintenance will be done in accordance with Owner's maintenance procedures and Owner's Maintenance Logs will be kept.  The Owner's chief technician will be available to respond to Equipment failures through beeper or cellular telephone in order to quickly repair the Equipment and maximize usage.  Owner will be contacted whenever inoperative Equipment cannot be quickly repaired by the Operator's staff. |
| 3. | Electronic Data Line: | Operator will provide electronic access through a broadband data line (T1, DSL or equivalent) for monitoring and servicing the Equipment. |
| 4. | Non-Refundable Security Deposit: | $ 100,000 |
| 5. | Required Light Levels | Operator will assure no more than one foot candle of stray light on the screens and no visible shadows. |

| Item # | | TERMS & PERFORMANCE EXPECTATIONS |
|---|---|---|
| 1. | Term: | Commencing January 1, 2004 and terminating at the end of 2006 NASCAR Nextel Cup series season.  Extendable by agreement of both parties. |
| 2. | Location of Installation: | Rancho Santa Margarita , CA |
| 3. | Insurance Value of Equipment: | $450,000 |
| 4. | Cost of Installation and Removal: | Operator to pay for crating and shipping of equipment and transportation, accommodations and associated expenses for  Owner's installers.  Additional out-of-pocket expenses may include electrical, installation labor and incidentals.  Owner to bear all costs of removing and shipping Equipment at end of term. |

3

| 5. | Sponsorship: | Nextel will be the sponsor of Owner's race car simulator experience at NASCAR Nextel Cup events for the 2004 season. |
|----|--------------|---------------------------------------------------------------------------------------------------------------------|
| 6. | Hours of Operation: | Whenever Nextel mobile unit is open during race weekends. |
| 7. | Annual Gross Revenue Expected: | No race sales permitted. |
| 8. | NASCAR royalty fees | NASCAR royalty fees, if any, will be the obligation of Owner. |
| 9. | Software Upgrades | Owner agrees to upgrade these simulators within 60 days of new software developed and introduced by Owner during the Term of this agreement. |
| 10. | Hardware Upgrades | Owner agrees to offer hardware upgrades, if any, to Operator during the term of this agreement. Costs of upgrades to be negotiated between the parties. |
| 11. | Payments: | Quarterly payments of $45,000 due January 1, April 1, July 1 and October 1 of each year during the Term. $100,000 will be paid as a non-refundable advance. |
| 12. | Termination: | This agreement may only be terminated by default by material breach of the terms of this agreement. Parties will have 60 days upon written notice of a breach to cure the breach. |
| 13. | Amusement Ride Permits | Operator will be required to obtain any and all temporary amusement permits which are required to operate the simulators. |

**Item #**                                                                    **SUMMARY OF**
                                        **STANDARD TERMS**

| 1. | Representations and Warrantees: | Both parties will provide standard representations. |
|----|----------------------------------|-----------------------------------------------------|
| 2. | Assignment: | Operator may not assign without prior written consent of Owner. |
| 3. | Indemnification: | Standard for both parties. |
| 4. | Insurance: | Owner to carry standard product liability naming Operator. Operator to carry standard operating, general liability, equipment loss and damage insurance naming Owner. |
| 5. | Maintenance: | Operator to maintain equipment so that at the end of the term it is returned in the same condition, less standard wear and tear. |
| 6. | Ownership: | Equipment to be clearly labeled as property of Perfect Line, Inc. Operator to keep equipment free of liens. |

4

| 7. | Publicity: | Upon the prior approval of Nextel and/or its agency Octagon, Operator shall have the right to use the attraction and associated pre-shows, software, etc. to publicize and promote the center. |
| 8. | Access: | Upon advance notice to Operator, Owner to enjoy access during normal operating and maintenance hours. On a case by case basis, and with sufficient advance notice, Operator agrees to allow Owner access to simulators after hours for corporate events at selected event sites. Owner agrees to pay Operator for extended staff hours for such events. |
| 9. | Audits: | Owner to provide software to count number of rides. |
| 10. | Taxes, Assessments, Permits, and Fees | All taxes, assessments, permits, and fees will be the sole responsibility of the Operator. |
| 11. | Force Majeure: | Standard terms. |
| 12. | Governing Law: | Indiana will be the governing law. Standard arbitration. |
| 13. | Confidentiality: | Both parties agree to keep the other party's business and proprietary information confidential. |

## ARTICLE II
## TERMS AND CONDITIONS; PAYMENTS

**Section 2.1** TERMS AND CONDITIONS.  Operator hereby agrees to lease from Owner on a revenue-share basis the equipment identified in the Equipment Schedule(s) on Exhibit B executed by Owner and Operator and forming a part hereof (the **"Equipment"**). Licensor hereby grants Operator the right to use its proprietary software that operates the simulators, including all operating and data software and related technology created by or on behalf of Licensor or any of its affiliates associated with the operation of such Equipment as described in the Equipment Schedule(s). Capitalized terms not otherwise defined herein shall have the meanings given to them in the Basic Terms.

**Section 2.2** EQUIPMENT.

(a)  Equipment will be installed by Licensor and Operator working together on the installation.

5

(b) Operator will perform ongoing regular maintenance in accordance with Licensor's published maintenance standards and requirements such that at the end of the Term (or earlier as provided herein) the Equipment will be returned to Owner in the same condition as when delivered, reasonable wear and tear excepted, and will appoint a qualified senior maintenance operations technician at the Premises to assume responsibility for the ongoing operation and maintenance of the Equipment and to train Operator's operations staff in the safe and proper operation of the Equipment;

(c) Operator will provide electronic access through broadband data lines (T1, DSL or equivalent with 384 KB/sec both ways and static IP addresses) for the purpose of monitoring and servicing the Equipment, and will record on a daily basis (i) in Maintenance Logs all rides undertaken for maintenance purposes and (ii) in Operations Logs all complimentary and other non-paying or discounted rides, number of Passenger Rides etc. and will provide copies of such Logs to Owner monthly;

(d) Operator shall use its best efforts to ensure that the Equipment will be available for operation with a full time attendant at all times when the Premises are open for business, and at all times will be illuminated and otherwise displayed between rides with the automatic sound function in operation;

(e) Upon completion of the installation, Operator shall promptly inspect the Equipment and, if acceptable, Operator shall execute and deliver to Owner and Licensor a Certificate of Acceptance in the form of **Exhibit A** hereto. If unacceptable, Operator shall immediately notify Owner and Licensor in writing and reasonably detail any issues or problems presented by such inspection.

(f) The lease term for the Equipment shall commence (the **"Schedule Commencement Date"**) on January 1, 2004 and terminate at the end of the 2006 NASCAR Nextel Cup series season unless otherwise extended by mutual agreement of the parties.

(g) The Equipment as delivered to Operator will have affixed to it by Licensor a durable label identifying the Equipment as the property of Owner, and Operator agrees not to remove, obliterate or cover such label. Operator will insure that it does not cause any lien or security interest to be created over or in respect of the Equipment.

### Section 2.4 PAYMENTS.

(a) Payment Amount. Operator agrees to pay Owner within seven days, time being of the essence, of the beginning of each quarter of the year during the Term (each, a **"Payment Date"**). In the event that a Payment Date falls on a Saturday or Sunday, payment shall be made on the next succeeding business day.

(b) Payments Generally. Operator agrees that time is of the essence, and to

6

make all payments regardless of any problems Operator might have with the Equipment, including operation, capability, installation, or repair, and regardless of any claim, setoff, counterclaim or defense Operator might have against Owner, Licensor or any other supplier of components of the Equipment, and any salesperson or other third party. In the event Operator fails to pay any amounts due hereunder or to perform any of its other obligations under this Agreement, Owner or Licensor may, at its option, pay such amounts or perform such obligations, and Operator shall reimburse Owner or Licensor the amount of such payment or cost of such performance, which shall be deemed to be rent, upon demand, together with interest pursuant to Section 7.3 hereof. Without Owner's prior written consent, any payment to Owner of a smaller sum than due at any time under this Agreement shall not constitute a release or an accord and satisfaction for any greater sum due, or to become due, regardless of any endorsement restriction, unless otherwise agreed by Owner and Operator in a signed writing. Licensor has an obligation to respond promptly if problems occur with the equipment or programs. Owner may accept any payment or partial payment, at any time and from time to time, with any restrictive endorsement, statement or writing without waiving any rights under this agreement and same shall not be deemed an accord and satisfaction or waiver of any of Owner's rights to collect the full amount due and owing pursuant to the terms of this Agreement, which shall remain due pursuant to the terms hereof.

Section 2.5 <u>DETERMINATION OF USAGE; OWNER'S AUDIT RIGHT</u>. Owner, Licensor and Operator hereby agree that on the first business day of each calendar month Licensor shall note and report (take a "Meter Reading") from the computer meter system installed in each Race Car System for the purpose of determining the amount of Usage of such unit during the immediately preceding month. Operator shall provide a log showing all free Rides (Comps, Demos, and Technician Rides) in such month. Operator will also provide an accounting of the number and revenue for all non-driving guests ("Passenger Rides") and any mutually agreed upon special offers and coupons.

Section 2.6 TAXES<u>, ASSESSMENTS AND FEES</u>. Operator agrees to pay all licensing, filing and registration fees; (Note – fees to track owners and racing teams are included in the payments to Owner and are to be paid by Licensor on rental equipment) TO SHOW THE RIDES AS "RENTAL PROPERTY" ON ALL TAX RETURNS; to pay all other taxes, assessments, fees and penalties which may be levied or assessed in respect to the Equipment, Operator's use of or any interest therein, or any payments, including, but not limited to, all federal, state, and local taxes, however designated, levied or assessed, whether upon Operator, Licensor or Owner or the Equipment or upon sale, ownership, use or operation, excepting only income taxes levied on Owner. Owner may, at its option, pay on Operator's behalf such taxes and other amounts, which shall be deemed as rent, file applicable returns, and collect full reimbursement plus reasonable costs incurred in collecting taxes, assessments, or fees for which Operator is liable. Operator shall pay such taxes or other amounts immediately upon demand.

Section 2.7 PERMITS. Operator will be responsible for obtaining any municipal, county, state or special district permits that relate to the installation or operation of the Equipment, Operator will provide Owner and Licensor with a detailed list of all documents that Operator, on the basis of diligent inquiry, believes that will be necessary or advisable

7

for Owner or Licensor to provide to enable Operator to obtain such licenses and permits, and thereafter will promptly notify Owner and Licensor of any additions to, deletions from, or other modifications of such list.

## ARTICLE III
## WARRANTIES AND COVENANTS

**Section 3.1** OPERATOR'S WARRANTIES AND COVENANTS. Operator represents, warrants, and covenants to Owner and Licensor that upon execution of this Agreement: a) Operator has read and understood each part of this Agreement before it is signed; b) Operator selected the Equipment, and once such Equipment is installed, tested and Operator's staff is trained and the Equipment has been demonstrated to the satisfaction of Operator to be proper working order, Operator shall execute and deliver a Certificate of Acceptance confirming same; c) financial information and other statements provided to Owner or Licensor are accurate and complete and will be updated consistent with past practices upon Owner's or Licensor's request during the term hereof; d) Operator has unrestricted power to enter into this Agreement, has duly authorized the person executing it, and certifies that all signatures are authentic; e) Operator will pay all costs, fees and non-maintenance expenses connected with the operation of the Equipment, including taxes, insurance, licenses and permits, and, to the extent Owner or Licensor pays any of the same, will reimburse Owner or Licensor therefor promptly upon demand; f) Operator shall not be entitled to use any Software other than in connection with, and as part the Equipment related to such Software as set forth in Article I.; g) Operator acknowledges and agrees that Owner and Licensor make no representation or warranty of any kind or nature, express or implied, as to any financial performance of the Equipment or the Premises or in connection with any other matter, of whatsoever nature, express or implied, or set forth in this agreement, unless such representation or warranty is specifically set forth in writing; h) Operator acknowledges, represents and warrants that it is entering into this Agreement as a result of its own due diligence investigations and is relying solely upon same; i) Operator shall not do or perform any act or cause to occur, in any manner, a default under any Lease, Licensor's License Agreement with NASCAR or otherwise, in any manner, cause Licensor to be in default of its third party obligations in connection with the performance and operation of the Equipment and the Premises; and j) notwithstanding anything to the contrary contained in this Agreement, Operator acknowledges and agrees that Owner is and remains the owner of all of the Equipment and the holder of all priority interests in and to the Equipment and as such can encumber, assign, transfer or otherwise, in any manner, sell, transfer, assign, encumber, hypothecate, or sub-license this Agreement and all of the rights contained in it as it deems desirable without the consent of Operator and has the exclusive right to negotiate any extensions of any lease or any other third party agreement in its sole discretion.

## ARTICLE IV
## QUIET ENJOYMENT

**Section 4.1** QUIET ENJOYMENT. Subject to Owner's right to regain possession and so long as no Event of Default (as defined below) exists, Owner and Licensor shall not interfere with Operator's quiet enjoyment and use of the Equipment during the Term. In no

case shall Owner, Licensor or Operator be liable to the other for special indirect, incidental, consequential or punitive damages. To the extent permitted by applicable law, Operator hereby waives any of Operator's rights to: 1) claim a security interest in the Equipment, and 2) Sell or dispose of the Equipment upon rejection or revocation.

**Section 4.2**   REPRESENTATIONS AND WARRANTIES BY OWNER AND LICENSOR TO OPERATOR. Owner and Licensor warrants to Operator that all Equipment (i) shall conform to the designs, product specifications and performance criteria mutually agreed by the parties, and (ii) shall be free from defects in title, material or workmanship for a period of one (1) year after the date the Certificate of Acceptance is signed by Operator for such Equipment; provided, however, that any components or subassemblies that carry a separate and assignable manufacturer's, distributor's or other warranty which Operator is entitled to the benefit of (each a "Third Party Warranty") shall be excluded from the warranty given by Owner and Licensor hereunder and shall be covered only by such Third-Party Warranty, any and all of which are hereby assigned by Owner or Licensor jointly to Owner, Licensor and Operator to the extent permissible thereunder; and provided further that Owner's and Licensor's responsibility under this warranty shall be limited to replacement or repair of the defective products at Licensor's facilities in Indianapolis, Indiana or any other facility designated by Licensor. After the one-year warranty period has expired, both parties agree to share equally in the cost of shipping, parts, and labor for all non-routine maintenance. A list of all Third Party Warranties shall be provided by Owner or Licensor to Operator upon execution of this Agreement. Owner or Licensor will bear the cost of freight to Licensor's repair facility. In no event shall Owner or Licensor be liable for consequential damages, including loss of profits or revenues, arising out of the failure of any Equipment or component part thereof. The warranty given hereunder does not cover normal wear and tear, or damages resulting from operator abuse. The foregoing limited warranty is in lieu of all other warranties of Owner or Licensor, and Owner and Licensor disclaim all other warranties of the Equipment, express or implied, including, but not limited to, any implied warranty of merchantability, profitability, fitness or adequacy for any particular purpose or use.

**ARTICLE V**
**OWNERSHIP AND TITLE; OPERATION; MAINTENANCE; AND INSURANCE**

**Section 5.1** OWNERSHIP AND TITLE. Owner is the sole owner of the Equipment and Licensor has a valid license to use the Software. Owner has all residual rights, has the right to inspect the Equipment, and has the right to affix and display notice of Owner's ownership thereon. The Equipment shall remain Owner's personal property whether or not affixed to realty and shall not be part of any real property on which it is placed. To the extent that Operator breaches its obligations under Section 5.5 hereof and attaches any additions, attachments or accessories to the Equipment, (i) such breach shall constitute an Event of Default hereunder, and (ii) all such additions, attachments, and accessories placed on such Equipment shall become part of the Equipment and Owner's property. Copyrighted materials and materials subject to other intellectual property rights may be used only in accordance with the terms of the license relating thereto. Operator authorizes Owner or Licensor to file at their respective option informational financing statements

and/or fixture filings without Operator's signature and, if a signature is required by law, Operator appoints Owner and Licensor as Operator's attorney-in-fact to execute such statements and filings. For the purpose of enabling Owner and Licensor to maintain all such filings as current and accurate, in the event Operator proposes to change its name or state of incorporation or organization, Operator agrees to notify Owner and Licensor of such proposed change at least thirty (30) days prior to undertaking any such action.

**Section 5.2** OPERATION. Operator shall be solely responsible for the operation of and shall use and operate the Equipment in compliance with applicable laws. Except as otherwise permitted hereunder, Operator agrees to keep and use the Equipment only at the business address identified in writing by Operator to Owner and Licensor, to never abandon the Equipment, and to never relinquish possession of the Equipment except to Owner.

**Section 5.3** <u>MAINTENANCE OF THE EQUIPMENT</u>. Operator hereby acknowledges and agrees that Owner and Licensor shall not in any way be responsible for any routine maintenance or servicing of the Equipment. Operator understands and agrees that, except as otherwise provided herein, ordinary daily service and maintenance, including cleaning of the Equipment and other daily adjustments will be provided by Operator, and that any non-routine maintenance, servicing and/or repairs shall be undertaken exclusively by Licensor or by Operator with Licensor's permission, either as part of Owner and Licensor's warranty obligations or outside of warranty at Owner's then current prices. Operator shall have at least one trained technician on staff at all times during the term of this Agreement. Operator's maintenance personnel will be trained and certified on site by Licensor during installation. Upon successful installation of the Equipment, training of new staff shall be conducted by Operator at Operator's facility. No repairs or adjustments are to be performed by any technician or individual who is not (a) certified by Licensor and (b) employed by the Operator, without permission of Licensor. Operator shall report all maintenance related issues to Owner and Licensor within twenty-four (24) hours of their occurrence, and if Operator is unable to operate the Equipment, to promptly report to Owner and Licensor. Operator hereby agrees to permit access (or cause its landlord, if applicable, to permit access) during ordinary business hours to Licensor to permit Licensor to undertake the performance of such servicing and maintenance obligations. Licensor is to perform required repairs in a timely manner.

**Section 5.4** <u>RISK OF LOSS AND INSURANCE</u>. Commencing on the date Equipment is delivered to Operator and properly installed to Operator's reasonable satisfaction and continuing until the Equipment have been removed from the Premises,, Operator will bear the entire risk of loss or damage to the Equipment, regardless how arising. Operator shall immediately notify Owner and Licensor of the occurrence of any loss or other event or circumstance affecting Owner's interests and shall, in the case of any damage to the Equipment, repair or replace the Equipment at Operator's expense. Operator agrees to keep the Equipment insured at Operator's expense against risks of loss or damage from any cause whatsoever. Operator agrees that such insurance shall not be less than the replacement value of the Equipment, which shall be designated by Owner from time to time. Operator also agrees that the insurance shall be in such additional amount as is reasonable to cover Owner and Licensor for public liability and property

10

damage arising from the Equipment or their use. Operator agrees to name Owner and Licensor as loss payees and as additional insured's on all such insurance. Each policy shall provide that the insurance cannot be canceled without thirty (30) days prior written notice to Owner and Licensor, and cannot be invalidated with respect to Owner's interest by acts or omissions of Operator. Operator agrees to furnish to Owner and Licensor proof of insurance, by a certificate of insurance. Failure to provide the required insurance herein set forth shall be deemed to be a material default for which Owner may cancel this Agreement or obtain the required insurance as herein provided. Any cancellation shall be in accord with the default and cure periods specified in the default provisions of this Agreement. In the event Operator fails to provide Owner and Licensor with evidence of the aforesaid insurance, Owner may, but shall not be obligated, in its sole discretion purchase insurance at Operator's expense to protect Owner's interests in the Equipment or to cancel this Agreement. This insurance may, but need not, protect Operator's interests. The coverage purchased by Owner may not pay any claim made by Operator or any claim that is made against Operator in connection with the Equipment. If Owner purchases insurance for the Equipment, Operator will be responsible for the costs of that insurance, including interest and other charges imposed by Owner in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Operator's obligations hereunder as rent. The costs of the insurance may be more than the cost of insurance Operator is able to obtain on its own. The proceeds of insurance shall be applied at Owner's sole election toward the replacement or repair of the Equipment or payment towards Operator's obligations. If there has been an Event of Default, Operator appoints Owner as its attorney-in-fact, coupled with a power to make any claim for, receive payment of, or execute or endorse all documents, checks or drafts for loss or damage or return of premium under such insurance. If Operator breaches its obligation to provide insurance in accordance with this Section 5.4, such breach shall constitute an Event of Default hereunder, and in addition to such Event of Default, Operator shall be obligated to pay to Owner each month a risk charge stipulated and liquidated at .25% of Owner's original cost of such Equipment until Operator provides proof of compliance with insurance requirements. In spite of the payment of such risk charge, Operator has no right or claim to any insurance benefits from Owner. Operator is still liable for all losses, and such risk charge is not in lieu of the insurance requirements of this Agreement.

**Section 5.5** <u>NO ALTERATIONS, MODIFICATIONS OR ADDITIONS TO EQUIPMENT</u>. Unless otherwise agreed to between Owner and Operator, Operator shall not in any way alter or modify in any respect the Equipment and shall not attach thereto any additions, attachments or accessories.

**Section 5.6** <u>SIMILAR ATTRACTIONS</u>. Operator agrees that no other full-body race car simulators with motion base will be placed at the Premises during the entire term of this Agreement.

**ARTICLE VI**
**INDEMNIFICATION**

**Section 6.1** <u>INDEMNITY</u>. Operator agrees to indemnify, defend and hold Owner

11

and Licensor harmless from and against, any and all damages (including special, indirect, incidental and consequential damages), liabilities (including liabilities for death and/or personal injury), penalties, claims and expenses or cost of whatsoever nature, including, but not limited to, any and all attorney's fees and legal expenses, arising from or caused directly or indirectly by Operators performance of this Agreement, excepting any gross negligence of Owner or Licensor.

Owner and Licensor agree to indemnify, hold harmless and defend Operator and its officers, directors and employees, ("Operator Indemnities") from any and all liabilities, obligations, losses, damages, penalties, claims, actions suits, costs, disbursements, and expenses (including reasonable legal and expert witness fees, costs and related expenses) of every kind and nature imposed upon, incurred by or asserted against the Operator Indemnities by reason of (i) any grossly negligent act, grossly negligent error, or grossly negligent omission of Owner or Licensor, or their respective officers, directors, or employees, (ii) any intentional or willful misconduct of Owner or Licensor, or their respective officers, directors, or employees.

The provisions of this <u>Section 6.1</u> shall survive the expiration or other termination of this Agreement.

**ARTICLE VII**
**DEFAULT; REMEDIES; MITIGATION; AND COSTS OF COLLECTION**

**Section 7.1 DEFAULT.** Operator shall be in default of this Agreement upon the occurrence of any of the following events (an **"Event of Default"**): a) Operator fails to pay any amount due hereunder when due and has not cured such default within 3 business days following receipt of written notice thereof; (b) Operator impairs, encumbers, damages, assigns, moves, pledges, subleases, sells or relinquishes possession of the Equipment, or attempts to do so, without Owner's prior written consent, (in each instance) which consent will not be unreasonably withheld; c) Operator breaches any of its warranties, covenants or other obligations under this Agreement, or any other agreement with Owner or Licensor, and fails to cure such breach within ten (10) days, time being of the essence, after Owner or Licensor sends notice of the existence of such breach; d) Operator becomes insolvent or unable to pay debts when due; stops doing business as a going concern; merges, consolidates, transfers all or substantially all of its assets; makes an assignment for the benefit of creditors, appoints a trustee or receiver or undergoes a substantial deterioration of financial health; or e) Operator or any guarantor fails to assume or reaffirm this Agreement obligation within sixty (60) days of the filing of any petition for protection under the United States Bankruptcy Code.

**7.2** <u>REMEDIES</u>. Upon the occurrence of any Event of Default, Owner shall give Operator Ten (10) days advance written notice to cure such default. In the event such default shall not be cured or diligently commenced to be cured to the reasonable satisfaction of Owner in its sole discretion, Owner, at its option, has the right, but not the obligation, to immediately, without notice retake possession of the Equipment and the Premises, without court order or other process of law, and for such purpose may enter upon any premises where the Equipment may be, remove or operate the same, with

12

Operator being liable for all reasonable costs and expenses incurred in the operation, repossession, recovery or repair, of the Equipment or otherwise avail itself to any remedy at law or in equity. Owner, at its option, may cancel this Agreement at the expiration of any cure period or repossession and Operator shall remain liable for all amounts due and owing to Owner as a result of such default, including any consequential damages resulting therefrom. The provisions of this Agreement are severable and shall not be affected or impaired if any provision is held unenforceable, invalid, or illegal. Any provisions held in conflict with any statute or rule of law shall be deemed inoperative only to the extent of such conflict and shall be modified to the extent possible to conform to such statute or rule. Operator agrees that Owner may avail itself to any remedies herein set forth or otherwise at law and or equity, in its discretion, and this paragraph 7.2 shall not be deemed an election of remedies. Operator agrees that Owner shall be deemed to be the attorney in fact of Operator, coupled with a power, to enforce the provisions of this paragraph 7.2

**7.3** <u>COLLECTION CHARGES AND ATTORNEY'S FEES</u>. If any part of any sum is not paid when due, Operator agrees to pay Owner: a) a charge for every month in which the sum is late to compensate Owner for the inability to reinvest the sum, stipulated and liquidated at 1.2% per month; plus b) all costs of collection, including collectors' contingency fees, Owner's reasonable attorney fees as damages and not costs in all proceedings arising under this Agreement, including any arbitration, bankruptcy proceeding, civil action, mediation, counterclaim or post-judgment action or appeal with respect to any of the foregoing; plus c) a returned-check or non-sufficient funds ("NSF") charge to reimburse Owner for its time and expense incurred with respect to a check that is returned for any reason, stipulated and liquidated at the greater of $50 or actual bank charges to Owner, plus other amounts allowed by law.

## ARTICLE VIII
## MISCELLANEOUS

**8.1** <u>NOTICE</u>. Any notices required to be given hereunder shall be given in writing by either (a) hand delivery, (b) overnight courier, (c) certified mail, or (d) facsimile, and directed to the address of each party set forth in this Agreement below its signature or to such other address as either party may substitute by written notice from time to time. In any legal action, Operator waives personal service and agrees to service of process by certified or registered mail, return receipt requested, postage prepaid, at Operator's address for notice purposes, which service shall be deemed complete five (5) days after posting.

**8.2** <u>SUCCESSORS AND ASSIGNMENTS</u>. OPERATOR AGREES NOT TO TRANSFER, SELL, SUBLEASE, OR ENCUMBER EITHER THE EQUIPMENT OR ANY RIGHTS UNDER THIS AGREEMENT WITHOUT THE PRIOR WRITTEN CONSENT OF OWNER AND LICENSOR, **in each instance** which consent will not be unreasonably withheld. Even with Owner's and Licensor's consent, Operator shall remain jointly and severally liable with any assignee. In all cases, the provisions of this Agreement bind all heirs, executors, administrators, successors, trustees, and assigns of Operator. OWNER AND LICENSOR MAY, AT THEIR OPTION, ASSIGN THEIR RESPECTIVE RIGHTS AND INTERESTS AT ANY TIME UNDER THIS AGREEMENT WITHOUT NOTICE. Operator

agrees that Owner's and/or Licensor's assigns will have the same rights and remedies as Owner and Licensor respectively. Operator stipulates that any such assignment by Owner and/or Licensor shall not materially change Operator's duties, obligations or risks under this Agreement.

        **8.3** <u>CONSENT TO INDIANA LAW, JURISDICTION, VENUE, AND NON-JURY TRIAL</u>. Operator consents, agrees, and stipulates that: a) this Agreement shall be deemed fully executed and performed in the State of Indiana and shall be governed by and construed in accordance with the laws thereof; and b) in any action, proceeding, or appeal on any matter related to or arising out of this Agreement, Owner, Licensor and Operator **1) SHALL BE SUBJECT TO THE PERSONAL JURISDICTION OF THE COURTS OF THE ABOVE STATE,** including any state or federal court sitting therein, and all court rules therefrom; and **2) SHALL ACCEPT VENUE IN ANY FEDERAL OR STATE COURT IN THE COUNTY OF LICENSOR'S OFFICE. OWNER AND OPERATOR EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY.**

        **8.4** <u>FORCE MAJUERE</u>. Except for obligations to make payment, no party shall be liable to the others for any failure of (or delay in performance of) its obligations hereunder due to any cause or circumstance which is beyond its reasonable control including, but without limiting the generality of the foregoing, any failure or delay caused by strike, lockout, labor shortage, unavailability of personnel, fire, explosion, shipwreck, act of God or the public enemy, war, riot, interference by the military or governmental authorities, or compliance with the laws of the United States or with the laws or orders of any other government authority. In the event such condition shall extend for a continuous period of six months all parties shall meet and agree upon appropriate fair and equitable action to safeguard the respective interests of the parties and to make restitution where reasonable.

        **8.5** <u>CONFIDENTIALITY</u>. Each party hereto agrees that it will not disclose any proprietary or confidential information of either or both of the other parties hereto ("Confidential Information") that may be provided to it hereunder or of which it may become aware as a consequence hereof, the fact that such Confidential Information has been made available, any of the terms, conditions or other facts relating to this Agreement, including the existence hereof, the identities of the parties hereto, or that any Confidential Information has been or will be made available; provided, however, that nothing contained herein shall preclude any party from disclosing such Confidential Information to its directors, officers, employees, and professional advisors on a need-to-know basis (it being understood and agreed that such persons shall in all instances be informed of the confidential nature of such Confidential Information and shall be directed to treat such Confidential Information confidentially); and provided, further, that the term "Confidential Information" shall not include information which (i) is already in a party's possession independent of this Agreement and its dealings in connection herewith, provided that such information is not known by such party to be subject to another confidentiality agreement with, or other obligations of secrecy to, any other party; (ii) is or becomes generally available to the public other than as a result of a direct or indirect disclosure by a party hereto; (iii) becomes available to a party on a non-confidential basis from a source other

14

than another party hereto, provided that such source is not known by the receiving party to be bound by a confidentiality agreement with, or other obligation of secrecy to, such other parties; or (iv) is independently developed by a party without uses of the Confidential Information; and provided further that nothing herein shall prevent a party from complying with applicable laws, rules or regulations or from complying with any order of any court or other tribunal of competent jurisdiction. Notwithstanding the above, the parties may disclose Confidential Information that may be required by law or reporting requirements of the Securities and Exchange Commission, and for financing due diligence provided that the financing company has signed a confidentiality agreement on terms consistent with the above.

**IN WITNESS WHEREOF**, the parties hereto have entered into this Agreement effective as of the date first written above.

**LICENSOR**

By: _____
Name: William R. Donaldson
Title: Chairman & CEO

Address for Notices
5624 West 73rd Street
Indianapolis, IN 46278

Attn: Mr. William R. Donaldson
Fax: 317-298-8924
Phone: 317-295-3500

**OPERATOR**

By: _____
Name: _____
Title: _____

Address for Notices

Attn:
Fax:
Phone:

**OWNER**

By: _____
Name: _____
Title: _____

Address for Notices
129 E. 17th Street
2nd Floor
New York, NY 10003

Attn:
Fax:
Phone 212 982-5071

15

## EXHIBIT A

CERTIFICATE OF ACCEPTANCE

## Location:_____

Reference is made to Simulator Lease Agreement, dated as of _____, 2004 (together with the Agreement, Schedule, the **"Lease Agreement"**), by and among National Tour, Inc., a _____ corporation ("Operator"), Perfect Line, Inc., an Indiana corporation and Racecar Simulation Corporation, a New York corporation. All terms used herein and not defied herein shall be defined pursuant to the requirements of the Master Agreement.

The undersigned hereby certifies that all of the Equipment and Software referred to below has been examined, that any installation or other work necessary prior to the use thereof has been completed, that the Equipment has been examined by Operator and are in good operating order and condition and are in all respects satisfactory to Operator, and that the Equipment is accepted by Operator for all purposes under this Lease Agreement.

### DESCRIPTION OF EQUIPMENT

| | |
|---|---|
| **Hardware Description:** | _6_ Race Car Systems complete with all equipment motion bases, projectors, screens, spectator monitor systems, and sound. Also included is a "Race Results" printer, for the printing of race results following each race. |
| **Enclosures:** | Environs are not planned for this location. |
| **Software Description:** | Licensor's software at each location to include image generator, race control, and 6-race track databases: Indianapolis Motor Speedway, Atlanta Motor Speedway, Daytona International Speedway, Bristol Motor Speedway, Richmond International Raceway and Lowe's Motor Speedway. Special software for the "Daytona Rookie Challenge" is also included as a training experience for new drivers. New tracks will be provided as they become available. Other new software will be made available as it is made available to the NSMS sites. |
| **Equipment Serial Numbers:** | See attached "Exhibit B" |

**IN WITNESS WHEREOF,** Operator has duly executed and delivered this Certificate of Acceptance as of this _____ day of _____, 2004.

Operator

By:_____

Name: _____

Title: _____

17

## Exhibit B

6 Race Car Simulators – Serial Numbers

9912130-4
9912129-3
9912128-2
9912135-8
9912132-6
9912127-1

| Quantity | Description |
|---|---|
| 6 | Racecar systems including cars, motion bases, projectors, screens, sound, and safety systems.. |
| 6 | Rear view mirror computers (one per car) |
| 6 | Car computers that control sound within the car and violations (one per car) |
| 6 | Computers to control the center screen images (one per car) |
| 6 | Computers to control the left screen images (one per car) |
| 6 | Computers to control the right screen images (one per car) |
| 6 | Computers to control the vehicle dynamics (one per car) |
| 6 | Hydraulic pumps to provide the car motion |
| 1 | Track Official computer to start & stop races |
| 1 | SMS Computer that controls the Live video |
| 1 | AV Computer that controls the audio and the training video |
| 1 | Drone Computer that controls the drone cars on the track |
| 1 | DFB Computer that controls car collisions |
| 1 | Amplifier that controls the speakers |
| 1 | Server computer to manage database functions and software management |
| 1 | Belkin Switch that connects monitors to PC's |
| 2 | Amplifiers for the training video and spectator speakers |
| 1 | Router |
| 2 ea | Keyboards, monitors and mice for the Track Official/Race Registration area |
| 1 | Deadstop box that allows the Track Official to stop vehicle motion in case of an |

| | emergency |
|---|---|
| 1 | Printer for producing race results |
| 1 | Network Hub |

Exhibit C

RECYCLED

Final Execution Copy

# MANAGEMENT AGREEMENT

This MANAGEMENT AGREEMENT (this "Agreement"), dated as of December 31, 2004 (the "Effective Date"), is entered into by and between Dolphin Direct Equity Partners, LP, a Delaware limited partnership ("Dolphin"), Race Car Simulation Corp., a New York corporation affiliated with Dolphin (the "Company"), and Interactive Motorsports and Entertainment Corporation, an Indiana corporation (together with its subsidiaries, the "Manager").

WHEREAS, the Company desires to receive certain management services from the Manager;

WHEREAS, the Manager desires to provide such services to the Company pursuant to the terms of this Agreement;

WHEREAS, the compensation arrangements set forth in this Agreement are designed to compensate the Manager for providing such services to the Company; and

WHEREAS, the Company and the Manager are entering into an Asset Purchase Agreement of even date herewith (the "Asset Purchase Agreement").

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, the parties hereto agree as follows:

1.    Services.

(a)    The Company hereby retains the Manager to, and the Manager hereby agrees to be retained to (i) accept and perform, on behalf of the Company, each and all of the Company's obligations of any kind (other than the obligation to leave Simulators in place) under all Leases whether now existing or entered into after the date hereof, (ii) if any Simulators are not, at any time, being utilized to generate revenue for the Company, place such Simulators into service under Leases with operators prior to placing any of its own or any competing racecar simulators into any such arrangements; provided, however, that the Company may reject any such arrangement in its sole discretion, and thereafter the Manager may place its own or any competing racecar simulators into such arrangement if the terms thereof are no more favorable to the Manager than the rejected terms would have been to the Company, (iii) use its best efforts to market and negotiate competitive terms for the placement of Simulators, and bear all costs of relocation and refurbishment of such Simulators, (iv) in every manner maintain, protect and enhance the value of all Simulators and all Leases, and perform the Company's and the Manager's obligations under all Leases, with the highest standard of care and with the highest commitment of financial, personnel, marketing, time and other resources as Manager applies with respect to its own racecar simulators and leases or other revenue sharing arrangements; (v) otherwise advise the Company with respect to the utilization of all Simulators, and perform such additional services relating thereto, as reasonably requested by the Company from time to time, in every case diligently, promptly and at the Manager's sole expense; and (vi) maintain, on

terms no less favorable to the Company and to the operators under the Leases than the existing arrangement, the ability of the Company and to the operators under the Leases to utilize the marks subject of the license agreement by and among National Association for Stock Car Racing, Inc. and PL, effective as of June 1, 2001, as the same may be amended from time to time.

       (b)    If the Manager is unable to place any of the Company's Simulators into service pursuant to Section 1(a) within sixty (60) days of such Simulator being taken out of service, the Company may elect to exchange any such Simulator for a simulator of the Company's choosing owned by the Manager that has been placed into a revenue-generating arrangement with a third party within the six (6) month period immediately preceding the date that the Company's Simulator was taken out of service. The Manager will assign to the Company its rights under any operating lease or revenue sharing agreement to which any such exchanged Simulator is subject, and such arrangement will be considered a Lease under this Agreement.

     2.     <u>Additional Funding; Issuance of Warrants</u>.

       (a)    If (i) the Manager and Dolphin mutually agree that Dolphin will contribute additional funds to the Company or (ii) Dolphin or the Company receives any claim, invoice or other notice from a third party alleging or otherwise indicating that Dolphin or the Company is required to make any payment or take any action, and Dolphin reasonably believes that the Company requires additional funding in order to make such payment, take such action or defend itself in connection with such claim, invoice or notice, Dolphin (X) in the case of clause (i) above, shall and (Y) in the case of clause (ii) above, may contribute such funds (in debt, equity or any combination thereof at its sole discretion), to such extent, from time to time and up to $2 million in the aggregate. As conditions precedent to Dolphin's obligation to make any such contribution contemplated by clause (i) above, the Manager shall (i) issue to Dolphin a warrant pursuant to Section 2(b) and (ii) have fully performed all obligations to be performed by it under the Transaction Documents.

       (b)    In the event of any additional funding of the Company pursuant to Section 2(a), Manager shall issue to Dolphin a warrant simultaneously with Dolphin's funding of each such contribution in form and substance as set forth on Exhibit A hereto, to purchase a number of shares of common stock of the Manager, par value $0.0001 per share, equal to 2.5 shares for each $1 of equity or principal amount of debt of such contribution. Any contribution made by Dolphin to the Company prior to the issuance by Manager of such warrant shall not be deemed a waiver of Manager's obligation to issue such warrant.

     3.     <u>Term</u>. The term of this Agreement shall commence as of the Effective Date and shall continue until terminated by mutual agreement of the parties.

     4.     <u>Compensation</u>.

       (a)    As sole consideration for the services to be rendered by the Manager hereunder, and commencing with the first (if any) full month at the beginning of which (i) the Aggregate Investment Amount equals zero ($0.00) and (ii) Dolphin does not reasonably believe

that the Company will require additional funding in order to meet its obligations under the Leases or any other legal obligations, the Manager shall accrue a monthly fee (the "Management Fee") equal to the excess of (X) 75% of the aggregate cash payments actually received by the Company under the Leases, computed without taking into consideration the fees payable under this Section 4, as determined by the Company's regular auditors, or in the absence thereof, by the Company, with respect to each full month <u>over</u> (Y) (1) $3,000 (2) without duplication, all amounts that the Company has been required to refund or otherwise pay under or in connection with the Leases, all amounts owing to the Company or Dolphin under the Transaction Documents and all operating and administrative expenses of the Company, including any and all legal expenses of the Company and Dolphin incurred in connection with any such refund, payment or expenses (in each case to the extent not already deducted from a prior payment of the Management Fee or otherwise reimbursed or paid by the Manager). The Management Fee shall be payable quarterly in arrears, and shall be payable with respect to full months only without pro-ration for any shorter period.

(b)    If for any reason the Company is unable to pay any or all of the amounts otherwise owed to the Manager pursuant to this Agreement, the Company shall make such payments as soon as the Company is able to do so, together with interest thereon at the rate of 1.5% of the unpaid amount per month.

5.    <u>Relationship of the Parties</u>. The Manager is providing services hereunder as an independent contractor, retaining control and responsibility for its operations and personnel. Nothing in this Agreement shall be deemed to constitute the parties hereto joint venturers, partners or participants in an unincorporated business or other separate entity, nor in any manner create any employer-employee relationship between the Company on the one hand, and the Manager or any of the Manager's employees on the other hand.

6.    <u>Control</u>. The activities of the Company shall at all times be subject to the control and direction of its manager. The Company reserves the right to make all decisions with regard to any matter upon which the Manager has rendered its services hereunder.

7.    <u>Indemnification</u>. (a) The Manager shall reimburse, defend, indemnify and hold the Company and its affiliates, members, partners, managers, officers, employees and agents, harmless from and against any damage, loss, liability, deficiency, diminution in value, action, suit, claim, proceeding, investigation, audit, demand, assessment, fine, judgment, cost and other expense (including, without limitation, reasonable legal fees and expenses) arising out of, related to or in connection with any act or omission of, or on behalf of, the Manager in carrying out its duties hereunder to the extent resulting in whole or in part from the Manager's failure to perform its duties under Section 1, including by breach of any of the Manager's obligations to the operators under the Leases. Without limiting the generality of the foregoing, the Manager acknowledges that the Company is relying entirely on the Manager to protect all relationships with operators and lessees under the Leases, and the Manager acknowledges that indemnification shall be due hereunder to the extent that the Company experiences a loss or diminution in value of any Lease. (b) The Company shall reimburse, defend, indemnify and hold the Manager and its affiliates, members, partners, managers, officers, employees and agents, harmless from and against any damage, loss, liability, deficiency, diminution in value, action, suit, claim, proceeding, investigation, audit, demand, assessment, fine, judgment, cost and other expense

(including, without limitation, reasonable legal fees and expenses) arising out of, related to or in connection with the Company's failure to leave the Simulators in place under the Leases.

8.    Assignment; Successors and Assigns.  This Agreement and the rights, duties and obligations of the Manager hereunder may not be assigned or delegated by the Manager without the prior written consent of the Company. All covenants, promises and agreements by or on behalf of the parties contained in this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and permitted assigns.

9.    Amendments.  No amendment, supplement or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Manager and the Company (in the case of an amendment or supplement) or by the waiving party (in the case of a waiver).

10.    Applicable Law.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to principles of conflicts of law or choice of law that would compel the application of the substantive laws of any other jurisdiction.

11.    Section Headings.  The headings of each section are contained herein for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

12.    Entire Agreement.  This Agreement sets forth the entire agreement of the parties hereto with regard to the subject matter hereof and supersedes and replaces all prior agreements, understandings and representations, oral or written, with regard to such matters.

13.    Severability. If any provision of this Agreement or application thereof under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction. If any provision is held void, invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances.

14.    Counterparts. This Agreement may be executed in counterparts, each of which shall be an original, and both of which together shall constitute one and the same document. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

15.    Defined Terms. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Asset Purchase Agreement.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties have executed this Management Agreement as of the date first above written.

DOLPHIN DIRECT EQUITY
PARTNERS, LP
By: Dolphin Advisors, LLC,
its Managing General Partner

By: _____
    Name: *Peter E. Solas*
    Title: *President, Dolphin Management Partners, Managing Member*

RACE CAR SIMULATION CORP.

By: _____
    Name: *Peter E. Solas*
    Title: *President*

INTERACTIVE MOTORSPORTS
AND
ENTERTAINMENT
CORPORATION

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties have executed this Management Agreement as of the date first above written.

DOLPHIN DIRECT EQUITY
PARTNERS, LP
By: Dolphin Advisors, LLC,
its Managing General Partner

By: _____
     Name:
     Title:

RACE CAR SIMULATION CORP.

By: _____
     Name:
     Title:

INTERACTIVE MOTORSPORTS
AND
ENTERTAINMENT
CORPORATION

By: _____
     Name: WILLIAM R. DONALDSON
     Title: CEO

NY 911719_2.DOC i

Exhibit D

RECYCLED

## NONCOMPETITION AGREEMENT

This NONCOMPETITION AGREEMENT is made effective as of December 31, 2004, by and between Race Car Simulation Corp., a New York corporation (the "Company") and William Donaldson (the "Executive").

## RECITALS

WHEREAS, the Executive is a shareholder and the chief executive officer of Interactive Motorsports and Entertainment Corporation, an Indiana corporation (together with its subsidiaries, "IMTS"); and

WHEREAS, the Executive desires that the Company enter into that certain Asset Purchase Agreement with IMTS of even date herewith (the "Asset Purchase Agreement") and is entering into this Noncompetition Agreement in order to induce the Company to enter into the Asset Purchase Agreements concurrently herewith.

**NOW, THEREFORE,** in consideration of the premises and of the mutual promises herein contained, the parties hereto agree as follows:

Section 1.     Term. The term of this Agreement shall commence on the date hereof and shall continue until such time, if any, as IMTS shall have exercised and fully performed its repurchase option under Section 4.11 of the Asset Purchase Agreement.

Section 2.     Representations and Agreements of Executive. Executive represents and warrants that he is free to enter into this Agreement and to perform the obligations required hereunder, and that there are no employment contracts, restrictive covenants or other restrictions preventing the performance of his obligations hereunder.

Section 3.     Agreements.

(a)     During the term of this Agreement, Executive agrees not to compete, directly or indirectly, with the business (including without limitation the ownership, maintenance or operation of racecar simulators and any related assets, such as are the subject of the Asset Purchase Agreement) conducted or to be conducted by the Company or its affiliates, including without limitation any activity on behalf of, in conjunction with or otherwise relating to NASCAR (collectively, the "Restricted Business") anywhere in North America (the "Restricted Territory"); provided, however, that the foregoing shall not prohibit such actions or inactions to the extent that they do not result in more favorable treatment to the operation and maintenance of other racecar simulators and related assets owned or operated by IMTS over the operation and maintenance of the Assets. For purposes of this Agreement, direct or indirect competition includes competition as a sole proprietor, partner, corporate officer, director, shareholder, manager, member, employee, consultant, agent, independent contractor, trustee, or in any other manner in which such person or entity holds any beneficial interest in a competitive business, derives any income from any beneficial interest in a competitive business, or provides any service to such business anywhere in the world; provided, however, that direct or indirect

competition does not include the ownership of not more than one percent (1%) of the capital stock of a publicly traded corporation so long as the party that owns such stock is not otherwise engaged or interested in such corporation. For purposes of this Agreement, competitive business shall mean any business engaged in the sale, manufacturing, engineering, distribution, design, development or installation of the products and/or services included within the Restricted Business.

(b)      If any portion of the restrictions set forth in this Section 3 should, for any reason whatever, be declared invalid by a court or other authority of competent jurisdiction, the validity or enforceability of the remainder of such restrictions shall not thereby be adversely affected.

(c)      Executive hereby declares that the foregoing territorial and time limitations are reasonable and properly required for the adequate protection of the Company's business, and Executive acknowledges that the Company would not enter into the Asset Purchase Agreement without the protections afforded by this Agreement. In the event any such territorial or time limitation is deemed to be unreasonable by a court of competent jurisdiction, Executive agrees to the reduction of either said territorial or time limitation to such area or period which said court shall have deemed reasonable. It is specifically agreed by Executive that the time periods set forth in this Section 3 shall be computed by excluding from such computation any time during which Executive is in violation of any provision of this Section 3, and any time during which there is pending in any court of competent jurisdiction any action (including any appeal from any judgment) brought by any person or entity, in which action the Company seeks to enforce the covenants of Executive pursuant to this Section 3 or in which any person or entity contests the validity of such covenants or their enforceability or seeks to avoid their performance or enforcement.

(d)      The existence of any claim or cause of action by Executive against the Company shall not constitute a defense to the enforcement by the Company of these protective covenants, but such claim or cause of action shall be litigated separately.

(e)      The parties hereby acknowledge and agree that, in the event of any conflict between the provisions of this Section 3 and Section 5.3 of the Asset Purchase Agreement, the provisions of this Section 3 shall control.

(f)      Executive shall give notice to the Company, within ten (10) days after accepting any other employment, of the identity of Executive's new employer. Executive acknowledges and agrees that the Company may notify such employer that Executive is bound by the protective covenants contained in this Agreement and, at the Company's election, furnish such employer with a copy of this Agreement or relevant portions thereof.

Section 4.      Remedies; Enforcement.  In the event of a breach of this Agreement by Executive, the Company shall be entitled to injunctive relief in addition to any other available legal or equitable remedies. Executive agrees that the Company may recover by appropriate action the amount of the actual damage caused the Company by any failure, refusal or neglect of Executive to perform his agreements, representations and warranties herein contained. The remedies provided in this Agreement shall be deemed cumulative and the exercise of one shall

2

not preclude the exercise of any other remedy at law or in equity for the same event or any other event.

Section 5.    Governing Law.    The laws of the State of New York shall apply to all provisions of this Agreement, without regard to conflicts of law principles.

Section 6.    Severability.    If any provision of this Agreement (including, without limitation, any provision relating to the activities covered by, or a time period of, the covenants contained in this Agreement) is held by any court or other authority of competent jurisdiction to be illegal, invalid, or unenforceable under present or future laws effective during the term hereof, such provision shall be severable, and this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had not comprised a part hereof, and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.    Furthermore, in lieu of such illegal, invalid, or unenforceable provisions, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable and that shall not be more restrictive than the one severed from this Agreement.    The parties desire and hereby expressly agree that a court or other body enforcing or interpreting this Agreement should, to the extent necessary to avoid any unenforceability, so reform such covenant, term, condition or other provision or portions of this Agreement to the maximum extent necessary so as to render the same enforceable in accordance with the intent herein expressed.

Section 7.    Amendment or Alteration.    No amendment or alteration of the terms of this Agreement shall be valid unless made in writing and signed by all of the parties hereto.

Section 8.    Notices.    All notices, requests, demands acceptances and other communications which are required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given (i) when delivered personally, or (ii) when sent by confirmed facsimile if sent on a business day prior to 5:00 P.M. local time at the place of receipt, or on the following business day if sent after 5:00 P.M. or on a non-business day, or (iii) on the day following delivery to a courier service if sent by next day delivery via a recognized international courier service, or (iv) three days after the date when mailed by registered or certified mail, return receipt requested, postage prepaid.    All such notices, requests, demands acceptances and other communications shall be addressed to the parties as follows, or at such other address as shall be specified by like notice:

If to Executive:

William Donaldson
c/o Interactive Motorsports and Entertainment Corporation
5624 West 73rd Street
Indianapolis, Indiana 46278
Facsimile:  (317) 298-8924

NY 911723_2.DOC i

If to the Company:

c/o Dolphin Asset Management Corp..
129 East 17th Street
New York, NY 10003
Attention: Carlos Salas
Facsimile : (212) 202-3817

With a copy to:

Hughes Hubbard & Reed LLP
One Battery Park Place
New York, NY 10004
Dallas, Texas  75202-2785
Attention: Gary J. Simon
Facsimile : (212) 299-6770

Section 9.     Waiver or Breach.  It is agreed that a waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by that same party.

Section 10.     Entire Agreement and Binding Effect.  This Agreement contains the entire agreement of the parties with respect to the subject matter hereof and shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, heirs, distributees, successors and assigns.  This Agreement supersedes and preempts any prior understandings, agreements or representations between the parties, written or oral, which may have related to the subject matter hereof in any way.

Section 11.     Assignment.  This Agreement may not be transferred or assigned by either party without the prior written consent of the other party.

Section 12.     Further Assurances.  The parties agree to execute and deliver all such further instruments and take such other and further action as may be reasonably necessary or appropriate to carry out the provisions of this Agreement.

Section 13.     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together, shall constitute one instrument.

4

IN WITNESS WHEREOF, the parties have executed this Noncompetition Agreement effective as of the date and year first above written.

RACE CAR SIMULATION CORP.

By _____

    Name: Peter E. Solas
    Title: President

EXECUTIVE

_____

William Donaldson

NY 911723_2.DOC i

5

IN WITNESS WHEREOF, the parties have executed this Noncompetition Agreement effective as of the date and year first above written.

RACE CAR SIMULATION CORP.

By_____
    Name:
    Title:

EXECUTIVE

_William R. Donaldson_
William Donaldson

Exhibit E

RECYCLED

10QSB 1 thirdqtr10qsb-11192007.htm FORM 10-QSB

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D. C. 20549

**FORM 10-QSB**

(X) QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE
SECURITIES EXCHANGE ACT OF 1934
For the quarterly period ended: September 30, 2007

( ) TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE
SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

*Commission File Number: 000-30771*

**INTERACTIVE MOTORSPORTS AND
ENTERTAINMENT CORP.**
(Exact name of registrant as specified in charter)

Indiana
(State or other jurisdiction of incorporation or organization)

35-2205637
(I.R.S. Employer I.D. No.)

5624 West 73rd Street, Indianapolis, Indiana 46278
(Address of principal executive offices)

(317) 295-3500
(Registrant's telephone number, including area code)

Indicate by checkmark whether the Issuer: (1) filed all reports required to be filed by section 13 or 15 (d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of October 18, 2007, there were 98,999,788 (par value $0.0001) common shares issued and outstanding.

Transitional Small Business Disclosure Format (Check one). Yes ☐ No ☒

DOCUMENTS INCORPORATED BY REFERENCE: Exhibit Index on page 25.

The accompanying notes are an integral part of these consolidated financial statements.

1

# INDEX TO QUARTERLY REPORT ON FORM 10-QSB

| | PAGE NUMBER |
|---|---|

**SECTION**

### PART I

ITEM 1.   Unaudited Condensed Financial Statements and Notes to Financial Statements

Consolidated Balance Sheets at September 30, 2007 and December 31, 2006  —  3

Consolidated Statements of Operations for the Three Months Ended September 30, 2007 and 2006  —  5

Consolidated Statements of Operations for the Nine Months ended September 30, 2007 and 2006  —  6

Consolidated Statements of Changes in Shareholders' Deficit for the Period Ended September 30, 2007 and December 31, 2006  —  7

Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2007 and 2006  —  8

Notes to Consolidated Financial Statements  —  10

ITEM 2.   Management's Discussion and Analysis of Financial Condition and Results of Operations  —  13

ITEM 3.   Internal Controls and Procedures  —  21

### PART II

ITEM 1.   Legal Proceedings  —  22

ITEM 2.   Changes in Securities  —  22

ITEM 3.   Defaults Upon Senior Securities  —  22

ITEM 4.   Submission of Matters to a Vote of Security Holders  —  22

ITEM 5.   Other Information  —  22

ITEM 6.   Exhibits and Reports on Form 8-K  —  23

SIGNATURES  —  24

EXHIBITS INDEX  —  25

The accompanying notes are an integral part of these consolidated financial statements.

2

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Consolidated Balance Sheets

## PART I

**ITEM 1. CONDENSED FINANCIAL STATEMENTS**

### ASSETS

|  | September 30, 2007 | | December 31, 2006 |
| --- | ---: | --- | ---: |
|  | (Unaudited) | | (Audited) |
| **Current Assets** | | | |
| Cash | $ 133,635 | $ | 216,323 |
| Accounts Receivable, Net of $238,781 allowance and $238,781, respectively | 249,234 | | 229,506 |
| Inventory | 323,665 | | 254,322 |
| Prepaid Expenses | 62,007 | | 22,724 |
| Notes Receivable | 10,427 | | 3,143 |
| Total Current Assets | 778,968 | | 726,018 |
| | | | |
| **Property and Equipment** | | | |
| Total Property and Equipment, Net | 626,671 | | 885,711 |
| | | | |
| **Other Assets** | | | |
| Deposits | 90,272 | | 28,471 |
| Notes Receivable | 296,807 | | 305,642 |
| Total Other Assets | 387,079 | | 334,113 |
| | | | |
| Total Assets | $ 1,792,718 | $ | 1,945,842 |

The accompanying notes are an integral part of these consolidated financial statements.

3

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Consolidated Balance Sheets (Continued)

**LIABILTIES AND SHAREHOLDERS' EQUITY (DEFICIT)**

|  | September 30, 2007 | December 31, 2006 |
|---|---|---|
|  | *(Unaudited)* | *(Audited)* |
| *Current Liabilities* | | |
| Accounts Payable | $ 830,680 | $ 581,281 |
| Accrued Payroll Expense | 38,361 | 66,762 |
| Accrued Sales Tax Payable | 39,516 | 34,360 |
| Gift Cert. & Customer Deposits | 30,293 | 23,248 |
| Deposits on Simulator Sales | 1,002,860 | 1,019,093 |
| Accrued Liabilities | 443,456 | 432,745 |
| Notes Payable - Related parties | 50,000 | 146,000 |
| Notes payable | 1,829,123 | 1,539,795 |
| Total Current Liabilities | 4,264,289 | 3,843,284 |
| | | |
| *Long-term Liabilities* | | |
| Notes payable | 1,720,396 | 1,957,471 |
| | | |
| Total Liabilities | 5,984,685 | 5,800,755 |
| | | |
| *Shareholders' Equity (Deficit)* | | |
| Common Stock | 9,900 | 9,640 |
| Additional Paid in Capital | 5,551,892 | 5,498,749 |
| Retained Deficit | (9,753,759) | (9,363,302) |
| Total Shareholders' Equity (Deficit) | (4,191,967) | (3,854,913) |
| | | |
| *Total Liabilities & Shareholders' Equity (Deficit)* | $ 1,792,718 | $ 1,945,842 |

The accompanying notes are an integral part of these consolidated financial statements.

4

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Consolidated Statements of Operations
(Unaudited)

|  | For the Three Months Ending September 30 | |
|  | 2007 | 2006 |
|---|---|---|
| *Revenues* | | |
| Company Store Sales | $ 475,203 | $ 531,856 |
| Revenue Share Sales | 144,056 | 77,462 |
| Simulator Leases | - | 19,000 |
| Sales of Simulator Systems | 385,878 | 292,708 |
| Special Event Sales | 51,659 | - |
| Total Revenues | 1,056,796 | 921,026 |
| | | |
| *Cost of Sales* | | |
| COGS - Merchandise | 6,118 | 10,386 |
| Group Sales Expenses | - | 1,759 |
| COGS - Sale of Simulators | 32,591 | 86,400 |
| COGS – Special Events | - | 10,674 |
| Inventory Adjustments | (1,264) | - |
| Total Cost of Sales | 37,445 | 109,219 |
| | | |
| *Gross Profit* | 1,019,351 | 811,807 |
| | | |
| *General & Admin Expenses* | | |
| Payroll Related Expenses | 350,506 | 353,072 |
| Occupancy Expenses | 275,322 | 274,764 |
| Other Operating Expenses | 182,129 | 350,384 |
| Total Operating Expenses | 807,957 | 978,220 |
| | | |
| *Operating Profit (Loss)* | 211,394 | (166,413) |
| | | |
| Interest Expense | (172,103) | (151,172) |
| | | |
| *Net Profit (Loss) before Income Tax Expense* | 39,291 | (317,585) |
| | | |
| Income Tax Expense | - | - |
| | | |
| *Net Profit (Loss)* | $ 39,291 | $ (317,585) |
| | | |
| Net Profit (Loss) per share – basic and diluted | $ 0.00 | $ (0.00) |
| | | |
| Weighted Average Shares Outstanding | 98,858,360 | 94,164,500 |
| Diluted Common Shares Outstanding | 111,224,860 | 100,862,516 |

The accompanying notes are an integral part of these consolidated financial statements.

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Consolidated Statement of Operations
(Unaudited)

|  | | For the Nine Months Ending September 30 | | |
|---|---|---|---|---|
|  | | 2007 | | 2006 |
| *Revenues* | | | | |
| Company Store Sales | $ | 1,383,912 | $ | 1,375,884 |
| Revenue Share Sales | | 320,740 | | 236,451 |
| Simulator Leases | | 6,333 | | 57,000 |
| Sales of Simulator Systems | | 1,450,287 | | 1,823,883 |
| Special Event Sales | | 160,160 | | 106,408 |
| Total Revenues | | 3,321,432 | | 3,599,626 |
| | | | | |
| *Cost of Sales* | | | | |
| COGS - Merchandise | | 36,435 | | 16,666 |
| Group Sales Expenses | | 819 | | 2,406 |
| COGS - Sale of Simulators | | 539,262 | | 491,367 |
| COGS – Special Events | | 41,769 | | 47,701 |
| Inventory Adjustments | | 2,046 | | (2,223) |
| Total Cost of Sales | | 620,331 | | 555,917 |
| | | | | |
| *Gross Profit* | | 2,701,101 | | 3,043,709 |
| | | | | |
| *General & Admin Expenses* | | | | |
| Payroll Related Expenses | | 1,056,160 | | 1,234,909 |
| Occupancy Expenses | | 829,899 | | 839,222 |
| Other Operating Expenses | | 744,103 | | 1,172,654 |
| Total Operating Expenses | | 2,630,162 | | 3,246,785 |
| | | | | |
| *Operating Profit (Loss)* | | 70,939 | | (203,076) |
| | | | | |
| Interest Expense | | (461,396) | | (400,452) |
| | | | | |
| *Net Loss before Income Tax Expense* | | (390,457) | | (603,528) |
| | | | | |
| Income Tax Expense | | - | | - |
| | | | | |
| *Net Loss* | $ | (390,457) | $ | (603,528) |
| | | | | |
| Net Loss per share – basic and diluted | $ | (0.00) | $ | (0.00) |
| | | | | |
| Weighted Average Shares Outstanding | | 97,226,805 | | 93,902,399 |
| Diluted Common Shares Outstanding | | 111,366,288 | | 102,902,399 |

The accompanying notes are an integral part of these consolidated financial statements.

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Statement of Shareholders' Deficit
(Unaudited)

| | Common Stock | | Additional Paid-In Capital | Retained Deficit | Total Shareholders' Equity (Deficit) |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balance at December 31, 2006 | 96,397,506 | $ 9,640 | $ 5,498,749 | $ (9,363,302) | $ (3,854,913) |
| Warrant issued for 2007 Note Payable (unaudited) | - | - | 11,403 | - | 11,403 |
| Common stock issued for payment of Loan Interest (unaudited) | 2,602,282 | 260 | 41,740 | - | 42,000 |
| Net loss for the Period ended September 30, 2007 (unaudited) | - | - | - | (390,457) | (390,457) |
| Balance at September 30, 2007 (unaudited) | 98,999,788 | $ 9,900 | $ 5,551,892 | $ (9,753,759) | $ (4,191,967) |

The accompanying notes are an integral part of these consolidated financial statements.

7

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Consolidated Statements of Cash Flows
(Unaudited)

| | | For the Nine Months Ended September 30 | | |
| --- | --- | --- | --- | --- |
| | | 2007 | | 2006 |
| CASH FLOWS FROM OPERATING ACTIVITIES | | | | |
| Net Loss | $ | (390,457) | $ | (603,528) |
| Adjustments to reconcile net loss to net cash used by operating activities: | | | | |
| Depreciation and amortization | | 221,202 | | 307,457 |
| Amortization of notes payable discount | | 17,258 | | 8,111 |
| Amortization of Dolphin Financing Agreement | | (348,819) | | (300,510) |
| Common stock issued for interest | | 42,000 | | 60,000 |
| Net changes in operating assets and liabilities: | | | | |
| (Increase) decrease in trade accounts and other receivable | | (18,177) | | 72,915 |
| Decrease in inventory | | 89,639 | | 51,813 |
| (Increase) decrease in prepaid expenses and other assets | | (101,086) | | 37,887 |
| Decrease in intangibles | | (69,390) | | - |
| Increase (decrease) in accounts payable | | 249,399 | | (248,932) |
| Decrease in accrued payroll and payroll taxes | | (28,401) | | (22,828) |
| Increase (decrease) in sales tax payable | | 5,156 | | (4,326) |
| Increase (decrease) in gift certificates and customer deposits | | 7,045 | | (4,721) |
| Increase in accrued expenses | | 10,712 | | 18,306 |
| (Decrease) in deposits on simulator sales | | (16,233) | | (347,983) |
| Net Cash Used by Operating Activities | | (330,152) | | (976,339) |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | | |
| Purchase of property and equipment | | (69,390) | | (308,710) |
| Sale of property and equipment | | 17,637 | | 29,437 |
| Net Cash Used by Investing Activities | | (51,753) | | (279,273) |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | | |
| Proceeds from issuance of notes payable | | 475,000 | | 1,166,181 |
| Payments of notes payable | | (175,783) | | (33,907) |
| Net Cash Provided by Financing Activities | | 299,217 | | 1,132,274 |
| DECREASE IN CASH | | (82,688) | | (123,338) |
| CASH, BEGINNING OF PERIOD | | 216,323 | | 353,180 |
| CASH, END OF PERIOD | $ | 133,635 | $ | 229,842 |

The accompanying notes are an integral part of these consolidated financial statements.

8

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Consolidated Statements of Cash Flows (Continued)
(Unaudited)

|  | For the Nine Months Ended September 30 | | | |
|  | 2007 | | 2006 | |
| SUPPLEMENTAL CASH FLOW DISCLOSURES: | | | | |
| Cash paid for interest | $ | 204,632 | $ | 54,479 |
| Cash paid for income taxes | $ | - | $ | - |

The accompanying notes are an integral part of these consolidated financial statements.

9

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
September 30, 2007 and December 31, 2006

NOTE 1 - BASIS OF PRESENTATION

The accompanying unaudited condensed consolidated balance sheets of Interactive Motorsports and Entertainment Corp. (the "Company") at September 30, 2007 and December 31, 2006 and the unaudited consolidated statements of operations and statements of cash flows for the nine months ended September 30, 2007 and September 30, 2006 have been prepared by the Company's management and do not include all the information and notes to the financial statements necessary for a complete presentation of the financial position, results of operations, and cash flows in conformity with generally accepted accounting principles. In the opinion of management, all adjustments necessary for a fair presentation of the results of operations and financial position have been included and all such adjustments are of a normal recurring nature. Although management believes the disclosures are adequate to make the information presented not misleading, it is suggested that these condensed consolidated financial statements be read in conjunction with the audited financial statements and the notes thereto included in the Company's latest annual financial statements included in the Company's annual report on Form 10-KSB. The results of operations for the nine months ended September 30, 2007 are not necessarily indicative of the results that may be expected for the full year ending December 31, 2007 or any future period.

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

a.   Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

b.   Accounting for the Sale of Simulators

The Company records the sale of simulators using the percentage of completion method of accounting. The percentage of completion for any given sales contract is determined by the ratio of costs incurred to date to the total estimated cost for each site build. Costs incurred consist of purchased components, outside services, and outside contract labor cost.

NOTE 3 - DEBT AND CREDIT ARRANGEMENTS

On February 2, 2004 and June 6, 2004, Perfect Line, Inc. issued notes bearing an interest rate of 9.6% payable in the total amount of $750,000. Each note came with an option to purchase common shares of the Company equal to the amount of notes purchased divided by the fair market value of the Company's stock on the date of issuance. The notes became due on February 2, 2005, and $260,000 of the notes was paid in full at that time. A note holder of an additional $344,000 of the notes elected to receive a cash payment of $16,000 and exercise options granted with the note purchase for full payment of the note per the terms of the 2004 Agreement. The note holder of the final $146,000 in notes has been repaid $58,500 as of April 17, 2007, and the balance was assigned to two unrelated third parties, one in the amount of $75,000 and the other in the amount of $12,500. The term of the note was extended by 24 months, and the pre-payment terms were amended to reflect that there will be no pre-payment option, while all other terms remained the same, including the expiration of the option 30 days past the maturity date.

10

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
September 30, 2007 and December 31, 2006

NOTE 3 - DEBT AND CREDIT ARRANGEMENTS (continued)

Pursuant to the Note and Option Purchase Agreement and Security Agreement dated November 2005 ("2005 Agreement"), the Company issued notes bearing an interest rate of 12% payable in the total amount of $122,500. These notes were issued between October 13, 2005 and November 4, 2005. Each note came with an option to purchase common shares of the Company equal to the amount of notes purchased divided by the exercise price of the option. The notes were due on October 1, 2007, and the Company has asked the note holders to extend the note under the same terms until additional funding is in place. The note holders have agreed to an extension as of the date of this notice, but there is no assurance that one or more of the note holders will demand payment.

The value of the options will be amortized to interest expense over their life which expires on November 1, 2007. Amortization of option discount for the options related to the 2005 Agreement of $3,915 and $7,831 was included in interest expense for the nine months ended September 30, 2007 and the twelve months ended December 31, 2006, respectively.

On March 29, 2006, Perfect Line and MOAC Mall Holdings, LLC, the Mall of America landlord, agreed to a settlement agreement whereby Perfect Line signed a promissory note totaling $294,652 payable in five (5) quarterly installments, with the first payment of $78,471 made on February 28, 2006, and payments of $54,045 to be made beginning July 14, 2006 and ending July 15, 2007. The $54,045 payments for 2006 were made on July 14 and November 15. See Note 6, Subsequent Events.

On July 14, 2006, the Company entered into Note and Warrant Purchase and Security Agreements with ten (10) investors in a private placement which is exempt from the registration provisions of the Securities Act of 1933, as amended, pursuant to Reg. D and Rule 506 adopted thereunder. The Notes, totaling $950,000, were issued by Perfect Line, will be fully paid down July 17, 2010, and bear interest at a rate of 16% per annum (increased from 15% on September 21, 2007) for the total interest amount over the four year period of $326,194. The principle balance of the notes on September 30, 2007, is $723,530. Each note came with an option to purchase common shares of the Company equal to two and one half times the amount of notes purchased divided by the exercise price of the option. The principle and interest on the Notes are payable weekly over a four (4) year term and are secured by a first security interest in 20 of the simulators owned by Perfect Line.

The value of the options will be amortized to interest expense over their life which expires on July 13, 2010. Amortization of option discount for the options related to the 2006 Agreement of $11,385 and $6,958 was included in interest expense for the nine months ended September 30, 2007, and twelve months ended December 31, 2006, respectively.

On April 12, 2007, the Company entered into a Mutual Release and Settlement Agreement with Mall of Georgia, LLC. The terms of the agreement released the Company from any future lease obligations at the site and set the financial settlement at $194,660, payable in six (6) installments between May, 2007 and May, 2008. $95,580 is directly attributable to Perfect Line with the remainder of the note attributable to unpaid rent due from lease assignee, Checker Flag Lightning, LLC. See Note 6, Subsequent Events. The Company has filed a Motion for Partial Summary Judgment against Checker Flag Lightning, LLC in the amount of $357,352. See Part II, Item I, Legal Proceedings for more details.

11

**INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements
September 30, 2007 and December 31, 2006

NOTE 3 - DEBT AND CREDIT ARRANGEMENTS (continued)

On September 21, 2007, the Company entered into Note and Warrant Purchase and Security Agreements with ten (10) investors in a private placement which is exempt from the registration provisions of the Securities Act of 1933, as amended, pursuant to Reg. D and Rule 506 adopted thereunder. The Notes, totaling $475,000, were issued by Perfect Line, will be fully paid down September 13, 2011 and bear interest at a rate of 16% per annum for the total interest amount over the four (4) year period of $167,477. The principle balance of the notes on September 30, 2007, is $472,661. Each note came with an option to purchase common shares of the Company equal to two and one half times the amount of notes purchased divided by the exercise price of the option.

The value of the options will be amortized to interest expense over their life which expires on September 13, 2011. Amortization of option discount for the options related to the 2007 Agreement of $0 was included in interest expense for the nine months ended September 30, 2007.

NOTE 4 - SIMULATOR SALE AGREEMENTS

The Company completed the sale of fourteen (14) Reactor simulators to DGI, Inc. for their Reactor Mobile Experiences in the first quarter of 2007, the sale of two (2) Reactor simulators to the George P. Johnson & Company in Auburn Hills, MI in the second quarter of 2007, and the sale of four (4) SMS simulators to Prime Time FEC in the third quarter of 2007. A contract for the installation of four (4) SMS simulators (2 purchase and 2 revenue share) was signed for the Charlotte, NC market and a $90,000 deposit was made. Installation is not expected until first quarter of 2008.

NOTE 5 - CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

In March of 2007, DGI, Inc., an Indiana corporation managed by and under majority ownership of William R. Donaldson, purchased fourteen (14) Reactor simulators for $574,000 from Perfect Line and subsequently leased the simulators to Sprint Nextel and Toyota. Mr. Donaldson is the Chairman and Chief Executive Officer of the Company

NOTE 6 - SUBSEQUENT EVENTS

The Company has agreed to amended note and settlement agreements with two of its landlords, Mall of Georgia, LLC and MOAC Mall Holdings, LLC (Mall of America). Having missed payments under the terms of earlier note and settlement agreements with both parties, the Company has negotiated terms for going forward. Under the terms of the Mall of Georgia agreement, the balance due of $157,346 is to be paid in eight payments between December 15, 2007 and October 1, 2008. Under the terms of the Mall of America agreement, the balance due of $310,553 is to be paid in seven payments between December 15, 2007 and October 1, 2008.

12

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion and analysis provides information that we believe is relevant to an assessment and understanding of the consolidated results of operations and financial condition of the Company. The terms "Company", "we", "our" or "us" are used in this discussion to refer to Interactive Motorsports and Entertainment Corp. along with Interactive Motorsports and Entertainment Corp.'s wholly owned subsidiary, Perfect Line, Inc., on a consolidated basis, except where the context clearly indicates otherwise. The discussion and information that follows concerns the Registrant as it exists today, as of this filing, including the predecessor of the Company's operations, Perfect Line, LLC.

### Information on Forward-Looking Statements

This Form 10-QSB and other statements issued or made from time to time by the Company or its representatives contain statements, which may constitute "forward-looking statements" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995, 15 U.S.C.A Sections 77z-2 and 78u-5. Those statements include statements regarding the intent, belief, or current expectations of the Company and members of its management team as well as the assumptions on which such statements are based. All statements, trend analyses, and other information contained in this report relative to markets for the Company's products and/or trends in the Company's operations or financial results, as well as other statements which include words such as "anticipate," "could," "feel(s)," "believes," "plan," "estimate," "expect," "should," "intend," "will," and other similar expressions, constitute forward-looking statements and are subject to known and unknown risks, uncertainties and other factors that may cause actual results to be materially different from those contemplated by the forward-looking statements. Such factors include, among other things: (i) general economic conditions that may impact the disposable income and spending habits of consumers; (ii) the availability of alternative entertainment for consumers; (iii) the ability of the company to obtain additional capital and/or debt financing; (iv) the ability of the company to control costs and execute its business plan.

The reader is cautioned that any such forward-looking statements are not guarantees of future performance and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Important factors currently known to management that could cause actual results to differ materially from those in forward-looking statements are set forth herein. The Company undertakes no obligation to update or revise forward-looking statements to reflect changed assumptions, the occurrence of unanticipated events or changes to future operating results over time.

### Recently Issued Accounting Standards

None

13

## History

IMTS is headquartered in Indianapolis, Indiana. In June 2001, Perfect Line, LLC (d/b/a NASCAR Silicon Motor Speedway) was formed to purchase, for approximately $1.5 million, the assets of SEI, including intellectual property and the contents of 14 of the 15 NSMS racing centers, which included 170 simulators. SEI showed these assets on its books at approximately $30 million. In August 2002, Perfect Line became a wholly owned subsidiary of IMTS, through an exchange of shares that resulted in Perfect Line shareholders owning approximately 82% of IMTS equity. Simultaneous with this event, approximately $2.6 million in private equity financing was made available to Perfect Line. Approximately one-half the funding was used to retire the Company's bank note and the balance was used for working capital.

In July of 2003, management began the process of revising the Company's business model, changing the focus from the inherited Company owned and operated mall-based racing centers to revenue share, lease and purchased simulators for mall merchandise retailers, family entertainment centers, amusement parks, casinos, auto malls, etc., as well as for experiential mobile marketing programs such as the Nextel Experience and the DaimlerChrysler auto show exhibits.

In late 2004, the Company raised funds through debt financing and began manufacturing new SMS simulators in 2005 to meet the demand. In late 2005 it introduced the new Reactor simulator, a more portable, mobile and affordable model for the market.

Funding the operations through revenues from the business and through primarily debt financing, the Company has laid the groundwork for a focus on the experiential mobile marketing industry and the out-of-home, multi-site interactive gaming opportunity. A recent license with iRacing.com, owned by John Henry (principle owner of the Boston Red Sox), and David Kaemmer (co-founder of Papyrus Racing Games), owners of the Papyrus NASCAR Racing 2003, will potentially allow the Company to complete its modeling of the multi-player/multi-site virtual league gaming, although there can be no assurance that the project will be successful.

## Overview

Interactive Motorsports and Entertainment Corp. ("IMTS" or the "Company"), an Indiana corporation, is a world leader in race simulation. Operating through its wholly owned subsidiary, Perfect Line, Inc., the Company manufactures two versions of race car simulators and sells racing experiences to the public through revenue sharing and marketing agreements for the "out-of-home" interactive gaming market. The Company contracts with operators in malls, amusement parks, family entertainment centers, casinos, and with third parties for trade shows and mobile fan interactive experiences. Under team and track licenses from America's fastest growing sport, NASCAR, simulator customers experience driving in a NASCAR race car that simulates the motion, sights and sounds of an actual NASCAR event. The Company owns and operates racing centers at the Mall of America in Minneapolis, MN, and at Universal CityWalk in Hollywood, CA. Each racing center features 12 simulators as well as a selection of popular NASCAR merchandise. The Company is positioning itself to be a world leader in the "out-of-home" multi-player/multi-site virtual league market, and the experiential mobile marketing industry.

The Company currently has two versions of racecar simulators, the SMS and the Reactor. In marketing these two products it leverages its strategic relationships and proprietary assets, which include sophisticated racing simulation technology (including 2 patents, and license agreements with NASCAR race tracks and race teams), to offer a unique and affordable race simulation experience.

The Company's business strategy currently targets: 1) end customers in fixed site venues who are gamers and/or NASCAR enthusiasts, and 2) experiential marketing clients, including but not limited to NASCAR sponsors, who use the experience to draw attention to their product display and to collect potential customer data and drive them to a website. In addition, under a new multi-year proprietary software license agreement with iRacing.com, exclusive for the "out-of-home" race simulation category, the anticipated multi-player/multi-site virtual league offering is expected to engage the hardcore customers to compete in leagues and competitions on a regularly scheduled basis, although there can be no assurances.

14

Through strategic alliances the Company currently has access to over twenty retail locations nationally, as well as eight experiential mobile marketing units traveling around the country. IMTS plans significant growth in product placement to fully exploit the available fixed and mobile marketing venues both domestically and internationally, although there can be no assurances.

Perfect Line's race simulators, including those owned by Race Car Simulation Corp., are currently featured in the following locations:

Company Owned (24 Simulators):

| Location | Year | Market | Sq. Ft. | Simulators |
|---|---|---|---|---|
| 1) Mall of America | 2001 | Minneapolis, MN | 5,899 | 12 SMS |
| 2) Universal CityWalk | 2001 | Los Angeles, CA | 5,000 | 12 SMS |

Revenue Share (75 Simulators):

| Location | Year | Market | Sq. Ft. | Simulators |
|---|---|---|---|---|
| 1) NASCAR SpeedPark | 2003 | Sevierville, TN | 1,584 | 6 SMS# |
| 2) NASCAR SpeedPark | 2003 | St. Louis, MO | 1,496 | 6 SMS# |
| 3) Bass Pro Outdoor | 2004 | Harrisburg, PA | 500 | 2 SMS |
| 4) Jordan Creek Town Center | 2004 | Des Moines, IA | 4,000 | 8 SMS |
| 5) NASCAR SpeedPark | 2005 | Toronto, Canada | 1,500 | 6 SMS# |
| 6) Bass Pro Outdoor | 2005 | Clarksville, IN | 750 | 3 SMS |
| 7) NASCAR SpeedPark | 2006 | Myrtle Beach, SC | 1,600 | 6 SMS# |
| 8) Bass Pro Outdoor | 2006 | Springfield, MO5 | 00 | 3 SMS |
| 9) Bass Pro Outdoor | 2006 | San Antonio, TX | 500 | 2 SMS |
| 10) Bass Pro Outdoor | 2007 | Mesa, AZ | 500 | 2 SMS |
| 11) Bass Pro Outdoor | 2007 | Rancho Cucamonga, CA | 500 | 2 SMS |
| 12) Wing Warehouse Sports Bar & Grill | 2007 | Akron, OH | 1200 | 4 SMS |
| 13) Incredible Pizza | 2007 | Euless, TX (Dallas) | 1200 | 4 SMS*# |
| 14) Incredible Pizza | 2007 | War Acres, OK | 1200 | 4 SMS*# |
| 15) Incredible Pizza | 2007 | Pasadena, TX | 500 | 2 SMS* |
| 16) Incredible Pizza | 2007 | Houston, TX | 1200 | 4 SMS* |
| 17) Miramar Speed Circuit | 2007 | San Diego, CA | 500 | 1 SMS* |
| 18) Carnival Triumph | 2007 | Carnival Cruise Lines | 500 | 2 SMS* |
| 19) Rapid City | 2007 | Rapid City, SD | 1200 | 2 SMS* |
| 20) Bass Pro Outdoor | 2008 | Denham Springs, LA | 500 | 2 SMS* |
| 21) Charlotte Simulated Speedway | 2008 | Charlotte, NC | 4000 | 4 SMS* |

Mobile Units (40 Simulators) :

| Buyer | Year | Market | Simulators |
|---|---|---|---|
| 1) DaimlerChrysler | 2005 | European Auto Shows | 2 SMS |
| 2) H&H Motorsports/IMTS | 2006 | Mobile Experience | 2 Reactors |
| 3) Florida Simulated Racing Network | 2006 | Mobile Experience | 4 Reactors |
| 4) Exhibit Enterprises (Dodge) | 2006 | Mobile Experience | 4 Reactors |
| 5) Exhibit Enterprises (Dodge) | 2006 | Mobile Experience | 4 Reactors |
| 6) DGI, Inc (Nextel) | 2006 | Mobile Experience | 6 Reactors |
| 7) DGI, Inc (Toyota) | 2006 | Mobile Experience | 4 Reactors |
| 8) DGI, Inc (Nextel, Toyota) | 2007 | Mobile Experience | 14 Reactors |

15

*Sales of Simulators (85 Simulators):*

| Buyer | Year | Market | Simulators |
|-------|------|--------|------------|
| 1) Gurnee Mills | 2004 | Chicago, IL | 6 SMS!! |
| 2) Concord Mills | 2004 | Charlotte, NC | 12 SMS!! |
| 3) Opry Mills | 2004 | Nashville, TN | 10 SMS!! |
| 4) I-Vision Tech. | 2004 | Abu Dhabi, UAE | 2 SMS |
| 5) I-Vision Tech. | 2005 | Abu Dhabi, UAE | 4 SMS |
| 6) Ft. Gordon | 2005 | Ft. Gordon, GA | 2 SMS |
| 7) Fun City | 2005 | Burlington, IA | 1 SMS |
| 8) DaimlerChrysler | 2005 | US Auto Shows | 2 SMS |
| 9) Gate A Sports | 2006 | Cleveland, OH | 5 SMS |
| 10) Skycoaster of Florida | 2006 | Kissimmee, FL | 6 SMS |
| 11) Vacationland F.E. | 2006 | Brainerd, MN | 4 SMS |
| 12) NASCAR SpeedPark | 2006 | Concord, NC | 3 Reactors |
| 13) George P. Johnson & Company | 2007 | Auburn Hills, MI (Shanghi experience) | 2 Reactors |
| 14) Prime Time FEC | 2007 | Abilene, TX | 3 SMS |
| 15) Miramar Speed Circuit | 2007 | San Diego, CA | 1 SMS* |
| 16) Rapid City | 2007 | Rapid City, SD | 2 SMS* |
| 17) Charlotte Simulated Speedway | 2008 | Charlotte, NC | 4 SMS* |

*Sales of Simulators (continued):*

| Buyer | Year | Market | Simulators |
|-------|------|--------|------------|
| 18) Road Story | 2008 | Austin, TX | 4 SMS* |
| 19) Roltex | * | Moscow, Russian Federation | 8 SMS* |
| 20) Tonne Mgmt. | * | Wisconsin Dells, WI | 4 SMS* |

\# Denotes assets sold to Race Car Simulation Corporation with no current revenue stream to Company
\* Denotes that simulators are not yet installed
!!Denotes site that CFL has vacated and Company is negotiating for buy back of simulators

The balance of the 192 SMS simulators built since inception are at the Company's warehouse or Elan Motorsports Technologies where they are built. The Company has built a total of 44 Reactor simulators.

**Review of Consolidated Financial Position**

**Cash:** The Company had $133,635 in cash as of September 30, 2007, compared with $216,323 at December 31, 2006, a decrease of $82,688. This decrease in the company's position of cash during the first nine months of 2007 was due principally to payments to vendors and general operating expenses. See further discussion under the "Liquidity and Capital Resources" section below.

**Trade Accounts Receivable:** At the year ending December 31, 2005, the Company established a reserve of $245,254 for a portion of the debt owed the Company by Checker Flag Lightning, LLC. The Company continues to pursue the collection of the debt owed the Company by Checker Flag Lightning, LLC, and there is disagreement between the parties as to the amount due.

**Inventory:** At September 30, 2007, inventory increased by $69,343 from December 31, 2006 levels due primarily to the reclassification of simulator parts in non-depreciated fixed assets to simulator inventory held for sale. Simulators in inventory increased by $81,029 from December 31, 2006, levels to $321,855 at September 30, 2007. Merchandise inventory decreased by $11,686 from December 31, 2006, levels during the nine month period ending September 30, 2007.

16

**Notes Payable:** On September 30, 2007, the Company had an aggregate balance of $3,599,519 for Notes Payable. The balance consisted of $50,000 in related party agreements, $600,000 on the Ropart Note Payable, $1,411,942 on the 2004 Race Car Simulator Corporation ("RCS") borrowing, $122,500 on the 2005 Agreement, $721,636 on the 2006 Agreements, $474,039 in the 2007 Agreements and $219,402 on other agreements.

On March 29, 2006, Perfect Line and MOAC Mall Holdings, LLC, the Mall of America landlord, agreed to a settlement agreement whereby Perfect Line signed a promissory note totaling $294,652 payable in five (5) quarterly installments, with the first payment of $78,471 made on February 28, 2006, and payments of $54,045 to be made beginning July 14, 2006 and ending July 15, 2007. The $54,045 payments for 2006 were made on July 14 and November 15. See Note 6, Subsequent Events.

On July 14, 2006, the Company entered into Note and Warrant Purchase and Security Agreements with ten (10) investors in a private placement which is exempt from the registration provisions of the Securities Act of 1933, as amended, pursuant to Reg. D and Rule 506 adopted thereunder. The Notes, totaling $950,000, were issued by Perfect Line, will be fully paid down July 17, 2010, and bear interest at a rate of 16% per annum (increased from 15% on September 21, 2007) for the total interest amount over the four year period of $326,194. The principle balance of the notes on September 30, 2007, is $723,530. Each note came with an option to purchase common shares of the Company equal to two and one half times the amount of notes purchased divided by the exercise price of the option. The principle and interest on the Notes are payable weekly over a four year term and are secured by a first security interest in 20 of the simulators owned by Perfect Line.

On April 12, 2007, the Company entered into a Mutual Release and Settlement Agreement with Mall of Georgia, LLC. The terms of the agreement released the Company from any future lease obligations at the site and set the financial settlement at $194,660, payable in six (6) installments between May, 2007 and May, 2008. $95,580 is directly attributable to Perfect Line with the remainder of the note attributable to unpaid rent due from lease assignee, Checker Flag Lightning, LLC. See Note 6, Subsequent Events. The Company has filed a Motion for Partial Summary Judgment against Checker Flag Lightning, LLC in the amount of $357,352. See Part II, Item I, Legal Proceedings for more details.

On September 21, 2007, the Company entered into Note and Warrant Purchase and Security Agreements with ten (10) investors in a private placement which is exempt from the registration provisions of the Securities Act of 1933, as amended, pursuant to Reg. D and Rule 506 adopted thereunder. The Notes, totaling $475,000, were issued by Perfect Line, will be fully paid down September 13, 2011 and bear interest at a rate of 16% per annum for the total interest amount over the four (4) year period of $167,477. The principle balance of the notes on September 30, 2007, is $472,661. Each note came with an option to purchase common shares of the Company equal to two and one half times the amount of notes purchased divided by the exercise price of the option.

**Deposits on Simulator Sales:** During the nine month period ending September 30, 2007, the Company recorded all or a portion of three simulator sales transactions. This activity resulted in the decrease of deposits on simulator sales of $16,233 to $1,002,860 as compared to the balance at December 31, 2006.

**Other Liabilities:** Accounts payable, accrued payroll and payroll taxes, sales taxes payable, unearned revenue, and other accrued expenses fluctuate with the volume of business, timing of payments, and the day of the week on which the period ends.

17

**Review of Consolidated Results of Operations**

*THREE MONTHS ENDED SEPTEMBER 30, 2007 COMPARED TO THREE MONTHS ENDED SEPTEMBER 30, 2006*

**Revenues:** Revenues are comprised primarily of Company store sales, revenue share sales, and simulator leases and sales.

Revenues for the three months ended September 30, 2007, increased by $135,770 or 14.9% to $1,056,796 from $921,026 for the comparable period in 2006. This was the result of increased store sales and simulator sales in the three month period ending September 30, 2007.

**Cost of Sales:** Cost of sales as a percentage of total revenues was 4% and 12% for the three months ended September 30, 2007 and 2006, respectively. Cost of sales decreased $71,774 or 65.7% to $37,445 for the three months ended September 30, 2007, from $109,219 for the comparable period in 2006. The primary reason for the decrease in cost of sales was due to realized cost being less than estimated in the second quarter of 2007.

**Gross Profit:** Gross profit as a percentage of total revenue was 96% and 88% for the three months ended September 30, 2007 and 2006, respectively. Gross profit increased $207,544 or 25.6% to $1,019,351 for the three months ended September 30, 2007, from $811,807 for the comparable period in 2006. The increase in gross profit margin was primarily associated with realized cost being less than estimated in the second quarter of 2007.

**General and Administrative:** General and administrative expenses decreased $170,263 or 17.4% to $807,957 for the three months ended September 30, 2007, compared to $978,220 for the comparable period in 2006. The primary reason for the decrease was a $168,255 decrease in other operating expenses.

**Operating Profit:** The Company's profit from operations during the three months ended September 30, 2007 was $211,394 compared to an operation loss during the three months ended September 30, 2006 of $166,413.

**Interest Expense:** Interest expense was $172,103 and $151,172 for the three months ended September 30, 2007 and 2006, respectively.

**Net Profit:** The Company's net profit for the three months ended September 30, 2007, was $39,291 compared to a net loss of $317,585 for the same period in 2006.

*NINE MONTHS ENDED SEPTEMBER 30, 2007 COMPARED TO NINE MONTHS ENDED SEPTEMBER 30, 2006*

**Revenues:** Revenues are comprised primarily of Company store sales, revenue share sales, and simulator leases and sales.

Revenues for the nine months ended September 30, 2007, decreased $278,194 or 8% to $3.321 million as compared with $3.600 million for the comparable period in 2006. This was the result of a combination of a strong simulator sales in the nine month period ending March 30, 2006, and soft sales in the nine month period ending September 30, 2007. Management believes that the timing of the sales transactions will balance out over the course of the next six months, but there can be no assurances.

18

**Cost of Sales:** Cost of sales as a percentage of total revenues was 19% and 15% for the nine months ended September 30, 2007 and 2006, respectively. Cost of sales for the nine months ended September 30, 2007, increased by $64,414 or 12% to $620,331 compared with $555,917 for the comparable period in 2006. The primary reason for the increase in cost of sales was an increase of $19,769 in Company store merchandise and a $44,646 increase in simulator related expenses.

**Gross Profit:** Gross profit as a percentage of total revenues was 81% and 85% for the nine months ended September 30, 2007 and 2006, respectively. Gross profit was $2.701 million for the nine months ended September 30, 2007, as compared to $3.044 million for the nine months ended September 30, 2006, a decrease of $342,608 or 11.3%. The decrease was primarily the result of lower simulator sales in the first three quarters of 2007. Management believes that the timing of the sales transactions will balance out over the course of the next six months, but there can be no assurances.

**General and Administrative:** General and administrative expenses decreased $616,623 or 19% to $2.630 million for the nine months ended September 30, 2007, compared to $3,247 million for the same period in 2006. The primary reasons for the decrease in general and administration was a $178,749 decrease in payroll related expenses, an $9,323 decrease in occupancy expenses, and a net decrease in other operating expenses of $428,551. The decrease in other operating expenses is mainly attributed to decreases in Research & Development of $114,569, Credit Acquisition Fee of $95,000, Depreciation of $86,255, Outside Services of $68,558 and Insurance of $32,024.

**Operating Profit:** The Company had a $70,939 profit from operations during the nine months ended September 30, 2007 compared to a $203,076 loss for the same period in 2006.

**Interest Expense:** Interest expense was $461,396 and $400,452 for the nine months ended September 30, 2007 and 2006, respectively.

**Income Taxes:** For the nine months ended September 30, 2007, the Company's income tax expense was minimal because of the Company's net operating loss carryforwards. For the nine months ended September 30, 2006, the Company did not record a provision for income taxes. No income tax is due for this period because the Company has net operating loss carryforwards from prior periods that fully offset the tax provision.

**Net Loss:** The Company's posted a net loss of $390,457 and $603,528 for the nine months ended September 30, 2007 and 2006, respectively.

**Liquidity and Capital Resources**

The primary source of funds available to the Company are receipts from customers for simulator and merchandise sales in its two owned and operated racing centers, percentage of gross revenues from simulator races and minimum guarantees from revenue share and lease sites, the sale of simulators, proceeds from equity offerings including the $2,610 million received in August 2002, proceeds from debt offerings including the $700,000 in Secured Bridge Notes and warrants issued in March 2003, the $604,000 in net proceeds from Notes and options issued between February and June, 2004, the additional loan of a net $100,000 from one of the existing Bridge Loan note holders, $122,000 from the 2005 Note, net proceeds of $855,000 borrowed in September of 2006, net proceeds of $427,500 borrowed in September of 2007, loans from shareholders, credit extended by vendors, and possible future financings.

19

On December 31, 2004, March 31, 2005 and April 15, 2005, the Company entered into three Asset Purchase Agreements with Race Car Simulation Corp. ("RCSC") pursuant to which it sold forty-four (44) of its race car simulators that were located in existing revenue share locations, or had been installed in new revenue share sites. The sale is accounted for as a borrowing in accordance with the guidance provided in paragraphs 21-22 of SFAS 13. While this transaction generated an aggregate purchase price of $2,856,600, it also depleted monthly revenue share payments to the Company generated by the simulators that were sold. As of this filing, the net proceeds of $1,874,708 from the three sales transactions for the sale of forty-four (44) simulators to RCSC have been depleted. Management intends to continue to contract with revenue share and/or lease partners in a timely manner and install simulators within its inventory to replenish the cash flow lost from the forty-four (44) simulators that were sold, although there can be no assurances. RCSC has filed a complaint against National Tour, Inc. and its chief executive officer, Johnny Capels, personally. RCSC claims that National Tour owes the company at least $193,000 in lease payments plus interest and other costs under the lease agreements between the parties. The lease agreements involve twelve (12) of the Company's simulators which were part of the forty-four (44) considered a "borrowing" under GAAP guidelines, and may be a contingent liability for the Company under the terms of its guarantee to RCSC under the asset purchase agreement. The Company has an obligation under their agreement with RCSC to guarantee certain contracted revenue share or lease payments through 2007, and also has the obligation to find new revenue share or lease partners for the RCSC simulators. The Company is in the process of removing eight SMS simulators from the Syracuse, NY site to Incredible Pizza sites in Oklahoma City, OK and Dallas, TX (four in each site). The Company and RCSC are in discussions of how best to resolve the guaranteed payments due under their agreement.

The Company believes that it has generated a significant interest in its simulators, and that some combination of revenue share agreements, lease agreements and simulator sales agreements with both the original SMS simulator and the new Reactor simulator will be sufficient to fund the daily operations of the business until a larger scale, multi-site virtual league format can be established, although there can be no assurances. Current prospects include family entertainment centers, bowling alleys, cruise ships, sports bars and large retailers.

Management is optimistic that the new Reactor simulator will be attractive to customers seeking a lower priced simulator with greater mobility and portability. The Reactor simulator debuted at the IAAPA convention in mid-November, 2005, and 44 Reactor simulators have been manufactured since that time. Management is also encouraged by the initial interest in, and the potential profitability of, the mobile application of the new Reactor, simulator although there can be no assurance.

The Company is pursuing some form of debt or equity financing sufficient to complete its development of the multi-site league play, and there is no assurance that such funding will be available, or available on terms acceptable to the Company.

During the nine months ending September 30, 2007, the operating activities of the Company used net cash of $330,152 compared to net cash used of $976,339 for the comparable period in 2006. The drivers for the decrease in cash used from operations can be attributed to the increase in prepaid expense, the increase in accounts payable and the amortization of the Dolphin financing agreement.

During the nine months ending September 30, 2007, the Company used $51,753 of net cash in investing activities compared with $279,273 of net cash used in investing activities during the comparable period in 2006. The decrease in cash from investing activities is primarily related to the purchase of simulators.

During the nine months ending September 30, 2007, the Company generated $299,217 of cash from financing activities compared with $1,132,274 of cash generated during the comparable period in 2006. The decrease from financing activities is primarily related to the payments on notes.

20

Cash flow from all sources (operations, investing activities and financing activities) was insufficient to fund the company during the nine months ending September 30, 2007, and resulted in an $82,688 reduction in the Company's cash position. This compares with $123,338 in cash reduction for all sources for the period ending September 30, 2006.

The Company has funded its retained losses through the initial investment of $650,000 in May 2001, $400,000 of capital contributed in February 2002, approximately $2.610 million received in August 2002, loans from related parties including net proceeds of $687,500 received in March, 2003, and net proceeds received between February 2004 and June 2004 totaling $604,000, $122,500 in loan proceeds from the sale of the 2005 Notes between October and November, net proceeds of $845,000 in loan proceeds from the sale of the 2006 Notes in July, net proceeds of $855,000 borrowed in September of 2006, net proceeds of $427,500 borrowed in September of 2007, $1.003 million received in the form of deposits for the placement of race car simulators in revenue share locations, or for the future purchase by third parties of race car simulators, and credit extended by vendors.

As of September 30, 2007, the Company had cash totaling $133,635 compared to $216,323 at December 31, 2006. Current assets totaled $778,968 at September 30, 2007 compared to $726,018 on December 31, 2006. Current liabilities totaled $4,264,289 on September 30, 2007 compared with $3,843,284 on December 31, 2006. As such, these amounts represent an overall decrease in working capital of $368,055 for the nine months ending September 30, 2007.

## ITEM 3. INTERNAL CONTROLS AND PROCEDURES

The Principal Executive Officer ("PEO") and the Principal Financial Officer ("PFO") of the Company (currently one individual) have evaluated the effectiveness of its disclosure controls and procedures (as defined in Rule 13a-14 of the Exchange Act) within 90 days prior to the filing of this report. Based on that evaluation, the PEO and PFO have concluded that the Company's disclosure controls and procedures are adequate and effective. There have been no significant changes in the Company's internal controls, or in factors that could significantly affect internal controls, subsequent to the most recent evaluation of such controls.

21

# PART II

## ITEM 1. LEGAL PROCEEDINGS

From time to time, the Company may be party to various legal actions and complaints arising in the ordinary course of business. The Company's subsidiary Perfect Line, Inc. filed a complaint in the US District Court Southern District of Indiana on December 6, 2006, against Checker Flag Lightning, LLC ("CFL") and Mike Schuelke, seeking a Declaratory Judgment, Injunctive Relief and Damages for failing to make the required payments (at least $559,119) under certain lease agreements between CFL and Perfect Line. On April 18, 2007, the Company filed a Motion for Partial Summary Judgment in the amount of $357,372 against CFL on Counts II and VI of the Complaint (amounts that are owed since January 1, 2006). CFL filed its response to the Summary Judgment and did not dispute the amounts due to Perfect Line; however the case has been stayed pending the outcome of the Bankruptcy Proceedings as described below.

A Petition for Involuntary Bankruptcy was filed by Perfect Line against CFL on June 11, 2007. CFL filed a motion to dismiss the case based upon an insufficient number of creditors. The Michigan Court has allowed more time for additional creditors to join the Petition, so the Petition remains pending. The Involuntary Petition was granted and a trustee has been appointed, and is proceeding to administer the estate. Perfect Line has a first position security interest in 6 SMS simulators at the Gurnee Mills location related to a $400,000 note with CFL, and has made an offer to the bankruptcy trustee for 22 SMS simulators that were in CFL sites. Another 8 SMS simulators that the Company owns are in the Jordan Creek site, and will be installed in future revenue producing sites.

Checkered Flag Lightning, LLC ("CFL") is a lease assignee of Perfect Line for the Riverchase Galleria racing center in Birmingham, Alabama. Since CFL recently vacated this space, the landlord for this space has recently informed Perfect Line of CFL's failure to pay an amount due at the end of 2006 of $204,380. Approximately half of this amount was a previous Perfect Line obligation that was to be paid by CFL under the terms of the revenue share agreement between the parties, and the other half are recent CFL defaults. No complaint has been filed in this matter, and the parties are attempting to negotiate reasonable settlement terms for both parties, although there can be no assurance. The landlord did release the 8 SMS simulators and related assets that were in this mall site to the Company, and they have been removed and stored in the Company's warehouse for future installation.

As of the filing of this Form 10-QSB, the Company is not aware of any material legal actions directed against the Company.

## ITEM 2. CHANGES IN SECURITIES

None, not applicable.

## ITEM 3. DEFAULTS UPON SENIOR SECURITIES

None, not applicable.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None, not applicable.

## ITEM 5. OTHER INFORMATION

None, not applicable.

22

## ITEM 6. EXHIBITS AND REPORTS ON FORM 8-K

A.    Exhibits.

| | |
|---|---|
| 3(i) | Articles of Incorporation [1] |
| 3(ii) | By-Laws[1] |
| 10.1 | Form of Secured Bridge Notes [2] |
| 10.2 | Form of Procurement Contract [3] |
| 10.3 | Form of Master Revenue Sharing Agreement [3] |
| 10.4 | Asset Purchase Agreement with Race Car Simulation Corporation, a portfolio company of Dolphin Direct Equity Partners, LP [4] |
| 10.5 | Asset Purchase Agreement with Checker Flag Lightning, LLC ("CFL"), a Michigan limited liability corporation [5] |
| 10.6 | Form of 2006 Secured Promissory Note[6] |
| 10.7 | Form of 2006 Common Stock Purchase Warrant[6] |
| 10.8 | Form of 2007 Secured Promissory Note[6] |
| 10.9 | Form of 2007 Common Stock Purchase Warrant[6] |
| 11.1 | Computation of Earnings (Loss) Per Share |
| 21.1 | Subsidiaries |
| 31.1 | Certification of William R. Donaldson as Chief Executive Officer and Chief Financial Officer pursuant to Rule 13a-14 of the Security Exchange Act of 1934. |
| 32.1 | Certification of William R. Donaldson as Chief Executive Officer pursuant to 18 U.S.C. Section 1350. |
| 32.2 | Certification of William R. Donaldson as Chief Financial Officer and Treasurer pursuant to 18 U.S.C. Section 1350. |

1) Incorporated by reference from Form 10-QSB filed on November 14, 2002
2) Incorporated by reference from Form 8-K filed on March 13, 2003
3) Incorporated by reference from Form 10-QSB filed on May 17, 2004
4) Incorporated by reference from Form 8-K filed on January 6, 2005
5) Incorporated by reference from Form 8-K filed on January 6, 2006
6) Incorporated by reference from Form 10-KSB filed on March 30, 2006

B.    Reports on Form 8-K.

None

23

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

### INTERACTIVE MOTORSPORTS AND ENTERTAINMENT CORP.

Date: November 19, 2007        By:    */s/ William R. Donaldson*
                                      ------------------------------------------------
                                      William R. Donaldson
                                      Chairman of the Board and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

Date: November 19, 2007        By:    */s/ William R. Donaldson*
                                      ------------------------------------------------
                                      William R. Donaldson
                                      Chairman of the Board and Chief Executive Officer
                                      (Principal Executive Officer)

Date: November 19, 2007        By:    */s/ William R. Donaldson*
                                      ------------------------------------------------
                                      William R. Donaldson
                                      Chairman of the Board and Chief Executive Officer
                                      (Principal Financial Officer)

24

**EXHIBIT INDEX**

Exhibits:

| | |
|---|---|
| 10.6 | Form of 2006 Secured Promissory Note |
| 10.7 | Form of 2006 Common Stock Purchase Warrant |
| 10.8 | Form of 2007 Secured Promissory Note |
| 10.9 | Form of 2007 Common Stock Purchase Warrant |
| 11.1 | Computation of Earnings (Loss) Per Share |
| 21.1 | Subsidiaries |
| 31.1 | Certification of William R. Donaldson as Chief Executive Officer and Chief Financial Officer pursuant to Rule 13a-14 of the Security Exchange Act of 1934. |
| 32.1 | Certification of William R. Donaldson as Chief Executive Officer pursuant to 18 U.S.C. Section 1350. |
| 32.2 | Certification of William R. Donaldson as Chief Financial Officer and Treasurer pursuant to 18 U.S.C. Section 1350. |

25

Exhibit F

RECYCLED



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com


Gary J. Simon
Direct Dial: 212-837-6770
simon@hugheshubbard.com

January 23, 2008

Interactive Motorsports and Entertainment Corporation
Perfect Line, Inc.
Race Car Simulators, Inc.
5624 West 73rd Street
Indianapolis, Indiana 46278

Attn:  Chief Executive Officer

Gentlemen:

We represent Dolphin Direct Equity Partners, LP ("Dolphin") and certain of its affiliates.

Reference is made to the Asset Purchase Agreement (the "Purchase Agreement") dated December 31, 2004 by and among Dolphin, a Dolphin affiliate, Race Car, Perfect Line, Inc. ("Perfect Line") and Interactive Motorsports and Entertainment Corporation ("IMTS"). On behalf of our clients and as advised by them, pursuant to the Purchase Agreement, we hereby make demand for payment in the present amount of $706,548 in cash (plus such additional amounts as accrue hereafter) for the adverse consequences suffered by our clients as a result of, among other things, the violations by you of (i) Section 4.12 of the Purchase Agreement in light of the failure to make the payments absolutely and unconditionally guaranteed thereby, (ii) Sections 5.1 and 5.2 of the Purchase Agreement in light of the violations of the Management Agreement (as defined below) and the indemnification of our clients pursuant to such sections, and (iii) Section 5.3 of the Purchase Agreement in light of your more favorable treatment to the operation and maintenance of other race car simulators and related assets over the operation and maintenance of the Assets (as defined in the Purchase Agreement).

Reference is made to the Management Agreement dated as of December 31, 2004 between Dolphin, Race Car Simulation Corp. (a Dolphin affiliate) and IMTS (the "Management Agreement"). On behalf of our clients and as advised by them, pursuant to the Management Agreement, you are hereby notified that the Manager (as defined in the Management Agreement) is in violation of the Manager's agreement to place simulators of our clients included in the Assets into service with operators prior to placing any of Manager's own or any competing racecar simulators into any such arrangements, as well as other violations by the Manager under

2

Section 1 of the Management Agreement and otherwise. In addition to any and all additional remedies reserved as described below, on behalf of our clients we hereby demand that you, in accordance with the terms of the Management Agreement, place all of our clients' racecar simulators into the most valuable lease and revenue share arrangements made available to IMTS, Perfect Line, or any person for which they or William Donaldson serves or served as an agent in the placement of racecar simulators since September 26, 2006. In addition, we further demand a schedule detailing the deployment, whether through lease, revenue share agreement, sale or other arrangement, of all racecar simulators deployed or sold by IMTS, Perfect Line or Mr. Donaldson since such date, whether on any such person's own behalf or as agent for any other person.

The foregoing shall not in any way limit, expressly or implicitly, any of Dolphin's rights and claims, all of which are hereby reserved, pursuant to the Guarantee, the Purchase Agreement, the Management Agreement or the other agreements entered into in connection therewith or otherwise. In addition to considering other claims that may exist on behalf of our clients, our clients also have instructed us to consider claims of fraud in various contexts in connection with the transactions contemplated by and under the foregoing agreements and otherwise.

In light of our retention by Dolphin in this matter, please be sure that any correspondence or other communication by your counsel to Dolphin is provided directly to us.

Very truly yours,

Gary J. Simon

cc:     Bose McKinney & Evans LLP
        2700 First Indiana Plaza
        135 N. Pennsylvania Street
        Indianapolis, Indiana 46204
        Attn: Jeffrey B. Bailey

Default Letter to IMTS.DOC

Exhibit G



# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com


Gary J. Simon
Direct Dial: 212-837-6770
simon@hugheshubbard.com

January 23, 2008

William Donaldson
c/oInteractive Motorsports and Entertainment Corporation
5624 West 73rd Street
Indianapolis, Indiana  46278

Dear Mr. Donaldson:

We represent Dolphin Direct Equity Partners, LP ("Dolphin") and certain of its affiliates.

Reference is made to the Asset Purchase Agreement (the "Purchase Agreement") dated December 31, 2004 by and among Dolphin, a Dolphin affiliate, Race Car, Perfect Line, Inc. ("Perfect Line") and Interactive Motorsports and Entertainment Corporation ("IMTS"). On behalf of our clients and as advised by them, pursuant to the Purchase Agreement, we have made demand for payment in the present amount of $706,548 in cash (plus such additional amounts as accrue hereafter) for the adverse consequences suffered by our clients as a result of, among other things, the violations by IMTS and certain of its affiliates of (i) Section 4.12 of the Purchase Agreement in light of the failure to make the payments absolutely and unconditionally guaranteed thereby, (ii) Sections 5.1 and 5.2 of the Purchase Agreement in light of the violations of the Management Agreement (as defined below) and the indemnification of our clients pursuant to such sections, and (iii) Section 5.3 of the Purchase Agreement in light of IMTS and its affiliates' more favorable treatment to the operation and maintenance of other race car simulators and related assets over the operation and maintenance of the Assets (as defined in the Purchase Agreement).

Reference is made to the Management Agreement dated as of December 31, 2004 between Dolphin, Race Car Simulation Corp. ("Simulation") and IMTS (the "Management Agreement"). On behalf of our clients and as advised by them, pursuant to the Management Agreement, you are hereby notified that the Manager (as defined in the Management Agreement) is in violation of the Manager's agreement to place simulators of our clients included in the Assets into service with operators prior to placing any of Manager's own or any competing racecar simulators into any  such arrangements, as well as other violations by the Manager under Section 1 of the Management Agreement and otherwise.  In addition to any and all additional remedies reserved as described below, on behalf of our clients we have made demand that IMTS and certain of its affiliates, in accordance with the terms of the Management Agreement, place all of our clients' racecar simulators into the most valuable lease and revenue share arrangements

New York   ■   Washington, D.C.   ■   Los Angeles   ■   Miami   ■   Jersey City   ■   Paris   ■   Tokyo

made available to IMTS, Perfect Line, or any person for which they or you serves or served as an agent in the placement of racecar simulators since September 26, 2006. In addition, we further made demand for a schedule detailing the deployment, whether through lease, revenue share agreement, sale or other arrangement, of all racecar simulators deployed or sold by IMTS, Perfect Line or you since such date, whether on any such person's own behalf or as agent for any other person.

**Reference is made to the Noncompetition Agreement dated as of December 31, 2004 by and between Simulation and you personally (the "NC Agreement"). On behalf of our clients and as advised by them, pursuant to the NC Agreement, you are hereby notified of the foregoing claims and that, based in large part on the same facts applicable to the foregoing, our clients intend to bring claims against you personally for your personal violations of the terms of Section 3 of such agreement. This notification relates among other things to the express terms of the first sentence of such section, which includes express language regarding more favorable treatment to the operation and maintenance of other racecar simulators and related assets owned or operated by IMTS over the operation and maintenance of the Assets. We note in particular that you executed the NC Agreement in your personal capacity and not in any position as an officer or director of any entity and that all legal action will be brought accordingly.**

The foregoing shall not in any way limit, expressly or implicitly, any of Dolphin's rights and claims, all of which are hereby reserved, pursuant to the Guarantee, the Purchase Agreement, the Management Agreement, the NC Agreement or the other agreements entered into in connection therewith or otherwise. In addition to considering other claims that may exist on behalf of our clients, our clients also have instructed us to consider claims of fraud in various contexts in connection with the transactions contemplated by and under the foregoing agreements and otherwise.

In light of our retention by Dolphin and its affiliates in this matter, please be sure that any correspondence or other communication by your counsel to Dolphin or its affiliates is provided directly to us. We are not aware that you are represented by counsel in this regard and recommend that you consult with counsel with respect to these matters.

Very truly yours,

Gary J. Simon