

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
DOLPHIN DIRECT EQUITY PARTNERS, LP,
and RACE CAR SIMULATION CORP.,
MORTGAGE CAPITAL, LLC,

            Plaintiffs,

   -against-

INTERACTIVE MOTORSPORTS AND
ENTERTAINMENT CORPORATION,
PERFECT LINE, INC., RACE CAR
SIMULATORS, INC., and WILLIAM
DONALDSON,
          Defendants.

-----------------------------------X

08 Civ. 1558 (RMB)(THK)

**REPORT AND RECOMMENDATION**

**TO: HON. RICHARD M. BERMAN, UNITED STATES DISTRICT JUDGE.**
**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

## I.   Introduction

Dolphin Direct Equity Partners, LP ("Dolphin Direct") and Race

Car Simulation Corp. ("Race Car Corp.) (collectively, "Plaintiffs")

brought this diversity action against Defendants Interactive

Motorsports and Entertainment Corporation ("IMTS"), Perfect Line,

Inc. ("Perfect Line"), Race Car Simulators, Inc. ("RCSI")

(collectively, "Corporate Defendants"), and William Donaldson

("Donaldson"), Chief Executive Officer ("CEO") of IMTS and Chairman

of its Board of Directors, CEO of Perfect Line, and CEO of RCSI

(collectively, "Defendants"). Plaintiffs alleged, inter alia, that

Defendants "breach[ed] written agreements regarding [the] purchase

of race car simulators and [the] lease of those race car simulators

to third-parties." (Complaint, dated Feb. 14, 2008 ("Compl."), ¶¶

-1-

1, 4-8; Plaintiffs' Rule 56.1 Statement, dated Oct. 28, 2008 ("Pls. 56.1"), ¶ 2.)

The District Court (Hon. Richard M. Berman) granted in part and denied in part Plaintiffs' motion for summary judgment. Plaintiffs prevailed on their claim for breach of a Performance Guarantee against the Corporate Defendants in the amount of $648,666.56 plus interest; Plaintiffs also prevailed on liability claims for breach of contract against the Corporate Defendants and Donaldson. See Dolphin Direct Equity Partners v. Interactive Motorsports, No. 08 Civ. 01558 (RMB), 2009 WL 577916, at *12 (S.D.N.Y Feb. 27, 2009). The District Court referred the case to this Court for an inquest to calculate the amount of Plaintiffs' actual damages on their claims for breach of a Purchase Agreement and Management Agreement against the Corporate Defendants and for breach of a Non-Competition Agreement against Donaldson in his individual capacity.

Plaintiffs filed their pre-inquest submission on March 27, 2009. (See Plaintiffs' Memorandum of Law in Support of Application for Award of Damages, dated Mar. 27, 2009 ("Pls. Damages Mem."); Affidavit of Michael Tiger in Support of Plaintiffs' Application for Award of Damages, dated Mar. 27, 2009 ("Tiger Damages Aff.").) Plaintiffs also directed the Court to their briefing on damages, submitted in their papers in support of their motion for summary judgment. Defendants filed their Opposition to Plaintiffs' damages

submission on May 19, 2009. (See Defendants' Affidavit in Opposition to Plaintiffs' Application For Award of Damages, dated May 19, 2009 ("Defs. Damages Opp.").) Plaintiffs submitted their Reply on June 2, 2009. (See Plaintiffs' Reply Memorandum of Law in Further Support of Application for Award of Damages, dated June 2, 2009 ("Pls. Reply Damages Mem."); Reply Declaration of Carlos Salas in Support of Plaintiffs' Application for Award of Damages, dated June 2, 2009 ("Salas Damages Decl.").) Plaintiffs and Defendants have also submitted letters in response to several questions posed by the Court. (See Letter from Michael D. Tiger, Esq., dated Dec. 8, 2009 ("Tiger Ltr."); Letter from Mario DeMarco, Esq., dated Dec. 15, 2009 ("DeMarco Ltr.").

Plaintiffs' submissions aver that they are entitled to recover: (1) $1,201,188.06 from the Corporate Defendants for breaches of the Purchase Agreement and Management Agreement; (2) $1,051,501.45 from Donaldson for breaches of the Non-Competition Agreement; and (3) pre-judgment interest on their damages.

## II. Background

### A. Established Facts and Liability

#### 1. The Parties

The following facts are established. Dolphin Direct is "a private investment firm" and "the sole shareholder" of Race Car Corp. (Pls. 56.1; Decl. of Carlos Salas, dated Oct. 27, 2008 ("Salas Decl."), ¶ 1.) The Corporate Defendants "manufacture and

market race car simulators[.]" (Pls. 56.1 ¶ 4; <u>see also</u> Dep. of William R. Donaldson, dated July 14, 2008 ("Donaldson Dep."), at 19:5-14.)  Particularly, the Corporate Defendants manufacture so-called 'SMS' simulators and 'Reactor' simulators, (<u>see</u> Pls. 56.1 ¶ 4; <u>see also</u> Donaldson Dep. at 20:14-21:15), and place them into three categories of revenue-generating arrangements: (1) revenue-sharing agreements, (2) leases, and (3) sales.  (<u>See</u> Pls. 56.1 ¶ 4; <u>see also</u> Donaldson Dep. at 47:2-10.)

2. <u>The Parties' Agreements</u>

Plaintiffs and Defendants entered into three agreements:

(1)  an Asset Purchase Agreement, dated Dec. 31, 2004 ("Purchase Agreement"), which involved the purchase of forty-four race-car simulators and "contains a guarantee that [P]laintiffs would receive from the Corporate Defendants certain minimum payments" ("Performance Guarantee") (Pls. 56.1 ¶ 9), and a clause providing that the Corporate Defendants "may not compete against [P]laintiffs in the race car simulator market if that competition would favor those [Corporate] [D]efendants" ("Corporate Non-Competition Clause"). (<u>Id.</u> ¶ 19.);

(2)  a Management Agreement, dated Dec. 31, 2004 ("Management Agreement"), which provides that the Corporate Defendants would arrange leases with third-parties for Plaintiffs' simulators, and that Plaintiffs "were to receive all proceeds from any leases arranged by the Corporate Defendants for the [s]imulators." (<u>Id.</u>

-4-

¶ 7; see also Mgmt. Agreement § 1(a); October 2008 Salas Decl. ¶ 4 & Ex. B.)   Further, the Corporate Defendants "must place into service any [of Plaintiffs'] [s]imulators that are lying idle" "prior to placing any other [race] car simulators into service" ("Most Favored Nation Clause").   (Pls. 56.1 ¶ 17.)   The Most Favored Nation Clause also provides Plaintiffs with the right to certain of the Corporate Defendants' simulators in the event that the Corporate Defendants fail to re-deploy one of Plaintiffs' simulators within sixty days of that simulator going out of service.   (Pls. 56.1 ¶ 18; October 2008 Salas Decl. Ex. B. § 1.)

(3) a personal Non-Competition Agreement, dated December 31, 2004 ("Personal Non-Competition Agreement"), between Race Car Corp. and Donaldson, which forbids Donaldson from "compet[ing] against Race Car Corp. in the race car simulator market if that competition would favor [Donaldson] over Race Car Corp." (Pls. 56.1 ¶ 20; see also Compl. ¶¶ 13, 15, 20, 26-27.)

3. Breach of the Performance Guarantee

After execution of the Purchase Agreement and the Management Agreement, on or about January 1, 2005, "the Corporate Defendants, acting on [P]laintiffs' behalf, leased [certain of Plaintiffs'] simulators to various third-parties, including National Tour, Inc. ['National Tour'] and RLB Development LLC ['RLB Development'] [collectively, the 'Third-Party Leases']." (Pls. 56.1 ¶ 10; see also Salas Decl. ¶¶ 8-9.)   Each of the Third-Party Leases "contains

a provision detailing minimum payments to [P]laintiffs[.]" (Pls. 56.1 ¶ 11; see, e.g., National Tour Simulator Lease Agreement, dated Jan. 1, 2005, at 4, attached as Ex. D to Salas Decl.) Pursuant to the Performance Guarantee, "the Corporate Defendants guaranteed that [P]laintiffs would receive no less than [the] expected minimum payments with respect to each of the [Third-Party] Leases." (Pls. 56.1 ¶ 11; see also Donaldson Dep. at 111:6-24.)[1]

The District Court found that the Corporate Defendants had failed to cover the shortfall in promised payments, payments which National Tour and RLB Development owed to Plaintiffs under the Third-Party Leases. "Plaintiffs are, unequivocally, entitled to summary judgment on their claim for breach of the Performance Guarantee against the Corporate Defendants in the amount of $648,666.56 plus interest." See Dolphin Direct, 2009 WL 577916, at *11.

4. Breach of Purchase Agreement and Management Agreement

In total, "Plaintiffs entered into three ... lease agreements [with National Tour]," covering deployment of twelve simulators. (Pls. 56.1 ¶ 21; see also Salas Decl. ¶ 8.) One of the leases governed six simulators ("the National Tour 6 Lease"); a second lease governed two simulators ("the National Tour 2 Lease"); and a

---

[1]    "Each of the [Corporate Defendants] hereby absolutely and unconditionally guarantees to [Plaintiffs], with respect to each Lease ... that [Plaintiffs] shall receive an amount at least equal to the minimum payments ... provided for therein ...." (Purchase Agreement § 4.12.)

third lease governed four simulators ("the National Tour 4 Lease"). The three leases ended, respectively, on November 21, 2006, December 31, 2006, and March 31, 2007. National Tour then returned Plaintiffs' simulators to the Corporate Defendants' warehouse in Concord, North Carolina. (See Donaldson Dep. at 101:10, 103:19-104:1.) The Corporate Defendants "never re-deployed [Plaintiffs' twelve] [s]imulators." (Pls. 56.1 ¶ 23; see Donaldson Dep. at 101:8-22, 103:7-18, 104:2-7.)

After the expiration of the first National Tour lease on November 21, 2006, the Corporate Defendants "entered into new revenue-sharing or lease arrangements with third-parties with ... their own race car simulators," (Pls. 56.1 ¶ 30; see also Affidavit of Michael Tiger in Support of Motion for Summary Judgment, dated Oct. 28, 2008 ("Oct. 2008 Tiger Aff."), ¶¶ 15-21 & Exs. K-M), and "sold ... race car simulators to third-parties." (Pls. 56.1 ¶ 31; see also Oct. 2008 Tiger Aff. ¶ 21 & Exs. K-M.) All the while, Plaintiffs' simulators remained idle in the Corporate Defendants' warehouse. (See Pls. 56.1 ¶¶ 24, 29, 30; see also Oct. 2008 Tiger Aff. ¶¶ 15-19 & Exs. K-M; Donaldson Dep. at 101:2-22, 103:7-104:7.) "The Corporate Defendants never re-deployed [Plaintiffs' twelve] [s]imulators in [their] new revenue-generating arrangements. (Pls. 56.1 ¶ 23; see also Donaldson Dep. at 101:8-22, 103:7-18, 104:2-7.)

The District Court found that such acts were a breach of the Corporate Defendants' obligations under the Corporate Non-

Competition Clause (in the Purchase Agreement) and the Most Favored

Nation Clause (in the Management Agreement).[2]  See Dolphin Direct,

2009 WL 577916, at *7.  The District Court also determined that

"[t]he Corporate Defendants [...] breached the Purchase Agreement

through DGI leases with Sprint Nextel and Toyota/Brand Promotions."

(See id. (internal quotation marks omitted).)  DGI, Inc. is an

affiliate of the Corporate Defendants — it is owned and operated by

Donaldson (see Donaldson Dep. at 16:1-24, 32:9-12), and "the

Corporate Non-Competition Clause bars competition by the Corporate

Defendants and 'their respective affiliates,'" (Pls. 56.1 ¶ 39

(quoting Purchase Agreement § 5.3(a)).)[3]  In addition, "[t]he

---

[2]    "[The Corporate Defendants] hereby agree[] to ..., if
any [of Plaintiffs'] Simulators are not, at any time, being
utilized to generate revenue for [Race Car Corp.], place such
Simulators into service under Leases with operators prior to
placing any of its own or any competing racecar simulators into
any such arrangements[.]"  (Mgmt. Agreement § 1(a).)

    "[The Corporate Defendants] shall not and shall cause their
affiliates not to ... directly or indirectly, own, manage,
control, participate in, consult with, render services for, or in
any manner engage in or represent any business involving directly
or indirectly, racecar simulators; provided that actions or
inactions prohibited by the foregoing shall not constitute a
violation of this Section 5.3(a) so long as such actions do not
favor or result in more favorable treatment to the operation and
maintenance of other racecar simulators and related assets over
the operation and maintenance of [Plaintiffs' simulators]."
(Purchase Agreement § 5.3(a).)

[3]    In December 2006, DGI, Inc. "purchased at least twenty-
four race car simulators from Perfect Line and subsequently
leased those simulators to third-parties Sprint Nextel and
Toyota/Brand Promotions."  (Pls. 56.1 ¶ 39; see also Donaldson
Dep. at 16:1-24, 32:9-12;  Oct. 2008 Tiger Aff. ¶ 21 & Ex. K.)

Corporate Defendants further breached the Purchase Agreement through the sale of simulators to third-parties because sales of race car simulators constitute 'business involving ... race car simulators' under the Purchase Agreement." <u>Dolphin Direct</u>, 2009 WL 577916, at *7 (internal quotation marks omitted).

The District Court rejected Defendants' argument that the Purchase Agreement and Management Agreement did not cover the particular models of simulator that the Corporate Defendants leased and sold, concluding that "the Most Favored Nation Clause and Corporate Non-Competition Clause do not distinguish between types of race case simulators." (<u>See</u> <u>id.</u> (internal quotation marks omitted).)

5. <u>Donaldson's Breach of Non-Competition Agreement</u>

The District Court determined that "Donaldson breached the Non-Competition Agreement through the actions of both the Corporate Defendants and DGI[.]" (<u>See</u> <u>id.</u> at 8.) First, "[b]eginning on November 21, 2006, Donaldson breached the Non-Competition Agreement because the Corporate Defendants placed their own race car simulators into revenue-generating arrangements in competition with Plaintiffs simulators[.]" (<u>See</u> <u>id.</u> (internal quotation marks omitted).) Under the terms of the Non-Competition Agreement, Donaldson is personally liable for the conduct of the Corporate Defendants. (<u>See</u> <u>id.</u>) Second, "Donaldson also breached the Non-Competition Agreement through DGI's leases with Sprint Nextel and

-9-

Toyota/Brand Promotions because DGI is owned and operated by Donaldson." (See id. (internal quotation marks omitted).) Under the terms of the Non-Competition Agreement, "competition" is defined as action taken by a "sole proprietor, partner or corporate officer." (See id. (internal quotation marks omitted).)

B. Plaintiffs' Application for Award of Damages

1. National Tour 6 Lease

The National Tour 6 Lease expired on November 21, 2006. As of that date, the Most Favored Nation Clause and the Non-Competition Clauses obligated the Corporate Defendants to place the National Tour 6 Lease simulators into service before placing into service any of their own race car simulators.

First, the Corporate Defendants violated this obligation by failing to re-deploy Plaintiffs' National Tour 6 simulators. Plaintiffs claim that pursuant to Section 1(b) of the Management Agreement, "[P]laintiffs are entitled to demand the assignment of any six simulators owned by the Corporate Defendants for which the Corporate Defendants entered into revenue-generating arrangements with third-parties in the six months prior to November 21, 2006." (See Pls. Damages Mem. at 6 (emphasis added).) Specifically, "between May 21, 2006 and November 21, 2006, the Corporate Defendants placed five of their simulators into leases and revenue-sharing agreements. [Thus] [p]ursuant to Section 1(b) of the

-10-

Management Agreement, [P]laintiffs are entitled to possess those five simulators ...." (See id. at 9 (internal citations omitted).)

Second, each of the Corporate Defendants' revenue-generating arrangements entered into after November 21, 2006, violated the Most Favored Nation Clause and the Non-Competition Clauses, "because those arrangements did not re-deploy the National Tour 6 Lease [s]imulators." (See id. (emphasis added).) Specifically, the Corporate Defendants have placed seventy-four (74) simulators into revenue-generating arrangements since November 21, 2006, comprising "new revenue-sharing or lease agreements with third-parties with respect to at least thirty-eight (38) of their own race car simulators .... [And sales of] at least thirty-six (36) other race car simulators to third-parties." (See id. at 8.) Under the Personal Non-Competition Agreement, Donaldson is liable for these breaches as well.

2. National Tour 2 Lease

The National Tour 2 Lease expired on December 31, 2006. As of that date, the Most Favored Nation Clause and the Non-Competition Clauses obligated the Corporate Defendants to place the National Tour 2 Lease simulators into service before placing into service any of their own race car simulators.

First, the Corporate Defendants violated this obligation by failing to re-deploy Plaintiffs' National Tour 2 simulators. Plaintiffs claim that pursuant to Section 1(b) of the Management

Agreement, "[P]laintiffs are entitled to demand the assignment of any two simulators owned by the Corporate Defendants for which the Corporate Defendants entered into revenue-generating arrangements with third-parties in the six months prior to December 31, 2006." (See id. at 7 (emphasis added).)  Specifically, "between June 30 and December 31, 2006, the Corporate Defendants placed six of their simulators into leases and revenue-sharing agreements. [Thus] [p]ursuant to Section 1(b) of the Management Agreement, [P]laintiffs are entitled to possess two of those six simulators .... " (See id. (internal citations omitted).)

Second, each of the Corporate Defendants' revenue-generating arrangements entered into after December 31, 2006, violated the Most Favored Nation Clause and the Non-Competition Clauses, "because those arrangements did not re-deploy the National Tour 2 Lease [s]imulators." (See id. (emphasis added).)  Specifically, the Corporate Defendants have placed fifty-eight (58) simulators into revenue-generating arrangements since December 31, 2006, comprising "new revenue-sharing or lease agreements with third-parties with respect to at least thirty-four (34) of their own race car simulators .... [And sales of] at least twenty-four (24) other race car simulators to third-parties." (See id. at 9.)  Under the Personal Non-Competition Agreement, Donaldson is liable for these breaches as well.

3. National Tour 4 Lease

-12-

The National Tour 4 Lease expired on March 31, 2007. As of that date the Most Favored Nation Clause and the Non-Competition Clauses obligated the Corporate Defendants to place the National Tour 4 Lease simulators into service before placing into service any of their own race car simulators.

First, the Corporate Defendants violated this obligation by failing to re-deploy Plaintiffs' National Tour 4 simulators. Plaintiffs claim that pursuant to Section 1(b) of the Management Agreement, "[P]laintiffs are entitled to demand the assignment of any four simulators owned by the Corporate Defendants for which the Corporate Defendants entered into revenue-generating arrangements with third-parties in the six months <u>prior to</u> March 31, 2007." (<u>See</u> <u>id.</u> at 8 (emphasis added).) Specifically, "between September 30, 2006 and March 31, 2007, the Corporate Defendants placed four of their simulators into leases and revenue-sharing agreements. [Thus] [p]ursuant to Section 1(b) of the Management Agreement, [P]laintiffs are entitled to possess those four simulators .... " (<u>See</u> <u>id.</u>)

Second, each of the Corporate Defendants' revenue-generating arrangements entered into <u>after</u> March 31, 2007, violated the Most Favored Nation Clause and the Non-Competition Clauses, "because those arrangements did not re-deploy the National Tour 4 Lease [s]imulators." (<u>See</u> <u>id.</u> (emphasis added).) Specifically, the Corporate Defendants have placed forty-six (46) simulators into

-13-

revenue-generating arrangements since December March 31, 2007, comprising "new revenue-sharing or lease agreements with third-parties with respect to at least thirty-four (34) of their own race car simulators .... [And sales of] at least twelve (12) other race car simulators to third-parties." (See id. at 10.)  Under the Personal Non-Competition Agreement, Donaldson is liable for these breaches as well.

## III. Legal Standard for Award of Damages

Plaintiffs are entitled to damages resulting from Defendants' breaches of contract.  It is well-established under New York law that "[a] party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms." Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 185 (2d Cir. 2007); see also Kenford Co. v. County of Erie, 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 3 (1989).  Furthermore, under New York law "a breaching party is liable for all direct and proximate damages which result from the breach." Tractebel Energy Mktg., Inc. v AEP Power Mktg., Inc., 487 F.3d 89, 110 (2d Cir. 2007).[4]

A plaintiff must show the amount of its damages with "reasonable certainty." See Travellers Intl., A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1577 (2d Cir. 1994).  Yet a

---

[4] The Parties do not dispute that the law of the state of New York governs this action.  See Purchase Agreement § 6.9; Management Agreement § 10.

"plaintiff need only show a <u>stable foundation for a reasonable</u> <u>estimate</u> of the damage incurred as a result of the breach[;] [s]uch an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection." <u>Tractebel</u>, 487 F.3d at 110 (emphasis added). Further, "the burden of uncertainty as to the amount of damage is upon the wrongdoer." (<u>See</u> <u>id.</u>)

> New York courts have significant flexibility in estimating damages once the fact of liability is established[;] [t]o the extent certain variables must be assumed in order to arrive at a reasonable estimate, the court may do so, unless evidence is presented that undermines the basis for the assumption.

(<u>Id.</u> at 112.)

Plaintiffs seek damages from ongoing breaches that are "akin to loss of future profits[.]" (Pls. Damages Mem. at 16.) Under New York law, where a plaintiff seeks lost profits damages, "plaintiff must show that the loss was due to the breach, that the alleged loss is capable of proof with reasonable certainty, and that the lost profits were within the contemplation of the parties at the time of contracting." <u>Afolabi v. Jones</u>, No. 06 CV 2756, 2008 WL 4890166, at *4 (E.D.N.Y. Nov. 12 2008) (citing <u>Kenford Co.,</u> <u>Inc. v. Erie County</u>, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 131 (1986)). <u>See also</u> <u>Trademark Research Corp. v. Maxwell Online,</u> <u>Inc.</u>, 995 F.2d 326, 332 (2d Cir. 1993)(where a new business seeks loss of future profits "a stricter standard is imposed [because] there does not exist a reasonable basis of experience upon which to

-15-

estimate lost profits with the requisite degree of reasonable certainty.").

**IV. Discussion**

    A. <u>Damages from Breach of the Most Favored Nation Clause and the Corporate Non-Competition Clause</u>

Plaintiffs contend that the Corporate Defendants' breach of the Most Favored Nation Clause and the Corporate Non-Competition Clause entitles Plaintiffs to (1) $718,042.41 in damages for breaches experienced up to the date of filing their damages application, on March 27, 2009 (hereafter, "damages to date"), and (2) $483,145.65 in damages resulting from the Corporate Defendants' ongoing breaches.

    1. <u>Plaintiffs' Damages to Date from Past Breaches</u>

Plaintiffs argue:

> [T]he Court should award [P]laintiffs an amount equal to the value of: (i) the twelve most lucrative simulators that the Corporate Defendants placed into revenue-generating arrangements since the National Tour Simulators went out of service; or (ii) pursuant to Section 1(b) of the Management Agreement, the twelve most lucrative simulators that the Corporate Defendants placed into leases or revenue-sharing agreements in the six months prior to the National Tour Simulators.

(<u>See</u> Pls. Damages Mem. at 12.)[5]

---

    [5] Plaintiffs invoke Section 1(b) of the Management Agreement, which provides, "[i]f [Defendants are] unable to place any of [Plaintiffs'] Simulators into service ... [Plaintiffs] may elect to exchange any such Simulator for <u>a simulator of [Plaintiffs'] choosing</u> owned by [Defendants] that has been placed into a revenue-generating arrangement with a third party within the six (6) month period immediately preceding the date that

Plaintiffs employ the following methodology to determine their damages to date.   Plaintiffs calculated the value of all of the Corporate Defendants' revenue-generating arrangements entered into (i) since the termination of the National Tour Leases, and (ii) within six months of their expiration.   From this group, Plaintiffs selected the twelve "most lucrative simulators," defined as those simulators that have generated the maximum revenue for Defendants. (See id. at 11.)   Plaintiffs' selection of the "most lucrative" of Defendants simulators finds support in section 1(b) of the Management Agreement.   That section provides that in the event of Plaintiffs' simulators coming out of service, Plaintiffs are entitled to elect "a simulator of Plaintiffs' choosing owned by [Defendants]."   (Pls. 56.1 ¶ 18.)

To that end, for each of the Corporate Defendants' lease or revenue-sharing agreements, Plaintiffs calculated the value of such agreements using the minimum monthly payments provided for therein. (Pls. 56.1 ¶ 45.)

> [F]or each lease or revenue-sharing agreement, [P]laintiffs calculated the value of that agreement using the amounts provided for in that agreement.   Plaintiffs do not do so when documents produced in response to [P]laintiffs' third-party subpoenas revealed information to the contrary[.]

---

[Plaintiffs'] Simulator was taken out of service.   [Defendants] will assign to [Plaintiffs] [their] rights under any operating lease or revenue-sharing agreement to which any such exchanged Simulator is subject, and such arrangement will be considered a Lease under this Agreement."   (Pls. 56.1 ¶ 18 (emphasis added).)

(Pls. Damages Mem. at 13 n.3)

For each sale that the Corporate Defendants made, Plaintiffs calculated the value of that sale by using the value of an equivalently-valued lease or revenue-sharing agreement.

> For the sales to DGI [which Donaldson owns], [P]laintiffs used the value of DGI's subsequent leases to [third-parties]. For the remaining sales, [P]laintiffs used the value of the Corporate Defendants' revenue-sharing agreements with their largest customer, Bass Pro, except as otherwise provided.

(Id.; see also Oct. 2008 Tiger Aff. ¶ 26.)

Employing the methodology described above, Plaintiffs provide, infra, a detailed and comprehensive breakdown of the revenue accrued by the Corporate Defendants under each revenue-generating arrangement that Plaintiffs select to calculate their damages to date. (See Tiger Damages Aff. ¶¶ 28-40 & Exs. B-D.) To support their calculations, Plaintiffs provide copies of the Corporate Defendants' most lucrative revenue-generating agreements, which comprise lease, revenue-sharing, and purchase agreements. (See Oct. 2008 Tiger Aff. Exs. N-R.) Each agreement contains a payment provision. And Plaintiffs extrapolate from the stated dollar amounts in such provisions to calculate the payments actually received by the Corporate Defendants under the agreements.[6]

---

[6] Defendants do not dispute that Plaintiffs can calculate the payments made under any of the revenue-generating agreements executed by the Corporate Defendants simply by referring to those agreements. (See Defendants' Response to Plaintiffs' Request for the Production of Documents, attached as Exhibit G to Oct. 2008 Tiger Aff.) Further, in response to Plaintiffs' discovery

-18-

However, Plaintiffs do not rely on the underlying agreements to calculate payments received where "documents produced in response to Plaintiffs' third-party subpoenas revealed information to the contrary, such as payment documents produced by non-party Bass Pro Outdoor World, LLC ("Bass Pro") [.]" (Pls. Damages Mem. at 13 n.3; see also Pls. 56.1 ¶ 43.)   And in this regard, Plaintiffs provide the Court with copies of Bass Pro's payment register.[7]   (See Tiger Damages Aff. Exs. K-L.)   The payment register contains each and every payment made by Bass Pro to the Corporate Defendants since December 31, 2004.[8]  Plaintiffs use the dollar amounts therein to calculate the total sum of Bass Pro's payments to the Corporate Defendants under various revenue-generating agreements; the compiled payment data is provided in a spreadsheet entitled 'Payments by Bass Pro to the Corporate

requests Defendants insist that they have produced all relevant documents concerning payments made to Defendants under revenue-generating agreements since December 31, 2004, and all communications with third-parties concerning same. (See id., ¶ 2.)

[7] "The Bass Pro payment register separates the payments made to the Corporate Defendants by Bass Pro location, referring to each specific Bass Pro location by a three-letter code designating the applicable location."   (Tiger Damages Aff. ¶ 69.)

[8] "Exhibit L does not indicate the specific Bass Pro location from which the payment originated; therefore, to properly apportion by simulator the amount paid by Bass Pro to the Corporate Defendants since October 3, 2008, [P]laintiffs calculated the total amount that Bass Pro paid according to Exhibit L and divided that amount by the number of Bass Pro simulators and added that amount to the previous total for each simulator."   (Tiger Ltr., Ex. C, n. 2.)

-19-

Defendants Since November 21, 2006, attached as Exhibit M to the Tiger Damages Affidavit.  (See id. Ex. M.)

Taking into account all of the supporting documents and data, Plaintiffs are able calculate the amount of their damages to date to a reasonable degree of certainty, as the law requires.

(a) <u>Damages to Date - National Tour 6 Lease</u>

In calculating damages from the Corporate Defendants' breaches since November 21, 2006, the date the National Tour 6 lease ended, Plaintiffs determined the value of all revenue-generating arrangements entered into by the Corporate Defendants (i) since November 21, 2006, and (ii) since May 21, 2006 (six months prior to expiration of the National Tour 6 Lease).  Plaintiffs then selected the six most lucrative simulator deals, corresponding with those six of Plaintiffs' simulators that the Corporate Defendants failed to re-deploy.  (See id. ¶¶ 29-32 & Exs. B, K-M.)  The chart below is illustrative.

| THIRD PARTY | TYPE OF ARRANGEMENT | NUMBER OF SIMULATORS | DATE ENTERED | REVENUE GENERATED PER SIMULATOR UNDER AGREEMENT FROM NOVEMBER 21, 2006 TO MARCH 27, 2009 | TOTAL REVENUE GENERATED UNDER AGREEMENT FROM NOVEMBER 21, 2006 TO MARCH 27, 2009 |
|---|---|---|---|---|---|
| Bass Pro (Springfield, MO)[9] | Revenue-generating | 3 | 5/23/06 | $76,100.87 | $228,302.61 |
| Bass Pro (San Antonio, TX)[10] | Revenue-generating | 2 | 8/1/06 | $65,692.00 | $131,384.00 |
| Bass Pro (Rancho Cucamonga, CA)[11] | Revenue-generating | 1 | 12/7/06 | $52,763.25 | $52,763.25 |
| TOTAL | | 6 | | | $412,449.86 |

(b) Damages to Date - National Tour 2 Lease

In calculating damages from the Corporate Defendants' breaches since December 31, 2006, the date the National Tour 2 Lease ended, Plaintiffs determined the value of all revenue-generating arrangements entered into (i) since December 31, 2006, and (ii) since June 30, 2006 (six months prior to expiration of the National Tour 2 Lease). Excluding those simulators already counted above,

---

[9] A copy of this revenue-sharing agreement, executed by Perfect Line with Bass Pro's Springfield, Missouri location, is attached as Exhibit N to the October 2008 Tiger Aff.

[10] A copy of this revenue-sharing agreement, executed by Perfect Line with Bass Pro's San Antonio, Texas location, is attached as Exhibit O to the October 2008 Tiger Aff.

[11] A copy of this revenue-sharing agreement, executed by Perfect Line with Bass Pro's Rancho Cucamonga, California location, is attached as Exhibit P to the October 2008 Tiger Aff.

Plaintiffs next selected the two most lucrative simulator deals, corresponding with those two of Plaintiffs' simulators that the Corporate Defendants failed to re-deploy. (See id. ¶¶ 34-36 & Exs. C, K-M.) The chart below is illustrative.

| THIRD PARTY | TYPE OF ARRANGEMENT | NUMBER OF SIMULATORS | DATE ENTERED | REVENUE GENERATED PER SIMULATOR UNDER AGREEMENT FROM DECEMBER 31, 2006 TO MARCH 27, 2009 | TOTAL REVENUE GENERATED UNDER AGREEMENT FROM DECEMBER 31, 2006 TO MARCH 27, 2009 |
|---|---|---|---|---|---|
| Bass Pro (Rancho Cucamonga, CA) | Revenue-sharing Agreement | 1 | 12/7/06 | $52,763.25 | $52,763.25 |
| Sprint Nextel[12] | Revenue-sharing Agreement | 1 | 12/12/06 (commencing 1/1/07) | $42,000.00 | $42,000.00 |
| TOTAL | | 2 | | | $94,763.25 |

(c) Damages to Date - National Tour 4 Lease

In calculating damages from the Corporate Defendants' breaches since March 31, 2007, the date the National Tour 4 Lease ended, Plaintiffs determined the value of all revenue-generating arrangements entered into (i) since March 31, 2007, and (ii) since September 30, 2006 (six months prior to expiration of the National Tour 2 Lease). Excluding those simulators already counted above, Plaintiffs then selected the four most lucrative simulator deals,

---

[12] A copy of this lease agreement, executed by DGI with Sprint Nextel, is attached as Exhibit R to the October 2008 Tiger Aff.

corresponding with those four of Plaintiffs' simulators that the Corporate Defendants failed to re-deploy.   (See id. ¶¶ 38-40 & Exs. D, K-M.)   The chart below is illustrative.

| THIRD PARTY | TYPE OF ARRANGEMENT | NUMBER OF SIMULATORS | DATE ENTERED | REVENUE GENERATED PER SIMULATOR UNDER AGREEMENT FROM MARCH 31, 2007 TO MARCH 27, 2009 | TOTAL REVENUE GENERATED UNDER AGREEMENT FROM MARCH 31, 2007 TO MARCH 27, 2009 |
|---|---|---|---|---|---|
| Sprint Nextel[13] | Revenue-sharing Agreement | 2 | 1/31/07 (commenc-ing 4/1/07) | $38,499.93 | $76,999.86 |
| Bass Pro (Denham Springs LA)[14] | Revenue-Sharing Agreement | 2 | 8/29/07 | $66,914.72 | $133,829.44 |
| TOTAL | | 4 | | | $210,829.30 |

(d) Total Revenue Generated

The sum of the revenue generated by the 12 simulators described above, through March 27, 2009, is $718,042.41.   Thus, Plaintiffs seek $718,042.41 in damages up to the date of the inquest submission.

---

[13] A copy of this lease agreement, executed by DGI with Sprint Nextel, is attached as Exhibit S to the October 2008 Tiger Aff.

[14] Neither Defendants nor Bass Pro produced the revenue-sharing agreement for the Bass Pro Denham Springs location. Plaintiffs, however, confirm the execution of this revenue-sharing agreement through copies of letters from the Corporate Defendants and Bass Pro, attached as Exhibit Q to the October 2008 Tiger Aff.  Defendants do not dispute Plaintiffs' calculations of revenue earned under this agreement.

-23-

2. <u>Plaintiffs' Damages from Ongoing Breaches</u>

Plaintiffs argue that their "damages continue to accumulate, as [D]efendants continue to generate revenue from leases and revenue-sharing agreements they entered into while [P]laintiffs' simulators remain idle." (Pls. Damages Mem. at 16.) Further, their ongoing damages "are akin to loss of future profits[.]" (<u>Id.</u>)

Plaintiffs employ the following methodology to calculate damages from the Corporate Defendants' ongoing breaches.

> [P]laintiffs calculated the revenue going forward for the Corporate Defendants' simulators by taking each simulator's average monthly revenue and then multiplying that amount by the number of months remaining on each simulator's lease or revenue-sharing agreement .... Plaintiffs then calculated the net present value of each of these amounts. Next, [P]laintiffs selected: (a) the six most lucrative simulators among the revenue-generating arrangements entered into by the Corporate Defendants since May 21, 2006 (six months prior to the November 21, 2006 termination of the National Tour 6 lease); (b) the two most lucrative simulators among the revenue-generating arrangements entered into by the Corporate Defendants since June 30, 2006 (six months prior to the December 31, 2006 termination of the National Tour 2 Lease; and (c) the four most lucrative simulators among the revenue-generating arrangements entered into by the Corporate Defendants since September 30, 2006 (six months prior to the March 31, 2007 termination of the National Tour 4 Lease).

(<u>Id.</u> at 17-18.)

Plaintiffs rely on the same documentation and evidence, detailed above, to support their revenue projections for the Corporate Defendants' simulators. That evidence is (a) lease, revenue-sharing, and purchase agreements produced by Defendants; (b) Defendants' responses to Plaintiffs' first set of

-24-

interrogatories; (c) documents produced by non-parties in response to subpoenas served by Plaintiffs; and, (d) Defendant Donaldson's deposition testimony.   Plaintiffs make use of these sources to calculate damages owed for ongoing breaches. (See Tiger Damages Aff. ¶¶ 58-64 & Ex. E.) And, in calculating the projected total revenue of the twelve most lucrative revenue-generating arrangements going forward, Plaintiffs adjusted to present value by discounting at a rate of nine percent.[15]

In total, Plaintiffs seek $483,145.65 in damages resulting from the Corporate Defendants' ongoing breaches.   The chart below is illustrative.

| SIMULA-TOR | NUMBER OF SIMULA-TORS | DATE REVENUE-GENERATING AGREEMENT ENTERED | TERMINAT-ION DATE | RELEVANT DOLPHIN SIMULATOR LEASE | TOTAL REVENUE GENERATED FOR ALL SIMULATORS FROM MARCH 28, 2009 UNTIL THE END OF THE AGREEMENT | TOTAL REVENUE GENERATED FOR ALL SIMULATORS FROM MARCH 28, 2009 UNTIL THE END OF THE AGREEMENT - ADJUSTED TO PRESENT VALUE |
|---|---|---|---|---|---|---|

---

[15] Plaintiffs' discounting methodology is set forth in the Tiger Ltr.   Defendants have made no objection to this methodology.

| Bass Pro (Denham Springs, LA)[16] | 2 | 8/29/07 | 8/28/10 | National Tour 6 | $128,376.98 | $120,502.70 |
| Miramar Speed Circuit, LLC[17] | 2 | 10/24/07 | 10/23/10 | National Tour 6 | $63,777.91 | $59,463.31 |
| Incredible Pizza (Lafayette, LA)[18] | 2 | 3/16/08 | 3/15/11 | National Tour 6 | $79,666.35 | $73,013.13 |

---

[16] Neither Defendants nor Bass Pro produced the revenue-sharing agreement for the Bass Pro Denham Springs location. Plaintiffs, however, confirm the execution of this revenue-sharing agreement through copies of letters from the Corporate Defendants and Bass Pro, attached as Exhibit Q to the October 2008 Tiger Aff. Further, Defendants do not refute Plaintiffs calculations for this agreement.

[17] Plaintiffs have submitted to the Court a copy of this revenue-sharing agreement executed by Perfect Line with Miramar Speed Circuit LLC (a/k/a Kartscape, Inc.). (See Revenue-Sharing Agreement attached to Letter from Michael D. Tiger, Esq., dated Dec. 2, 2009.)

[18] For this revenue-sharing agreement, executed by Perfect Line with Incredible Pizza's Lafayette, Louisiana location, Plaintiffs have provided the Court with an unexecuted copy of the agreement, dated March 16, 2008. (See Tiger Damages Aff. Ex. H.) Defendants never produced the original signed and dated version of the agreement. Further, in response to Plaintiffs' subpoena, Incredible Pizza was unable to produce the signed and dated version of this revenue-sharing agreement. Nonetheless, Plaintiffs are able to prove that the Corporate Defendants did place two simulators with Incredible Pizza Lafayette, Louisiana, under this agreement. To that end, Plaintiffs provide the Court with correspondence that evidences the agreement. (See id., Ex. I.) Further, Defendants do not refute Plaintiffs calculations for this agreement.

| | | | | | | |
|---|---|---|---|---|---|---|
| Incredible Pizza (Pasadena, TX)[19] | 4 | 3/16/08 | 3/15/11 | National Tour 4 | $159,332.70 | $146,026.26 |
| Bass Pro (Hanover, VA)[20] | 2 | 7/30/08 | 7/29/11 | National Tour 2 | $93,309.10 | $84,140.25 |
| TOTAL | 12 | | | | $524,463.04 | $483,145.65 |

Although Plaintiffs' choice of twelve simulators to calculate ongoing damages differs from its selection used to calculate damages to date, this difference is acceptable.  For so long as Plaintiffs' simulators remained idle, and Defendants failed to assign substitute arrangements to Plaintiffs pursuant to the terms of the Most Favored Nation Clause, each and every one of Defendants' new revenue-generating agreements constituted a breach of the Most Favored Nation Clause and the Corporate Non-Competition Clause.  During this window, Plaintiffs retain the right to twelve equivalent simulators of their choosing pursuant to the terms of the Most Favored Nation Clause.

3. Defendants' Objections to Plaintiffs' Methodology

(a) Damages to Date for Past Breaches

In their response to Plaintiffs' damages submissions, Defendants do not contest the veracity or the reliability of the

---

[19] A copy of this revenue-sharing agreement, executed by Perfect Line with Incredible Pizza's Pasadena, Texas location, is attached as Exhibit G to the Tiger Damages Aff.

[20] A copy of this revenue-sharing agreement, executed by Perfect Line with Bass Pro's Hanover, Virginia location, is attached as Exhibit J to the Tiger Damages Aff.

-27-

evidence that Plaintiffs use to calculate their damages.   Nor do Defendants advert to any additional documents to challenge the damages amounts described above.   In fact, Defendants insist that they have produced all relevant documents relating to revenue-generating arrangements and correspondence with third-parties.   The revenue figures pertaining to the referenced simulator agreements are thus not in dispute.   Instead, Defendants' quarrel is with Plaintiffs' methodology, which Defendants argue is inapposite.

      (i) <u>Damages Related to the Purchase Agreement</u>[21]

           (1) <u>Objections to Plaintiffs' Methodology</u>

     The measure of Plaintiffs' damages for breaches of the Purchase Agreement (which contains both the Performance Guarantee and the Non-Competition Clause), Defendants contend, should be predicated on the formula in the Performance Guarantee provision alone.[22]

---

[21] Defendants split the damages inquiry into (1) damages related to the Purchase Agreement (i.e. breaches of the Performance Guarantee and the Corporate Non-Competition Clause), and (2) damages related to the Management Agreement (i.e. breach of the Most Favored Nation Clause).   The distinction is artificial.   The Court (Hon. Richard M. Berman) has already determined that Plaintiffs' contract damages result from Defendants' simultaneous breach of <u>both</u> the Corporate Non-Competition Clause (contained in the Purchase Agreement) and the Most Favored Nation Clause (contained in the Management Agreement).   In order to address fully Defendants' inquest arguments, however, the Court is responsive to this framework.

[22] The District Court determined that Defendants breached both the Performance Guarantee and the Corporate Non-Competition Clause in the Purchase Agreement.

> The Plaintiffs' methodology for calculating their proposed damages is fundamentally flawed and in contravention of the damages calculus mandated by the [Purchase] Agreement pursuant to Paragraph 4.12 .... The Plaintiffs' [sic] apply a 'most lucrative simulator' formula to calculate damages which is purely speculative and inapposite to the Purchase Agreement [....] Plaintiffs are limited in their damages to the 'minimum payments to sellers.'

(Defs. Damages Opp. ¶¶ 7-9.)

Defendants' argument is meritless. It is evident from the District Court's opinion that Plaintiffs have distinct sources of damages relating to breach of the Purchase Agreement. First, Plaintiffs have contract damages resulting, <u>inter alia</u>, from the Corporate Defendants' breach of the Corporate Non-Competition Clause. <u>See</u> <u>Dolphin Direct</u>, 2009 WL 577916, at *7. Second, Plaintiffs have damages relating to the Corporate Defendants' breach of a suretyship obligation - the Performance Guarantee. <u>See</u> <u>id.</u> at *6. Simply put, the Performance Guarantee speaks to a different set of obligations than those in the Non-Competition Clause.

Further, the measure of damages contemplated in the Performance Guarantee provision has no bearing on Plaintiffs' contract claims. That measure of damages specifically relates to the Corporate Defendants' guarantee of payment of a debt that third-parties (National Tour and RLB Development) owed to Plaintiffs.

National Tour and RLB Development owe Plaintiffs a total of $648,666.56 under Third-Party Leases as of October 28,

> 2008 .... the Corporate Defendants guaranteed that
> Plaintiffs would receive the minimum payments specified
> in each Third Party Lease.

See id. at *5 (internal citations and quotation marks omitted).[23]

The Performance Guarantee provides, "[P]laintiffs shall receive an amount at least equal to the minimum payments to [Defendants]". (Purchase Agreement § 4.12; Pls. 56.1 ¶ 9) (emphasis added).) It is clear that the provision was not intended as, nor can it be interpreted as, a liquidated damages clause. Section 4.12 of the Purchase Agreement explicitly provides that the "foregoing [provision] is a guarantee of payment and not of collection." (Pls. 56.1 ¶ 9.) And evidently, the Performance Guarantee was "intended as a floor for the amount of revenue the parties' agreements would create for Plaintiffs." (Pls. Damages Reply at 3.)

By contrast, Plaintiffs' contract damages are premised on breaches of separate obligations - the Corporate Defendants' breaches of the Corporate Non-Competition Clause and the Most

---

[23] With respect to the Corporate Defendants' breach of the Performance Guarantee, the District Court found that Plaintiff sufficiently proved both the existence and the quantum of damages - $648,666.56. Relying on the sworn statements of Carlos Salas (the managing general partner of Dolphin Direct), the sworn statements of Michael Tiger (counsel for Plaintiffs), and Plaintiffs Rule 56.1 Statement, the Court noted, "Plaintiffs have detailed every payment made to them by National Tour and RLB Development Pursuant to the Third Party Leases." Dolphin Direct, at *6. Further, the Court determined that Defendants' "unsubstantiated conjecture" and "unsupported denials of Plaintiffs' evidence" failed to undermine Plaintiffs' calculations. See id.

Favored Nation Clause.  In this regard, the District Court noted that Plaintiffs' proper measure of damages is its expectation interest.  See Dolphin Direct, 2009 WL 577916, at *8 ("Under New York law, a party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms.") (citing Gusmao v. GMT Group Inc., No. 06 Civ. 5113, 2008 WL 2980039, at *11 (S.D.N.Y. Aug. 1, 2008).)

Conspicuously, Defendants also provide no support for their assertion that the formula specified in the Performance Guarantee should apply to damages resulting from breach of the Corporate Non-Competition Clause.  Defendants' damages analysis on breach of the Purchase Agreement, in fact, makes no reference to breach of the Non-Competition Clause.  (See Defs. Damages Opp. ¶¶ 6-15.) Instead, Defendants offer conclusory and opaque arguments.  For example:

> [For breach of the Purchase Agreement] [t]he Plaintiffs are limited in their damages to the "minimum payments to Sellers." What's more, the theoretical damages cannot exceed the actual revenue received from the leases where the simulators would have been installed had they been placed ahead of Perfect Line's simulators. What's more, the Plaintiffs incorrectly increase their proposed damages calculations by incrementally adding the Perfect Line damages to those alleged to be attributed to the Asset Purchase Agreement.

(Id. ¶ 9.)

Defendants neither explain the meaning of these statements nor do they cite to supporting evidence.

-31-

### (2) Additional Objections

Defendants proceed to offer additional objections to Plaintiffs' damages methodology: the calculation of the damages from breach of the Purchase Agreement, Defendants argue, must deduct "the amounts received by Plaintiffs pursuant to the revenue-sharing lease agreements that were performing and in the market place ... [and] the market value of the forty-four (44) simulators conveyed to them pursuant to the Asset Purchase Agreement." (Id. ¶ 10.) Defendants obfuscate. The market value of the purchased simulators, and any past revenue earned through their use, is irrelevant. Putting Plaintiffs in the position they would have occupied absent the breach, means giving Plaintiffs the revenue that they would have gained in addition to past revenue, had the Corporate Defendants placed the idle twelve simulators into service.

### (ii) Damages Related to the Management Agreement

Turning to "damages related to the Management Agreement" (id. ¶¶ 16-22), which Defendants choose to analyze separately, Defendants adopt inconsistent positions. Initially, the Corporate Defendants argue that "there are no damages due to Plaintiffs under the [Most Favored Nation Clause] because no loss occurred and no actual breach occurred." (Id. ¶ 16.) Next, the Corporate Defendants appear to concede that Plaintiffs might be owed contract damages under the Management Agreement (from breach of the Most

-32-

Favored Nation Clause) for "lost revenue from the twelve (12) [National Tour] simulators not in the market place up until November of 2008." (Id. ¶ 18.)

> [T]he only possible damage amounts that Plaintiffs would be entitled to would be the payments actually received [from twelve revenue-generating arrangements entered into after the National Tour Simulators went out of service] from the following five locations:
>
> (i)   Bass Pro, Springfield, MO -          3 Simulators
> (ii)  Bass Pro, San Antonio, TX -          2 Simulators
> (iii) Bass Pro, Mesa, AZ -                  2 Simulators
> (iv)  Bass Pro, Rancho Cucamonga, CA -      2 Simulators
> (v)   Wing Warehouse, Akron OH -            3 Simulators

(Id.)

Put another way, insofar as Defendants concede that Plaintiffs are owed contract damages, Defendants only objection is to Plaintiffs' selection of twelve equivalent simulators. Defendants do not refute Plaintiffs' calculations of the revenue earned from the simulator agreements that Plaintiffs select. As it happens, Defendants select seven of the same revenue-generating arrangements as Plaintiffs to calculate Plaintiffs' damages to date. Defendants, however, provide no grounds to justify their choice of any of their chosen equivalent simulators. To the extent that the Corporate Defendants do try to explain their choice of simulator equivalents - a highly generous reading of the Corporate

Defendants' intentions - they impermissibly seek to relitigate points on which the District Court has already ruled.[24]

For example, Defendants argue that the Most Favored Nation Clause "does not apply to outright sales of equipment" (id. ¶ 19), and that certain simulator sales "would not be violative of any provision of the Asset Purchase Agreement, Management Agreement or Guarantee." (Id. ¶ 14.)  The District Court explicitly ruled, however, that Plaintiffs are entitled to contract damages, albeit from "[breach of] the Purchase Agreement through the sale of simulators to third-parties ...." Dolphin Direct, 2009 WL 577916, at *7 (internal quotation marks omitted) (emphasis added).  In any event, as Plaintiffs indicate, the issue is academic.

> [T]he most lucrative simulators described in [P]laintiffs' opening papers were all either: (a) placed into leases or revenue-sharing agreements directly by the Corporate Defendants; or (b) sold by the Corporate Defendants to their affiliate DGI, Inc. ("DGI") and then placed into leases or revenue-sharing agreements by DGI.

(Pls. Damages Reply at 5.)

Thus, it is entirely permissible for Plaintiffs to include simulator sales in their damages calculus.

Similarly, the Corporate Defendants contend that their placement of so-called "Reactor" simulators into revenue-generating

---

[24] Defendants request a hearing at which they will be able to "prove that there are no damages due to Plaintiffs under this portion of the Management Agreement because no loss occurred and because no actual breach occurred." (Defs. Damages Opp. ¶ 16 (emphasis added).)

arrangements did not violate the Most Favored Nation Clause (or the Corporate Non-Competition Clause). (See Defs. Damages Opp. ¶¶ 19-22; see also DeMarco Ltr.)  Again, the District Court has already determined that "the Most Favored Nation Clause and the Corporate Non-Competition Clause do not distinguish between types of race car simulators."  Dolphin Direct, 2009 WL 577916, at *7.  It is, therefore, entirely appropriate for Plaintiffs to include "Reactor" simulators in their damages calculus.

(b) Ongoing Damages

Insofar as the Corporate Defendants concede that Plaintiffs are entitled to lost revenue, they inexplicably truncate the time period for which damages are owed at November, 2008. (See Defs. Damages Opp. ¶ 18.)  The Corporate Defendants explain neither the significance of this date, nor why Plaintiffs should not be entitled to damages for "their breaches of contract that have occurred since that date." (Pls. Damages Reply at 6.)

4. Conclusion

In conclusion, therefore, Plaintiffs have provided a comprehensive and reasonably certain account of their damages through March of 2009, the date they submitted their damages report, as well as their damages incurred thereafter.  Furthermore, Plaintiffs estimations are supported with competent evidence, the veracity and reliability of which Defendants do not contest. Plaintiffs, accordingly, prevail on their claim for (1) $718,042.53

-35-

in damages to date, and (2) $483,145.65 in damages resulting from the Corporate Defendants' ongoing breaches.

B.  Donaldson's Breaches of the Personal Non-Competition Agreement

Plaintiffs contend that Donaldson's breaches of the Personal Non-Competition Agreement entitle Plaintiffs to (1) $568,355.80 in damages for breaches experienced up to the date of filing their damages application, and (2) $483,145.65 in damages resulting from ongoing breaches.

1. Damages to Date

The District Court found that (1) Donaldson is personally liable for the conduct of the Corporate Defendants, and (2) Donaldson breached the Personal Non-Competition Agreement through the conduct of the Donaldson Companies.

Thus, Plaintiffs argue,

> [t]he Court should award [P]laintiffs an amount equal to the value of the twelve most lucrative simulators controlled by the Donaldson Companies placed into revenue-generating arrangements since the National Tour Simulators went out of service.

(Pls. Damages Mem. at 20.)

Plaintiffs employ the same methodology set forth above to calculate their damages against Donaldson personally.  The only difference is that the group from which Plaintiffs select the twelve most lucrative simulators does not include revenue-generating agreements that the Donaldson Companies entered into

during the six months prior to the National Tour Simulators going out of service.  The reason for this is that Donaldson is not personally liable under the Most Favored Nation Clause.  (See id. n. 10.)

(a) Damages to Date - National Tour 6 Simulators

To calculate the damages from Donaldson's breaches of the Personal Non-Competition Clause since November 21, 2006, the expiration date of the National Tour 6 agreement, Plaintiffs determined the value of all revenue-generating arrangements entered into by the Donaldson Companies since that date.  Plaintiffs then selected the Donaldson Companies' six most lucrative simulators. (See Tiger Damages Aff. ¶¶ 42-45 & Ex. B;  Oct. 2008 Tiger Aff. Exs. P, R.)  The chart below is illustrative.

| THIRD PARTY | TYPE OF ARRANGEMENT | NUMBER OF SIMULATORS | DATE ENTERED | REVENUE GENERATED PER SIMULATOR UNDER AGREEMENT FROM NOVEMBER 21, 2006 TO MARCH 27,2009 | TOTAL REVENUE GENERATED UNDER AGREEMENT FROM NOVEMBER 21, 2006 TO MARCH 27,2009 |
|---|---|---|---|---|---|
| Bass Pro (Rancho Cucamonga, CA)[25] | Revenue-sharing Agreement | 2 | 12/7/06 | $52,763.25 | $105,526.50 |
| Sprint Nextel[26] | Revenue-sharing Agreement | 4 | 12/12/06 (commencing 1/1/07) | $42,000.00 | $168,000.00 |
| TOTAL | | 6 | | | $273,526.50 |

(b) Damages to Date - National Tour 2 Simulators

To calculate the damages from Donaldson's breaches of the Personal Non-Competition Clause since December 31, 2006, the expiration date of the National Tour 2 agreement, Plaintiffs determined the value of all revenue-generating arrangements entered into by the Donaldson Companies since that date. Plaintiffs then selected the Donaldson Companies' two most lucrative simulators, excluding those already counted above. (See Tiger Damages Aff. ¶¶ 46-48 & Ex. C; Oct. 2008 Tiger Aff. Ex. R.) The chart below is illustrative.

---

[25] See n. 11, supra.

[26] See n. 12, supra.

| THIRD PARTY | TYPE OF ARRANGEMENT | NUMBER OF SIMULATORS | DATE ENTERED | REVENUE GENERATED PER SIMULATOR UNDER AGREEMENT FROM DECEMBER 21, 2006 TO MARCH 27, 2009 | TOTAL REVENUE GENERATED UNDER AGREEMENT FROM DECEMBER 21, 2006 TO MARCH 27, 2009 |
|---|---|---|---|---|---|
| Sprint Nextel | Revenue-sharing Agreement | 2 | 12/12/06 (commencing 1/1/07) | $42,000.00 | $84,000.00 |
| TOTAL | | 2 | | | $84,000.00 |

(c) <u>Damages to Date - National Tour 4 Simulators</u>

To calculate the damages from Donaldson's breaches of the Personal Non-Competition Clause since March 31, 2007, the expiration date of the National Tour 4 agreement, Plaintiffs determined the value of all revenue-generating arrangements entered into by the Donaldson Companies since that date. Plaintiffs then selected the Donaldson Companies' four most lucrative simulators, excluding those already counted above. (<u>See</u> Tiger Damages Aff. ¶¶ 49-52 & Ex. D; Oct. 2008 Tiger Aff. Exs. Q-S.) The chart below is illustrative.

| THIRD PARTY | TYPE OF ARRANGEMENT | NUMBER OF SIMULATORS | DATE ENTERED | REVENUE GENERATED PER SIMULATOR UNDER AGREEMENT FROM MARCH 31, 2007 TO MARCH 27, 2009 | TOTAL REVENUE GENERATED UNDER AGREEMENT FROM MARCH 31, 2007 TO MARCH 27, 2009 |
|---|---|---|---|---|---|
| Sprint Nextel[27] | Revenue-sharing Agreement | 2 | 1/31/07 (effective 4/1/07) | $38,499.93 | $76,999.86 |
| Bass Pro (Denham Springs, LA)[28] | Revenue-sharing Agreement | 2 | 8/29/07 | $66,914.72 | $133,829.44 |
| TOTAL | | 4 | | | $210,829.30 |

2. Damages for Ongoing Breaches

Plaintiffs also argue that they are entitled to recover for "damages resulting from Donaldson's ongoing breaches[.]" (See Pls. Damages Mem. at 22.)

To calculate their purported damages stemming from Donaldson's ongoing breaches, Plaintiffs replicated the methodology as explained above. That is to say, Plaintiffs based their ongoing damages on projected revenue figures from (1) the six most lucrative simulators among the revenue-generating arrangements entered into by the Donaldson Companies since the November 21, 2006 termination of the National Tour 6 Lease; (2) the two most lucrative simulators among the revenue-generating arrangements

---

[27] See n. 13, supra.

[28] See n. 14, supra.

entered into by the Donaldson Companies since the December 31, 2006 termination of the National Tour 2 Lease; (3) the four most lucrative simulators among the revenue-generating arrangements entered into by the Donaldson Companies since the March 31, 2007 termination of the National Tour 4 Lease.

The following chart is illustrative.

| SIMULATOR | NUMBER OF SIMULA-TORS | DATE ENTERED | TERMINA-TION DATE | RELEVANT DOLPHIN SIMULATOR LEASE | TOTAL REVENUE GENERATED FOR ALL SIMULATORS FROM MARCH 28, 2009 UNTIL THE END OF THE AGREEMENT | TOTAL REVENUE GENERATED FOR ALL SIMULATORS FROM MARCH 28, 2009 UNTIL THE END OF THE AGREEMENT - ADJUSTED TO NET PRESENT VALUE |
|---|---|---|---|---|---|---|
| Bass Pro (Denham Springs, LA)[29] | 2 | 8/29/07 | 8/29/10 | National Tour 6 | $128,376.98 | $120,502.70 |
| Miramar Speed Circuit, LLC[30] | 2 | 10/24/07 | 10/23/10 | National Tour 6 | $63,777.91 | $59,463.31 |
| Incredible Pizza (Lafayette, LA)[31] | 2 | 3/16/08 | 3/15/11 | National Tour 6 | $79,666.35 | $73,013.13 |
| Incredible Pizza, TX[32] | 4 | 3/16/08 | 3/15/11 | National Tour 4 | $159,332.70 | $146,026.26 |
| Bass Pro (Hanover, VA)[33] | 2 | 7/30/08 | 7/29/11 | National Tour 2 | $93,309.10 | $84,140.25 |
| TOTAL | 12 | | | | $524,463.04 | $483,145.65 |

---

[29] See n. 16, supra.

[30] See n. 17, supra.

[31] See n. 18, supra.

[32] See n. 19, supra.

[33] See n. 20, supra.

-42-

3. <u>Defendants' Objections</u>

Defendants do not dispute Plaintiffs' revenue calculations for those simulators selected to value damages resulting from Donaldson's breaches. Instead, Defendants advert to issues already decided against them. For example, "Defendants continue to maintain that Donaldson did not breach, nor was personally subject to, the Non-Competition Agreement ...." (Defs. Damages Opp. ¶ 24.) Next, Defendants state, "even were the Court to view the Agreement in the light most favorable to Plaintiffs, the Court must conclude that the Plaintiffs suffered no damages attributable to the Non-Competition Agreement." (<u>Id.</u>) In this regard, Defendants direct the Court to Section 3(a) of the Non-Competition Agreement which provides, "...the foregoing [provision] shall not prohibit such actions or inactions to the extent that they do not result in more favorable treatment to the operation and maintenance of the Assets." (<u>Id.</u> ¶ 25.) Defendants summarily conclude that "Donaldson did not violate this portion of the Non-Competition Agreement because any action taken by Donaldson did not result in any more favorable treatment to the operation of the Assets." (Id. ¶ 26.)

Yet again, Defendants objections are conclusory and inadequate. Defendants are seeking to relitigate the <u>existence</u> of damages arising from Donaldson's conduct. The District Court, however, has already decided this question stating, "[n]o genuine

-43-

issue of material fact exists with respect to Plaintiffs' claim for breach of the Non-Competition Agreement against Donaldson." Dolphin Direct, 2009 WL 577916, at *8.  Further,

> Plaintiffs sufficiently evidence the existence of damages ... by coming forward with revenue-sharing agreements and lease agreements the Corporate Defendants and/or DGI entered into with third-parties for the use of Defendants' simulators during the time Plaintiffs' simulators were idle.

Id. at *9 (internal citations and quotation marks omitted).

    4. Conclusion

In sum, therefore, Plaintiffs have provided a comprehensive and reasonably certain account of both their damages through March 27, 2009, as well as ongoing damages thereafter resulting from Donaldson's breaches.  Further, they have supported their claim with competent evidence, the veracity of which Defendants do not contest.  As such, Plaintiffs are entitled to (1) $568,355.80 in damages to date, and (2) $483,145.65 in damages resulting from Donaldson's ongoing breaches.

Whereas Plaintiffs' initial damages submissions suggest that Plaintiffs seek damages for Donaldson's breaches in addition to damages from the Corporate Defendants' breaches, Plaintiffs' subsequent submissions provide clarification.  In response to the Court's inquiry, Plaintiffs acknowledge that a separate damages award against Donaldson is necessitated because "the Corporate Defendants could become insolvent and unable to satisfy [a judgment entered against them alone].  Absent a damages award against

-44-

Donaldson, Donaldson would escape liability for his breach of the Personal Non-Competition Agreement[.]"   (Tiger Ltr.)   Further, Plaintiffs argue that this approach is "akin to joint and several liability in the tort context or the liability of a personal guarantor in the loan default context."   (Id.)   Taking these arguments into account, and in order to ensure that Plaintiffs do not double recover, Donaldson and the Corporate Defendants should be jointly and severally liable for any judgment amount up to $1,051,501.45, and the Corporate Defendants should be liable for the remaining amount of damages owing.

C. Mitigation

Defendants raise the question of mitigation.   Having earlier claimed that Plaintiffs are entitled to no damages, the Defendants then offer the incongruous argument that Plaintiffs have failed to mitigate their damages.   Defendants state,

> The Plaintiffs knew that the subject simulators were not actively in the marketplace and for a period of approximately one year, took absolutely no action, made no communication and gave no notice thereto.   They simply sat idly by and allowed losses to accumulate.

(Defs. Damages Opp. ¶ 28.)

Defendants protest too much.   Plaintiffs' submissions prove that Plaintiffs communicated with Defendants on numerous occasions. To name but a few, on May 18, 2007, July 8, 2007, and October 17, 2007, Salas sent e-mails to Donaldson concerning the status of the National Tour simulators and Defendants' potential liability.   (See

-45-

Pls. Damages Reply at 7; see also Salas Damages Decl. ¶¶ 3-10.)   In addition, on January 23, 2008, Plaintiffs "sent two letters to Defendants demanding among other things, payment for [D]efendants' violations of the Most Favored Nation Clause and the Non-Competition Clauses."  (Pl. Damages Reply at 7.)

In any event, Defendants possession and control of Plaintiffs' simulators precluded the Plaintiffs from benefitting from them. The National Tour simulators have been in Defendants' control throughout this litigation and still remain in Defendants' warehouses.  (See Pls. Damages Reply at 7; see also Tiger Damages Aff. ¶ 14.)   Plaintiffs are not in the position to mitigate the effects of Defendants' breaches.  Plaintiffs' damages result from Defendants' placement of Defendants' own race car simulators into revenue-generating arrangements ahead of Plaintiffs' simulators, in contravention of the Most Favored Nation Clause and the Corporate Non-Competition Clause.  Plaintiffs have repeatedly implored Defendants to honor their contractual obligations and have made frequent requests for assignment of Defendants' simulators.  Most recently, following the District Court's February 2009 Decision and Order, Plaintiffs sent Defendants a demand letter on March 27, 2009.  Again, Defendants have reportedly failed to respond.  (See Pls. Damages Reply at 8.)   See Tractebel, 487 F.3d at 110 n.21 ("The non-breaching party [to a contract] is ... under a duty to mitigate damages to the extent practicable[.]")(emphasis added.).

-46-

Given the above, Defendants' argument that Plaintiffs have failed to mitigate damages, over which they clearly have little or no control, fails to persuade. "The party alleging a failure to mitigate bears the burden of proving the injured party's willful or negligent failure to make reasonable efforts to mitigate its injury." Technest Holding, Inc. v. Deer Creek Fund, LLC, No. 06 Civ. 1665 (HBP), 2008 WL 3449941, at *19 (S.D.N.Y. Aug. 12, 2008).

D. Pre-Judgment Interest

Plaintiffs also seek prejudgment interest from January 23, 2008, through the date of final judgment. Under New York law, a prevailing party in a breach of contract action is entitled to prejudgment interest from the date that the breach occurred ("the earliest ascertainable date the cause of action existed") through the entry of judgment. See Graham v. James, 144 F.3d 229, 239 (2d Cir. 1998) ("Under New York law, 'prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract.'") (quoting Adams v. Lindblad Travel, Inc., 730 F.2d 89, 93 (2d Cir. 1984)); see also N.Y.C.P.L.R. § 5001 (McKinney's 2007); accord Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC, No. 07 Civ. 6665 (HB), 2009 WL 1803458, at *23 (S.D.N.Y. June 23, 2009). New York requires that prejudgment interest shall be at the rate of nine percent (9%), unless otherwise provided in the contract. See N.Y. C.P.L.R. § 5004; Atateks, 2009 WL 1803458, at

*23; <u>English Boiler & Tube, Inc. v. Optimira Energy, Inc.</u>, No. 08 Civ. 3605 (JGK), 2009 WL 884662, at *2 (S.D.N.Y. Apr. 1, 2009).

Plaintiffs are entitled to prejudgment interest to be computed from January 23, 2008 through to the date of judgment, at an annual rate of nine percent (9%). January 23, 2008 is the date on which Plaintiffs wrote to Defendants demanding that they cease their violation of the Most Favored Nation Clause and the Corporate Non-Competition Clause. Under New York law, when "damages were incurred at various times, interest shall be computed upon each item from the date it was incurred <u>or upon all of the damages from a single reasonable intermediate date</u>." N.Y. C.P.L.R. § 5001(b) (emphasis added); <u>see also</u> <u>City of N.Y. v. Coastal Oil N.Y., Inc.</u>, 96 Civ. 8667 (RPP), 2000 WL 648365, *2 (S.D.N.Y. May 18, 2000) (setting reasonable intermediate date as February 15, 1993, where plaintiff had overpaid for deliveries between October 1992 and 1993); <u>Oy Saimaa Lines Logistics Ltd. v. Mozaica-N.Y., Inc.</u>, 193 F.R.D. 87, 91 (E.D.N.Y. 2000) (calculating prejudgment interest from the midpoint of the outstanding invoices). Here, January 23, 2008 is a reasonable date from which to calculate prejudgment interest given that it is a date well beyond the earliest ascertainable date that Plaintiffs' cause of action existed. Plaintiffs' damages began to accrue around November 21, 2006, December 31, 2006, and March 31, 2007, the dates when the National Tour leases expired.

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to the following damages award: (1) $648,666.56 plus interest from the Corporate Defendants for their breach of the Performance Guarantee; (2) $1,201,188.06 from the Corporate Defendants for their violations of the Most Favored Nation Clause and the Corporate Non-Competition Clause, plus interest; (3) $1,051,501.45 from Donaldson for his violation of the Personal Non-Competition Clause, plus interest.

The Defendants should be jointly and severally liable for any judgment amount up to $1,051,501.45, and the Corporate Defendants should be liable for the remaining amount of damages — $798,353.17 ($648,666.56 plus $1,201,188.06 minus $1,051,501.45), plus interest.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (d) (2008). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard M. Berman, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Berman. Failure to file objections will result in a waiver of those objections for

purposes of appeal.  See Thomas v. Arn, 474 U.S. 140, 145, 155, 106 S. Ct. 466, 470, 475 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully submitted,

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: December 18, 2009
       New York, New York